No. 24-50176

# In the United States Court of Appeals
# For the Fifth Circuit

**UNITED STATES OF AMERICA EX REL. TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,**
***Plaintiffs-Appellees,***

**v.**

**PERIPHERAL VASCULAR ASSOCIATES, P.A.,**
***Defendant-Appellant.***

Appeal from the United States District Court for the
Western District of Texas, San Antonio Division; No. 5:17-CV-317

## RECORD EXCERPTS OF APPELLANT


Joshua S. Smith
jsmith@beckredden.com
David M. Gunn
dgunn@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**ATTORNEYS FOR APPELLANT**

## TABLE OF CONTENTS


| TAB | DESCRIPTION | PAGE |
|---|---|---|
| 1. | Docket Sheet | ROA.1-48 |
| 2. | PVA's Notice of Appeal | ROA.5566-8 |
| 3. | Verdict Form | ROA.5006-10 |
| 4. | Final Judgment (Feb. 14, 2024) | ROA.5564-65 |
| 5. | Order on Cross-Motions for Summary Judgment and Motions to Exclude (Dec. 14, 2020) | ROA.3972-4030 |
| 6. | Order on PVA's Renewed Motion for Judgment as a Matter of Law and Relators' Motion for Statutory Penalties (Jan. 9, 2023) | ROA.5147-78 |
| 7. | Order on Relators' Motion for Attorneys' Fees, Costs, and Expenses (Aug. 1, 2023) | ROA.5480-94 |
| 8. | Order on PVA's Motion for Finding of Fact, Motion to Reconsider Partial Summary Judgment on Scienter, and Motion for New Trial (Jan. 30, 2024) | ROA.5540-63 |
| 9. | Current Procedural Terminology – Fourth Edition (Am. Med. Ass'n 2020) | ROA.17671-79 |
| 10. | Current Procedural Terminology – Fourth Edition (Am. Med. Ass'n 2000) | ROA.17805-14 |

Respectfully submitted,

**BECK REDDEN LLP**

By: */s/ Joshua S. Smith*
Joshua S. Smith
jsmith@beckredden.com
David M. Gunn
dgunn@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**Attorneys for Appellant**

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024 a copy of the foregoing Record Excerpts of Appellant was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record

Misty A. Hataway-Cone
Misty@conepllc.com
Cone' PLLC
2019 Washington Avenue, Ste. 201
Houston, Texas 77007

*Attorneys for Appellees*

*/s/ Joshua S. Smith*
Joshua S. Smith
Attorney of Record for Appellant

# Tab 1

APPEAL,HJB

# U.S. District Court [LIVE]
# Western District of Texas (San Antonio)
# CIVIL DOCKET FOR CASE #: 5:17-cv-00317-XR

Montcrieff et al v. Peripheral Vascular Associates, P.A.
Assigned to: Judge Xavier Rodriguez
Case in other court: 5CCA, 24-50176 (Doc. 255)
Cause: 31:3729 False Claims Act

Date Filed: 04/12/2017
Date Terminated: 02/24/2022
Jury Demand: Plaintiff
Nature of Suit: 375 Other Statutes: False Claims Act
Jurisdiction: Federal Question

**Plaintiff**

**UNITED STATES OF AMERICA**
*Ex. Rel.*

represented by **John Deck**
P.O. Box 261, Ben Franklin Station
Washington, DC 20002
202-305-5369
Email: john.m.deck@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Bryan O'Connell**
United States Attorney's Office
601 NW Loop 410 - Ste 600
San Antonio, TX 78216
(210) 384-7396
Fax: 210/384-7312
Email: sean.o'connell@usdoj.gov
*TERMINATED: 07/29/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Arthur Parnham , Jr.**
United States Attorney's Office
903 San Jacinto Blvd, Suite 334
Austin, TX 78701
512-916-5858
Fax: 512-916-5854
Email: thomas.parnham@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tiffany Montcrieff**
*Relator*

represented by **Adam M. Shapiro**
Cotchett Pitre & McCarthy LLP
840 Malcolm Road
Burlingame, CA 94010
650-697-6000
Fax: 650-697-0577
Email: ashapiro@cpmlegal.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin T. Berger**
Cotchett Pitre & McCarthy LLP
840 Malcolm Road
Burlingame, CA 94010
650-697-6000
Fax: 650-697-0577
Email: jberger@cpmlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarvenaz J. Fahimi**
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010
650-697-6000
Fax: 650-697-0577
Email: sfahimi@cpmlegal.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wallace M. Brylak , Jr.**
Brylak & Associates
15900 La Cantera Pkwy., Ste. 19245
San Antonio, TX 78256
(210) 733-5533
Fax: (210) 558-4804
Email: wbrylak@brylaklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Roberta A. Martinez**
*Relator*

represented by

**Adam M. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin T. Berger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarvenaz J. Fahimi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wallace M. Brylak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alicia Burnett**
*Relator*

represented by

**Adam M. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin T. Berger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarvenaz J. Fahimi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wallace M. Brylak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Peripheral Vascular Associates, P.A.**

represented by

**David McDonald Prichard**
Prichard Young, L.L.P.
10101 Reunion Place, Suite 600
San Antonio, TX 78216
(210) 477-7401
Fax: (210) 477-7451
Email: dprichard@prichardyoungllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn W. MacTaggart**
Prichard Young LLP
10101 Reunion Place, Suite 600
San Antonio, TX 78216
210-477-7419
Fax: 210-477-7469
Email: gmactaggart@prichardyoungllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeff J. Wurzburg**

Norton Rose Fulbright US LLP
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
210-244-5575
Email:
jeff.wurzburg@nortonrosefulbright.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark A. Cole**
Spencer Fane LLP
6201 College Boulevard, Suite 500
Overland Park, KS 66211
913-345-8100
Fax: 913-345-0736
Email: mcole@spencerfane.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean R. McKenna**
Nelson Mullins Riley & Scarborough LLP
5830 Granite Parkway, Suite 1000
Plano, TX 75024
469-484-6100
Fax: 469-828-7217
Email: sean.mckenna@nelsonmullins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Romero**
Norton Rose Fulbright US LLP
111 W. Houston Street
Suite 1800
San Antonio, TX 78205
(210) 224-5575
Fax: 210/270-7205
Email:
stephen.romero@nortonrosefulbright.com
*TERMINATED: 01/18/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Colin P. Goodman**
Spencer Fane, LLP
3040 Post Oak Boulevard
Suite 1300
Houston, TX 77056
713-212-2657
Email: cgoodman@spencerfane.com
*ATTORNEY TO BE NOTICED*

**Lauren Margaret Nelson**

Spencer Fane LLP
3040 Post Oak Blvd., Suite 1300
Houston, TX 77056
713-552-1234
Email: lnelson@spencerfane.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/12/2017 | | Case Assigned to the Honorable Judge Fred Biery. (wg) (Entered: 04/12/2017) |
| 04/12/2017 | | If ordered by the court, all referrals will be assigned to Magistrate Judge Bemporad (wg) (Entered: 04/12/2017) |
| 04/12/2017 | 1 (p.49) | SEALED COMPLAINT ( Filing fee $ 400 receipt number 500039083), filed by UNITED STATES OF AMERICA, Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Civil Cover Sheet, # 2 Supplement Filing Fee Receipt)(wg) (Entered: 04/12/2017) |
| 06/15/2017 | 2 | UNITED STATES FIRST APPLICATION for Extension of Time to Intervene by UNITED STATES OF AMERICA. (Attachments: # 1 (p.49) Sealed Document Memo in Support)(wg) (Entered: 06/15/2017) |
| 06/15/2017 | 3 | ORDER GRANTING 2 Motion for Extension of Time to Intervene. Signed by Judge Fred Biery. (wg) (Entered: 06/15/2017) |
| 12/12/2017 | 4 | MOTION to Appear Pro Hac Vice (Adam M. Shapiro) by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (wg) (Entered: 12/13/2017) |
| 12/12/2017 | 5 | MOTION to Appear Pro Hac Vice (Justin T. Berger) by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (wg) (Entered: 12/13/2017) |
| 12/13/2017 | 7 | Memorandum in Support of 6 SEALED EX PARTE MOTION by UNITED STATES OF AMERICA. (wg) (Entered: 12/14/2017) |
| 12/21/2017 | 8 | FIRST AMENDED COMPLAINT against Peripheral Vascular Associates, P.A. amending 1 (p.49) Complaint., filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.(wg) (Entered: 12/26/2017) |
| 12/28/2017 | 9 | Sealed Order. Signed by Judge Fred Biery. (wg) (Entered: 12/28/2017) |
| 12/28/2017 | 10 | Sealed Order. Signed by Judge Fred Biery. (wg) (Entered: 12/28/2017) |
| 01/02/2018 | 11 | ORDER GRANTING re 6 SEALED EX PARTE MOTION filed by UNITED STATES OF AMERICA,The United States shall have up to and including June 13, 2018, to file a |

| | | |
|---|---|---|
| | | notice informing the Court of its decision whether to intervene in this qui tam action, the court further grants a partial lifting of the seal for the U.S. to reveal the existence of this case and it's specific allegations. Aside from that this Order and this case shall remain sealed. Signed by Judge Fred Biery. (wg) (Entered: 01/02/2018) |
| 01/02/2018 | 12 | ORDER OF RECUSAL. Judge Fred Biery recused. Case reassigned to Judge Xavier Rodriguez for all further proceedings. Signed by Judge Fred Biery. (wg) (Entered: 01/03/2018) |
| 01/17/2018 | 13 | Pro Hac Vice Fee Paid by Justin T, Berger; Filing fee $ 100, receipt number 500042919. (wg) (Entered: 01/18/2018) |
| 01/17/2018 | 14 | Pro Hac Vice Fee Paid by Adam M. Shapiro; Filing fee $ 100, receipt number 500042918. (wg) (Entered: 01/18/2018) |
| 06/13/2018 | 15 | Sealed Motion filed (wg) (Entered: 06/14/2018) |
| 06/13/2018 | 16 | Sealed Document in Support filed (wg) (Entered: 06/14/2018) |
| 06/14/2018 | 17 | Sealed Order. Signed by Judge Xavier Rodriguez. (wg) (Entered: 06/14/2018) |
| 09/27/2018 | 18 | ORDER ADMINISTRATIVELY CLOSING CASE, The Clerks office is therefore DIRECTED to administratively close this case pending further order of the Court. Though administratively closed, this case will still exist on the docket of this Court and may be reopened upon request of any party or on the Courts own motion. Mire, 389 F.3d at 167. The United States shall notify the Court no later than October 13, 2018 whether it intends to intervene or shall seek an additional extension. Signed by Judge Xavier Rodriguez. (wg) (Entered: 09/27/2018) |
| 10/12/2018 | 19 | Sealed Motion Extension of Time to Intervene filed USA. (wg) (Entered: 10/15/2018) |
| 10/16/2018 | | Text Order GRANTING 19 Sealed Motion entered by Judge Xavier Rodriguez. The United States' Ex Parte Application for Extension of Time to Intervene is GRANTED. The United States shall have until November 13, 2018, to file a notice informing the Court of the government's election and how this case will proceed, if at all. Except as otherwise provided in the Court's Order dated June 14, 2018 (Dkt. #17), this qui tam action, the Complaint, and all other filings in this case, including this Order, shall remain UNDER SEAL until further order of this Court. (This is a text-only entry generated by the court. There is no document associated with this entry.) (md) (Entered: 10/16/2018) |
| 10/17/2018 | | Remark: Copy of Sealed Gavel Order E-mailed to AUSA. (wg) (Entered: 10/17/2018) |

| | | |
|---|---|---|
| 11/26/2018 | 20 (p.66) | NOTICE of Filing Government's Notice to Decline Intervention by UNITED STATES OF AMERICA (Attachments: # 1 (p.49) Proposed Order)(wg) (Entered: 11/27/2018) |
| 11/27/2018 | 21 (p.71) | ORDER that the complaint be unsealed and served upon the defendant by the relator and not be made public or served upon the Defendant, except for this Order and Notice to Decline Intervention and Complaint; the seal be lifted as to all other matters occurring in this action after the date of this Order, re 20 (p.66) Notice of Filing filed by UNITED STATES OF AMERICA, Motions terminated:. Signed by Judge Xavier Rodriguez. (wg) (Main Document 21 replaced on 11/29/2018) (wg). (Entered: 11/28/2018) |
| 11/28/2018 | | Remark: Copy of Govt's Notice Doc#20, and Courts Order, Doc #21 forwarded by E-Mail to all listed Attys. on case. (wg) (Entered: 11/28/2018) |
| 12/23/2018 | 22 (p.73) | NOTICE OF ENTRY OF APPEARANCE FOR DEFENDANT to 8 Amended Complaint . Attorney Sean R. McKenna added to party Peripheral Vascular Associates, P.A.(pty:dft) by Peripheral Vascular Associates, P.A..(McKenna, Sean) Modified on 12/27/2018, to edit text (mgr). (Entered: 12/23/2018) |
| 12/27/2018 | | Notice of Correction: ***NOTIFIED COUNSEL THAT THE ENTRY WAS EDITED TO REFLECT AS THE TITLED DOCUMENT***re 22 (p.73) Answer to Amended Complaint,. (mgr) (Entered: 12/27/2018) |
| 12/31/2018 | 23 (p.75) | ***ORDER VACATED PER DOC # 24 ****Order for Scheduling Recommendations/Proposed Scheduling Order. Plaintiff shall submit a scheduling recommendations/proposed scheduling order to the Court on or before 1/31/2019,), Notice of right to consent to disposition of a civil case by a U.S. Magistrate Judge. Signed by Judge Xavier Rodriguez. (wg) Modified on 1/7/2019 (wg). (Entered: 01/02/2019) |
| 01/07/2019 | 24 (p.85) | ORDER VACATING ORDER re 23 (p.75) Order for Scheduling Recommendations/Proposed Scheduling Order,, Notice of Right to Consent to Magistrate Trial,. Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/07/2019) |
| 02/19/2019 | 25 (p.86) | NOTICE of Attorney Appearance by Thomas Arthur Parnham, Jr on behalf of UNITED STATES OF AMERICA. Attorney Thomas Arthur Parnham, Jr added to party UNITED STATES OF AMERICA(pty:pla) (Parnham, Thomas) (Entered: 02/19/2019) |
| 02/20/2019 | 26 (p.88) | Unopposed MOTION for Leave to Exceed Page Limitation *on Defendant's Motion to Dismiss* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Defendant's Motion to Dismiss, # 2 Proposed Order Order |

| | | |
|---|---|---|
| | | Granting Defendant's Unopposed Motion to Exceed Page Limits on Defendant's Motion to Dismiss)(Romero, Stephen) (Entered: 02/20/2019) |
| 02/20/2019 | | Text Order GRANTING 26 (p.88) Motion for Leave to File Excess Pages entered by Judge Xavier Rodriguez. The page limit is waived. Defendant's Motion to Dismiss, attached as Exhibit A to Defendant's Unopposed Motion To Exceed Page Limits, shall be accepted for filing and shall be docketed accordingly. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 02/20/2019) |
| 02/20/2019 | 27 (p.123) | DEFENDANT'S MOTION to Dismiss by Peripheral Vascular Associates, P.A.. (wg) (Entered: 02/22/2019) |
| 03/04/2019 | 28 (p.153) | ORDER AND ADVISORY for Scheduling Recommendations/Proposed Scheduling Order. Plantiff shall submit agreed scheduling recommendations/proposed scheduling order to the Court.(Scheduling Recommendations/Proposed Schedule Order due April 4, 2019); Notice of right to consent to disposition of a civil case by a U.S. Magistrate Judge. Signed by Judge Xavier Rodriguez.(jhw) (Entered: 03/04/2019) |
| 03/04/2019 | 29 (p.162) | MOTION to Appear Pro Hac Vice by Wallace M. Brylak, Jr ( Filing fee $ 100 receipt number 0542-11834683) by on behalf of Tiffany Montcrieff. (Attachments: # 1 (p.49) Proposed Order Order Granting Motion for Admission Pro Hac Vice (Sarvenaz J. Fahimi))(Brylak, Wallace) (Entered: 03/04/2019) |
| 03/04/2019 | | Text Order GRANTING 29 (p.162) Motion to Appear Pro Hac Vice. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 03/04/2019) |
| 03/06/2019 | 30 (p.166) | MOTION for Leave to Exceed Page Limitation *ON RELATORS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Exhibit EXHIBIT A TO MOTION TO EXCEED PAGE LIMIT, # 2 Proposed Order PROPOSED ORDER GRANTING RELATORS' MOTION TO EXCEED PAGE LIMIT TO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS)(Berger, Justin) (Entered: 03/06/2019) |
| 03/06/2019 | 31 (p.202) | Memorandum in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 27 (p.123) MOTION to Dismiss filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: |

| | | |
|---|---|---|
| | | 03/06/2019) |
| 03/07/2019 | | Text Order GRANTING 30 (p.166) Motion for Leave to File Excess Pages entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 03/07/2019) |
| 03/07/2019 | 32 (p.233) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 27 (p.123) MOTION to Dismiss filed by Defendant Peripheral Vascular Associates, P.A. (rf) (Entered: 03/07/2019) |
| 03/11/2019 | 33 (p.264) | NOTICE of Attorney Appearance by Stephen J. Romero on behalf of Peripheral Vascular Associates, P.A.. Attorney Stephen J. Romero added to party Peripheral Vascular Associates, P.A.(pty:dft) (Romero, Stephen) (Entered: 03/11/2019) |
| 03/13/2019 | 34 (p.267) | Unopposed MOTION for Leave to Exceed Page Limitation *on Defendant's Reply to Relators' Opposition to Defendant's Motion to Dismiss* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Defendant's Reply to Relators' Opposition to Defendant's Motion to Dismiss, # 2 Proposed Order)(Romero, Stephen) (Entered: 03/13/2019) |
| 03/14/2019 | | Text Order GRANTING 34 (p.267) Unopposed Motion for Leave to File Excess Pages entered by Judge Xavier Rodriguez. Defendant's Reply, attached as Exhibit A to Defendant's Unopposed Motion To Exceed Page Limits, shall be accepted for filing and shall be docketed accordingly. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 03/14/2019) |
| 03/14/2019 | 35 (p.287) | DEFENADNT'S REPLY/RESPONSE TO RELATOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS to 32 (p.233) Response in Opposition to Motion by Peripheral Vascular Associates, P.A.. (wg) (Entered: 03/14/2019) |
| 04/03/2019 | 36 (p.302) | Defendant's Opposed MOTION to Stay *Discovery Pending Resolution of Defendant's Motion to Dismiss* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 04/03/2019) |
| 04/03/2019 | 37 (p.309) | NON-CONSENT to Trial by US Magistrate Judge by Peripheral Vascular Associates, P.A.. (Romero, Stephen) (Entered: 04/03/2019) |
| 04/03/2019 | 38 (p.310) | CONSENT to Trial by US Magistrate Judge by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Berger, Justin) (Entered: 04/03/2019) |
| 04/04/2019 | 39 (p.311) | STATUS REPORT *JOINT FED. R. CIV. P. 26 REPORT* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. |

| | | |
|---|---|---|
| | | (Fahimi, Sarvenaz) (Entered: 04/04/2019) |
| 04/04/2019 | 40 (p.321) | Proposed Scheduling Order by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 04/04/2019) |
| 04/05/2019 | 41 (p.327) | SCHEDULING ORDER, ( ADR Report Deadline due by 4/30/2020,, Amended Pleadings due by 5/30/2019,, Discovery due by 9/26/2019,, Joinder of Parties due by 5/30/2019,, Dispositive Motions due by 2/3/2020,, Jury Selection set for 5/11/2020 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 5/11/2020 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 4/30/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 04/05/2019) |
| 04/05/2019 | 42 (p.331) | ORDER, ( Status Conference & any Pending Motion Hearing set for 5/9/2019 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 04/05/2019) |
| 04/10/2019 | 43 (p.332) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 36 (p.302) Opposed MOTION to Stay *Discovery Pending Resolution of Defendant's Motion to Dismiss* filed by Defendant Peripheral Vascular Associates, P.A. (Fahimi, Sarvenaz) (Entered: 04/10/2019) |
| 05/01/2019 | 44 (p.336) | MOTION to Appear Pro Hac Vice by Stephen J. Romero *Jeff J. Wurzburg* ( Filing fee $ 100 receipt number 0542-12064565) by on behalf of Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 05/01/2019) |
| 05/01/2019 | | Text Order GRANTING 44 (p.336) Motion to Appear Pro Hac Vice. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 05/01/2019) |
| 05/09/2019 | 45 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Status Conference held on 5/9/2019 (Minute entry documents are not available electronically.), Motion Hearing held on 5/9/2019 GRANTED IN PART/DENIED IN PART re 27 (p.123) MOTION to Dismiss filed by Peripheral Vascular Associates, P.A. (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 05/09/2019) |
| 05/09/2019 | | ORAL ORDER DENYING 27 (p.123) Motion to Dismiss Entered by Judge Xavier Rodriguez. (wg) (Entered: |

| | | |
|---|---|---|
| | | 05/09/2019) |
| 05/09/2019 | | Text Order GRANTING IN PART AND DENYING IN PART 27 (p.123) Motion to Dismiss entered by Judge Xavier Rodriguez. As stated in open court, the motion to dismiss is granted as to Plaintiff Roberta Martinez's Sabine Pilot claim and Plaintiff Alicia Burnett's FMLA interference claim. The remaining claims survive: Plaintiffs' False Claim Act claim, Martinez's retaliation claim, and Burnett's FMLA retaliation claim. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 05/09/2019) |
| 05/09/2019 | | Text Order DENYING AS MOOT 36 (p.302) Motion to Stay Pending Discovery entered by Judge Xavier Rodriguez. Given the Court's disposition of the motion to dismiss, this motion is mooted. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 05/09/2019) |
| 05/19/2019 | 46 (p.5576) | Transcript filed of Proceedings held on 5/9/19, Proceedings Transcribed: Motion to Dismiss. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, email: gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 6/10/2019, Redacted Transcript Deadline set for 6/19/2019, Release of Transcript Restriction set for 8/19/2019, (gs) (Entered: 05/19/2019) |
| 05/23/2019 | 47 (p.341) | DOCUMENT DEFICIENT - See Deficiency Notice #49. MOTION for Reconsideration re Order on Motion to Dismiss, by Peripheral Vascular Associates, P.A. (Romero, Stephen) Modified on 5/24/2019 (rg). (Entered: 05/23/2019) |
| 05/23/2019 | 48 (p.369) | ANSWER to Complaint *First Amended* by Peripheral Vascular Associates, P.A..(Romero, Stephen) (Entered: 05/23/2019) |
| 05/24/2019 | 49 (p.385) | DEFICIENCY NOTICE: to attorney Stephen Romero Proposed order required with motion. DO NOT re-file entire document. Please file ONLY the proposed order using the "Attachment" event located under "Other Documents" from menu and link the proposed order to thisdocument. See page 11, item 9d of the Administrative Policies and Procedures for Electronic Filing, Western of District of Texas. re 47 (p.341) MOTION for Reconsideration re Order on Motion to Dismiss (rg) (Entered: 05/24/2019) |

| | | |
|---|---|---|
| 05/24/2019 | 50 (p.386) | ATTACHMENT *Proposed Order* to 47 (p.341) MOTION for Reconsideration re Order on Motion to Dismiss,, by Peripheral Vascular Associates, P.A.. (Romero, Stephen) (Entered: 05/24/2019) |
| 06/03/2019 | | Text Order DENYING 47 (p.341) Motion for Reconsideration entered by Judge Xavier Rodriguez. Having previously considered Defendant's arguments, the Court, in its discretion, declines to reconsider its prior order denying in part Defendant's Motion to Dismiss. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 06/03/2019) |
| 06/07/2019 | 51 (p.387) | NOTICE of Change of Address by Thomas Arthur Parnham, Jr (Parnham, Thomas) (Entered: 06/07/2019) |
| 06/14/2019 | 52 (p.389) | Unopposed MOTION for Leave to File Defendant's First Amended Answer to Plaintiffs' First Amended Complaint for MoneyDamages and Civil Penalties for Violations of the False Claims Act by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Defendant's First Amended Answer to Plaintiffs' First Amended Complaint for Money Damages and Civil Penalties for Violations of the False Claims Act, # 2 Proposed Order)(Romero, Stephen) (Entered: 06/14/2019) |
| 06/14/2019 | | Text Order GRANTING 52 (p.389) Unopposed Motion for Leave to File entered by Judge Xavier Rodriguez. Defendant Peripheral Vascular Associates, P.A.'s First Amended Answer, attached as Exhibit A to Defendant's Unopposed Motion for Leave to File, shall be accepted for filing and shall be docketed accordingly. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mdxr) (Entered: 06/14/2019) |
| 06/14/2019 | 53 (p.411) | DEFENDANT'S 1st AMENDED ANSWER to 8 1st Amended Complaint by Peripheral Vascular Associates, P.A.. (wg) (Entered: 06/14/2019) |
| 06/19/2019 | 54 (p.428) | Opposed MOTION for Certificate of Appealability by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 06/19/2019) |
| 07/02/2019 | 55 (p.440) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 54 (p.428) Opposed MOTION for Certificate of Appealability filed by Defendant Peripheral Vascular Associates, P.A. *Relators' Opposition to Defendant's Petition for Certification* (Fahimi, Sarvenaz) (Entered: 07/02/2019) |
| 07/23/2019 | 56 (p.447) | ORDER DENYING 54 (p.428) Motion for Certificate of Appealability Signed by Judge Xavier Rodriguez. (wg) (Entered: 07/23/2019) |
| 07/25/2019 | 57 (p.451) | |

| | | |
|---|---|---|
| | | Joint MOTION for Entry of Confidentiality and Protective Order by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Confidentiality and Protective Order)(Romero, Stephen) (Entered: 07/25/2019) |
| 07/30/2019 | 58 (p.464) | CONFIDENTIALITY AND PROTECTIVE ORDER. Signed by Judge Xavier Rodriguez. (mgr) (Entered: 07/31/2019) |
| 08/09/2019 | 59 (p.472) | Joint MOTION to Extend Scheduling Order Deadlines by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 08/09/2019) |
| 08/12/2019 | 60 (p.476) | ORDER re 59 (p.472) Joint MOTION to Extend Scheduling Order Deadlines filed by Peripheral Vascular Associates, P.A., Motions terminated: 59 (p.472) Joint MOTION to Extend Scheduling Order Deadlines filed by Peripheral Vascular Associates, P.A.., ( Discovery due by 12/20/2019,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 08/12/2019) |
| 10/01/2019 | 61 (p.477) | MOTION to Amend/Correct 41 (p.327) Order,, Set Deadlines/Hearings, 60 (p.476) Order,, Terminate Motions,, Set Deadlines/Hearings, by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Proposed Order Amending Scheduling Order)(Fahimi, Sarvenaz) (Entered: 10/01/2019) |
| 10/02/2019 | 62 (p.486) | Joint MOTION to Extend Scheduling Order Deadlines by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 10/02/2019) |
| 10/03/2019 | | Text Order TERMINATING 61 (p.477) Motion to Amend/Correct entered by Judge Xavier Rodriguez. This motion is terminated in light of the parties' subsequent joint motion to extend scheduling order deadlines. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 10/03/2019) |
| 10/03/2019 | | Text Order GRANTING 62 (p.486) Motion to Extend Scheduling Order Deadlines entered by Judge Xavier Rodriguez. The Court will separately issue the Amended Scheduling Order. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 10/03/2019) |
| 10/03/2019 | 63 (p.491) | AMENDED SCHEDULING ORDER, ( ADR Report Deadline due by 4/30/2020,, Amended Pleadings due by 5/30/2019,, Discovery due by 9/26/2019,, Joinder of Parties due by 5/30/2019,, Dispositive Motions due by 2/3/2020,, Jury Selection set for 5/11/2020 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 5/11/2020 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for |

| | | |
|---|---|---|
| | | 4/30/2020 10:30 AM before Judge Xavier Rodriguez,) Signed by Judge Xavier Rodriguez. (wg) (Entered: 10/03/2019) |
| 10/07/2019 | 64 (p.495) | AMENDED SCHEDULING ORDER, ( ADR Report Deadline due by 4/30/2020,, Amended Pleadings due by 5/30/2019,, Discovery due by 12/20/2019,, Joinder of Parties due by 5/30/2019,, Dispositive Motions due by 2/3/2020,, Jury Selection set for 5/11/2020 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 5/11/2020 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 4/30/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 10/07/2019) |
| 11/01/2019 | 65 (p.499) | Joint MOTION to Extend Scheduling Order Deadlines by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Barrera, Mario) (Entered: 11/01/2019) |
| 11/04/2019 | 66 (p.505) | SCHEDULING ORDER, ( ADR Report Deadline due by 5/8/2020,, Discovery due by 5/8/2020,, Dispositive Motions due by 5/29/2020,, Jury Selection set for 9/14/2020 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 9/14/2020 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 9/3/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 11/04/2019) |
| 11/07/2019 | 67 (p.509) | NOTICE of Attorney Appearance by John Deck on behalf of UNITED STATES OF AMERICA. Attorney John Deck added to party UNITED STATES OF AMERICA(pty:pla) (Deck, John) (Entered: 11/07/2019) |
| 11/08/2019 | | Text Order GRANTING 65 (p.499) Motion to Extend Scheduling Order Deadlines entered by Judge Xavier Rodriguez. See docket no. 66 for the remaining deadlines. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 11/08/2019) |
| 03/16/2020 | 68 (p.511) | MOTION to Compel *Defendants' Responses to Request for Production of Documents, Set Two, Three and Four* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Memo in Support of Plaintiffs' Motion to Compel Defendants' Responses to Request for Production of Documents, Set Two, Three and Four, # 2 Declaration of Justin T. Berger in Support of Plaintiffs' Motion to Compel Defendants' Responses to Request for Production of Documents, Set Two, Three and Four, # 3 Proposed Order Granting Plaintiffs' Motion to Compel Defendants' Responses to Request for Production of Documents, Set Two, Three and Four)(Berger, Justin) (Entered: 03/16/2020) |

| | | |
|---|---|---|
| 03/23/2020 | 69 (p.615) | Unopposed MOTION for Extension of Time to File Response/Reply as to 68 (p.511) MOTION to Compel *Defendants' Responses to Request for Production of Documents, Set Two, Three and Four* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 03/23/2020) |
| 03/23/2020 | | Text Order GRANTING 69 (p.615) Motion for Extension of Time to File Response/Reply entered by Judge Xavier Rodriguez. Defendant's response to Plaintiffs' motion (docket no. 68) is due on Friday, March 27, 2020. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 03/23/2020) |
| 03/27/2020 | 70 (p.619) | Response in Opposition to Motion, filed by Peripheral Vascular Associates, P.A., re 68 (p.511) MOTION to Compel *Defendants' Responses to Request for Production of Documents, Set Two, Three and Four* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 03/27/2020) |
| 03/31/2020 | 71 (p.629) | Opposed MOTION to Stay Case *Emergency* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 03/31/2020) |
| 03/31/2020 | 72 (p.636) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 71 (p.629) Opposed MOTION to Stay Case *Emergency* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 03/31/2020) |
| 04/01/2020 | 73 (p.639) | ORDER, ( Status Conference & any Pending Motions set for 4/2/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 04/01/2020) |
| 04/01/2020 | 74 (p.640) | MOTION to Appear Pro Hac Vice by Sean R. McKenna *Motion for Pro Hac Vice by Mark A. Cole* ( Filing fee $ 100 receipt number 0542-13413663) by on behalf of Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 04/01/2020) |
| 04/02/2020 | | Text Order GRANTING 74 (p.640) Motion to Appear Pro Hac Vice. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Order entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 04/02/2020) |
| 04/02/2020 | | Text Order GRANTING IN PART AND DENYING IN PART 71 (p.629) Motion to Stay Case entered by Judge Xavier Rodriguez. As stated in open court, the current |

| | | |
|---|---|---|
| | | scheduling order deadline for expert reports is extended 60 days for Defendant's experts, but not to Defendant's statistical expert. As to the remaining deadlines, the parties are ORDERED to submit a joint amended scheduling order within 14 days of this order. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 04/02/2020) |
| 04/02/2020 | 75 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Motion Hearing held on 4/2/2020 re 68 (p.511) MOTION to Compel *Defendants' Responses to Request for Production of Documents, Set Two, Three and Four* filed by Alicia Burnett, Tiffany Montcrieff, Roberta A. Martinez, GRANTED IN PART 71 (p.629) Opposed MOTION to Stay Case *Emergency* filed by Peripheral Vascular Associates, P.A. (Minute entry documents are not available electronically.), Status Conference held on 4/2/2020 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 04/03/2020) |
| 04/23/2020 | 76 (p.644) | Joint MOTION to Extend Scheduling Order Deadlines by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Proposed Order Amending Scheduling Order)(Berger, Justin) (Entered: 04/23/2020) |
| 04/24/2020 | 77 (p.651) | AMENDED SCHEDULING ORDER re 76 (p.644) Joint MOTION to Extend Scheduling Order Deadlines filed by Alicia Burnett, Tiffany Montcrieff, Roberta A. Martinez, ( Discovery due by 7/22/2020,, Dispositive Motions due by 8/7/2020,, Jury Selection set for 11/16/2020 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 11/16/2020 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 11/5/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 04/24/2020) |
| 04/30/2020 | | Text Order TERMINATING 68 (p.511) Motion to Compel entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arb) (Entered: 04/30/2020) |
| 07/23/2020 | 78 (p.655) | ADR Report Filed - *Joint* by Peripheral Vascular Associates, P.A.(Romero, Stephen)& (Justin T. Berger) (Entered: 07/23/2020) |
| 07/27/2020 | 79 (p.657) | Joint MOTION to Extend Scheduling Order Deadlines by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 07/27/2020) |
| 07/28/2020 | | Text Order GRANTING 79 (p.657) Joint Motion to Extend Scheduling Order Deadlines entered by Judge Xavier Rodriguez. The deadline to file pretrial motions is extended two weeks to August 21, 2020. No other deadline is affected. (This is a text-only entry generated by the court. |

| | | |
|---|---|---|
| | | There is no document associated with this entry.) (arb) (Entered: 07/28/2020) |
| 08/03/2020 | 80 (p.661) | PLAINTIFF'S MOTION to Strike *or Exclude Certain Opinions of Defendant's Expert Melissa Scott, CPC, CHC, CHIAP as Untimely* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Plaintiffs' Opposed Motion to Strike or Exclude Certain Opinions of Defendant's Expert Melissa Scott, CPC, CHC, CHIAP as Untimely, # 2 Proposed Order Granting Plaintiffs' Opposed Motion to Strike or Exclude Certain Opinions of Defendant's Expert Melissa Scott, CPC, CHC, CHIAP as Untimely)(Fahimi, Sarvenaz) (Entered: 08/03/2020) |
| 08/04/2020 | 81 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Sealed Document Motion to Exclude, # 2 Sealed Document Ex A to Motion to Exclude, # 3 Sealed Document Ex B to Motion to Exclude, # 4 Sealed Document Ex C to Motion to Exclude, # 5 Sealed Document Ex D to Motion to Exclude, # 6 Sealed Document Order to Motion to Exclude, # 7 Proposed Order Motion for Leave) (Romero, Stephen) (Entered: 08/04/2020) |
| 08/05/2020 | | Text Order GRANTING 81 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/05/2020) |
| 08/05/2020 | 82 | Sealed Motion filed (Attachments: # 1 (p.49) Sealed Document A, # 2 Sealed Document B, # 3 Sealed Document C, # 4 Sealed Document D, # 5 Proposed Order) (wg) (Entered: 08/05/2020) |
| 08/10/2020 | 83 (p.675) | Defendant's Opposed MOTION to Exclude *Relators' Expert Witness Robert D. Church, Jr.* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Ex A to Mtn to Exclude, # 2 Exhibit Ex B to Mtn to Exclude, # 3 Exhibit Ex C to Mtn to Exclude, # 4 Exhibit Ex D to Mtn to Exclude, # 5 Proposed Order)(Romero, Stephen) (Entered: 08/10/2020) |
| 08/10/2020 | 84 (p.988) | Defendant's Response in Opposition to Motion, filed by Peripheral Vascular Associates, P.A., re 80 (p.661) MOTION to Strike *or Exclude Certain Opinions of Defendant's Expert Melissa Scott, CPC, CHC, CHIAP as Untimely* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Exhibit Ex A to Resp to Mtn to Strike, # 2 Exhibit Ex B to Resp to Mtn to Strike, # 3 Proposed Order)(Romero, Stephen) (Entered: 08/10/2020) |
| 08/11/2020 | 85 (p.1054) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 82 Sealed Motion filed filed by Defendant Peripheral Vascular |

| | | |
|---|---|---|
| | | Associates, P.A. (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Relators' Opposition to Defendant's Motion to Exclude Relators' Expert Witness James Alexander, M.D., # 2 Exhibit A to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit B to Declaration of Sarvenaz J. Fahimi, # 4 Exhibit C to Declaration of Sarvenaz J. Fahimi, # 5 Exhibit D to Declaration of Sarvenaz J. Fahimi, # 6 Exhibit E to Declaration of Sarvenaz J. Fahimi, # 7 Exhibit F to Declaration of Sarvenaz J. Fahimi, # 8 Exhibit G to Declaration of Sarvenaz J. Fahimi, # 9 Exhibit H to Declaration of Sarvenaz J. Fahimi, # 10 Proposed Order Denying Defendant's Motion to Exclude Relators' Expert Witness James Alexander, M.D.)(Fahimi, Sarvenaz) (Entered: 08/11/2020) |
| 08/13/2020 | 86 (p.1749) | Opposed MOTION to Exclude *Relators' Expert Witness Zachary Nye and Strike His Supplemental Reports* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Romero, Stephen) (Entered: 08/13/2020) |
| 08/17/2020 | 87 (p.2475) | REPLY to Response to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 80 (p.661) MOTION to Strike *or Exclude Certain Opinions of Defendant's Expert Melissa Scott, CPC, CHC, CHIAP as Untimely* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Berger, Justin) (Entered: 08/17/2020) |
| 08/17/2020 | 88 (p.2480) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 83 (p.675) Opposed MOTION to Exclude *Relators' Expert Witness Robert D. Church, Jr.* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Relators' Opposition to Defendant's Motion to Exclude Relators' Expert Witness Robert D. Church, Jr., # 2 Exhibit 1 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 2 to Declaration of Sarvenaz J. Fahimi, # 4 Exhibit 3 to Declaration of Sarvenaz J. Fahimi, # 5 Exhibit 4 to Declaration of Sarvenaz J. Fahimi, # 6 Exhibit 5 to Declaration of Sarvenaz J. Fahimi, # 7 Exhibit 6 to Declaration of Sarvenaz J. Fahimi, # 8 Exhibit 7 to Declaration of Sarvenaz J. Fahimi, # 9 Exhibit 8 to Declaration of Sarvenaz J. Fahimi, # 10 Exhibit 9 to Declaration of Sarvenaz J. Fahimi, # 11 Exhibit 10 to Declaration of Sarvenaz J. Fahimi, # 12 Proposed Order Denying Defendant's Motion to Exclude Relators' Expert Witness Robert D. Church, Jr.)(Fahimi, Sarvenaz) (Entered: 08/17/2020) |
| 08/18/2020 | 89 (p.2693) | DEFENDANT'S REPLY to Response to Motion, filed by Peripheral Vascular Associates, P.A., re 82 Sealed Motion |

| | | |
|---|---|---|
| | | filed filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Exhibit Ex A to Reply, # 2 Exhibit Ex B to Reply, # 3 Exhibit Ex C to Reply)(Romero, Stephen) (Entered: 08/18/2020) |
| 08/20/2020 | 90 (p.2811) | STIPULATION *TO DISMISS CERTAIN CLAIMS WITH PREJUDICE AND PROPOSED ORDER* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) Modified event for Motion on 8/20/2020 (wg). (Entered: 08/20/2020) |
| 08/20/2020 | 91 (p.2814) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 86 (p.1749) Opposed MOTION to Exclude *Relators' Expert Witness Zachary Nye and Strike His Supplemental Reports* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Declaration of Justin T. Berger in Support of Relators' Opposition to Defendant's Motion to Exclude Relators' Expert Witness Zachary Nye and Strike His Supplemental Reports, # 2 Exhibit 1 to the Declaration of Justin T. Berger, # 3 Proposed Order Denying Defendant's Motion to Exclude Relators' Expert Witness Zachary Nye and Strike His Supplemental Reports)(Berger, Justin) (Entered: 08/20/2020) |
| 08/21/2020 | 92 (p.2896) | ORDER GRANTING THE PARTIES STIPULATION TO DISMISSCERTAIN CLAIMS WITH PREJUDICE re 90 (p.2811) MOTION filed by Alicia Burnett, Tiffany Montcrieff, Roberta A. Martinez. Signed by Judge Xavier Rodriguez. (wg) (Entered: 08/21/2020) |
| 08/21/2020 | 93 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Sealed Document Exhibit B, # 2 Proposed Order) (Romero, Stephen) (Entered: 08/21/2020) |
| 08/21/2020 | 94 (p.2897) | MOTION for Summary Judgment *on Relators' Claims* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit Ex A to MSJ, # 2 Exhibit Ex B to MSJ, # 3 Exhibit Ex C to MSJ, # 4 Exhibit Ex D to MSJ, # 5 Exhibit Ex E to MSJ, # 6 Exhibit Ex F to MSJ, # 7 Exhibit Ex G to MSJ)(Romero, Stephen) (Attachment 2 replaced on 8/25/2020) (wg). (Additional attachment(s) added on 9/17/2020: # 8 Sealed Document #108, # 9 Sealed Document Exh #1-20, # 10 Sealed Document Exh. #21-30) (wg). (Additional attachment(s) added on 9/17/2020: # 11 Sealed Document Exh 31-40, # 12 Sealed Document Exh. 41-60, # 13 Sealed Document Exh. 61-80) (wg). (Additional attachment(s) added on 9/17/2020: # 14 Sealed Document Exh. 81-100, # 15 Sealed Document Exh. 101-120, # 16 Sealed Document Exh. 121-140) (wg). (Additional attachment(s) added on 9/17/2020: # 17 Sealed Document Exh. 141-160, # 18 Sealed Document Exh. 161-180, # 19 Sealed Document Exh. 181-200, # 20 (p.66) Sealed Document Exh. 201-207) (wg). (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 95 (p.3129) | MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Appendix in Support of Relators' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment Against Defendant Peripheral Vascular Associates, P.A.)(Berger, Justin) (Additional attachment(s) added on 8/25/2020: # 2 Sealed Document Declaration, # 3 Sealed Document Sealed Exh. 1, # 4 Sealed Document Exh. 21) (wg). (Additional attachment(s) added on 8/25/2020: # 5 Sealed Document Exh. 31-40, # 6 Sealed Document Exh. 41-60) (wg). (Additional attachment(s) added on 8/25/2020: # 7 Sealed Document eXH. 61-80, # 8 Sealed Document eXH. 81-100, # 9 Sealed Document Exh. 101-120) (wg). (Additional attachment(s) added on 8/25/2020: # 10 Sealed Document Exh. 121-140, # 11 Sealed Document Exh. 141-160, # 12 Sealed Document Exh. 161-180) (wg). (Additional attachment(s) added on 8/25/2020: # 13 Sealed Document Exh. 181-200, # 14 Sealed Document Exh. 201-207) (wg). (Entered: 08/21/2020) |
| 08/22/2020 | 96 | Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Against Defendant Peripheral Vascular Associates, P.A., # 2 Exhibit 1-20 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 21-30 to Declaration of Sarvenaz J. Fahimi, # 4 Proposed Order Granting Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Under Seal) (Berger, Justin) (Entered: 08/22/2020) |
| 08/22/2020 | 97 | Second Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 31-40 to Declaration of Sarvenaz J. Fahimi, # 2 Exhibit 41-60 to Declaration of Sarvenaz J. Fahimi, # 3 Proposed Order Granting Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Under Seal) (Berger, Justin) (Entered: 08/22/2020) |
| 08/22/2020 | 98 | Third Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 61-80, # 2 Exhibit 81-100, # 3 Exhibit 101-120, # 4 Proposed Order Granting Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Under Seal) (Berger, Justin) (Entered: 08/22/2020) |

| | | |
|---|---|---|
| 08/22/2020 | 99 | Fourth Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 121-140, # 2 Exhibit 141-160, # 3 Exhibit 161-180, # 4 Proposed Order Granting Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Under Seal) (Berger, Justin) (Entered: 08/22/2020) |
| 08/22/2020 | 100 | Fifth Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 181-200, # 2 Exhibit 201-207, # 3 Proposed Order Granting Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relator's Motion for Summary Judgment or in the Alternative Partial Summary Judgment Under Seal) (Berger, Justin) (Entered: 08/22/2020) |
| 08/24/2020 | 101 (p.3204) | Unopposed MOTION for Extension of Time to File Response/Reply as to 88 (p.2480) Response in Opposition to Motion,,,, by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 93 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 96 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 97 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 98 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 99 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 100 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/24/2020 | | Text Order GRANTING 101 (p.3204) Motion for Extension of Time to File Response/Reply entered by Judge Xavier |

| | | |
|---|---|---|
| | | Rodriguez. The deadline to file a reply to Plaintiffs' opposition to Defendants' motion is extended to August 25, 2020. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 08/24/2020) |
| 08/25/2020 | 102 (p.3208) | DEFENDANT'S REPLY to Response to Motion, filed by Peripheral Vascular Associates, P.A., re 83 (p.675) Opposed MOTION to Exclude *Relators' Expert Witness Robert D. Church, Jr.* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Exhibit Ex A to Reply, # 2 Exhibit Ex B to Reply, # 3 Exhibit Ex C to Reply, # 4 Exhibit Ex D to Reply)(Romero, Stephen) (Entered: 08/25/2020) |
| 08/27/2020 | 103 (p.3437) | DEFENDANT'S RESPONSE in Support, filed by Peripheral Vascular Associates, P.A., re 86 (p.1749) Opposed MOTION to Exclude *Relators' Expert Witness Zachary Nye and Strike His Supplemental Reports* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Exhibit Ex A to Reply, # 2 Exhibit Ex B to Reply, # 3 Exhibit Ex C to Reply, # 4 Exhibit Ex D to Reply)(Romero, Stephen) (Entered: 08/27/2020) |
| 09/01/2020 | 104 (p.3511) | Unopposed MOTION for Extension of Time to File Response/Reply as to 95 (p.3129) MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 09/01/2020) |
| 09/02/2020 | 105 (p.3515) | Amended MOTION for Extension of Time to File Response/Reply as to 95 (p.3129) MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 09/02/2020) |
| 09/02/2020 | 106 (p.3520) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 105 (p.3515) Amended MOTION for Extension of Time to File Response/Reply as to 95 (p.3129) MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 09/02/2020) |
| 09/03/2020 | | Text Order GRANTING 105 (p.3515) Motion for Extension of Time to File Response/Reply entered by Judge Xavier Rodriguez. The parties' deadlines to file their responses to the pending motions for summary judgment and replies to those responses are extended by one week. (This is a text-only entry generated by the court. There is no document |

| | | |
|---|---|---|
| | | associated with this entry.) (dc3) (Entered: 09/03/2020) |
| 09/08/2020 | | Text Order MOOTING 104 (p.3511) Motion for Extension of Time to File Response/Reply entered by Judge Xavier Rodriguez. An amended motion was filed. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/08/2020) |
| 09/11/2020 | 107 (p.3524) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 94 (p.2897) MOTION for Summary Judgment *on Relators' Claims* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Appendix in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment, # 2 Relators' Objections to the Declaration of Katherine Britt, # 3 Relators' Objections to the Declaration of Brian Puente)(Berger, Justin) (Entered: 09/11/2020) |
| 09/11/2020 | 108 | Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment, # 2 Exhibit 1-20 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 21-30 to Declaration of Sarvenaz J. Fahimi, # 4 Proposed Order Granting Unopposed Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment) (Berger, Justin) (Entered: 09/11/2020) |
| 09/11/2020 | 109 | Second Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 31-40 to Declaration of Sarvenaz J. Fahimi, # 2 Exhibit 41-60 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 61-80 to Declaration of Sarvenaz J. Fahimi, # 4 Proposed Order Granting Unopposed Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment) (Berger, Justin) (Entered: 09/11/2020) |
| 09/11/2020 | 110 | Third Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 81-100 to Declaration of Sarvenaz J. Fahimi, # 2 Exhibit 101-120 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 121-140 to Declaration of Sarvenaz J. Fahimi, # 4 Proposed Order Granting Unopposed Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment) (Berger, Justin) (Entered: 09/11/2020) |
| 09/11/2020 | 111 | Fourth Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit 141-160 to Declaration of |

| | | |
|---|---|---|
| | | Sarvenaz J. Fahimi, # 2 Exhibit 161-180 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 181-200 to Declaration of Sarvenaz J. Fahimi, # 4 Exhibit 201-207 to Declaration of Sarvenaz J. Fahimi, # 5 Proposed Order Granting Unopposed Motion for Leave to File Declaration of Sarvenaz J. Fahimi and Corresponding Exhibits in Support of Relators' Opposition to Defendant Peripheral Vascular Associates' Motion for Summary Judgment) (Berger, Justin) (Entered: 09/11/2020) |
| 09/11/2020 | 112 (p.3620) | Defendant's Response in Opposition to Motion, filed by Peripheral Vascular Associates, P.A., re 95 (p.3129) MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Exhibit Ex. A to Def Resp to Relators MSJ, # 2 Exhibit Ex. B to Def Resp to Relators MSJ)(Romero, Stephen) (Entered: 09/11/2020) |
| 09/16/2020 | | Text Order GRANTING 108 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/16/2020) |
| 09/16/2020 | | Text Order GRANTING 109 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/16/2020) |
| 09/16/2020 | | Text Order GRANTING 110 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/16/2020) |
| 09/16/2020 | | Text Order GRANTING 111 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/16/2020) |
| 09/18/2020 | 113 (p.3672) | RESPONSE to Motion, filed by UNITED STATES OF AMERICA, re 94 (p.2897) MOTION for Summary Judgment *on Relators' Claims* filed by Defendant Peripheral Vascular Associates, P.A. *United States' Statement of Interest* (Deck, John) (Entered: 09/18/2020) |
| 09/18/2020 | 114 (p.3683) | RESPONSE in Support, filed by Peripheral Vascular Associates, P.A., re 94 (p.2897) MOTION for Summary Judgment *on Relators' Claims* filed by Defendant Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) Exhibit Ex A to Reply Support MSJ, # 2 Exhibit Ex B to Reply |

| | | |
|---|---|---|
| | | Support MSJ, # 3 Exhibit Ex C to Reply Support MSJ, # 4 Exhibit Ex D to Reply Support MSJ, # 5 Exhibit Ex E to Reply Support MSJ, # 6 Exhibit Ex F to Reply Support MSJ, # 7 Exhibit Ex G to Reply Support MSJ, # 8 Exhibit Ex H to Reply Support MSJ)(Romero, Stephen) (Entered: 09/18/2020) |
| 09/18/2020 | 115 (p.3915) | RESPONSE in Support, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 95 (p.3129) MOTION for Summary Judgment *Or, in the Alternative, Partial Summary Judgment against Defendant Peripheral Vascular Associates, P.A.* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Declaration of Sarvenaz J. Fahimi in Support of Relators' Reply in Support of Motion for Summary Judgment or, in the Alternative, Partal Summary Judgment Against Defendant Peripheral Vascular Associates, P.A., # 2 Exhibit 208 to Declaration of Sarvenaz J. Fahimi, # 3 Exhibit 209 to Declaration of Sarvenaz J. Fahimi)(Berger, Justin) (Entered: 09/18/2020) |
| 09/22/2020 | 116 (p.3954) | DEFENDANT'S RESPONSE *to United States' Statement of Interest* to 113 (p.3672) Response to Motion by Peripheral Vascular Associates, P.A.. (Romero, Stephen) (Entered: 09/22/2020) |
| 09/25/2020 | 117 (p.3959) | ORDER, ( Status Conference set for 10/7/2020 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (mgr) (Entered: 09/25/2020) |
| 09/25/2020 | 118 (p.3960) | Unopposed MOTION to Extend Scheduling Order Deadlines by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 09/25/2020) |
| 09/28/2020 | | Text Order GRANTING 118 (p.3960) Motion to Extend Scheduling Order Deadlines entered by Judge Xavier Rodriguez. The deadline for Rule 26(a)(3) disclosures is extended to Monday, October 12, 2020. The deadline for objections to the Rule 26(a)(3) disclosures is extended to October 26, 2020. This case has been set for a status conference per the Court's previous text order (ECF No. 117). (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 09/28/2020) |
| 10/02/2020 | 119 (p.3965) | ORDER RESETTING VIDEO CONFERENCE, ( Status Conference & any Pending Motions Re-set for 10/7/2020 11:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 10/02/2020) |
| 10/07/2020 | 120 | Minute Entry for proceedings held before Judge Xavier Rodriguez Via Video: Status Conference held on 10/7/2020 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 10/08/2020) |

| | | |
|---|---|---|
| 10/27/2020 | 121 (p.3966) | SCHEDULING ORDER, ( Jury Selection set for 4/12/2021 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 4/12/2021 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 4/1/2021 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 10/28/2020) |
| 10/28/2020 | 122 (p.3969) | ADVISORY TO THE COURT by Peripheral Vascular Associates, P.A.. (Romero, Stephen) (Entered: 10/28/2020) |
| 12/14/2020 | 123 (p.3972) | ORDER GRANTING 80 (p.661) Motion to Strike or Exclude Certain Opinions of Melissa Scott, CPC, CHC, CHIAP; DENYING 82 Sealed Motion; DENYING 83 (p.675) Motion to exclude he Testimony of Robert D. Church, Jr ; DENYING 86 (p.1749) Motion to exclude the Testimony of Dr.Zachary Nye; DENYING 94 (p.2897) Defendant Peripheral Vascular Associates, P.A.s Motion for Summary Judgment; GRANTING IN PART AND DENYING IN PART 95 (p.3129) Relator's Motion for Summary Judgment. Signed by Judge Xavier Rodriguez. (wg) (Entered: 12/14/2020) |
| 02/24/2021 | 124 (p.4031) | Joint MOTION for Extension of Time to Complete Discovery *Rule 26(A)(3) Disclosures* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Romero, Stephen) (Entered: 02/24/2021) |
| 02/25/2021 | | Text Order GRANTING 124 (p.4031) Motion for Extension of Time to Complete Discovery entered by Judge Xavier Rodriguez. The deadline to file Rule 26(a)(3) disclosures is extended to March 12, 2021. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 02/25/2021) |
| 03/10/2021 | 125 (p.4035) | ORDER Vacating all current Scheduling Order Deadlines, Setting & trial dates re 121 (p.3966) Order,, Set Deadlines/Hearings,, Motions terminated:. Signed by Judge Xavier Rodriguez. (wg) (Entered: 03/10/2021) |
| 03/22/2021 | 126 (p.4036) | AMENDED SCHEDULING ORDER re 125 (p.4035) Order, Terminate Motions, Terminate Deadlines and Hearings, ( Jury Selection set for 8/16/2021 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 8/16/2021 10:30 AM before Judge Xavier Rodriguez,, Pretrial Conference set for 8/5/2021 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 03/22/2021) |
| 04/29/2021 | 127 (p.4039) | NOTICE *of Vacation* by Peripheral Vascular Associates, P.A. (Romero, Stephen) (Entered: 04/29/2021) |
| 06/09/2021 | 128 (p.4040) | AMENDED ORDER REGARDING THE RESUMPTION OF CIVIL JURY TRIALS. Signed by Chief Judge Orlando L. Garcia. (bc) (Entered: 06/10/2021) |
| 06/17/2021 | 129 (p.4043) | |

| | | |
|---|---|---|
| | | MOTION to Continue *Trial Setting* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order Order Granting Motion for Continuance of Trial Setting)(Romero, Stephen) (Entered: 06/17/2021) |
| 06/17/2021 | | Text Order TAKING UNDER ADVISEMENT 129 (p.4043) Motion to Continue entered by Judge Xavier Rodriguez. Plaintiffs shall submit their response in opposition by June 23, 2021. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 06/17/2021) |
| 06/22/2021 | 130 (p.4048) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 129 (p.4043) MOTION to Continue *Trial Setting* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 06/22/2021) |
| 06/23/2021 | 131 (p.4052) | RESPONSE in Support, filed by Peripheral Vascular Associates, P.A., re 129 (p.4043) MOTION to Continue *Trial Setting* filed by Defendant Peripheral Vascular Associates, P.A. (Romero, Stephen) (Entered: 06/23/2021) |
| 06/24/2021 | 132 (p.4055) | ORDER SETTING STATUS CONFERENCE AND HEARING ON ALL PENDING MOTIONS( Status Conference set for 6/29/2021 12:00 PM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (mgr) (Entered: 06/24/2021) |
| 06/25/2021 | 133 (p.4056) | Pretrial Disclosures *Relators' Pretrial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(3)* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Exhibit A - Witness List, # 2 Exhibit B - Exhibit List)(Berger, Justin) (Entered: 06/25/2021) |
| 06/25/2021 | 134 (p.4105) | Witness List by Peripheral Vascular Associates, P.A.. (Romero, Stephen) (Entered: 06/25/2021) |
| 06/25/2021 | 135 (p.4109) | Exhibit List by Peripheral Vascular Associates, P.A... (Romero, Stephen) (Entered: 06/25/2021) |
| 06/29/2021 | | Text Order GRANTING 129 (p.4043) Motion to Continue entered by Judge Xavier Rodriguez. The parties are instructed to confer regarding a new proposed trial date. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dc3) (Entered: 06/29/2021) |
| 06/29/2021 | 136 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Status Conference held on 6/29/2021 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 06/29/2021) |
| 07/09/2021 | 137 (p.4132) | Miscellaneous Objection to 135 (p.4109) Exhibit List *RELATORS OBJECTIONS TO DEFENDANTS PRETRIAL DISCLOSURES PURSUANT TO FED. R. CIV. P.* |

| | | |
|---|---|---|
| | | *26(a)(3)(B)* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 07/09/2021) |
| 07/23/2021 | 138 (p.4190) | Miscellaneous Objection to 133 (p.4056) Pretrial Disclosures, *Defendant's Objections to Relator's Exhibit Disclosure* by Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 07/23/2021) |
| 08/26/2021 | 139 (p.4246) | AMENDED SCHEDULING ORDER:( Final Pretrial Conference set for 1/27/2022 10:30 AM before Judge Xavier Rodriguez,, Jury Selection and Trial set for 2/7/2022 10:30AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (mgr) (Entered: 08/26/2021) |
| 09/09/2021 | 140 (p.4248) | MOTION for Reconsideration *of portions of the Courts December 14, 2020 Order (Order) granting, in part, Relators Motion for Summary Judgment with regard to the Wrong Provider Tranche. PVA* by Peripheral Vascular Associates, P.A.. (Wurzburg, Jeff) (Entered: 09/09/2021) |
| 09/23/2021 | 141 (p.4258) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 140 (p.4248) MOTION for Reconsideration *of portions of the Courts December 14, 2020 Order (Order) granting, in part, Relators Motion for Summary Judgment with regard to the Wrong Provider Tranche. PVA* filed by Defendant Peripheral Vascular Associates, P.A. (Fahimi, Sarvenaz) (Entered: 09/23/2021) |
| 09/30/2021 | 142 (p.4267) | DEFENDANT'S REPLY in Support, filed by Peripheral Vascular Associates, P.A., re 140 (p.4248) MOTION for Reconsideration *of portions of the Courts December 14, 2020 Order (Order) granting, in part, Relators Motion for Summary Judgment with regard to the Wrong Provider Tranche. PVA* filed by Defendant Peripheral Vascular Associates, P.A. (Wurzburg, Jeff) Modified TEXT on 10/1/2021 (wg). (Entered: 09/30/2021) |
| 11/10/2021 | 143 (p.4274) | MOTION to Continue *Trial Setting* by Peripheral Vascular Associates, P.A.. (Wurzburg, Jeff) (Entered: 11/10/2021) |
| 11/10/2021 | 144 (p.4278) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 143 (p.4274) MOTION to Continue *Trial Setting* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 11/10/2021) |
| 11/11/2021 | 145 (p.4282) | DEFENDANT'S REPLY to Response to Motion, filed by Peripheral Vascular Associates, P.A., re 143 (p.4274) MOTION to Continue *Trial Setting* filed by Defendant Peripheral Vascular Associates, P.A. (McKenna, Sean) (Entered: 11/11/2021) |
| 11/15/2021 | | Text Order DENYING 143 (p.4274) Motion to Continue entered by Judge Xavier Rodriguez. Counsel has known of this potential conflict for several months. (This is a text-only |

| | | |
|---|---|---|
| | | entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 11/15/2021) |
| 12/03/2021 | 146 (p.4286) | Exhibit List by Peripheral Vascular Associates, P.A... (McKenna, Sean) (Entered: 12/03/2021) |
| 12/03/2021 | 147 (p.4290) | Witness List by Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 12/03/2021) |
| 12/03/2021 | 148 (p.4294) | WITNESS/EXHIBIT/EXPERT LIST by Peripheral Vascular Associates, P.A. . (McKenna, Sean) (Entered: 12/03/2021) |
| 12/03/2021 | 149 (p.4310) | Exhibit List *Amended* by Peripheral Vascular Associates, P.A... (McKenna, Sean) (Entered: 12/03/2021) |
| 12/17/2021 | 150 (p.4332) | RESPONSE *RELATORS' OBJECTIONS TO DEFENDANT'S AMENDED PRETRIAL DISLCOSURES PURSUANT TO FED. R. CIV. 26(a)(3)(B)* to 147 (p.4290) Witness List, 149 (p.4310) Exhibit List, 148 (p.4294) Witness/Exhibit/Expert List by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 12/17/2021) |
| 01/07/2022 | 151 (p.4383) | ORDER GRANTING IN PART AND DENYING IN PART 140 (p.4248) Motion for Reconsideration. Having reconsidered its order on the parties cross-motions for summary judgment, Relators motion for summary judgment is hereby DENIED on the issue of materiality with respect to the allegedly false claims under the WrongProvider tranche. All other rulings resolving the parties cross-motions for summary judgment remain in effect. Signed by Judge Xavier Rodriguez. (rg) (Entered: 01/07/2022) |
| 01/12/2022 | 152 (p.4391) | AMENDED SCHEDULING ORDER, ( Jury Selection set for 2/2/2022 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 2/2/2022 10:30 AM before Judge Xavier Rodriguez, Final Pretrial Conference set for 1/27/2022 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/12/2022) |
| 01/14/2022 | 153 (p.4393) | Unopposed MOTION to Withdraw as Attorney by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order Order Granting Unopposed Motion to Withdraw As Counsel)(Romero, Stephen) (Entered: 01/14/2022) |
| 01/14/2022 | 154 (p.4397) | MOTION in Limine *NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING STATUTORY PENALTIES, TREBLE DAMAGES, AND ATTORNEY'S FEES* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 155 (p.4404) | MOTION in Limine *NO. 2 TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING RELATORS' RIGHT TO RECEIVE A SHARE OF THE UNITED STATES'* |

| | | |
|---|---|---|
| | | *RECOVERY* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 156 (p.4410) | MOTION in Limine *NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING THE UNITED STATES' DECLINATION TO INTERVENE* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 157 (p.4416) | MOTION in Limine *NO. 4 TO EXCLUDE EVIDENCE BASED UPON THE UNITED STATES' INVESTIGATION OF DEFENDANT AND ANY MEETING WITH THE UNITED STATES* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 158 (p.4424) | MOTION in Limine *NO. 5 TO EXCLUDE EXPERT TESTIMONY OF DEFENDANT'S UNDISCLOSED EXPERT SUNIL V. LALLA, MD* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 159 (p.4430) | MOTION in Limine *NO. 6 TO EXCLUDE TESTIMONY OF IMPROPER NON-DISCLOSED EXPERT TESTIMONY BY BRIAN PUENTE* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 160 (p.4436) | MOTION in Limine *NO. 7 TO EXCLUDE DEFENDANT'S DOCUMENTARY EVIDENCE NOT TIMELY DISCLOSED* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 161 (p.4441) | MOTION in Limine *NO. 8 TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING THE ELEMENTS OF FALSITY & SCIENTER* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Fahimi, Sarvenaz) (Entered: 01/14/2022) |
| 01/14/2022 | 162 (p.4446) | MOTION in Limine by Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 01/14/2022) |
| 01/14/2022 | 163 (p.4458) | FINAL JOINT PRETRIAL MEMORANDUM by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Berger, Justin) Modified on 1/18/2022 (wg). (Entered: 01/14/2022) |
| 01/18/2022 | | Text Order GRANTING 153 (p.4393) Motion to Withdraw as Attorney entered by Judge Xavier Rodriguez. Stephen J. Romero and Norton Rose Fulbright US LLP are withdrawn as counsel of record for Defendant Peripheral Vascular Associates, P.A. (This is a text-only entry generated by the court. There is no document associated with this entry.) |

| | | |
|---|---|---|
| | | (JA3) (Entered: 01/18/2022) |
| 01/19/2022 | 164 (p.4647) | AMENDED SCHEDULING ORDER, ( Jury Selection set for 2/2/2022 10:30AM before Judge Xavier Rodriguez,, Jury Trial set for 2/2/2022 10:30 AM before Judge Xavier Rodriguez,, Final Pretrial Conference set for 1/24/2022 09:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/19/2022) |
| 01/20/2022 | 165 (p.4648) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 162 (p.4446) MOTION in Limine filed by Defendant Peripheral Vascular Associates, P.A. (Fahimi, Sarvenaz) (Entered: 01/20/2022) |
| 01/21/2022 | 166 (p.4661) | Response in Opposition to Motion, filed by Peripheral Vascular Associates, P.A., re 158 (p.4424) MOTION in Limine *NO. 5 TO EXCLUDE EXPERT TESTIMONY OF DEFENDANT'S UNDISCLOSED EXPERT SUNIL V. LALLA, MD* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 157 (p.4416) MOTION in Limine *NO. 4 TO EXCLUDE EVIDENCE BASED UPON THE UNITED STATES' INVESTIGATION OF DEFENDANT AND ANY MEETING WITH THE UNITED STATES* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 161 (p.4441) MOTION in Limine *NO. 8 TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING THE ELEMENTS OF FALSITY & SCIENTER* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 154 (p.4397) MOTION in Limine *NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING STATUTORY PENALTIES, TREBLE DAMAGES, AND ATTORNEY'S FEES* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 156 (p.4410) MOTION in Limine *NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING THE UNITED STATES' DECLINATION TO INTERVENE* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 155 (p.4404) MOTION in Limine *NO. 2 TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING RELATORS' RIGHT TO RECEIVE A SHARE OF THE UNITED STATES' RECOVERY* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez, 159 (p.4430) MOTION in Limine *NO. 6 TO EXCLUDE TESTIMONY OF IMPROPER NON-DISCLOSED EXPERT TESTIMONY BY BRIAN PUENTE* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (McKenna, Sean) (Entered: 01/21/2022) |
| 01/24/2022 | | Text Order GRANTING 154 (p.4397) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document |

| | | |
|---|---|---|
| | | associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 155 (p.4404) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 156 (p.4410) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 157 (p.4416) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 158 (p.4424) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 159 (p.4430) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 160 (p.4436) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING 161 (p.4441) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | | Text Order GRANTING IN PART AND DENYING IN PART 162 (p.4446) Motion in Limine entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is GRANTED IN PART and DENIED IN PART. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/24/2022) |
| 01/24/2022 | 167 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Pretrial Conference held on 1/24/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 01/25/2022) |

| | | |
|---|---|---|
| 01/25/2022 | 168 (p.4678) | Opposed MOTION to Continue *Trial Setting* by Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 01/25/2022) |
| 01/26/2022 | 169 (p.4684) | ORDER re 168 (p.4678) Opposed MOTION to Continue *Trial Setting* filed by Peripheral Vascular Associates, P.A., Set Motion Hearing for 168 (p.4678) Opposed MOTION to Continue *Trial Setting* ( Motion Hearing set for 1/27/2022 03:00 PM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/26/2022) |
| 01/26/2022 | 170 (p.4685) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 168 (p.4678) Opposed MOTION to Continue *Trial Setting* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 01/26/2022) |
| 01/26/2022 | 171 (p.4688) | NOTICE of Attorney Appearance by Lauren Margaret Nelson on behalf of Peripheral Vascular Associates, P.A.. Attorney Lauren Margaret Nelson added to party Peripheral Vascular Associates, P.A.(pty:dft) (Nelson, Lauren) (Entered: 01/26/2022) |
| 01/26/2022 | 172 (p.4690) | Exhibit List *JOINT UPDATED EXHIBIT LIST WITH OBJECTIONS* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.. (Berger, Justin) (Entered: 01/26/2022) |
| 01/26/2022 | 173 (p.4735) | DESIGNATION OF EXPERT WITNESSES by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Berger, Justin) (Entered: 01/26/2022) |
| 01/27/2022 | 177 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Motion Hearing held on 1/27/2022 re 168 (p.4678) Opposed MOTION to Continue *Trial Setting* filed by Peripheral Vascular Associates, P.A. (Minute entry documents are not available electronically.). (Court Reporter GiGi Simcox.)(wg) (Entered: 01/31/2022) |
| 01/28/2022 | 174 (p.4738) | Exhibit List *Amended/Corrected* by Peripheral Vascular Associates, P.A... (McKenna, Sean) (Entered: 01/28/2022) |
| 01/28/2022 | | Text Order GRANTING IN PART AND DENYING IN PART 168 (p.4678) Motion to Continue entered by Judge Xavier Rodriguez. Jury selection and trial is reset for 8:00 a.m. on Wednesday, February 9, 2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 01/28/2022) |
| 01/28/2022 | | Reset Hearings: Jury Selection & Trial Re-set for 2/9/2022 08:00 AM before Judge Xavier Rodriguez, (wg) (Entered: 01/28/2022) |
| 01/28/2022 | 175 (p.4803) | Opposed MOTION for Reconsideration re Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, 167 Pretrial |

| | | |
|---|---|---|
| | | Conference, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine by Peripheral Vascular Associates, P.A.. (McKenna, Sean) (Entered: 01/28/2022) |
| 01/28/2022 | | Text Order TAKING UNDER ADVISEMENT 175 (p.4803) Motion for Reconsideration entered by Judge Xavier Rodriguez. Relators are to submit a response no later than COB Monday, January 31, 2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (XR) (Entered: 01/28/2022) |
| 01/31/2022 | 176 (p.4811) | ORDER SETTING HEARING VIA ZOOM re 175 (p.4803) Opposed MOTION for Reconsideration re Order on Motions in Limine, 167 Pretrial Conference, Order on Motion filed by Peripheral Vascular Associates, P.A., ( Motion Hearing set for 2/2/2022 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/31/2022) |
| 01/31/2022 | 178 (p.4812) | Relator's Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 175 (p.4803) Opposed MOTION for Reconsideration re Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, 167 Pretrial Conference, Order on Motion filed by Defendant Peripheral Vascular Associates, P.A. (Fahimi, Sarvenaz) (Entered: 01/31/2022) |
| 02/02/2022 | 179 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Motion Hearing held on 2/2/2022 DENIED re 175 (p.4803) Opposed MOTION for Reconsideration re Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, 167 Pretrial Conference, Order on Motion filed by Peripheral Vascular Associates, P.A. (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/02/2022) |
| 02/02/2022 | 180 (p.4823) | Defendant's Miscellaneous Objection to 173 (p.4735) Designation of Expert Witnesses *and Counter-Designations* by Peripheral Vascular Associates, P.A.. (Goodman, Colin) (Entered: 02/02/2022) |
| 02/04/2022 | 181 (p.4826) | RESPONSE *United States' Statement of Interest* by UNITED STATES OF AMERICA. (Attachments: # 1 (p.49) Exhibit Response to FOIA)(Deck, John) (Entered: 02/04/2022) |
| 02/04/2022 | 182 (p.4862) | ORDER, that the United States is hereby ORDERED to file under seal for in camera review only an unredacted version of the Report of Investigative Activity prepared on October 15, 2018, located at ECF No. 181-1, at 24, no later than Monday, February 7, 2022, at 3:00 p.m. The Special Agents |

| | | |
|---|---|---|
| | | name and phone number may remain redacted. re 181 (p.4826) Response filed by UNITED STATES OF AMERICA. Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/04/2022) |
| 02/04/2022 | 183 (p.4863) | DEFENDANT'S RESPONSE to 181 (p.4826) Response by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit, # 2 Exhibit)(McKenna, Sean) (Entered: 02/04/2022) |
| 02/04/2022 | 184 (p.4873) | ORDER as to Defendants motion for reconsideration with respect to the exclusion of Dr. Lallas testimony and untimely disclosed documentary evidence is DENIED. Dr. Lallas testimony and untimely disclosed documentary evidence remain excluded. As for Defendants request that the Court reconsider its ruling on the exclusion of evidence related to the United States Governments investigation of Defendant and any meeting Defendant had with the United States Government, the Court will DEFER ruling on the matter until trial: re 175 (p.4803) Opposed MOTION for Reconsideration re Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, Order on Motion in Limine, 167 Pretrial Conference, Order on Motion filed by Peripheral Vascular Associates, P.A., Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/04/2022) |
| 02/04/2022 | 185 (p.4875) | RESPONSE to 183 (p.4863) Response, 181 (p.4826) Response by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Berger, Justin) (Entered: 02/04/2022) |
| 02/06/2022 | 186 (p.5596) | Transcript filed of Proceedings held on 1-24-22, Proceedings Transcribed: Pretrial Hearing. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 2/28/2022, Redacted Transcript Deadline set for 3/9/2022, Release of Transcript Restriction set for 5/9/2022, (gs) (Entered: 02/06/2022) |
| 02/07/2022 | 187 (p.4878) | RESPONSE *UNITED STATES STATEMENT OF INTEREST REGARDING THE COURT'S ORDER* by UNITED STATES OF AMERICA. (Deck, John) (Entered: 02/07/2022) |
| 02/07/2022 | 188 (p.4882) | |

| | | |
|---|---|---|
| | | ORDER, ( Status Conference set for 2/8/2022 03:00 PM before Judge Xavier Rodriguez,) The Courtroom Deputy will inform the parties of the means by which the hearing will be conducted.Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/07/2022) |
| 02/08/2022 | 189 (p.4883) | MOTION for Leave to File Amended Exhibit List by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Exhibit, # 2 Proposed Order)(Goodman, Colin) (Entered: 02/08/2022) |
| 02/08/2022 | | Text Order GRANTING 189 (p.4883) Motion for Leave to File entered by Judge Xavier Rodriguez. Defendant's request to amend its exhibit list by adding the attached documents is granted. The Court makes no ruling on the admissibility of the attached documents at this time. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 02/08/2022) |
| 02/08/2022 | 190 (p.4913) | Defendant's Amended Exhibit List *and Offers of Proof* by Peripheral Vascular Associates, P.A... (Goodman, Colin) (Entered: 02/08/2022) |
| 02/08/2022 | 192 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Status Conference held on 2/8/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/10/2022) |
| 02/09/2022 | 191 (p.4980) | ORDER, referring to Jury Panel Lunch, etc.. Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/09/2022) |
| 02/09/2022 | 193 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Jury Selection held on 2/9/2022 (Minute entry documents are not available electronically), Jury Trial begun on 2/9/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/10/2022) |
| 02/10/2022 | 194 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Trial Recessed, to continue Friday 11, 2022 @ 1:30 PM without the Jury.Jury Trial held on 2/10/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/11/2022) |
| 02/11/2022 | 195 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Trial Resumed without the Presence of the Jury.Jury Trial held on 2/11/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/14/2022) |
| 02/14/2022 | 196 (p.4981) | DEFENDANT'S MOTION for Judgment as a Matter of Law by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Goodman, Colin) (Entered: 02/14/2022) |
| 02/14/2022 | 197 (p.4992) | |

| | | |
|---|---|---|
| | | Second MOTION for Judgment as a Matter of Law by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Goodman, Colin) (Entered: 02/14/2022) |
| 02/14/2022 | | Text Order GRANTING IN PART AND DENYING IN PART 175 (p.4803) Motion for Reconsideration entered by Judge Xavier Rodriguez. For the reasons stated in open court, the motion is hereby DENIED IN PART and GRANTED IN PART. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 02/14/2022) |
| 02/14/2022 | 198 (p.5004) | Witness List by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, Peripheral Vascular Associates, P.A., UNITED STATES OF AMERICA. (wg) (Entered: 02/15/2022) |
| 02/14/2022 | 199 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Jury Trial held on 2/14/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/15/2022) |
| 02/15/2022 | | Text Order GRANTING IN PART AND DENYING IN PART 196 (p.4981) Motion for Judgment as a Matter of Law entered by Judge Xavier Rodriguez. For the reasons stated in court, the motion is hereby GRANTED IN PART and DENIED IN PART. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 02/15/2022) |
| 02/15/2022 | | Text Order GRANTING IN PART AND DENYING IN PART 197 (p.4992) Motion for Judgment as a Matter of Law entered by Judge Xavier Rodriguez. For the reasons stated in court, the motion is hereby GRANTED IN PART and DENIED IN PART. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JA3) (Entered: 02/15/2022) |
| 02/15/2022 | 200 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Closing Arguments, Jury Retires to Deliberate.Jury Trial held on 2/15/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/16/2022) |
| 02/16/2022 | 201 (p.5006) | JURY VERDICT (Redacted Version) for UNITED STATES OF AMERICA filed. Unredacted Jury Verdict Sealed pursuant to E-Government Act of 2002.. (wg) (Entered: 02/17/2022) |
| 02/16/2022 | 202 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Jury Trial Concluded.Jury Trial completed on 2/16/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/17/2022) |

| | | |
|---|---|---|
| 02/16/2022 | 256 (p.5569) | Exhibit List by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, Peripheral Vascular Associates, P.A., UNITED STATES OF AMERICA.. (wg) (Entered: 03/14/2024) |
| 02/17/2022 | 203 (p.5011) | ORDER, ( Status Conference set for 2/22/2022 10:30 AM before Judge Xavier Rodriguez,). Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/17/2022) |
| 02/22/2022 | 204 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Status Conference held on 2/22/2022 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 02/22/2022) |
| 02/23/2022 | 205 (p.5012) | DEADLINES ORDER. Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/23/2022) |
| 02/24/2022 | 206 (p.5013) | ORDER, The Clerks office is DIRECTED to administratively close this case pending further order of the Court. Though administratively closed, this case will still exist on the docket of this Court and may be reopened upon request of any party or on the Courts own motion. Further, the parties may continue to file motions and other documents in the case. re 205 (p.5012) Order. Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/24/2022) |
| 03/08/2022 | 207 (p.5014) | BRIEF *Notice of Motion for Assessment of Statutory Penalties and Entry of Judgment* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Declaration of Zachary Nye, Ph.D.)(Berger, Justin) Modified on 4/1/2022 (wg). (Entered: 03/08/2022) |
| 03/08/2022 | 208 (p.5025) | Reurged MOTION for Directed Verdict by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(McKenna, Sean) (Entered: 03/08/2022) |
| 03/09/2022 | 209 (p.5776) | Transcript filed of Proceedings held on 2-9-22, Proceedings Transcribed: Jury Trial. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 3/30/2022, Redacted Transcript Deadline set for 4/11/2022, Release of Transcript Restriction set for 6/7/2022, (gs) (Entered: 03/09/2022) |
| 03/09/2022 | 210 (p.6028) | Transcript filed of Proceedings held on 2-10-22, Proceedings Transcribed: Jury Trial. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are |

| | | |
|---|---|---|
| | | notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 3/30/2022, Redacted Transcript Deadline set for 4/11/2022, Release of Transcript Restriction set for 6/7/2022, (gs) (Entered: 03/09/2022) |
| 03/09/2022 | 211 (p.6238) | Transcript filed of Proceedings held on 2-11-22, Proceedings Transcribed: Jury Trial. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 3/30/2022, Redacted Transcript Deadline set for 4/11/2022, Release of Transcript Restriction set for 6/7/2022, (gs) (Entered: 03/09/2022) |
| 03/09/2022 | 212 (p.6306) | Transcript filed of Proceedings held on 2-14-22, Proceedings Transcribed: Jury Trial. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 3/30/2022, Redacted Transcript Deadline set for 4/11/2022, Release of Transcript Restriction set for 6/7/2022, (gs) (Entered: 03/09/2022) |
| 03/09/2022 | 213 (p.6533) | Transcript filed of Proceedings held on 2-15-22, Proceedings Transcribed: Jury Trial. Court Reporter/Transcriber: Gigi Simcox, Telephone number: 210-244-5037, gigi_simcox@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the |

| | | |
|---|---|---|
| | | clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 3/30/2022, Redacted Transcript Deadline set for 4/11/2022, Release of Transcript Restriction set for 6/7/2022, (gs) (Entered: 03/09/2022) |
| 03/15/2022 | 214 (p.5046) | Relator's Memorandum in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 208 (p.5025) Reurged MOTION for Directed Verdict filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) Modified on 3/16/2022 (wg). (Entered: 03/15/2022) |
| 03/15/2022 | 215 (p.5079) | Defendant's Response in Opposition re 207 (p.5014) Brief by Peripheral Vascular Associates, P.A.. (Goodman, Colin) Modified text & term Mtn. on 3/16/2022 (wg). (Entered: 03/15/2022) |
| 03/15/2022 | | Notice of Correction: Filed as a Motion in Error, Edited Text & Termed Mtn. re 215 (p.5079) MOTION *Response in Opposition* re 207 (p.5014) Brief. (wg) (Entered: 03/16/2022) |
| 03/22/2022 | 216 (p.5090) | RESPONSE to Motion, filed by UNITED STATES OF AMERICA, re 215 (p.5079) MOTION *Response in Opposition* re 207 (p.5014) Brief filed by Defendant Peripheral Vascular Associates, P.A. *UNITED STATES' STATEMENT OF INTEREST REGARDING POST-VERDICT MOTIONS* (Deck, John) (Entered: 03/22/2022) |
| 03/22/2022 | 217 (p.5103) | DEFENDANT'S REPLY to Response to Motion, filed by Peripheral Vascular Associates, P.A., re 208 (p.5025) Reurged MOTION for Directed Verdict filed by Defendant Peripheral Vascular Associates, P.A. (Goodman, Colin) (Entered: 03/22/2022) |
| 03/22/2022 | 218 (p.5117) | REPLY to Response to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 215 (p.5079) MOTION *Response in Opposition* re 207 (p.5014) Brief filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 03/22/2022) |
| 03/29/2022 | 219 (p.5135) | DEFENDANT'S RESPONSE to 216 (p.5090) Response to Motion, by Peripheral Vascular Associates, P.A.. (Goodman, Colin) (Entered: 03/29/2022) |
| 08/15/2022 | 220 (p.5143) | NOTICE by UNITED STATES OF AMERICA (Attachments: # 1 (p.49) Declaration)(Deck, John) (Entered: 08/15/2022) |
| 01/09/2023 | 221 (p.5147) | ORDER GRANTING 207 (p.5014) Relator's Motion for Statutory Penalties; GRANTING IN PART AND |

| | | |
|---|---|---|
| | | DENYING IN PART 208 (p.5025) Motion for Directed Verdict. Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/09/2023) |
| 02/08/2023 | 222 (p.5179) | ADVISORY TO THE COURT by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff *Joint Advisory Re Proposed Models for Interest-Based Damages*. (Attachments: # 1 (p.49) Declaration of Justin T. Berger, # 2 Exhibit to Declaration of Justin T. Berger, # 3 Declaration of Zachary Nye, Ph.D.)(Berger, Justin) (Entered: 02/08/2023) |
| 02/08/2023 | 223 (p.5201) | MOTION for Attorney Fees *Costs and Expenses* by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Declaration of Justin T. Berger, # 2 Exhibit 1 to Declaration of Justin T. Berger, # 3 Exhibit 2 to Declaration of Justin T. Berger, # 4 Declaration of Sarvenaz J. Fahimi, # 5 Declaration of Glenn Grossenbacher, # 6 Declaration of Rand J. Riklin, # 7 Declaration of Wallace M. Brylak)(Berger, Justin) (Entered: 02/08/2023) |
| 02/21/2023 | 224 (p.5286) | Opposed MOTION for Extension of Time to File Response/Reply as to 223 (p.5201) MOTION for Attorney Fees *Costs and Expenses* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(McKenna, Sean) (Entered: 02/21/2023) |
| 02/22/2023 | | Text Order GRANTING 224 (p.5286) Motion for Extension of Time to File Response/Reply entered by Judge Xavier Rodriguez. PVA shall have until March 12, 2023, to file a Response to Relators' Memorandum in Support of Realtors Motion for Attorney's Fees, Costs, and Expenses 223 (p.5201) . (This is a text-only entry generated by the court. There is no document associated with this entry.) (cb) (Entered: 02/22/2023) |
| 03/09/2023 | 225 (p.5290) | NOTICE of Attorney Appearance by David McDonald Prichard on behalf of Peripheral Vascular Associates, P.A.. Attorney David McDonald Prichard added to party Peripheral Vascular Associates, P.A.(pty:dft) (Prichard, David) (Entered: 03/09/2023) |
| 03/13/2023 | 226 (p.5292) | MOTION for Extension of Time to File Response/Reply as to 223 (p.5201) MOTION for Attorney Fees *Costs and Expenses* by Peripheral Vascular Associates, P.A.. (Goodman, Colin) (Entered: 03/13/2023) |
| 03/13/2023 | | Text Order GRANTING 226 (p.5292) Motion for Extension of Time to File Response/Reply entered by Judge Xavier Rodriguez. The deadline for PVA to file a Response to Realtors' Motion for Attorney's Fees, Costs, and Expenses 222 (p.5179) is hereby extended to March 17, 2023. (This is a text-only entry generated by the court. There is no document associated with this entry.) (cb) (Entered: 03/13/2023) |

| | | |
|---|---|---|
| 03/15/2023 | 227 (p.5296) | MOTION *to Request Settlement Conference and Various Other Relief* by Peripheral Vascular Associates, P.A.. (Attachments: # 1 (p.49) Proposed Order)(Prichard, David) (Entered: 03/15/2023) |
| 03/15/2023 | | Text Order GRANTING 227 (p.5296) Motion to Stay Entry of Judgment and Response Deadline Pending Settlement Conference entered by Judge Xavier Rodriguez. This case is set for an in-person status conference on Monday, April 10, 2023 at 1:30 p.m. in Courtroom H, United States Courthouse, 262 West Nueva, San Antonio, Texas 78207. If the parties wish to proceed via Zoom, they must notify the Courtroom Deputy, Sylvia Fernandez, at least 48 hours in advance. The Court shall refrain from entering a final judgment in this matter until after the status conference. The deadline for PVA to respond to Relators' Motion for Attorneys Fees 223 (p.5201) is hereby extended until seven days after the status conference. (This is a text-only entry generated by the court. There is no document associated with this entry.) (cb) (Entered: 03/15/2023) |
| 04/10/2023 | 228 | Minute Entry for proceedings held before Judge Xavier Rodriguez: Status Conference held on 4/10/2023 (Minute entry documents are not available electronically.). (Court Reporter Gigi Simcox.)(wg) (Entered: 04/11/2023) |
| 04/11/2023 | 229 (p.5302) | ORDERED, That Defendant shall provide the required financial information to the DOJ no later than April 21, 2023. The DOJ shall conclude its analysis by June 23, 2023. The parties shall complete settlement discussions by no later than July 14, 2023. On or before July 17, 2023, Relators shall file an advisory indicating whether or not the case has settled. If the case has not settled: re 228 Status Conference. Signed by Judge Xavier Rodriguez. (wg) (Entered: 04/11/2023) |
| 06/23/2023 | 230 (p.5304) | ADVISORY TO THE COURT by Peripheral Vascular Associates, P.A. *Supplemental Advisory on Interest Based Damages*. (Attachments: # 1 (p.49) Exhibit Britt Declaration, # 2 Exhibit Montpas Declaration)(Prichard, David) (Entered: 06/23/2023) |
| 06/23/2023 | 231 | Motion for leave to File Sealed Document (Attachments: # 1 (p.49) Exhibit SEALED DOCUMENT, # 2 Proposed Order PROPOSED ORDER) (Prichard, David) (Entered: 06/23/2023) |
| 06/23/2023 | 232 (p.5373) | MOTION *for Finding of Fact Regarding Omitted Element* by Peripheral Vascular Associates, P.A.. (Prichard, David) (Entered: 06/23/2023) |
| 06/26/2023 | | Text Order GRANTING 231 Motion for Leave to File Sealed Document entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (cb) (Entered: |

| | | |
|---|---|---|
| | | 06/26/2023) |
| 06/26/2023 | 233 | Sealed Document filed (wg) (Entered: 06/27/2023) |
| 07/10/2023 | 234 (p.5384) | MOTION for Reconsideration re 123 (p.3972) Order on Motion to Strike,, Order on Sealed Motion,, Order on Motion to exclude,,,, Order on Motion for Summary Judgment,,, by Peripheral Vascular Associates, P.A.. (Prichard, David) (Entered: 07/10/2023) |
| 07/14/2023 | 235 (p.5391) | ADVISORY TO THE COURT by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff *Response to PVA's Supplemental Advisory Interest-Based Damages*. (Berger, Justin) (Entered: 07/14/2023) |
| 07/14/2023 | 236 (p.5400) | RESPONSE to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 232 (p.5373) MOTION *for Finding of Fact Regarding Omitted Element* filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 07/14/2023) |
| 07/14/2023 | 237 (p.5407) | ADVISORY TO THE COURT by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff *Relators' Advisory Re: Conclusion of Settlement Discussions and Proposed Briefing Schedule*. (Berger, Justin) (Entered: 07/14/2023) |
| 07/21/2023 | 238 (p.5410) | RESPONSE to Motion, filed by Peripheral Vascular Associates, P.A., re 223 (p.5201) MOTION for Attorney Fees *Costs and Expenses* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Exhibit Affidavit)(Prichard, David) (Entered: 07/21/2023) |
| 07/21/2023 | 239 (p.5421) | RESPONSE in Support, filed by Peripheral Vascular Associates, P.A., re 232 (p.5373) MOTION *for Finding of Fact Regarding Omitted Element* filed by Defendant Peripheral Vascular Associates, P.A. (Prichard, David) (Entered: 07/21/2023) |
| 07/21/2023 | 240 (p.5427) | ADVISORY TO THE COURT by Peripheral Vascular Associates, P.A. - *REPLY IN SUPPORT OF ITS SUPPLEMENTAL ADVISORY CONCERNING INTEREST-BASED DAMAGES*. (Prichard, David) (Entered: 07/21/2023) |
| 07/21/2023 | 241 (p.5436) | NOTICE *United States' Statement of Interest Regarding PVA's Additional Post-Verdict Motions* by UNITED STATES OF AMERICA (Deck, John) (Entered: 07/21/2023) |
| 07/24/2023 | 242 (p.5446) | RESPONSE to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 234 (p.5384) MOTION for Reconsideration re 123 (p.3972) Order on Motion to Strike,, Order on Sealed Motion,, Order on Motion to exclude,,,, Order on Motion for Summary Judgment,,, filed by Defendant Peripheral Vascular Associates, P.A. (Berger, |

| | | |
|---|---|---|
| | | Justin) (Entered: 07/24/2023) |
| 07/28/2023 | 243 (p.5452) | RESPONSE in Support, filed by Peripheral Vascular Associates, P.A., re 234 (p.5384) MOTION for Reconsideration re 123 (p.3972) Order on Motion to Strike,, Order on Sealed Motion,, Order on Motion to exclude,,,, Order on Motion for Summary Judgment,,, filed by Defendant Peripheral Vascular Associates, P.A. (Prichard, David) (Entered: 07/28/2023) |
| 07/28/2023 | 244 (p.5457) | RESPONSE *of PVA to the Government's Statement of Interest Regarding Knowledge of Materiality* to 241 (p.5436) Notice (Other) by Peripheral Vascular Associates, P.A.. (Prichard, David) (Entered: 07/28/2023) |
| 07/28/2023 | 245 (p.5464) | REPLY to Response to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 223 (p.5201) MOTION for Attorney Fees *Costs and Expenses* filed by Plaintiff Alicia Burnett, Plaintiff Tiffany Montcrieff, Plaintiff Roberta A. Martinez (Attachments: # 1 (p.49) Declaration of Justin Berger, # 2 Exhibit 1 to Declaration of Justin Berger, # 3 Exhibit 2 to Declaration of Justin Berger)(Berger, Justin) (Entered: 07/28/2023) |
| 08/01/2023 | 246 (p.5480) | ORDER GRANTING IN PART AND DENYING IN PART 223 (p.5201) Motion for Attorney Fees, Costs & Expenses. Signed by Judge Xavier Rodriguez. (wg) (Entered: 08/01/2023) |
| 08/08/2023 | 247 (p.5495) | MOTION for New Trial by Peripheral Vascular Associates, P.A.. (Prichard, David) (Entered: 08/08/2023) |
| 08/21/2023 | 248 (p.5506) | Unopposed MOTION for Extension of Time to File Response/Reply as to 247 (p.5495) MOTION for New Trial by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) Proposed Order)(Berger, Justin) (Entered: 08/21/2023) |
| 08/24/2023 | | Text Order GRANTING 248 (p.5506) Motion for Extension of Time to File Response/Reply re 248 (p.5506) Unopposed MOTION for Extension of Time to File Response/Reply as to 247 (p.5495) MOTION for New Trial entered by Judge Xavier Rodriguez. (This is a text-only entry generated by the court. There is no document associated with this entry.) (XR) (Entered: 08/24/2023) |
| 09/01/2023 | 249 (p.5511) | Response in Opposition to Motion, filed by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff, re 247 (p.5495) MOTION for New Trial filed by Defendant Peripheral Vascular Associates, P.A. (Berger, Justin) (Entered: 09/01/2023) |
| 09/06/2023 | 250 (p.5520) | DEFENDANT'S REPLY to Response to Motion, filed by Peripheral Vascular Associates, P.A., re 247 (p.5495) MOTION for New Trial filed by Defendant Peripheral Vascular Associates, P.A. (Prichard, David) (Entered: |

| | | |
|---|---|---|
| | | 09/06/2023) |
| 11/09/2023 | 251 (p.5530) | ADVISORY TO THE COURT by Peripheral Vascular Associates, P.A. . (Attachments: # 1 (p.49) Exhibit)(Prichard, David) (Entered: 11/09/2023) |
| 11/14/2023 | 252 (p.6653) | Transcript filed of Proceedings held on 4-10-23, Proceedings Transcribed: Status Conference. Court Reporter/Transcriber: Gigi Simcox, Telephone number: gigi_simcox@txwd.uscourts.gov, 210-244-5037. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 12/5/2023, Redacted Transcript Deadline set for 12/15/2023, Release of Transcript Restriction set for 2/12/2024, (gs) (Entered: 11/14/2023) |
| 01/30/2024 | 253 (p.5540) | ORDER DENYING re 232 (p.5373) MOTION *for Finding of Fact Regarding Omitted Element* filed by Peripheral Vascular Associates, P.A., DENIED 234 (p.5384) MOTION for Reconsideration re 123 (p.3972) Order on Motion to Strike,, Order on Sealed Motion,, Order on Motion to exclude,,,, Order on Motion for Summary Judgment,,, filed by Peripheral Vascular Associates, P.A., DENIED 247 (p.5495) MOTION for New Trial filed by Peripheral Vascular Associates, P.A., Signed by Judge Xavier Rodriguez. (wg) (Entered: 01/31/2024) |
| 02/14/2024 | 254 (p.5564) | FINAL JUDGMENT, It is ORDERED AND ADJUDGED that the United States of America shall recover $4,366,137 in trebled damages from Defendant Peripheral Vascular Associates, P.A., as well as $21,825,592 in statutory penalties. Relators Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett are collectively awarded $1,781,900 in attorneys fees and $705,188.70 in costs andreasonable expenses. Post-judgment interest shall accrue at a rate of 4.84%. Signed by Judge Xavier Rodriguez. (wg) (Entered: 02/14/2024) |
| 03/11/2024 | 255 (p.5566) | Appeal of Final Judgment 254 (p.5564) by Peripheral Vascular Associates, P.A.. ( Filing fee $ 605 receipt number ATXWDC-18515068) (Prichard, David) (Entered: 03/11/2024) |
| 03/11/2024 | | NOTICE OF APPEAL following 255 (p.5566) Notice of Appeal (E-Filed) by Peripheral Vascular Associates, P.A.. Filing fee $ 605, receipt number ATXWDC-18515068. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a |

| | | |
|---|---|---|
| | | transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (wg) (Entered: 03/12/2024) |
| 03/15/2024 | 257 (p.5571) | TRANSCRIPT REQUEST by Peripheral Vascular Associates, P.A. for dates of 02/09/22. Proceedings Transcribed: Voir Dire. Court Reporter: Gigi Simcox.. (Prichard, David)***Modified TEXT on 3/18/2024 (dtg).***2/2/2022 MOTION HEARING; 2/8/2022 STATUS CONFERENCE; 2/9/2022 JURY SELECTION; 2/16/2022 JURY TRIAL CONCLUSION; ALL HEARINGS BEFORE JUDGE XAVIER RODRIGUEZ, COURT REPORTER: GIGI SIMCOX.*** (Entered: 03/15/2024) |
| 03/15/2024 | 258 (p.5572) | COPY of Letter of transmittal from USCA to Mr. Sean Robert McKenna and Mr. David McDonald Prichard received for 255 (p.5566) Notice of Appeal, filed by Peripheral Vascular Associates, P.A.***We have docketed the appeal and ask you to use the case number above in future inquiries.***(dtg) (Entered: 03/15/2024) |
| 04/22/2024 | 259 (p.5703) | Transcript filed of Proceedings held on 2-2-22, Proceedings Transcribed: Motion Hearing. Court Reporter/Transcriber: Gigi Simcox, Telephone number: gigi_simcox@txwd.uscourts.gov, 210-244-5037. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 5/13/2024, Redacted Transcript Deadline set for 5/23/2024, Release of Transcript Restriction set for 7/22/2024, Appeal Record due by 5/7/2024, (gs) (Entered: 04/22/2024) |
| 04/22/2024 | 260 (p.5747) | Transcript filed of Proceedings held on 2-8-22, Proceedings Transcribed: Status Conference. Court Reporter/Transcriber: Gigi Simcox, Telephone number: gigi_simcox@txwd.uscourts.gov, 210-244-5037. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 5/13/2024, Redacted Transcript Deadline set for 5/23/2024, Release of Transcript Restriction set for 7/22/2024, Appeal Record due |

| | | |
|---|---|---|
| | | by 5/7/2024, (gs) (Entered: 04/22/2024) |
| 04/22/2024 | 261 (p.5935) | Transcript filed of Proceedings held on 2-9-22, Proceedings Transcribed: Voir Dire. Court Reporter/Transcriber: Gigi Simcox, Telephone number: gigi_simcox@txwd.uscourts.gov, 210-244-5037. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 5/13/2024, Redacted Transcript Deadline set for 5/23/2024, Release of Transcript Restriction set for 7/22/2024, Appeal Record due by 5/7/2024, (gs) (Entered: 04/22/2024) |
| 04/22/2024 | 262 (p.6644) | Transcript filed of Proceedings held on 2-16-22, Proceedings Transcribed: Verdict. Court Reporter/Transcriber: Gigi Simcox, Telephone number: gigi_simcox@txwd.uscourts.gov, 210-244-5037. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 5/13/2024, Redacted Transcript Deadline set for 5/23/2024, Release of Transcript Restriction set for 7/22/2024, Appeal Record due by 5/7/2024, (gs) (Entered: 04/22/2024) |
| 05/06/2024 | 263 (p.6675) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff. (Attachments: # 1 (p.49) P-11, # 2 P-13, # 3 P-15, # 4 P-17, # 5 P-19)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 264 (p.6742) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-20*** (Attachments: # 1 (p.49) P-23, # 2 P-26, # 3 P-28, # 4 P-29)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 265 (p.6837) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-30*** (Attachments: # 1 (p.49) P-32, # 2 P-35, # 3 P-36)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 266 (p.6930) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-41-A*** (Attachments: # 1 (p.49) P-41-B, # 2 P-41-C)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 267 (p.6967) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-57*** (Attachments: # 1 (p.49) |

| | | |
|---|---|---|
| | | P-58)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 268 (p.7126) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-88*** (dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 269 (p.10432) | TRIAL EXHIBITS by Alicia Burnett, Roberta A. Martinez, Tiffany Montcrieff.***P-116-A*** (Attachments: # 1 (p.49) P-116-B, # 2 P-116-C, # 3 P-116-D, # 4 P-116-E, # 5 P-116-F, # 6 P-116-G, # 7 P-116-H, # 8 P-116-I, # 9 P-116-J, # 10 P-116-K, # 11 P-116-L, # 12 P-116-M)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 270 (p.10580) | TRIAL EXHIBITS by Peripheral Vascular Associates, P.A. (Attachments: # 1 (p.49) D-501-10)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 271 (p.10612) | TRIAL EXHIBITS by Peripheral Vascular Associates, P.A.***D-646-113***. (Attachments: # 1 (p.49) D-646-117)(dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 272 (p.10760) | TRIAL EXHIBITS by Peripheral Vascular Associates, P.A.***D-646-126***. (dtg) (Entered: 05/06/2024) |
| 05/06/2024 | 273 (p.10781) | TRIAL EXHIBITS by Peripheral Vascular Associates, P.A.***D-727-1***. (dtg) (Entered: 05/06/2024) |

# Tab 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., TIFFANY MONTCRIEFF, et al., | § | |
| Relators, Plaintiff, | § | |
| v. | § | Civil Action No. 5:17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., | § | |
| Defendant. | § | |

**PERIPHERAL VASCULAR ASSOCIATES, P.A.'S NOTICE OF APPEAL**

TO UNITED STATES DISTRICT JUDGE XAVIER RODRIGUEZ:

Notice is hereby given that Defendant Peripheral Vascular Associates, P.A. ("PVA") appeals to the United States Court of Appeals for the Fifth Circuit from the Final Judgment (ECF Doc. No. 254) entered on February 14, 2024, including all adverse interlocutory rulings that merged into the Final Judgment.[1]

[1] Those interlocutory rulings include, but are not limited to: (1) the Court's order denying PVA's motion for finding of fact regarding an omitted element, PVA's motion to reconsider partial summary judgment on scienter, and PVA's motion for new trial (ECF No. 253; order dated January 30, 2024); (2) the Court's order awarding attorney's fees, costs, and expenses (ECF No. 246; order dated August 1, 2023); (3) the Court's order granting Relators' motion for statutory penalties and partially denying PVA's renewed motion for judgment as a matter of law (ECF No. 221; order dated January 9, 2023); (4) the adverse portions of this Court's order disposing of various summary judgment motions and motions to exclude (ECF No. 123; order dated December 14, 2020); and (5) the Court's order partially denying PVA's motion for reconsideration (ECF No. 151; order dated January 7, 2022).

Respectfully submitted,

*/s/ David M. Prichard*

David M. Prichard
State Bar No. 16317900
E-mail: dprichard@prichardyoungllp.com
David R. Montpas
State Bar No. 00794324
E-mail: dmontpas@prichardyoungllp.com
Glenn W. MacTaggart
State Bar No. 12787680
E-mail: gmactaggart@prichardyoungllp.com
PRICHARD YOUNG, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216
(210) 477-7400 [Telephone]
(210) 477-7450 [Facsimile]

Sean McKenna
State Bar No. 24007652
smckenna@spencerfane.com
Mark A. Cole
*Admitted Pro Hac Vice*
mcole@spencerfane.com
Lauren M. Nelson
State Bar No. 24058016
lnelson@spencerfane.com
SPENCER FANE LLP
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: 214-459-5890
Facsimile: 214-750-3612

Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

***Counsel for Defendant Peripheral Vascular Associates, P.A.***

**CERTIFICATE OF SERVICE**

I certify that on March 11, 2024 I submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the electronic case files system of the Court. I hereby certify that I have served all counsel of record in the manner authorized by Federal Rule of Civil Procedure 5(b)(2):

*/s/ David Prichard*
David Prichard

# Tab 3

FILED
FEB 16 2022
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY ______ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR, *Plaintiffs,*<br><br>v.<br><br>PERIPHERAL VASCULAR ASSOCIATES, P.A., *Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | SA-17-CV-00317-XR |

**VERDICT FORM**

Answer Questions 1 **AND** 2.

**Question No. 1**

Did Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett prove by a preponderance of the evidence that the "Testing Only" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare were material?

Yes ✓

No ______

**Question No. 2**

Did Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett prove by a preponderance of the evidence that the "Testing Only" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare caused the United States Government to pay out money or to forfeit moneys due (i.e., that involved a claim)?

Yes ✓

No ______

If you answered "Yes" to Questions 1 **AND** 2, then answer Questions 3 **AND** 4. Otherwise, do **NOT** answer Questions 3 **AND** 4, and proceed to Questions 5 **AND** 6.

**Question No. 3**

How many "Testing Only" false claims submitted by Defendant Peripheral Vascular Associates, P.A. to Medicare caused the United States Government to pay out money or to forfeit moneys due (i.e., that involved a claim)?

Number: 2,755

**Question No. 4**

What amount, in dollars, of damages to the United States Government do you find that Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett proved by a preponderance of the evidence because of the "Testing Only" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare?

$ 408,765.

Answer Questions 5 **AND** 6.

**Question No. 5**

Did Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett prove by a preponderance of the evidence that the "Double Billing" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare were material?

Yes ✓

No ________

**Question No. 6**

Did Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett prove by a preponderance of the evidence that the "Double Billing" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare caused the United States Government to pay out money or to forfeit moneys due (i.e., that involved a claim)?

Yes ✓

No ________



24-50176.5008

If you answered "Yes" to Questions 5 **AND** 6, then answer Questions 7 **AND** 8. Otherwise, do **NOT** answer Questions 7 **AND** 8.

**Question No. 7**

How many "Double Billing" false claims submitted by Defendant Peripheral Vascular Associates, P.A. to Medicare caused the United States Government to pay out money or to forfeit moneys due (i.e., that involved a claim)?

Number: 4,625

**Question No. 8**

What amount, in dollars, of damages to the United States Government do you find that Plaintiffs Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett proved by a preponderance of the evidence because of the "Double Billing" false claims Defendant Peripheral Vascular Associates, P.A. submitted to Medicare?

$ 2,319,434.

## VERDICT CERTIFICATE

We, the Jury, find in this case, unanimously, as indicated in then answers to the foregoing Questions.

**SIGNED** at San Antonio, Texas, on this 16th of February, 2022.

[redacted]
Printed Name of Foreperson

[redacted]
Signature of Foreperson

# Tab 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR; *Plaintiffs* | § § § § § | SA-17-CV-00317-XR |
| -vs- | § § § | |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., *Defendant* | | |

**FINAL JUDGMENT**

This action was tried by a jury from February 9, 2022, to February 15, 2022, with the Honorable Xavier Rodriguez, District Judge, presiding. The jury rendered a verdict. Thereafter, the Court entered a remittitur as a matter of law. Additionally, the Court granted Relators' motion for statutory penalties, and granted in part and denied in part Relators' motion for attorneys' fees and costs.

It is, therefore, **ORDERED AND ADJUDGED** that the United States of America shall recover $4,366,137 in trebled damages from Defendant Peripheral Vascular Associates, P.A., as well as $21,825,592 in statutory penalties. Relators Tiffany Montcrieff, Roberta A. Martinez, and Alicia Burnett are collectively awarded $1,781,900 in attorneys' fees and $705,188.70 in costs and reasonable expenses. Post-judgment interest shall accrue at a rate of 4.84%.

It is so **ORDERED**.

**SIGNED** this 14th day of February, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

# Tab 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR,<br>*Plaintiffs*<br><br>v.<br><br>PERIPHERAL VASCULAR ASSOCIATES, P.A.,<br>*Defendant* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | SA-17-CV-00317-XR |

**ORDER**

On this day the Court considered six pretrial motions: Plaintiffs' motion to exclude certain opinions of a defense expert (ECF No. 80), three Defense motions to exclude the testimony of Plaintiffs' witnesses (ECF Nos. 82, 83, and 86), and cross motions for summary judgment (ECF Nos. 94 and 95). After careful consideration, the Court issues the following order.

**BACKGROUND**

This False Claims Act case arises out of the alleged fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"). The Plaintiffs ("Relators") allege that PVA, a healthcare provider, falsely billed Medicare for services it did not perform, either in whole or in part. Relators assert that PVA submitted tens of thousands of false bills, exposing PVA to millions of dollars in liability.

PVA is a full-service vascular surgery practice with multiple locations throughout San Antonio, Texas. ECF No. 94 ¶¶ 1–2.[1] PVA performs vascular ultrasounds, among other things. Vascular ultrasounds may be ordered by a PVA physician or an outside referring physician. *Id.* ¶ 2. Vascular studies have two components relevant to this case: a technical component and a professional component. *Id.* ¶ 3. In essence, the technical component is performing the ultrasound and the professional component is a physician analyzing the results of ultrasound. *Id.* When PVA performs one or both of these components, it submits a bill for reimbursement of the cost of the procedure to the appropriate payor—Medicare, an insurance company, or an uninsured patient. For the purposes of this order, only the method by which PVA bills Medicare and other federal payors is relevant.

Starting in the 1960s, shortly after Congress created Medicare, the need for a uniform system of medical billing became apparent. In response to this growing need, the American Medical Association ("AMA"), with industry input, developed the first version of the Current Procedural Terminology ("CPT") Codes. William T. Thorwarth Jr., M.D., *CPT: An Open System That Describes All That You Do*, 5 J. Am. Coll. Radiol. 535, 555–560 (2008), https://www.jacr.org/article/S1546-1440(07)00612-6/fulltext. The CPT Codes are a series of alphanumeric sequences used by healthcare providers to describe the procedures and services that they perform. These Codes are incredibly specific. For example, CPT Code 90832 describes an individual psychotherapy session that lasts 30 minutes. However, CPT Code 90834 describes an individual psychotherapy session that lasts 45 minutes. Yet another Code describes a session that

[1] Each party's motion for summary judgment includes a statement of uncontested facts that are presented in enumerated paragraphs. Any citation to a paragraph number in one of the briefs is a citation to these uncontested facts. Citations to pages of a brief are citations to disputed facts or legal argument.

lasts 60 minutes. These Codes are necessarily specific because health insurance companies reimburse a healthcare provider at a predetermined rate for each code.

In 1996, Congress passed the Health Insurance Portability and Accountability Act, which required the U.S. Department of Health and Human Services ("HHS") to adopt uniform standards of coding for electronic transactions involving healthcare information. *Id*. HHS adopted as one of the standards of coding the AMA's CPT Codes, which had undergone significant revision and updating. *Id*. In 2002, the CPT Codes formally became one of the methods by which healthcare providers must bill Medicare for medical services:

> The Secretary adopts the following maintaining organization's code sets as the standard medical data code sets . . . (a)(5) The combination of Health Care Financing Administration Common Procedure Coding System (HCPCS), as maintained and distributed by HHS, and Current Procedural Terminology, Fourth Edition (CPT–4), as maintained and distributed by the American Medical Association, for physician services and other health care services.

45 C.F.R. § 162.1002(a)(5). The CPT-4 continues to be a valid method of billing medical services to Medicare for reimbursement. *Id*. § 162.1002(c).

PVA and other healthcare providers submit bills to Medicare using an electronic version of the CMS-1500 form. ECF No. 95 ¶ 1. PVA lists a particular CPT Code on that form in order to inform Medicare that it has performed a particular procedure or service. *Id*. ¶ 3. When submitting the CMS-1500 form, a healthcare provider certifies that the claim for reimbursement is "true, accurate and complete," "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment," and that the "services on this form were medically necessary and personally furnished by me." *Id*. ¶ 2.

The technical and professional components of a vascular study can be billed separately or jointly. ECF No. 94 ¶ 3. Which provider bills a particular component of a vascular study depends on who performs the study. PVA physicians read and interpret studies performed at PVA offices

and at hospitals. *Id.* ¶ 6. When a hospital performs the technical component of a study, the hospital bills for that component. *Id* ¶ 5. When a PVA physician or registered vascular technologist performs the technical component, PVA bills for that component. *Id.* ¶ 6–7. PVA performs some vascular studies without a PVA physician seeing or treating the patient. *Id.* ¶ 15. These "Testing Only" studies occur when PVA performs the technical component of a vascular study for a different treating provider. *Id.* The technical component of a vascular study can be billed immediately after it is performed. *Id.* ¶ 8.

Once the technical component of a vascular study is complete, the professional component—a physician interpretation of a vascular study—can occur. A physician can interpret a vascular study in a number of ways: the physician can observe the ultrasound as it is performed; the physician can review printouts of the studies with the patient; and technologists can provide the physician with completed worksheets and preliminary reports depicting the results of the study. *Id.* ¶ 13.

A healthcare provider can bill Medicare for both the technical and professional components of a vascular study using a "global" CPT Code. ECF No. 95 Ex. 4. at 84. This is a standard five-digit code indicating that each component was performed. When a provider bills for just one component, it must use a two-character "modifier" that signifies that only one component has been performed. *Id.* at 181. As relevant here, a provider can append the "-TC" modifier when billing just the technical component, or the provider can use the "-26" modifier to bill for just the professional component. ECF No. 81 Ex. A at 8. Other than for a brief period in 2017, PVA billed Medicare for all vascular studies performed in its vascular laboratories using the "global" CPT Code without a modifier. ECF No. 95 ¶¶ 4–5.

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. *Id.* ¶¶ 17, 22. A patient's medical record is contained in Allscripts CM. *Id.* ¶ 17. Any documentation of interpretations of a vascular study are contained in the patient's medical record. *Id.* ¶ 18. When a service or procedure is provided to a patient, PVA records the encounter in Allscripts CM. *Id.* ¶ 22. After the encounter is recorded, an interface software called ChargePass records it in APM, and a voucher is created for processing by PVA's coding and billing staff. *Id.* Two coders review a claim before submitting a bill to the payor. *Id.* ¶ 23.

In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* ¶¶ 10–11. The purpose of this system was to help PVA physicians manage workflow and to create a reporting system that was easier for healthcare providers and patients to understand. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.* ¶ 12. PVA's practices regarding its use of MedStreaming play a central role in this litigation.

Relators filed their initial Complaint under seal in April 2017. ECF No. 1. They filed their First Amended Complaint, also under seal, in December 2017. ECF No. 8. The Relators brought this action under the authority granted by 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq*, on behalf of the United States Government. They allege that PVA submitted false claims to Medicare by 1) billing for services before they were complete; and 2) billing for services that were not ordered by a physician. ECF No. 8 ¶¶ 1–3.

Relators assert that in an appropriate case, PVA follows particular steps to perform and bill Medicare for ultrasound studies: When a patient is referred to PVA, the patient is designated as "scheduled" in MedStreaming. *Id.* ¶ 28. The patient has an initial appointment with a PVA

physician, and the physician orders necessary tests. *Id.* A PVA sonographer performs the tests, the images are captured in MedStreaming, and the patient's status is updated to "acquired." *Id.* When the sonographer begins a preliminary report, the sonographer changes the status to "Ready." *Id.* When the sonographer completes the preliminary report, the information is sent to the PVA physician and the patient's status is updated to "QA." *Id.* At this point, the technical component is complete and can be billed to Medicare. *Id.* The PVA physician can then review the preliminary report and imaging and interpret the study. *Id.* Once the doctor's review is complete, the patient's status becomes "Final" and the professional component is ready to be billed. *Id.*

However, Relators allege PVA implemented a scheme of too-quick billing in 2012 designed to increase revenue. *Id.* ¶¶ 36–38. Specifically, PVA began frequently billing Medicare for both the professional and technical component before the patient's status becomes "Final"— before the PVA physician has reviewed and interpreted the study. *Id.* ¶ 29. The Relators allege that they personally witnessed PVA submit claims to Medicare after the sonographer completed a preliminary report, but before a physician had seen the report and conducted an independent interpretation. *Id.* ¶¶ 29–30. Relators also witnessed incidents where PVA billed for both the technical and professional components before the technical component was complete, and even where PVA billed for imaging that was never completed due to technical errors. *Id.* ¶¶ 31–32. Finally, Relators allege that PVA would on occasion order an ultrasound for referred patients before the patient had been seen by a PVA Physician, meaning no physician ordered the ultrasound. *Id.* ¶ 33–34.

The Relators provided notice of the lawsuit to the U.S. Government as required by 31 U.S.C. § 3730(b). The Department of Justice investigated the Relators' allegations for roughly a year. Over the course of the investigation, PVA provided thousands of pages of medical and business

records to the Government pursuant to a subpoena. ECF No. 94 ¶¶ 30–33. On November 26, 2018, the Government informed the Court of its decision to decline to intervene in Relators' case. ECF No. 20. The following day, the Court ordered that the Complaint be unsealed and served upon PVA. ECF No. 21.

On February 20, 2019, PVA moved to dismiss Relators' Complaint. ECF No. 27. The Court held a hearing on this motion on May 9, 2019, at which the Court orally granted in part and denied in part PVA's motion. Relators' False Claims Act claims survived. The parties proceeded with discovery for more than a year after the Court's order. On August 3, 2020, Relators moved to exclude certain opinions of PVA's expert witness, Melissa Scott. ECF No. 80. Later that month, PVA filed motions to exclude the testimony of three of Relators' expert witnesses: Dr. James Alexander, Robert Church Jr., and Dr. Zachary Nye, respectively. ECF Nos. 82, 83, 86. On August 21, 2020, the parties submitted their cross-motions for summary judgment. ECF Nos. 94, 95. The Government filed a Statement of Interest on September 18, 2020. ECF No. 113. The Court held a hearing on all pending motions on October 7, 2020. The Court made no rulings on the motions for summary judgment but ruled orally that any witness opinions amounting to legal conclusions would be excluded. The Court then considered the parties' motions.

## DISCUSSION

### I. Legal Standard

#### A. Motion to Exclude

Rule 702 of the Federal Rules of Evidence allows a witness "who is qualified as an expert" to testify if:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b) the testimony is based on sufficient facts or data;

c) the testimony is the product of reliable principles and methods; and

d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id*. at 589. As a preliminary matter, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). If the expert is qualified, a court must follow *Daubert*'s analytical framework to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id*. at 592–93. In *Daubert*, the Supreme Court enumerated five nonexclusive factors to consider when assessing reliability: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*. at 593–94; *see also Burleson v. Tex. Dep't of Crim. Just.*, 393 F. 3d 577, 584 (5th Cir. 2004). The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The point of this inquiry "is to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

The relevance inquiry requires the Court to determine if expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." FED. R. EVID. 401.

In determining the admissibility of expert testimony, the district court should approach its task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also* FED. R. EVID. 104.

**B. Motion for Summary Judgment**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017). All facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the

movant carries its initial burden, the burden shifts to the party opposing the motion to present competent summary judgment evidence showing the existence of a genuine fact dispute. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The nonmovant must come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 587.

## II. Motions to Exclude Expert Testimony

### A. Relators' Motion to Exclude Portions of Melissa Scott's Report.

#### i. Sections 7.0 and 8.0 of Melissa Scott's Report are Improper Rebuttal Evidence.

Relators move to strike Sections 7.0 and 8.0 of the June 23, 2020 Expert Report of Melissa Scott, CPC, CHC, CHIAP as untimely. ECF No. 80 at 3. On March 27, Relators designated expert statistician Dr. Zachary Nye. *Id*. Relators served Dr. Nye's report on PVA on March 27, 2020. *Id*. Pursuant to the Court's Amended Scheduling Order, PVA had 15 days from March 27, 2020 to serve an expert rebuttal. *See* ECF No. 77. However, PVA served their rebuttal report on June 23, 2020—more than seven weeks late.

PVA correctly points out that Relators do not challenge Scott's qualifications or the reliability of her opinions. ECF No. 84 at 3. However, it responds that Scott is not a rebuttal expert as defined by FED R. CIV. P. 26(a)(2)(D)(ii). It asserts that rebuttal experts are only those whose opinions are "intended solely to contradict or rebut evidence on the same subject matter identified by another party." *Id.* (citing FED. R. CIV. P. 26(a)(2)(D)(ii)). In analyzing whether Scott is a rebuttal witness, PVA asks the Court to apply the factors laid out in *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 WL 394511 at *2 (W.D. Tex. Jan. 27, 2017).

The *YETI Coolers* court applied three factors to determine whether an expert report is a rebuttal report: (1) whether the report is purporting to contradict or rebut expert opinions offered by the opposing party as to a claim or defense on which the opposing party has the burden of proof; (2) whether the opinions are on the same subject matter as that identified by the opposing party's expert in its Rule 26(a)(2)(B) disclosure; and (3) whether the evidence disclosed as rebuttal evidence is intended solely to contradict or rebut that evidence. *Id.* (citing *Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, 2006 WL 5127278, at *2 (N.D. Tex. May 31, 2006)). An examination of these factors reveals that Sections 7.0 and 8.0 of Scott's report are rebuttal evidence.

First, the disputed Sections plainly purport to contradict or rebut the opinions offered by Dr. Nye on Relators' FCA claim. Section 7.0, entitled "Nye's Opinions," identifies Dr. Nye's conclusions and highlights Scott's contradictory opinion. ECF No. 80 Ex. A. That Section states "[a]s discussed below, Nye's calculations have a multitude of fundamental flaws and rely too heavily on Plaintiffs' assertions without independent validation of his underlying data sets." *Id.* ¶ 58. This is a direct response to Dr. Nye's opinions. Section 8.0, entitled "Analyses of Nye's Opinions and His Cited Bases for Calculations," provides an in-depth explanation of Scott's response to Dr. Nye. It begins with an overview of Dr. Nye's qualifications, and then explains how "Nye's analysis is fundamentally flawed." *Id.* ¶¶ 59–60. No reader could reasonably interpret these Sections as anything other than rebuttals to Dr. Nye's opinions.

Second, Sections 7.0 and 8.0 of Scott's report discuss the same subject matter as that identified by the Relators' expert in their Rule 26(a)(2)(B) disclosure. "[A] rebuttal witness must respond to new opinions brought out in her opponent's case in chief." *United States v. 9.345 Acres of Land*, No. CV 11-803-JJB-EWD, 2016 WL 5723665, at *3 (M.D. La. Sept. 30, 2016) (citing

*Morgan v. Comm. Union Assurance Cos.*, 606 F.2d 554, 555–6 (5th Cir. 1979)). As discussed above, Scott's report does just that.

Third, the evidence is intended solely to contradict or rebut Dr. Nye's evidence. Not only do Sections 7.0 and 8.0 mention Dr. Nye by name, they specifically refute his opinions. These Sections offer detailed analysis of Scott's opinion of why Dr. Nye's analysis is unreliable. No other opinions are offered in these Sections. They cannot reasonably be offered to do anything but contradict or rebut Dr. Nye's testimony. The Court finds that Sections 7.0 and 8.0 of Scott's report are rebuttal evidence. Accordingly, the evidence should have been served pursuant to this Court's Amended Scheduling Order, ECF No. 77, within fifteen days of receipt of Dr. Nye's report.

**ii. The Proper Remedy is to Exclude Sections 7.0 and 8.0 of Ms. Scott's Report.**

After concluding that Scott's report contains untimely rebuttal evidence, the Court must determine the appropriate remedy.

> Concluding that a report is not a proper expert rebuttal report completes only the first of two steps to determine whether the Court should strike the report. The Court must also decide whether the improper rebuttal report is either substantially justified or harmless, and thus may avoid being excluded under Rule 26(a). When determining whether exclusion is appropriate, a court must consider the following factors ("the *Sierra* factors"): (1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order.

*9.345 Acres of Land*, 2016 WL 5723665, at *5 (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546,572 (5th Cir. 1996)).

First, it is difficult to determine the exact importance of Scott's testimony. Only Sections 7.0 and 8.0 of her report are improper. These amount to just three pages in a 37-page report, to which there is no evidentiary challenge. *See* ECF No. 83 Ex. A. The substance of Section 8.0,

which contains most of the explanation of Scott's rebuttal, asserts that there is no regulatory mandate that PVA generate a standalone report depicting a physician's interpretive findings before submitting a bill to Medicare for the professional component of a vascular study. *Id.* As discussed in Part III.B, *infra*, this premise is one of PVA's primary arguments in support of its motion for summary judgment and its opposition to Relators' motion for summary judgment. *See generally* ECF Nos. 94, 112. To that end, the argument itself is of vital importance to PVA's defense. However, as PVA asserts in its motion for summary judgment, the thrust of this argument is that PVA's actions do not constitute false claims under the FCA because it was not obliged to generate a standalone written report. This is a legal argument that can be argued by PVA's counsel without these Sections of Scott's report.

As to the second and third factors, there seems to be some prejudice to the Relators, but not much, should Scott be permitted to testify on the opinions in Sections 7.0 and 8.0. Relators argue in their reply brief that these opinions provide the foundation for Scott's further opinion that Robert Church's opinion is unreliable. ECF No. 87 at 1. They state that had they known about Scott's critiques they could have explored the underlying facts of her report during discovery. *Id.* at 2. PVA argues that there is no prejudice because Relators deposed Scott on July 23, 2020, but did not question the basis of her opinions regarding Dr. Nye's report. ECF No. 84 at 5. However, fact discovery closed on July 22, 2020. ECF No. 77. This leads the Court to consider whether additional fact discovery would remedy this dispute, but Relators assert that they have spent time and effort manually verifying discrepancies that Scott highlighted in her report. *Id.* Thus, additional fact discovery would only have limited benefit.

Fourth, PVA does not provide an explanation for its failure to comply with the Court's Amended Scheduling Order. PVA's only defense in opposition to Relators' motion is that Scott is not a rebuttal expert, an argument that the Court addressed above.

In sum, the analysis of the *Sierra* factors does not particularly help the Court resolve this dispute. It is clear that Scott's opinions are untimely, but their untimeliness does not appear to be overly prejudicial to Relators. It also does not appear that additional discovery would remedy the prejudice. On the whole, the Court concludes that the exclusion of Sections 7.0 and 8.0 of Ms. Scott's report is a fair outcome. The Court's conclusion can best be summed up by paraphrasing *Sierra Club*: "While a continuance would have given [Relators] more time to review the late disclosures, such a measure 'would neither punish [PVA] for its conduct nor deter similar behavior in the future.'" *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 572 (5th Cir. 1996) (quoting *Bradley v. United States*, 866 F.2d 120, 125 (5th Cir.1989)). Relators' motion to exclude the testimony of Scott is granted as to Sections 7.0 and 8.0.

### B. PVA's Opposed Motion to Exclude Relators' Expert Witness, Dr. James Alexander.

PVA moves to exclude the testimony and opinions of Dr. James Alexander as inadmissible under Federal Rule of Evidence ("FRE") 702. PVA argues that Relators have not demonstrated that Dr. Alexander is qualified to opine on vascular insurance claims or Medicare billing requirements, nor that his opinions are reliable. ECF No. 82 at 5.

#### i. Dr. Alexander is Qualified to Opine on Medicare Billing Requirements.

PVA argues that Dr. Alexander does not possess the expertise to provide opinions regarding PVA's practices or Medicare billing requirements. *Id.* at 6. It argues that Dr. Alexander's

background is in general surgery, not in vascular surgery, ultrasound studies, or medical coding. *Id*. In particular, PVA asserts that Dr. Alexander lacks the requisite knowledge to support Relators' theory of liability. As discussed in Part III.B, *infra*, one of Relators' primary theories is that PVA should have been creating a standalone report containing PVA physicians' interpretations prior to submitting a bill to Medicare for the professional component of a vascular study. This standalone report, Relators assert, could have been created in MedStreaming. According to PVA, however, Dr. Alexander has no specialized knowledge about the use of MedStreaming in clinical practice. *Id*.

Relators respond that Dr. Alexander's education, training, affiliations, and accreditations qualify him to opine on Medicare claims for diagnostic ultrasounds. ECF No. 85 at 15. After highlighting Dr. Alexander's distinguished background as a surgeon and military servicemember, Relators assert that Dr. Alexander's expertise in Medicare billing requirements comes from his role as the head Medical Director for Medicare in Texas and his experience overseeing the implementation of billing, coding, and Medicare compliance policies with Blue Cross and Blue Shield of Texas. *Id*. at 16 (citing ECF No. 82 Ex. B at 3–4). This experience, according to Relators, outweighs Dr. Alexander's lack of certification in coding. *Id*. (citing *Natchez Reg'l Med. Ctr. v. Quorum Health Res.*, LLC, 879 F. Supp. 2d 556, 577 (S.D. Miss. 2012) for the proposition that "*Daubert* demands reliability, not evidence of certification."). Lastly, Relators argue that there are hundreds of archiving and communication systems available for radiology use with similar functionalities as MedStreaming. So, it is sufficient that Dr. Alexander has worked with similar electronic databases, even if he has not worked with MedStreaming specifically. *Id*.

The Court finds that Dr. Alexander is qualified to opine on Medicare-billing best practices. The Fifth Circuit has repeatedly affirmed the qualification of experts based on the witness's work

experience in a particular field. *See, e.g., United States v. Brown*, 871 F.3d 352, 357 (5th Cir. 2017) (upholding a witness's qualification in healthcare fraud case as an expert in "Medicare and the practices of medical equipment providers" largely because the witness had worked as a "Medicare claims-processing contractor" for over a decade and taught others "how to properly bill Medicare and comply with its guidelines."); *Mike Hooks Dredging Co. v Marquette Transp. Gulf-Inland*, LLC, 716 F.3d 886, 894 (5th Cir. 2013) (affirming the lower court's admission of an expert based on his experience in maritime navigation); *United States v. West*, 58 F.3d 133, 140 (5th Cir. 1995) (admitting an IRS agent as expert witness on tax evasion based on her work experience and accounting education); *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 458 (5th Cir. 1996) ("Given [the expert']s broad, general experience in the insurance industry, we cannot say that the district court abused its discretion in qualifying him as an expert witness.").

Dr. Alexander's experience in the field of Medicare compliance justifies his qualification as an expert. Dr. Alexander has more than two decades of experience, having worked as the Associate Medical Director for the Medicare Division of Blue Cross and Blue Shield of Texas, and as the Medicare Contractor Medical Director for the State of Texas. ECF No. 82 Ex. B at 3–4. This work involved analysis of claims data for the detection of overutilization and fraud and abuse, and other issues relating to Medicare compliance and proper coding and billing practices. *Id.*; ECF No. 82-2 at 22. This expertise gives Dr. Alexander the "specialized knowledge [that] will help the trier of fact to understand the evidence." FRE 702(a).

**ii. Dr. Alexander's Opinions are Reliable Under Federal Rule of Evidence 702.**

PVA next argues that Dr. Alexander's opinions are not reliable. According to PVA, Dr. Alexander parrots Relators' theory that a standalone written report is required to bill for the

professional component of a vascular study when he could not provide a statute or regulation to support this argument. ECF No. 82 at 9. PVA also asserts that Dr. Alexander's opinion that compliance with accreditation guidelines is required to bill Medicare for vascular studies is unreliable because no such requirement exists. *Id*. at 10–11. PVA argues that Dr. Alexander's opinions are undercut by his own admission that PVA could bill Medicare if it simply appended a physician's interpretations in a patients' medical record, meaning a standalone report is not required. *Id*. at 11–12.

Relators respond that PVA's arguments about whether a standalone report is required to bill Medicare are misplaced in a Daubert motion and should instead be addressed in the context of a motion for summary judgment. ECF No. 85 at 18. Relators then argue that compliance with accreditation guidelines is relevant to Medicare reimbursement because the local coverage determination for the services at issue here state that "[a]ll non-invasive vascular studies must be . . . performed in an accredited vascular laboratory." *Id*. at 19 (citing Fahimi Decl. ¶ 7; Ex. F at p. 6). Finally, Relators argue that Dr. Alexander reviewed all the data that PVA provided and insisted was complete when coming to his conclusions. To the extent that PVA wishes to argue that this data was incomplete, it may argue that to the jury. *Id*. at 20 (citing Alexander Report at p. 8; Fahimi Decl. ¶ 2; Ex. A, Alexander Tr. at 145:3-5).

The Court agrees that argument on whether a standalone report is required is appropriately addressed in a motion for summary judgment, as the Court does below. *See* Part III.B, *infra*. The Court rejects the remainder of PVA's speculation arguments outright. The Court finds that PVA's objections primarily go to the weight to be given Dr. Alexander's testimony, not its admissibility. *See, e.g. Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The crux of PVA's reliability argument is that none of Relators' experts can proffer any legal support for Relators' assertion that PVA billed for the professional component of vascular studies before the professional component was complete. PVA asserts that Dr. Alexander "attempt[s] to shoehorn accreditation requirements into a CMS condition of payment," or that "Dr. Alexander relied on incomplete and inaccurate information to support his opinion." ECF No. 82 at 10–11. But as discussed below, the Court does not rely on the experts' opinions alone in concluding that billing Medicare for the professional component of a vascular study before generating a written report can constitute a false claim. *See* Part III.B, *infra*.

The Court concludes that PVA's argument that Dr. Alexander's opinions are unreliable is merely a reiteration of its substantive legal argument couched in terms of an evidentiary objection and does not justify striking his testimony. Nonetheless, for the reasons discussed below, the Court disagrees with PVA's characterization of the types of fraud that can constitute a False Claims Act violation. The Court carefully weighed PVA's arguments and evidence against Relators' allegations and found Dr. Alexander's opinions reliable and helpful to the extent explained below. Any evidence provided by Relators that was not likely to be admissible, was unreliable, or was irrelevant was not considered by the Court. The Court declines to strike Dr. Alexander's testimony as unreliable.

**iii. Dr. Alexander's "Medical Necessity" Opinion is not Misleading.**

Dr. Alexander makes a distinction between "regulatory medical necessity" and "clinical medical necessity." ECF No. 82-3 at 111:9–112:22. PVA argues that this is a fictitious distinction that will only mislead the jury. ECF No. 82 at 12–14. Relators respond that Medicare requires that

charged services be "reasonable and necessary," and Dr. Alexander's testimony relates to the industry understanding of that phrase.

The Court need not devote a lengthy analysis to this issue. Dr. Alexander's first opinion is that "incomplete services (in effect, services not rendered) cannot be considered medically necessary within Medicare or other payer requirements." ECF No. 82-2 at 11. He bases this opinion on the text of the Social Security Act, which states "no payment may be made under part A or part B for any expenses incurred for items or services . . . not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). Chapter 3 of the Medicare Program Integrity Manual goes on to state that a service is considered "reasonable and necessary" if it meets certain criteria, including whether the service is "[f]urnished in accordance with accepted standards of medical practice." ECF No. 82-2 at 12–13. It is certainly not misleading for a physician and Medicare compliance expert to opine on whether these criteria are met in a given case. Further, Dr. Alexander's interpretation of "medical necessity" has been accepted before in this Circuit. *See Waldmann v. Fulp*, 259 F. Supp. 3d 579, 591 (S.D. Tex. 2016) (stating in an FCA case "[t]he Court considers Dr. Alexander's statements are an axiom: the performance of surgeries by an untrained, unsupervised, under-qualified scrub technician is neither 'medically reasonable' nor 'medically necessary' under these circumstances. No further discussion on this issue is merited."). The Court sees no reason to exclude this testimony.

**iv. Dr. Alexander's Remaining Opinions are Permissible.**

PVA makes several additional arguments: that Dr. Alexander's opinion that billing Medicare for the professional component of a vascular study before a standalone report has been created implicates patient safety is speculation, ECF No. 82 at 14–6; that Dr. Alexander's opinion that PVA physicians likely did not actually review vascular studies is baseless, ECF No. 82 at 16–

17; and that the documents that Dr. Alexander reviewed are not sufficient to support his conclusions, ECF No. 82 at 17–18.

First, the Court need not rule on whether Dr. Alexander's patient safety opinion is permissible at this juncture. Relators respond to PVA by conceding that this opinion will likely be unnecessary because Relators do not bear the burden of proving patient harm. ECF No. 85 at 21. Relators anticipate that PVA will argue that Medicare fraud is a "victimless crime" and plan to elicit Dr. Alexander's opinion to counter that argument. *Id*. The Court declines to rule on the admissibility of evidence that may not even arise at trial. Unless and until the issue is renewed in a motion in limine before trial, the Court will take the parties' arguments under advisement.

Second, Dr. Alexander's opinion that PVA physicians likely did not review vascular studies is relevant to the Relators' case. As discussed in Part III.D, *infra*, Relators must prove that PVA knowingly submitted false claims to Medicare. PVA argues that this opinion should still be excluded because Dr. Alexander has no experience with MedStreaming or in interpreting vascular studies. ECF No. 82 at 16. Relators respond that another expert, Dr. Nye, will present evidence that over 25% of PVA's reports were signed within five seconds of one another, and that Relators should be permitted to rebut PVA's argument that this practice was above-board. ECF No. 85 at 22.

The Court finds that this opinion is permissible. As discussed, Dr. Alexander is qualified to opine on Medicare compliance and billing best practices. This includes opinions relating to the expected use of archiving and communication systems like MedStreaming. Surely a former Medical Officer for Medicare in the State of Texas can testify as to how Medicare would view data showing rapid-succession signatures. Further, a Medicare compliance expert with experience working with archiving and communications systems is free to testify that, in his experience, it is

unlikely that a physician could interpret vascular studies within five seconds of one another. To the extent that PVA wished to argue that MedStreaming is a unique system that permits this type of speedy signing, it is free to do so.

Third, Dr. Alexander relies on sufficient evidence such that his opinion may be presented to the jury. FRE 702(b) requires a court to determine whether an expert's testimony "is based on sufficient facts or data." As mentioned, the Court weighed Dr. Alexander's report in conjunction with the evidence presented by Relators and PVA. To the extent that PVA argues that Dr. Alexander relies on insufficient data to support his conclusions, that goes to the weight of his testimony and not its admissibility.

In sum, the Court denies PVA's motion to exclude the testimony of Dr. James Alexander. As stated in open court, any legal conclusions proffered by the experts are excluded and were not relied upon by the Court in coming to its conclusions in this opinion.

### C. PVA's Opposed Motion to Exclude Relators' Expert Witness, Robert Church, Jr.

PVA next moves to exclude the testimony of Relators' expert witness Robert D. Church, Jr. under FRE 702 and 403. ECF No. 83. Specifically, PVA challenges Church's opinions regarding the requirements for billing the professional and technical components of a vascular study globally and whether PVA violated its own compliance plan. *Id.* at 3–4.

#### i. Church is qualified to opine on Medicare billing requirements.

PVA argues that Church is not qualified to opine on Medicare billing requirements because he has no specialized expertise in coding, billing, or Medicare conditions of payment. *Id.* at 6. This is because Church is not a certified professional coder and has no special certification in any type of coding or billing. *Id.* PVA asserts that Church's lack of qualifications manifests itself in the

unreliable bases for his opinions—Church relies on internet sources and blog posts to "obfuscate his unfamiliarity with basic Medicare coding and billing requirements." *Id.* at 7.

PVA cites to Church's deposition testimony, in which Church says he has never used MedStreaming, is not familiar with its capabilities, and was not retained to determine whether particular MedStreaming reports satisfied the applicable billing requirements. *Id.* at 8 (citing ECF No. 83 Ex. C, Tr. 94:7–95:20, 108:20–109:3). PVA argues that, while Church has experience in accounting, his experience with billing and coding is insufficient to qualify him to opine on Medicare fraud issues. *Id.* (citing ECF No. 83 Ex. C, Tr. 19:7–38:15). For example, even though he founded Health Care Economics, a company that provides healthcare business management services to healthcare providers, he was not involved in the group focused on healthcare billing and coding. *Id.* (citing ECF No. 83 Ex. C, Tr. 37:4–38:11).

Relators respond that PVA focuses too much on Church's accounting experience and ignores his other experience that is relevant to PVA's alleged false billings. ECF No. 88 at 17. They point out that Church has worked as an expert in healthcare lawsuits and worked for many years in the healthcare billing industry, and has special experience working for state Medicaid divisions educating the divisions about fraud and abuse. *Id.* (citing ECF No. 88 Ex. 1, Church Dep. Tr. at 22:9–18, 24:5–20, 25:6–19). Relators further cite to Church's experience providing coding services through his company Health Care Economics, which involved taking meetings, engaging in discussions, and advising businesses based on the submission of coding and billing—more than simply running the company, as PVA alleged. *Id.* (citing ECF No. 88 Ex. 1, Church Dep. Tr. at 36:20–37:15, 38:4-11).

The Court finds that Church is qualified to opine on Medicare billing requirements. First, PVA's argument that an expert is unqualified simply because he is unfamiliar with MedStreaming

is rejected for the same reason set forth in Section II.B *supra*. PVA is free to argue at trial that unfamiliarity with MedStreaming impugns an expert's credibility. Second, the Court finds that Church has experience that gives him "specialized knowledge [that] will help the trier of fact to understand the evidence." FRE 702(a). Church has experience reviewing and consulting on matters related to healthcare fraud that make him more knowledgeable than the typical layperson. For example, Church founded two companies that conduct investigations in fraud cases, including in *qui tam* lawsuits such as this. ECF No. 83-2. Church was the vice president of compliance and fraud for Gateway Health Plan, and in that capacity consulted with eight states to develop fraud, waste, and abuse teams. His C.V. highlights extensive Medicare and Medicaid experience, including his work managing fraud investigations and coordination with CMS for the Alabama Medicaid Agency and the Mississippi Division of Medicaid. *Id.* The Fifth Circuit has upheld the qualification of experts based on similar experience. *See* Part II.B.i (collecting cases).

**ii. Church's opinions are not unreliable.**

PVA next argues that Church's medical necessity opinions are unreliable because he is not a physician. ECF No. 83 at 10. It asserts that Church has had no medical training and could not identify any patient in the records he reviewed for whom a procedure was not medically necessary. *Id.* (citing ECF No. 83 Ex. C, Tr. 55:9–57:14). It goes on to assert that he "attempts to rescue his opinion by creating fictional concepts of medical necessity." *Id.* at 11. According to PVA, Church testified that if a study was not documented in an appropriate manner, it would not meet the definition of "medical necessity." But, PVA argues, this is not based on any legal or medical definition and is simply parroting the Relators' case. PVA further argues Church's only support for this opinion is a blog post from the American Association of Professional Coders. *Id.* at 11–

12. PVA asserts that his opinions cannot be reliable because he does not cite any statute or regulation supporting his opinions. *Id*. 12–14.

Relators disagree, citing the difficulty in measuring the reliability inherent in the "soft sciences" like Church's expertise. ECF No. 88 at 18–19. Relators assert that Church cites to numerous authorities supporting his opinions and methodology in his report, and that these sources all agree that providers cannot bill for incomplete services. *Id*. at 19. Relators further argue that even though PVA ignores these numerous sources, its fixation on a "blog" is misplaced because there is nothing improper about finding industry sources online that support an expert's theory. *Id*. at 19–20. That is, "PVA fails to acknowledge the numerous pages of testimony where Mr. Church repeatedly indicated that CMS-1500, ICAVL, and ACR all speak to 'abiding by what Medicare requires in terms of documentation to bill a service.'" *Id*. at 20 (citing ECF No. 88 Ex. 1 Dep. Tr. at 74:3–77:12).

As with its argument that Dr. Alexander's opinions are unreliable, outlined above, the theme underlying PVA's argument here is that it was not required to generate a standalone written report containing a physician's interpretation before billing Medicare for the professional component of a vascular study. The Court again rejects that argument as a ground for excluding expert testimony. PVA's argument that no regulation or statute supports Relators' theory of liability is noted and addressed below.

The Court finds that Church has relied on sufficient evidence such that his opinion may be presented to the jury. FRE 702(b) requires a court to determine whether an expert's testimony "is based on sufficient facts or data." In his report, Church highlights the numerous industry publications that he relied upon, including publications by CMS and other governmental agencies. ECF No. 83-2. Additionally, Church states that he relied upon documents provided by PVA,

including PVA's own compliance policies and procedures. *Id*. Any argument that this evidence was insufficient is best addressed on cross-examination. *Huss*, 571 F.3d at 452; *Daubert*, 509 U.S. at 596. The Court also rejects PVA's "medical necessity" arguments for the reasons stated in Part II.B.iii of this Opinion.

**iii. PVA's remaining objections.**

PVA next argues that Church's opinion that PVA submitted false claims in violation of federal law should be excluded because this opinion is derivative of the testimony of Relators' expert witness, Dr. Zachary Nye. ECF No. 83 at 14. PVA also asserts that Church's opinions are a "red herring" and speculative because there is no federal requirement that a healthcare provider have a regulatory compliance plan. *Id.* at 17–18. Relators respond that there is nothing improper about courts admitting testimony that relies on the data provided by other experts. ECF No. 88 at 22. Relators also assert that Church's opinions relating to PVA's compliance with its own plan are relevant to the scienter element of a False Claims Act claim. *Id.* at 24–25.

The Court finds that PVA's objections do not warrant exclusion. "The Fifth Circuit has [stated] that, in determining the admissibility of expert testimony, a district court must defer to 'the jury's role as the proper arbiter of disputes between conflicting opinions." *Scordill v. Louisville Ladder Grp., L.L.C,* No. Civ. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003) (internal citations omitted). "As a general rule, questions related to the bases and sources of an expert's opinions affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.3 Acres of Land More Or Less Situated in Lefore County, Ms.*, 80 F.3d 1074, 1077 (5th Cir. 1996). Likewise, experts are permitted to rely on inadmissible evidence as long as the evidence is "reasonably relied upon by experts in the particular field." FED .R. EVID. 703. This includes reliance on reports provided by other experts.

*See e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("Likewise, numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703."). That Church relies on a report generated by Dr. Nye is not grounds for exclusion. To the extent that PVA asserts that there is "too great an analytical gap" between Church's opinions and the bases for those opinions, it is free to argue as much to the jury.

In sum, the Court denies PVA's motion to exclude the testimony of Robert Church, Jr. As stated in open court, any legal conclusions proffered by the experts are excluded and were not relied upon by the Court in coming to its conclusions in this opinion.

**D. PVA's Opposed Motion to Exclude Relators' Expert Witness, Dr. Zachary Nye.**

PVA's final expert challenge is to exclude the testimony of Relators' expert witness Dr. Zachary Nye under FRE 702, or in the alternative, to exclude two of Dr. Nye's supplemental reports as non-compliant with Rule 26 of the Federal Rules of Civil Procedure. ECF No. 86. Specifically, PVA argues that Dr. Nye's reports are unreliable because they are based on "disingenuous and simplistic guidelines offered by Relators' counsel," that Dr. Nye's supplemental reports are based on information available at the time of Dr. Nye's initial report, and that Dr. Nye's opinions are speculative. *Id.* at 1–2.

**i. Dr. Nye relied on sufficient data to form his opinions.**

PVA asserts that Dr. Nye's opinions are unreliable under FRE 702 because he has no experience in the healthcare industry and bases his opinions on data provided by Relators' counsel. *Id.* at 6. PVA cites to an excerpt of Dr. Nye's deposition in which he states that he did not verify that the medical records and billing system data provided by Relators' counsel was accurate. *Id.*

(citing ECF No. 86 Ex. D, Tr. 38:13-24). Further, PVA argues that Dr. Nye's opinions do not assist the trier of fact because he does not distinguish between the technical and professional components of a global claim submitted for reimbursement, thus failing to distinguish the portions of the global claim that was allegedly improperly paid from that which was properly paid. *Id.* at 7.

Relators respond that it is disingenuous of PVA to argue that Dr. Nye merely relied on data provided by Relators' counsel because the data was actually provided by PVA. ECF No. 91 at 4. Dr. Nye analyzed data from PVA's Allscripts and MedStreaming databases, ultimately amounting to over 2.5 million lines of PVA's raw data. *Id.* at 14. Dr. Nye then performed relatively simple calculations, flagging data charges with a posting date that was prior to the finalization date as "false billings" and sorting those charges in a variety of manners. *Id.* Additionally, Relators respond to PVA's argument that Dr. Nye improperly included non-federal payors in his analysis by pointing to Exhibits 4d and 6d in his initial report, which breaks down his findings by payor. *Id.* at 17.

The Court finds that Dr. Nye relied on sufficient data to form his opinions. Certainly, a Court should decline to admit opinions that are based on an insufficient quantum of data. But "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) (citing *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc.*, 80 F.3d 681, 687 (2d Cir.1996) (discussing *Daubert* factors)). PVA does not argue that the calculations performed by Dr. Nye are themselves unreliable, or that Dr. Nye is unqualified to perform those calculations. PVA's objection is that Dr. Nye does not have the medical expertise to verify the veracity of the records provided by PVA. This argument goes to the weight of Dr. Nye's opinion, and is not grounds for exclusion.

The same is true for PVA's argument that Dr. Nye fails to distinguish between the professional and technical components of a vascular study in his reports. Whether Dr. Nye failed to do so does not undercut the sufficiency of the data he relied upon. PVA's concerns are properly addressed on cross-examination or the presentation of refuting evidence.

**ii. Dr. Nye's supplemental reports are timely.**

PVA next argues that Dr. Nye's supplemental reports, produced July 8, 2020 and July 30, 2020, were untimely under FED. R. CIV. P. 26(a)(2)(B). ECF No. 86 at 9. It asserts that "Dr. Nye's supplemental reports do not relate to new disclosures, but instead offer entirely new opinions and calculations based on data and information available at the time of his Initial Report on March 27, 2020." *Id.* PVA cites to Dr. Nye's deposition, in which he admits he did not perform certain calculations absent from his initial report but present in his supplemental reports until asked by Relators. *Id.* at 9–10.

Relators respond that Dr. Nye's supplemental reports are timely because PVA's original production of data was incomplete. ECF No. 91 at 18. PVA originally served responses to Relators Requests for Production of Documents on August 22, 2019 and January 7, 2020, and Relators moved to compel the production of more complete data on April 2, 2020. *Id.* PVA eventually provided a complete production on June 25, 2020, three months after Dr. Nye's initial report. *Id.* (citing Berger Decl. ¶ 4). Relators assert that Dr. Nye's supplemental reports were based on new data, and thus not untimely under Rule 26. Relators also argue that PVA does not point to any prejudice that it would suffer because of Dr. Nye's supplemental reports.

FED. R. CIV. P. 37(c) states "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified

or harmless." *Torres v. City of San Antonio*, No. SA:14–CV–555–DAE, 2014 WL 7339122, at *1 (W.D. Tex. Dec. 23, 2014). Rule 26(e) requires supplementation of an expert report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Here, it appears Dr. Nye's supplemental reports were provided to PVA within one month of Relators' receiving PVA's complete data production. Insofar as Dr. Nye's initial report was based on partial data provided by PVA, his incomplete report was supplemented and corrected as required by Rule 26(e). Even if it was untimely, PVA does not state how the untimeliness resulted in prejudice. *See generally*, ECF No. 103. PVA was able to take Dr. Nye's deposition after receipt of his supplemental reports and has not identified any other way in which it was harmed by the disclosure. Accordingly, the Court declines to exclude Dr. Nye's supplemental reports as untimely.

**iii. PVA's remaining arguments.**

PVA's final arguments are that Dr. Nye's opinions reflecting subjective assessments of the data should be excluded because he does not have the necessary expertise to form those opinions, and that his opinions regarding E/M claims are unsupported. ECF No. 86 at 11–12. PVA takes particular umbrage with Dr. Nye's use of the phrase "false billings" throughout his report, asserting that such phraseology will mislead the jury. *Id*. at 11. PVA also argues that any calculations regarding E/M services are irrelevant because Relators do not claim that E/M services were fraudulently billed. *Id*. at 12.

Relators respond that Dr. Nye will freely admit his "use of the term 'False Billings' is based solely on his understanding of Relators' theory of the case, and not his independent judgment." ECF No. 91 at 19. Relators also assert that Dr. Nye's calculations regarding E/M services are

relevant to Relators' theory that PVA engaged in fraudulent conduct by improperly "double billing" for both global vascular studies and E/M visits. *Id*.

The Court finds PVA's remaining arguments unavailing. The risk of prejudice from the use of the phrase "false billings," if any, is minimal and easily remediable through cross examination. To the extent that PVA disagrees that it falsely billed, that is a legal argument against Relators' theory of the case and is addressed below. The same is true of Dr. Nye's calculations regarding E/M services. The relevance of the E/M services provided by PVA is addressed extensively below, and is not grounds for excluding Dr. Nye's report.

In sum, the Court denies PVA's motion to exclude the testimony of Dr. Zachary Nye. As stated in open court, any legal conclusions proffered by the experts are excluded and were not relied upon by the Court in coming to its conclusions in this opinion.

## III. Cross-Motions for Summary Judgment

On August 21, 2020 the Parties filed cross-motions for summary judgment. ECF No. 94, 95. Although the parties filed separate motions, there is significant overlap in the arguments made in the motions and accompanying responses. The Relators' response to PVA's motion largely imitates their own motion, and PVA's response to the Relators' motion largely imitates its own motion. Accordingly, the Court will address the motions together.

### A. False Claims Act Liability

The False Claims Act ("FCA") prohibits false and fraudulent claims for reimbursement to the federal government. An entity violates the FCA when it:

> 1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval;
>
> 2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

*United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (citing 31 U.S.C. § 3729(a) (2015)). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

The FCA applies to those who "knowingly assist[] in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). A person acts "knowingly" with respect to information if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

"In addition to the statutory requirements, courts have held that a false or fraudulent claim violates the FCA only if the misrepresentation it contains is material." *Waldmann*, 259 F. Supp. 3d at 589–90 (citing *Longhi*, 575 F.3d at 467; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 2002, 195 L.Ed.2d 348 (2016)). The materiality requirement is a "rigorous" one. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016).

The Fifth Circuit has adopted a concise test for liability under the FCA. To succeed on a claim for violation of the FCA, the Government or relator must prove:

1) there was a false statement or fraudulent course of conduct;

2) made or carried out with the requisite scienter;

3) that was material; and

4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim).

*Longhi*, 575 F.3d at 467.

**B. Relators have proven the existence of a fraudulent course of conduct.**

The FCA is not meant to punish every type of fraud committed against the government. *See United States v. McNinch*, 356 U.S. 595, 599 (1958). "The [FCA] attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.'" *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996). "The courts have held that a claim may be false or fraudulent under the FCA because it includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit." *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010) (collecting cases).

A claim may be "false" under the FCA if it is either "factually false" or "legally false." *Id.* "Factually false" claims involve "an incorrect description of goods or services or a request for reimbursement for goods or services never provided." *Bennett*, 747 F. Supp. 2d at 765. "Alternatively, legally false claims arise when a party that submits claims to the government affirmatively certifies compliance with a statute or regulation and the certification is a material condition to receiving a government benefit." *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 590 (S.D. Tex. 2016) (internal citation omitted).

Relators argue that PVA used CPT Codes that misrepresented the services provided on a bill to Medicare. ECF No. 95 at 11. The crux of Relators' allegation is that PVA billed for ultrasound services using a 5-digit "global" CPT Code, which indicates that PVA has performed both the technical component and professional component of a vascular study, before the professional component was completed. *See* ECF No. 95-3 Ex. 1 at 38–39. According to Relators,

the CPT Codes are the only tool that PVA used to receive reimbursement from Medicare. To use these Codes, PVA had to certify that they accurately describe the services rendered by PVA. Thus, using the wrong CPT Codes "could have influenced the government's pay decision." ECF No. 95 at 31–33. Moreover, Medicare makes clear that it considers billing for services not rendered and naming the wrong provider as quintessential examples of fraud. *Id.*

Relators identify three distinct tranches of false claims that PVA made: 1) the "Testing Only" patient tranche; 2) the "Double Billing" tranche; and 3) the "Wrong Provider" tranche. Each of these is discussed in turn.

Relators describe the Testing Only tranche as follows: PVA often receives referrals from non-PVA healthcare providers to perform vascular studies. ECF No. 95 ¶ 8 (citing ECF No. 95 Ex. 10, Hembling Dep. Tr. at 32:20-33:11; ECF No. 95 Ex. 3, Gilpin Dep. Tr. at 57:15-23; ECF No. 95 Exs. 54, 75–196). When a patient is referred to PVA only for a vascular study, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). *Id.* ¶ 9. For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. *Id.* ¶ 10 (citing ECF No. 95 Ex. 2, Burrow Dep. Tr. at 49:16-50:18; ECF No. 95 Exs. 53, 74–195). Accordingly, "there is nowhere besides a MedStreaming report that a PVA physician's interpretations could appear." *Id.* at 14 (citing ECF No. 95 Ex. 1, Alsabrook Dep. Tr., at 94:2-94:16; ECF No. 95 Ex. 10, Hembling Dep. Tr. at 32:20-33:11; ECF No. 95 Ex. 2, Burrow Dep. Tr. at 29:24-30:9; ECF No. 95 Exs. 53, 74–195). But PVA submitted 11,728 charges to Medicare for which no E/M Services took place and no MedStreaming report was generated. *Id.* at 15 (citing ECF No. 95 Ex. 201, Dr. Nye 2nd Supp. Report at Exs. 10a & 10b; ECF No. 95 Ex. 200, Nye Supp. Report, at Ex. 2). Relators assert that all of these claims are false because PVA billed

Medicare before completing the professional component of a vascular study, which includes creating a written report with the physician's interpretations. ECF No. 95 at 30.

Relators describe the Double Billing tranche as follows: The remainder of PVA's false charges involved PVA's own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and would then order a vascular study to be conducted on the same day. *Id*. at 15. Like the patients in the Testing Only tranche, Relators argue that no MedStreaming report was generated reflecting the PVA physicians' interpretations of vascular studies. *Id*. at 15–16. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations. *Id*. at 16 (citing App. No. 42; ECF No. 95 Ex. 45 at 6). In particular, Relators point out that the CPT Manual states:

> The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services. Physician performance of diagnostic tests/studies for which specific CPT® codes are available may be reported separately, in addition to the appropriate E/M code. The physician's interpretation of the results of diagnostic tests/studies (i.e., professional component) *with preparation of a separate distinctly identifiable signed written report* may also be reported separately, using the appropriate CPT® code with modifier 26 appended.

ECF No. 95, Ex. 45, at p. 6 (emphasis added).

The Wrong Provider tranche apparently overlaps with the prior tranches. This tranche does not need as much explanation. Relators simply allege that PVA submitted bills to Medicare representing the wrong "rendering" physician. ECF No. 95 at 31. This happened, Relators allege, because PVA utilized for a period of time a "pool" rendering system under which any PVA physician could review and sign MedStreaming reports in quick succession regardless of whether

that physician performed the interpretation. ECF No. 95 App. No. 18. In total, Relators assert that PVA submitted 1,690 claims that contained the wrong physician's signature. ECF No. 95 at 31.

PVA argues that the conduct alleged by Relators does not rise to the level of falsehood needed to constitute a violation of the False Claims Act. ECF No. 94 at 10–11. PVA asserts that "Medicare does not require a special report to bill for vascular studies. No statute, federal healthcare program regulation, rule, or even non-binding guidance requires a MedStreaming report or any other specialized report." *Id.* at 11. The crux of PVA's argument is that the CPT Manual is guidance that does not have the force of a regulatory requirement. ECF No. 112 at 8. According to PVA, *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) commands that sub-regulatory guidance cannot serve as the basis of an FCA violation and should therefore control here.

It does not. *Allina* established a rule that the government cannot retroactively change the method by which it calculates how much to reimburse for submitted claims without going through the notice and comment procedure set out by the Administrative Procedure Act. In that case, HHS revealed a change of policy on its website that retroactively reduced payments to hospitals. The government had, without notice and comment, changed how it calculated a hospital's "Medicare fraction"—the proportion of care that a hospital provides to Medicare patients that is provided to low-income Medicare patients. The fraction's denominator is the time the hospital spent caring for patients who were "entitled to benefits under" Medicare Part A. The numerator is the time the hospital spent caring for Part-A-entitled patients who were also entitled to income support payments under the Social Security Act. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The bigger the fraction, the bigger the payment. *Allina*, 139 S. Ct. at 1809. After Medicare Part C was created, HHS wanted to include Part C patients in the calculation of the Medicare Fraction, but challenges to a proposed rule permitting that calculation were pending. So, in 2015 the Agency decided to

post online its calculations for the 2012 Medicare fractions for 3,500 hospitals nationwide including Part C patients. This resulted in the loss of millions of dollars for the hospitals. *Id.* at 1810. Our case is distinguishable because no substantive requirements or calculations of payments have been altered. The question is whether PVA was truthful when it billed the Global CPT Code for a vascular study.

At this point it is important to clarify what the alleged fraud actually is. Throughout its extensive briefing, PVA repeatedly asserts that for a claim to constitute actionable fraud, it must violate some legal requirement set forth by Congress or HHS. *See* ECF No. 112 at 8 ("There is no federal healthcare program statute, regulation, rule, or even non-binding guidance requiring a MedStreaming report or any other separate, stand-alone report to bill for a vascular study."); *see also* ECF No. 112 at 8, 10, 11, 15, 17; ECF No. 94 at 11, 13, 15, 16. This is not what Relators assert. Certainly, PVA is correct that violating a legal condition of payment set forth by statute or regulation may be grounds for FCA liability. But that is not the sole basis by which a healthcare provider can violate the FCA.

Relators' theory of liability is that when PVA billed Medicare by using the global CPT Codes, it was representing that it had completed both the technical and professional components of a vascular study, including the generation of a written report reflecting the physicians' interpretations. ECF No. 95 at 30. That is, PVA billed Medicare for services it had not rendered by failing to complete the professional component. Relators' assertion is that PVA violated the FCA itself. It is undisputed that the use of the Global CPT Code on the CMS-1500 form certifies that a written report including a physician's interpretations of a vascular study have been completed. *See* ECF No. 95 Ex. 1; ECF No. 112 Ex. 1. The question is whether submitting a global CPT Code without creating a written report renders that certification "false" under the FCA.

45 C.F.R. § 162.1002 states that "[t]he Secretary adopts the following maintaining organization's code sets as the standard medical data code sets . . . (a)(5) The combination of Health Care Financing Administration Common Procedure Coding System (HCPCS), as maintained and distributed by HHS, and Current Procedural Terminology, Fourth Edition (CPT–4), as maintained and distributed by the American Medical Association, for physician services and other health care services." Merriam-Webster's dictionary defines "maintain" as (1) to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline; (2) to sustain against opposition or danger: uphold and defend; (3) to continue or persevere in: carry on, keep up; (4) to support or provide for; sustain; or (5) to affirm in or as if in argument. As an initial matter, the dictionary definition of "maintain" seems to indicate that the AMA is tasked with keeping the codes up to date. This means that the AMA is tasked with defining the services that are encompassed within a particular CPT Code. That is, the AMA is the organization that decides what it means to submit a given CPT Code to Medicare for billing. Thus, it is imperative that a healthcare provider knows exactly what a particular CPT Code means before certifying that it has completed the services described by that Code.

This appears to be understood by the AMA. The CPT Codes occasionally require cross-referencing before billing. For example, CPT Code 67225 (photodynamic therapy of a second eye) must be billed along with CPT Code 67221 (photodynamic therapy of just one eye). MEDICAL BILLING AND CODING, https://www.medicalbillingandcoding.org/using-cpt/ (last visited Dec. 6, 2020). Alternatively, some CPT Codes typically are not billed together because even though each Code involves a scan of roughly the same body parts, the CPT Manual precludes "'double dipping" for component services nominally described in two Codes. That is, each code requires a separate

physician order. *See United States v. Fadul*, No. CIV.A. DKC 11-0385, 2013 WL 781614, at *2 (D. Md. Feb. 28, 2013).

It also appears that failing to reasonably interpret the CPT Manual can lead to criminal conviction under the False Claims Act even though the CPT Manual's standards are not subject to constitutional vagueness challenges. *See United States v. Janati*, 237 F. App'x 843, 846 (4th Cir. 2007). Stated differently, even though the CPT Manual's instructions are not "laws" that must survive Due Process Clause challenges, one can still be criminally liable for knowingly misusing the CPT Codes. This is because the law that is alleged to be violated is the False Claims Act, not the CPT Manual. The False Claims Act prohibits falsely billing Medicare. So, it stands to reason that if one agrees to use the CPT Codes to bill Medicare, one must meet all the requirements set forth by the CPT Manual. If one does not, it is the False Claims Act that is violated, not the CPT Manual. *Cf. id.* at 847 ("Any opacity of the CPT manual would have to be so great that one could not *know* the proper code and therefore could not *knowingly* record an improper code.") (emphasis in original).

So, a provider can be liable for falsely certifying that it has completed the requirements for billing a particular CPT Code. PVA argues that it made no such false certification. It asserts that a separate written report is only required when the physician performs the professional component of a vascular study, but not the technical component. ECF No. 112 at 11. PVA asserts that this is clear from the text of the CPT Manual, which states: "The physician's interpretation of the results of diagnostic tests/studies (i.e., professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT® code with modifier 26 appended." ECF No. 112 at 11 (citing ECF No. 95 at 11). The question,

then, is whether a separate, written report is always required when billing for the professional component of a vascular study—whether separately or globally.

The CPT Manual's Radiology Guidelines, which expressly cover diagnostic ultrasounds, states "All imaging guidance codes require: (1) image documentation in the patient record and (2) description of imaging guidance in the procedure report. All [radiological supervision and interpretation] codes ***require***: (1) image documentation in the patient's permanent record and (2) a procedure report or separate imaging report that ***includes written documentation of interpretive findings of information contained in the images and radiologic supervision of the service***." ECF No. 95 Ex. 45 at 475 (emphasis added). That same page later states "A written report (e.g., handwritten or electronic) signed by the interpreting individual should be considered an integral part of a radiologic procedure or interpretation." *Id.* Further, the Medicare Claims Processing Manual, Chapter 13 – Radiology Services and Other Diagnostic Procedures, in section 20.1, entitled "Professional Component (PC)" states, "The interpretation of a diagnostic procedure includes a written report." ECF No. 113 Ex. 37 at 425. From this it appears that a written report is required when using any radiological imaging Code, including the global CPT Code for vascular ultrasounds.

Other parts of the CPT Manual reiterate the need for a written report when separately billing for the professional component of a vascular ultrasound. The Manual later states that "[u]se of ultrasound, without thorough evaluation of organ(s) or anatomic region, image documentation, and final, written report, is not separately reportable." ECF No. 95 Ex. 45 at 495. Thus, a written report is required when a provider bills Medicare for the professional component of a vascular study. PVA does not dispute this. ECF No. 112 at 11–12 (stating that portions of the CPT Manual describe "what the AMA recommends for physician interpretation of vascular studies when the

physician or physician group does not perform the technical component of the study."). But PVA's assertion that a separate written report is only required when billing separately for the professional component is undercut by the CPT Manual's insistence that a "procedure report or separate imaging report that includes written documentation of interpretive findings" is required for "all RS&I codes." ECF No. 95 Ex. 45 at 475. Thus, a written report is required to bill the professional component generally, whether separately or globally.

Relators' assertion here is not that the CPT Codes always require a *separate* report. Relators assert only that a written report must be generated before billing the professional component. ECF No. 95 at 12–14. Relators claim that 69,178 of PVA's charges are false because of the particular circumstances of those charges. That is, PVA only included the physicians' interpretations of the vascular studies associated with each of these charges in MedStreaming or in the patients' E/M visit notes. *Id.* at 13–14 (citing Dr. Alsabrook Dep. Tr. at 94:2-16 (testifying that there is nowhere that PVA would document a physician's interpretation of a patient imaging study other than an E/M note or MedStreaming)). But for the Testing Only patients there was no E/M visit note, so the only place a written report could have been generated was in MedStreaming. *Id.* at 14 (citing ECF No. 95 Ex. 10, Hembling Dep. Tr. at 32:20-33:11; Ex. 2, Burrow Dep. Tr. at 29:24–30:9; ECF No. 95 Ex. 3, Gilpin Dep. Tr. at 57:15–23; ECF No. 95 Exs. 53, 74–195). As mentioned, Relators assert that no MedStreaming report was ever generated for this tranche. As for the Double Billing patients, Relators argue that PVA would have submitted false claims even if PVA included the physicians' interpretations in the E/M visit notes because the CPT Manual prohibits that practice. *Id.* (citing ECF No. 95 Exs. 45, 55, 197, 204–205; ECF No. 95 Ex. 4, Britt Dep. Tr. at 126:25–127:13; Ex. 7, July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21–82:5; Scott Dep. Exs. 5–14). Thus, the argument goes, because one of the only

two places where PVA includes a physician's interpretation of a vascular study is not available, PVA's certification that it completed the professional component would be false unless it included the physicians' interpretations in MedStreaming. *Id.*

This begs the question of whether the CPT Manual actually prohibits PVA's practice of including the physicians' interpretations in the E/M visit notes. As mentioned, the CPT Manual states "the physician's interpretation of the results of diagnostic tests/studies (i.e., professional component) *with preparation of a separate distinctly identifiable signed written report* may also be reported separately, using the appropriate CPT® code with modifier 26 appended." ECF No. 95, Ex. 45, at p. 6 (emphasis added). PVA's response is summed up by their expert witness, Melissa Scott:

> The guidance specifies that when a physician does not render both the technical and professional components, the interpretation of the diagnostic test (professional component only) may still be separately billable when supported by a written report. What the guidance does not state is that in the context of an evaluation and management service, there should be a stand-alone report. It simply states that in the absence of a technical component, the interpretation must be documented in written report to be supported.

ECF No. 112 at 12 (citing Scott Expert Report, ¶ 77).

One industry publication, titled "Medical Documentation Requirements: Diagnostic Urologic Ultrasound and Ultrasound-Guided Procedures," indicates that including a physician interpretation of a vascular study in the patient's medical chart is permissible in some circumstances. ECF No. 95-6 at 14 ("The minimum documentation required by CPT® is a separate summarized written paragraph documented in the patient's chart"). However, under the caption "Imaging Performed on the Same Day as an Encounter," the article states "The American Medical Association clarified that if an imaging test is performed on the same day as an Evaluation & Management (E&M) service, that each should be separately documented and billed, as stated in

the E&M Services Guidelines Section in the CPT® book." *Id.* at 15. The article posits that this interpretation is consistent with other sections of the CPT Manual, which state that CPT Codes for radiological imaging in other contexts "require image documentation and radiological supervision, interpretation, and report services require a separate interpretation." *Id.* Relators highlight many other industry publications that appear to support their theory. ECF No. 95 App. No. 75 (collecting industry publications).

The Court agrees with the Relators' and industry's interpretation of the CPT Manual. The first sentence of the cited section—"The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services"—indicates that E/M Services and diagnostic studies should be billed separately. The following sentence—"Physician performance of diagnostic tests/studies for which specific CPT® codes are available may be reported separately, in addition to the appropriate E/M code"—indicates that when a diagnostic study has been performed, it can be billed separately in addition to an E/M code. The Court reads the use of the permissive "may" not as bestowing an option, but as highlighting a possibility that need not always have occurred—*i.e.*, that a diagnostic study was performed, as opposed to another service. The final sentence highlights the fact that the professional component may also be billed separately. Its reference to the separate report appears to simply reiterate the requirements of billing for the professional component. The Court does not agree with PVA's reading of the CPT Manual.

Relators' Wrong Provider tranche of allegedly false charges needs no meticulous analysis. Submitting bills to Medicare that represent the wrong rendering physician is plainly a false claim. *See United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) ("a claim may be false even if the services billed were actually provided, if the purported provider did not actually render or

supervise the service."); *see also Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). The Medicare Program Integrity Manual provides a list of "Examples of Medicare Fraud," which includes "[m]isrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnished the services." ECF No. 95 Ex. 205, § 4.2.1. Any bills submitted under the name of a physician who did not render the services described therein are false.

In sum, the conduct alleged by the Relators constitutes a fraudulent course of conduct under the False Claims Act.

**C. Fact issues remain on materiality.**

For a false claim to violate the FCA, it must be material. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Fifth Circuit has held that the FCA requires "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017). The Supreme Court clarified the scope of the materiality requirement, emphasizing "that the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Universal Health Servs., Inc. v. United States ("Escobar")*, 136 S. Ct. 1989, 2004 (2016). The Court stated:

> The materiality standard is demanding. The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial. In sum, when evaluating

> materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.
>
> Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04.

PVA argues that Relators have not satisfied the *Escobar* standard. ECF No. 94 at 22; ECF No. 112 at 19. It asserts that Relators have demonstrated no prior instance in which the Government has declined to pay a particular type of claim despite knowledge that certain requirements were violated. ECF No. 94 at 23. Contrarily, PVA argues that the Government's continuing payments to PVA despite knowledge of PVA's billing practices is "strong evidence that the requirements are not material." *Id.* (citing *Escobar*, 136 S. Ct. at 2003–04). It posits, "The Government's continual lack of any action is more than enough to show that Relators cannot satisfy their burden of proving the FCA's 'demanding' and 'rigorous' materiality requirement." *Id.* at 26.

In support of this contention, PVA offers the declaration of Katherine Britt, Vice President of Operations at PVA. ECF No. 94-2. Britt attests that the HHS issued a subpoena to PVA on June 19, 2018, for medical and business records. *Id.* ¶¶ 30, 31; *see also* ECF No. 94 Ex. 10 (HHS Subpoena Duces Tecum). PVA produced more than 50,000 pages of documents, including 414 patient files. *Id.* ¶ 32. PVA representatives, including Britt, met with members of the HHS Office of Inspector General and Department of Justice attorneys to discuss the production. *Id.* ¶ 33. Despite its transparency and compliance with the Government's investigation, Britt asserts that no

Government agency has ever demanded a return of federal funds for allegedly false bills. *Id.* ¶ 34. Relators do not dispute that the Government investigated the alleged false billing and declined to intervene.

Relators respond that PVA's false certification that it completed the professional components of the vascular studies is material. In support, Relators highlight the CMS manual entitled "Medicare Fraud & Abuse: Prevent, Detect, Report," which states that "billing for services not provided" is an example of an improper claim. ECF No. 95, Ex. 204, at 11. They further point out that the conduct alleged is included among the Medicare Program Integrity Manual's "Examples of Medicare Fraud." ECF No. 95 at 32–33 (citing Ex. 205, § 4.2.1).

Although the Government declined to intervene in this case, it submitted a Statement of Interest, as is its prerogative. In it, the Government argued that its declination to intervene in the case is irrelevant to the materiality analysis. ECF No. 113 at 5 (citing *U.S. ex rel. Chandler v. Cook Cty., Ill.*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd*, 538 U.S. 119 (2003) and *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005)). This proposition logically flows from the structure of the FCA, which expressly permits *qui tam* lawsuits in which a private citizen proceeds on behalf of the United States. The Government also argues that continued payment by a federal agency is not dispositive of materiality either. *Id.* at 7. This is because the Court in *Escobar* stated that "actual knowledge that certain requirements were violated" is predicate to the proposition handed down therein. *Id.* (citing *Escobar*, 136 S. Ct. at 2003). That is, continued payment is only "strong evidence" of immateriality if Medicare actually knew that false claims were being submitted.

And that makes sense. There are simply too many possible explanations for an agency's action or inaction to impute a decision on the merits of an allegation of fraud unless it is clear that

the agency has actual knowledge of fraud. It is not enough that the agency is aware of allegations of fraud, it must be aware of the fraud itself. The First Circuit held precisely this way in *Escobar* on remand. *See Universal Health Servs., Inc. v. United States (“Escobar II”)*, 842 F.3d 103, 111–12 (1st Cir. 2016) (“mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance”). So, the Court is not in a position to conclude outright that the Government has made a determination that the fraudulent conduct alleged is not “material” as defined by the FCA. As this Court has recently held, “There is no *per se* rule; continued payment is only relevant to the extent that it is probative of materiality.” *United States ex rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193-KC, 2019 WL 6884485, at *10 (W.D. Tex. Dec. 10, 2019) (citing *Trinity Indus. Inc.*, 872 F.3d at 663–64).

It is important to clarify what the Government’s inaction here actually is. The Government’s declination to intervene does not indicate a decision was made by the Government that Relators’ claims must fail. Importantly, PVA provides no evidence that Medicare actually knew that PVA was submitting false claims. That the Government conducted an investigation is certainly probative of materiality, but without evidence of actual knowledge, the Court cannot apply the strong presumption of immateriality highlighted by *Escobar*. Thus, the Government’s inaction is probative, but not dispositive on this issue.

PVA is correct that Medicare’s continued payment of claims submitted by PVA is evidence that PVA’s actions are not material under the *Escobar* standard. However, that evidence is contradicted by Medicare and CMS’ own statements that billing for services not provided are examples of fraud. *See* ECF No. 95, Ex. 205, § 4.2.1 One of the reasons that the Government’s decision to continue to make payments on allegedly fraudulent claims is “relevant, but not automatically dispositive,” *Escobar*, 136 S. Ct. at 2003–04, is that the Court cannot speculate about

what information the Government actually knows, especially in Medicare fraud lawsuits in which the Government has declined to intervene.

Healthcare administration is complicated. "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing." *United States v. Berkeley HeartLab, Inc*., No. 14-cv-230, 2017 WL 4803911, at *7 (D.S.C. Oct. 23, 2017). Thus, the Government's continued payment despite knowledge of Relators' allegations does not necessarily imply immateriality. It is equally likely that Medicare saw value in continuing to reimburse PVA for its services until the legality of its actions could be properly adjudicated. The Court considers evidence of the Government's declination to intervene only insofar as it is probative as described by *Escobar*. Relators' objections to this evidence are overruled. *See* ECF No. 107-2.

Relators and PVA have each provided evidence that could reasonably be construed to favor their materiality arguments. The Fifth Circuit commands the Court not to weigh this evidence. *See Deville*, 567 F.3d 163–64. As long as a jury can reasonably return a verdict in favor of either party, a genuine issue of material fact exists and the Court cannot grant summary judgment. The Court finds that fact issues exist as to whether the alleged false bills were material to the Government's reimbursement decision.

However, the Court finds that there is no genuine issue of material fact as to the materiality of claims that encompass the Wrong Provider Tranche. Strong evidence shows that the Government probably would not have reimbursed PVA for claims which listed the name of a physician who did not render the services described therein had it known such claims had been submitted. As Relators point out, the Medicare Program Integrity Manual's list of "Examples of Medicare Fraud" include "Misrepresenting . . . the identity of the beneficiary or **the individual**

**who furnished the services**." ECF No. 95 at 32–33 (citing ECF No. 95 Ex. 205 § 4.2.1) (emphasis added). That this particular conduct is listed as an example of Medicare fraud is telling. CMS uses less forceful language in its CMS Manual when it provides a list of "[e]xamples of **improper** claims." *See* ECF 95 Ex. 204 at 11 (emphasis added). Put simply, identifying conduct as "fraud" as opposed to "improper" implies a greater level of culpability associated with that conduct. This language from CMS, viewed in conjunction with American courts' understanding that the submission of claims under the wrong physician's name generally leads to FCA liability, *see Mackby*, 261 F.3d at 826, leads the Court to conclude that the Government would not have paid these claims if it knew of their falsity. Accordingly, summary judgment is granted to Relators on the issue of materiality only as to the claims that encompass the Wrong Provider Tranche. Both parties' motions for summary judgment are denied as to the issue of materiality on the remainder of the Relators' claims.

**D. Relators have proven that PVA acted with scienter.**

The FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a). The FCA defines "knowingly" as not only "actual knowledge" of information, but also "deliberate ignorance" or "reckless disregard of the truth or falsity of the information," even when there is no "proof of specific intent to defraud." *Id.* § 3729(b)(1). When "state of mind is an essential element," "it is less fashionable to grant summary judgment." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991). But the "presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists." *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996). Summary judgment is proper under the FCA where the defendants "either purposefully, or with

reckless disregard to the truth or falsity of their statements, misled" the Government. *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009). As relevant here, no genuine issue of material fact exists when "there is no plausible reading of the CMS Manual that could support the defendants' billing practices." *United States ex rel. Drummond v. BestCare Lab. Servs.*, L.L.C., 950 F.3d 277, 281 (5th Cir. 2020).

Relators argue that both Medicare and industry publications make clear that PVA's practices were improper. There is no reasonable explanation for PVA's failure to understand that no other healthcare providers utilized similar billing practices. Further, Relators detail an attempted change to PVA's billing practices intended to "allow[] for compliance," but abandoned when it realized that the change would affect revenue. ECF No. 95 at 17 (citing App. Nos. 16, 46, 47, 79). As outlined above, PVA's practice was to bill Medicare regardless of whether a PVA Physician had completed a written report. *See* Part III.B, *supra*. Relators assert that PVA knew that this practice was improper and tried to change it. ECF No. 95 at 17. In 2017, PVA embarked on a "compliance project" in which it attempted to change this practice. *Id*. On February 8, 2017, PVA's Vascular Lab Committee identified three motives for its "transition to billing after studies are read." *Id*. (citing ECF No. 95 Ex. 31 at DEF007698). The motives were to (1) "Ensure billed to appropriate physician," (2) "Ensure no audit requests for incomplete medical records," and (3) "Allow for docs to read each others stuff." *Id*.

To achieve these goals, PVA made attempts to require billing Medicare only after interpretations and reports were completed and decreasing the delays in physician interpretation. *Id*. The meeting minutes from an April 5, 2017 PVA Vascular Lab Committee meeting describe these changes as an attempt to "Allow[] for Compliance," by "billing after study interpreted." *Id*. at 17–18 (citing ECF No. 95 Ex. 32 at DEF007691). Relators also cite a document that Barbara

Burrow, PVA's Technical Director, sent to Brian Hembling entitled "Vascular Lab Billing/Coding" which states "[t]he billing/coding process was changed this year. It is now required for a study to have a completed report to be signed and read before it is billed." ECF No. 95, Ex. 31 at DEF007085. That same document indicates that PVA Physicians would be required to bill for a vascular study within five days of completion, and that "read groups" would be created because "Physicians were having issues reading reports in a timely fashion." *Id.* at DEF 007085–86. Relators also cite an email from Barbara Burrow to all PVA Physicians stating studies which have not been read for over 48 hours after generation would be reassigned to the read group. ECF No. 95 Ex. 30. Finally, Relators cite portions of Burrow's deposition, in which she says that her "understanding is that for a time we thought that we needed to have the study interpreted before it was billed. . . . before [2016] we were not in the understanding that we had to have a report completed in MedStreaming to bill for it." ECF No. 95 Ex. 2, Burrow Dep. Tr. at 143:21–144:14.

Problems quickly arose. Relators assert that PVA feared the changes would result in a "35% change in vascular lab office related revenue." ECF No. 95 at 18 (citing Ex. 32 at DEF007698). PVA had trouble getting physicians to read studies on time. *Id.* (citing Ex. 32 at DEF007703–04). By June, PVA reverted to its previous practice of billing when the vascular study was in "QA" status—before it had been interpreted. *Id.* (citing Ex. 32 at DEF007700 ("Coding Process Changed; Changed again; Now study only set to QA, then charged / billed.")). Thus, the short-lived attempt at compliance came to an end.[2]

PVA responds that whether it attempted to alter its billing practices has "zero bearing on whether a false claim was submitted." ECF No. 112 at 14. This is because, according to PVA,

[2] Relators also cite internal e-mails from before PVA started using MedStreaming, which appear to indicate that Burrow knew that vascular studies could not be billed until after interpretation. ECF No. 95 at 18–19 (citing ECF No. 95 Exs. 12 and 14).

Relators are required to show that a particular individual knew the practices were improper, and collective action cannot suffice. *Id.* at 17 (citing *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2015 WL 5178074, at *29 (S.D. Tex. Sept. 3, 2015), *aff'd sub nom. U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368 (5th Cir. 2016)). It then asserts that even though no official compliance policies are required by Medicare, PVA's use of comprehensive compliance procedures indicate that PVA did not act with reckless disregard or deliberate ignorance as to the propriety of its practices. *Id.* at 18.

PVA further asserts that its interpretation of the CPT Manual was reasonable, and there can be no summary judgment where a statute or regulation is subject to multiple reasonable interpretations. *Id.* at 15 (collecting cases). PVA's final argument is that it only performed 9,458 vascular studies without generating a report, accounting for only 4.9% of its business. ECF No. 94 at 21. "An error rate that low," it asserts, "does not support an argument that PVA engaged in a fraudulent scheme to cheat the Government, and, in fact, supports the opposite conclusion." *Id.* (citing *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1034 (D. Nev. 2006)).

The cases that PVA cites in support of its proposition that no summary judgment can be had where the defendant's interpretation of a statute or regulation is reasonable do not control here. The point is simple; the applicable statute is the FCA, which unambiguously commands all government contractors not to submit false claims. The only reasonable interpretation of the FCA is that it prohibits the submission of false claims to the federal government. However, the principle that scienter is not satisfied where a defendant acted reasonably still stands. So, if the evidence that PVA provides indicates that its interpretation was reasonable, summary judgment must fail.

But PVA provides no evidence. PVA points to no concrete evidence that it was under the impression that its actions were proper. The only argument that PVA makes that might prevent

summary judgment on this issue is whether it was reasonable, even if incorrect, for PVA to believe it did not need to generate a written report prior to billing Medicare. ECF No. 112 at 15. But its argument is simply that there is no requirement of such a written report. As described above, that is not true. For an interpretation to be reasonable, it must actually be held. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."). There is simply no indication that PVA actually held that the belief that its interpretation was legal and correct.

Relators, on the other hand, have provided substantial evidence to support their scienter argument. In fact, most of the evidence comes from PVA's own Technical Director and member of the Vascular Lab Committee, Barbara Burrow. The Fifth Circuit has recognized that it is difficult to grant summary judgment on a claim in which scienter is an essential element. Even though a court may grant summary judgment when the intent element is clearly met, those cases are few and far between. For example, the case relied on by Relators, *Drummond*, was one of the rare cases in which the defendants were clearly billing for services not rendered, and no reasonable interpretation of regulatory guidance could support the defendants' position. In that case, the defendants were submitting claims for travel expense reimbursement when no personnel had actually traveled. *United States ex rel. Drummond v. BestCare Lab. Servs.*, L.L.C., 950 F.3d 277, 281 (5th Cir. 2020). That is a clear-cut violation of the FCA.

The issue is more complex in this case. Relators must prove that PVA acted with at least "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information that it submitted to Medicare. Although the widespread industry publications supporting Relators theory are strong evidence that PVA recklessly disregarded industry practice, it is not necessarily the case that PVA knew that its practices were fraudulent. The strongest evidence offered by Relators is

the evidence indicating that PVA was not reading vascular studies before billing for them. Relators provide evidence that suggests that at least some staff at PVA knew that studies needed to be interpreted prior to billing for those claims. In 2014, when PVA started using MedStreaming, it stopped focusing on the timing of the interpretation and was billing prior to interpretation. This practice continued until 2017, when PVA began a process of changing its regulatory compliance policies to require interpretations be completed prior to billing Medicare. However, PVA abandoned this policy change when it realized that about a third of its revenue would not come in as quickly as it did under the current practice. PVA then continued billing prior to reading vascular studies. This scheme described by Relators strongly suggests that PVA knew its practices skirted the line of compliance, and declined to get back into compliance when it realized that revenues would drop if it did so. Additionally, PVA does not dispute that it used a "pool" rendering system that it knew allowed MedStreaming reports to occasionally be signed by physicians who did not perform the professional component of the vascular study. *See* Part III.B, *supra*.

The Court holds that PVA has not established that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law on this issue. The Court further finds that, even construing all reasonable inferences in PVA's favor, *Deville*, 567 F.3d at 163–64, Relators have proffered evidence demonstrating that PVA knew that it was submitting claims for reimbursement to Medicare when it had not fully furnished the services it certified it had completed. At the very least, PVA acted with "deliberate ignorance" or "reckless disregard of the truth or falsity of the information" it was providing to Medicare. 31 U.S.C. § 3729(b)(1). Accordingly, the Court GRANTS summary judgment to Relators on the issue of scienter.

**E. Whether PVA's claims caused the government to pay significant monies.**

The Court turns to the proof offered by the Relators and the contradictory evidence proffered by PVA. Relators have the burden of showing that the defendants submitted false claims, but Relators are not required to provide direct evidence of each instance of fraud. "On the contrary, courts regularly find liability where—as here—relators provide circumstantial evidence that shows defendants engaged in a fraudulent scheme and submitted claims to Medicare seeking payment of such fraudulent claims." *Waldmann*, 259 F. Supp. 3d at 609; *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009). After establishing FCA liability, a relator can base damages calculations on statistical "sampling and extrapolation." *United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *12, n.100 (N.D. Tex. June 20, 2016) (citing *United States v. Fadul*, 2013 WL 781614, at *14 (D. Md. Feb. 28, 2013)). Statistical sampling can be particularly valuable in the medical fraud context. *See, e.g. United States v. Krizek*, 192 F.3d 1024, 1030–31 (D.C. Cir. 1999); *see also U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 714 (7th Cir. 2014) ("there has to be some evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of [defendant's] documents contained false certifications.").

PVA argues that Relators have failed to carry their burden of production of evidence showing that PVA double billed Medicare. ECF No. 112 at 10. It asserts that Relators' expert witness Church did not review the medical records necessary to determine whether PVA improperly billed for E/M Services in conjunction with a vascular study. *Id.* at 10–11 (Ex. B, Church Depo. 118:3-17; Docs. 83 & 102). A mere passing glance at the cited portion of Church's testimony reveals that Church was not retained to conduct a factual statistical analysis for Relators. Indeed, after Church admitted that he did not review medical records to determine whether PVA had actually improperly billed Medicare, he added, "Reviewing medical records is outside the

scope of my work." ECF No. 112 Ex. B, Church Depo. 118:18–19. PVA cites no other affirmative evidence showing that Relators' description of its billing practices is factually incorrect.

Relators proffered the report of statistician Dr. Zachary Nye, which contains Dr. Nye's analysis of PVA's billing data. ECF No. 94 Ex. 200. Dr. Nye's report asserts that it relied on PVA "Medical Records Data," "Billing System Data for Imaging," and "Billing System Data for E/M Services," each of which are defined in the report. *Id.* at 2–3. Relators charged Dr. Nye with identifying "instances when PVA posted a charge in its Billing System Data for Imaging prior to the completion date of the associated 'final report' (*i.e.*, what Plaintiffs allege to be a 'False Billing')." *Id.* at 3. Dr. Nye's analysis found 69,178 instances of such false billing out of 285,481 charges billed, amounting to a falsity rate of 24.2%. *Id.* at 4. Of that figure, 2,094 instances of falsity fall within the Wrong Provider Tranche and 11,728 instances of falsity fall into the Testing Only Tranche described above. *Id.* at 5. Dr. Nye calculated that these false bills resulted in a total of $8,288,590 in payments. *Id.* Not all of this money was paid by the federal government, however. Exhibit 4a.i in Dr. Nye's supplemental report breaks down the total charges and payments made for false billings by payor. The scope of the FCA does not reach the payments received from private insurance companies that are included in this report.

PVA attempts to contradict Relators' evidence in the form of a "Response to Relators' Appendix" attached as Exhibit A to PVA's response to Relators' Motion for Summary Judgment. *See* ECF No. 112-1. In its response, PVA objects to the admissibility of Dr. Nye's expert report as improper hearsay, and for the reasons rejected above. *Id.* ¶ 26. PVA admits that "the professional component of vascular studies was billed before a MedStreaming report was signed for some services," but does not present evidence refuting Dr. Nye's analysis. *Id.* ¶ 27.

"[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir.1987)). Relators did not argue that Dr. Nye's report is admissible under any exception to the hearsay rule. However, the Court notes that there is a possibility that Dr. Nye's report could be admissible under Rule 1006 of the Federal Rules of Evidence, which permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006. Dr. Nye's report and accompanying exhibits comprise hundreds of pages of spreadsheets summarizing Dr. Nye's analysis. Even so, there has been no argument on the issue of whether the evidence underlying Dr. Nye's report is admissible—a necessary step in the FRE 1006 analysis. *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 244–45 (2003). The Court will defer ruling on the admissibility of Dr. Nye's report until trial.

As is often the case in lawsuits that involve expert analysis, PVA may call its own expert witnesses to refute Dr. Nye's analysis. As noted in Part II.A, *supra*, the Court has excluded the portions of Dr. Scott's report that rebut Dr. Nye's opinions, but PVA can offer other expert analysis to refute Dr. Nye's findings. *See e.g.*, ECF No. 94 Ex. 203 (Expert Report of Dr. Collier).

PVA can also provide non-expert testimony to refute Relators' claims. For example, PVA offered the declaration of Brian Puente, PVA's IT Director. ECF No. 94-7. Although Mr. Puente fails to explain in detail the methodology he relied upon, he attests that he examined PVA's Allscripts PM data and found that out of 194,886 relevant billable vascular studies, 9,458 studies did not have an E/M visit within 14 days after the date that the study was performed. *Id.* ¶¶ 4–7. Relators object that Puente is improperly providing expert testimony and was not disclosed as a

non-retained expert under Rule 26(a)(2)(c). ECF No. 107-3. The Court declines to rule on those objections because the Court is merely highlighting that PVA can provide testimony from PVA employees establishing fact issues as to the number of false claims submitted.

The Court finds that Relators have proffered reliable and valid statistical evidence from which a jury could determine by a preponderance of the evidence the number of false claims submitted by PVA. However, a fact issue exists as to the number of false claims actually submitted and the amount of money paid by the Government. Accordingly, the Court denies each party's motion for summary judgment on this issue.

**F. PVA's Constitutional arguments fail as a matter of law.**

PVA's final argument is that Relators' pursuit of non-intervened FCA claims is unconstitutional. Specifically, PVA argues that a private individual bringing a non-intervened FCA claim violates the Appointments Clause and Separation of Powers. ECF No. 112 at 24. The Court rejects this argument as clearly contradictory to existing Fifth Circuit precedent. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001).

## CONCLUSION

As explained herein, the Court finds that Relators have provided legally sufficient evidence to overcome PVA's motion for summary judgment. The Court finds that a healthcare provider's submission of the CMS-1500 form certifying that it had rendered the services described therein is legally and factually false when a separate written report depicting a physician's interpretations has not been completed. The Court also finds that PVA acted knowingly, with deliberate ignorance, or with reckless disregard for the truth or falsity of the information provided when it submitted the CMS-1500 form certifying that it had completed the professional component of a vascular studying when it had not done so. The Court finds that the claims described in the Wrong

Provider Tranche were materially false under the False Claims Act, but that there is a genuine issue of fact as to whether the submission of the remaining false claims was material to the Government's payment decisions. Finally, the Court finds there is a genuine issue of fact as to whether the Government paid significant money on the alleged false claims, and that the trier of fact could determine by a preponderance of the evidence the number and amount of claims that PVA submitted that were rendered false by the conduct that Relators describe.

Accordingly, the Court hereby **ORDERS** that:

Relators' Motion to Strike or Exclude Certain Opinions of Melissa Scott, CPC, CHC, CHIAP (ECF No. 80) is hereby **GRANTED**. Furthermore,

Defendant Peripheral Vascular Associates, P.A.'s Motion to Exclude the Testimony of Dr. James Alexander (ECF No. 82) is hereby **DENIED**. Furthermore,

Defendant Peripheral Vascular Associates, P.A.'s Motion to Exclude the Testimony of Robert D. Church, Jr. (ECF No. 83) is hereby **DENIED**. Furthermore,

Defendant Peripheral Vascular Associates, P.A.'s Motion to Exclude the Testimony of Dr. Zachary Nye (ECF No. 86) is hereby **DENIED**. Furthermore,

Defendant Peripheral Vascular Associates, P.A.'s Motion for Summary Judgment (ECF No. 94), is hereby **DENIED**. Furthermore,

Relators' Motion for Summary Judgment (ECF No. 95) is **GRANTED IN PART** as to the issues of falsity, materiality with regard to the Wrong Provider Tranche, and scienter, and **DENIED IN PART** as to the other issues of materiality and payment.

It is so **ORDERED**.

SIGNED this 14th day of December, 2020.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE



24-50176.4030

# Tab 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR, *Plaintiffs* | § | |
| v. | § | SA-17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., *Defendant.* | § | |

**ORDER**

On this date, the Court considered (1) Defendant's renewed motion for judgment as a matter of law (ECF No. 208), Relators' response (ECF No. 214), and Defendant's reply (ECF No. 217); and (2) Relators' motion for statutory penalties and entry of judgment (ECF No. 207), the responses filed by Defendant (ECF No. 215) and the United States (ECF No. 216), and Relators' replies thereto (ECF No. 218, 219).

**BACKGROUND**

This False Claims Act case arises out of the alleged fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Relators filed this action in April 2017 under the authority granted by 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Relators allege that PVA falsely billed Medicare for services it had not performed. *See* ECF No. 8. After a five-day trial held in February 2022, the jury agreed, awarding $2,728,199 in damages. ECF No. 201. Relators now ask the Court to assess statutory penalties against PVA consistent with the jury's verdict. ECF No. 207. PVA asks the Court to set aside the jury verdict. ECF No. 208.

PVA is a full-service vascular surgery practice with multiple locations throughout San Antonio, Texas. ECF No. 123 at 2. Among other services, PVA performs vascular ultrasounds, which have two components relevant to this case: a technical component and a professional component. *Id.* In essence, the technical component is performing the ultrasound and the professional component is a physician analyzing the results. *Id.*

The technical and professional components of a vascular study can be billed to Medicare (or any other payor) separately or jointly. *Id.* Which provider bills a particular component of a vascular study depends on who performs which component. *Id.* at 3. PVA physicians read and interpret studies performed at PVA offices and at hospitals. *Id.* at 3–4. When a hospital performs the technical component of a study, the hospital bills for that component. *Id.* at 4. When a PVA physician or registered vascular technologist performs the technical component, PVA bills for that component. *Id.* PVA performs some vascular studies without a PVA physician seeing or treating the patient. *Id.* These "Testing Only" studies occur when PVA performs the technical component of a vascular study ordered by a different treating provider. *Id.*

A healthcare provider can bill Medicare for both the technical and professional components of a vascular study using a "global" Current Procedural Terminology ("CPT") Code. *Id.* The CPT Codes are a series of alphanumeric sequences—developed by the American Medical Association ("AMA") and adopted by the Department of Health and Human Services ("HHS")—that healthcare providers use to describe the procedures and services that they perform. ECF No. 123 at 2–3. When a provider bills for just one component of a study, it must use a two-character "modifier" that signifies that only one component has been performed. *Id.* As relevant here, a provider can append the "-TC" modifier when billing the technical component only, or the "-26" modifier to bill for the professional component only. *Id.*

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. *Id.* ¶¶ 17, 22. A patient's medical record is contained in Allscripts CM. In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* at 5. The purpose of this system was to help PVA physicians manage workflow and to create a reporting system that was easier for healthcare providers and patients to understand. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.*

Relators filed their initial Complaint under seal in April 2017, ECF No. 1, followed by an Amended Complaint, filed under seal in December 2017, ECF No. 8. Relators brought this action under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the FCA on behalf of the United States Government. Relators alleged, *inter alia*, that, in 2012, PVA implemented a scheme of too-quick billing designed to increase revenue. *Id.* ¶¶ 36–38. Specifically, PVA began billing Medicare for both the professional and technical component before the patient's status became "Final" in MedStreaming—before the PVA physician had reviewed and interpreted the study and signed the report. Relators alleged three tranches of claims, representing three separate theories of liability under the FCA.

(1) **The "Testing Only" Tranche:** The Testing Only Tranche includes vascular studies that PVA performed based on referrals from non-PVA healthcare providers. When a patient is referred to PVA only for a vascular study, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. Accordingly, a PVA physician's interpretations appear only in the MedStreaming reports. Relators assert that PVA billed Medicare before the MedStreaming report was signed.

(2) **The "Double Billing" Tranche**: The Double-Billing Tranche contemplates services PVA provided to its own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and then order a vascular study to be conducted on the same day. Relators argue that PVA

failed to generate a MedStreaming report to reflect the PVA physicians' interpretations of vascular studies. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations.

(3) **The "Wrong Provider" Tranche**: Relators allege that PVA submitted bills to Medicare indicating the wrong "rendering" physician because PVA used a system that allowed any PVA physician to review and sign MedStreaming reports regardless of whether that physician performed the interpretation.

The Department of Justice investigated the Relators' allegations for roughly a year. Over the course of the investigation, PVA provided thousands of pages of medical and business records pursuant to a Government subpoena, including over 400 patient records covering a three-year period. On August 22, 2018, Katherine Britt, PVA's vice president of operations, met for an hour and a half with special agents from the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") to discuss PVA's Medicare billing practices and explain the documents provided in response to the subpoena. Three months later, the Government informed the Court of its decision to decline to intervene in Relators' case. ECF No. 20.

In August 2020, the parties filed cross-motions for summary judgment. ECF Nos. 94, 95. On December 14, 2020, the Court issued an order resolving the parties' cross-motions for summary judgment. *See United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 759–60 (W.D. Tex. 2020). As is relevant here, the Court granted Relators' motion with respect to the falsity and scienter elements of their claims, concluding that the issues of materiality and damages would be tried to the jury. *See id.* at 773.

A five-day trial was held in February 2022. After the close of Relators' case and then again before submission to the jury, PVA moved for judgment as a matter of law, arguing that that Relators had not satisfied their burden of proof as to materiality or damages, and had failed to

introduce any evidence relating to payments made by the Medicare Advantage and Tricare programs, which have their own rules for payment. *See* ECF Nos. 196, 197. The Court concluded that Relators had failed to present sufficient evidence that designation of the wrong provider on PVA's invoices was material to the Government and, accordingly, granted PVA's motions with respect to the Wrong Provider Tranche of Claims. Trial Tr. at 660:1–4. The Court also granted judgment as a matter of law as to the claims arising out of payments by the Medicare Advantage and Tricare programs. *Id.* at 672:3–8. The motions were denied in all other respects. ECF No. 199.

Pursuant to the Court's rulings narrowing the case, Relators asked the jury to find 2,780 false claims within the Testing Only Tranche and 4,650 within the Double Billing Tranche. Trial Tr. 772:10–8. On February 16, 2022, the jury returned a verdict in favor of Relators, but deducted 25 claims from each tranche.[1] ECF No. 201. In total, the jury found that PVA had submitted 7,380 false claims, causing $2,728,199 in damages to the Government. *Id.* Trebled, the damages awarded by the jury total $8,184,597. 31 U.S.C. § 3929(a)(1). Relators ask the Court to impose additional statutory penalties in the amount of $21,825,592—significantly less than the applicable statutory range of $64,144,311 to $128,288,622. ECF No. 207 at 1, 3. PVA objects that even this reduced penalty violates the Eighth Amendment's prohibition on excessive fines (ECF No. 215) and, pursuant to Federal Rule of Civil Procedure 50(b), renews those portions of its previous motions for judgment as a matter of law that were denied by the Court (ECF No. 208).

[1] This deduction was presumably based on Ms. Britt's testimony that one of the Relators may have caused roughly 50 MedStreaming reports to be misdated. *See* Trial Tr. at 646:12–647:2.

## DISCUSSION

## I. Defendant's Renewed Motion for Judgment as a Matter of Law

### A. Legal Standard

Motions for judgment as a matter of law are governed by Federal Rule of Civil Procedure 50, which provides in relevant part:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim . . . that can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1). If a party makes a motion for judgment as a matter of law during trial, but the court does not grant the motion, the moving party may renew its motion no later than twenty-eight days after the entry of judgment. FED. R. CIV. P. 50(b). A court considering a such a motion may (1) allow judgment on the verdict; if the jury returned a verdict, (2) order a new trial; or (3) direct the entry of judgment as a matter of law. FED. R. CIV. P. 50(b).

In considering a Rule 50(b) motion for judgment as a matter of law following a jury verdict, the court must be "especially deferential" to the jury's findings. *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008). It should "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). A court must deny a motion for judgment as a matter of law "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (quoting *Flowers v. S. Reg'l*

*Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)). In deciding a Rule 50(b) motion, even if the court would reach a different conclusion as the trier of fact, the court is "not free to reweigh the evidence or to re-evaluate credibility of witnesses." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 564 (5th Cir. 2001) (quoting *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995)). In short, "[u]nless there was no credible evidence presented which might authorize the verdict, the jury's findings must stand." *Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 297 (5th Cir. 2006) (internal quotations omitted) (quoting *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995)).

"The court may, on motion, grant a new trial on all or some of the issues." FED. R. CIV. P. 59(a)(1). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). "While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, '[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial.'" *Id.* (quoting C. Wright, Federal Courts 634 (4th ed. 1983)). In ruling on a motion for new trial, the jury's verdict may not be lightly set aside. *Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 343 (5th Cir. 2001).

**B. Analysis**

The FCA prohibits false and fraudulent claims for reimbursement to the federal government. To succeed on a claim for violation of the FCA, the Government or relator must prove:

1) there was a false statement or fraudulent course of conduct;

2) made or carried out with the requisite scienter;

3) that was material; and

4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).

*United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (citing 31 U.S.C. § 3729(a) (2015)). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

The Court notes that PVA's motion raises several arguments that are not properly before the Court. For example, the motion repeatedly addresses the elements of falsity and scienter, *see* ECF No. 208 at 16–18, even though neither of those issues were sent to the jury. PVA further asserts for the first time in its renewed motion that, as to the "double-billing" tranche, "Relators put forth no credible evidence demonstrating that PVA was paid twice for the professional component." ECF No. 208 at 12. PVA did not make this argument in either of its prior Motions for Judgment as a Matter of Law, and it is not properly before this Court as a "renewed" motion. *See Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998); *Charbonnet v. Lee*, 951 F.2d 638, 642 n.20 (5th Cir. 1992). Similarly, PVA's briefing appears to challenge several of the Court's evidentiary rulings, including its decision to limit the scope of testimony concerning the 2018 OIG meeting, *see* ECF No. 208 at 10, and its decision to permit Relators to rely on Dr. Nye's statistical analysis in support of their claim for damages, *see id.* at 16.[2] The Court will not address these arguments further in this order.

---

[2] *See Montcrieff*, 507 F. Supp. at 771 (citing *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 609 (S.D. Tex. 2016) ("[C]ourts regularly find liability where—as here—relators provide circumstantial evidence that shows defendants engaged in a fraudulent scheme and submitted claims to Medicare seeking payment of such fraudulent claims."); *United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *12, n.100 (N.D. Tex. June 20, 2016) ("Extrapolation has been used to establish damages in FCA cases."); *United States v. Krizek*, 192 F.3d 1024, 1030–31 (D.C. Cir. 1999); *see also United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 714 (7th Cir. 2014) ("there has to be some evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of [defendant's] documents contained false certifications.").

### 2. Materiality

For a false claim to violate the FCA, it must be material. *Universal Health Servs., Inc. v. United States ("Escobar")*, 579 U.S. 176, 191 (2016). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In the Fifth Circuit, the FCA requires "proof only that the defendant's false statements *could have* influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (emphasis added). "[T]he False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 579 U.S. at 196.

PVA devotes much of its briefing to the issue of materiality. *See* ECF No. 208 at 4–11; ECF No. 217 at 2–9; ECF No. 219 at 2–5. In support of its position that Relators failed to show that the false claims were material to the Government's payment decisions, PVA advances two primary arguments. First, PVA repeatedly asserts that the falsity of its claims amounted to a mere "timing issue" and was immaterial because "the issue was not whether PVA should be paid, but only when." ECF No. 208 at 4, 6, 8. Second, PVA asserts that, "[a]s a matter of law," the DOJ investigation and 2018 meeting with the OIG "clearly renders the purported false statements immaterial under the FCA." ECF No. 208 at 8; *see also id.* at 9 ("OIG's investigation, after notice of possible violations, negates the existence of materiality as a matter of law.").

The thrust of PVA's first materiality argument is that Relators—and the jury—have conflated falsity with materiality. In fact, PVA's theory of materiality suffers from the converse logical defect: conflating materiality with damages. PVA argues that the Government "would have" paid for its services at some point and that PVA simply reported those services at an

improper time.[3] Even if this were true, Congress has rejected this so-called "no harm, no foul" argument. *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) (citing S. Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5275) ("A false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act . . . even though the services are provided as claimed."); *see also United States v. Mackby*, 68 F. App'x 776, 777 (9th Cir. 2003) ("Mackby's conduct was not harmless. The government has an interest in preserving the integrity of the Medicare system and protecting against fraud. Fraudulent claims, even when the medical services were actually performed, hinder the effective administration of Medicare."). Both courts and Congress have recognized that a false claim may be material even when the damage it causes is minimal or—if the false claim has been denied—non-existent.

PVA next asserts that its pre-billing scheme does not satisfy the standard for materiality set out in the Supreme Court's decision in *Escobar*. Under *Escobar*, "a matter is material" if: (1) a reasonable person would attach importance to it in determining a "choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *Escobar*, 579 U.S. at 192 (quotation marks and citation omitted). *Escobar* identified several factors that are relevant to, but not dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id*. at 193 n.5 (internal quotation marks omitted); whether the violation is "minor or insubstantial," *id*. at 194; and whether the government has taken action when it had actual knowledge of similar violations, *id*. at 195. "[P]roof of materiality can include, but is not necessarily limited to, evidence

[3] This argument is addressed in greater detail in the Court's discussion of damages, *infra*.

that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement" at issue. *Id.* at 194–95.

Determining whether a violation is minor or insubstantial also appears to be a matter of common sense. In *Escobar*, the Supreme Court clarified that a defendant can have "actual knowledge" that a condition is material even when the Government does not expressly identify it as a condition of payment:

> If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." *Id.* Likewise, because a *reasonable person* would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

*Id.* at 191. On the other hand, even an express condition may be immaterial. For example, "[i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act."[4] *Id.* at 195. If the Government regularly pays the service provider's claims, even knowing that foreign-made staplers were used, that is "strong evidence" that the condition that the contractor must use American-made staplers is not material. *Id.* In other words, where "the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* The Fifth Circuit has reasoned that, under *Escobar*, "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Id.* at 663.

---

[4] At trial, PVA mischaracterized this hypothetical from *Escobar* as a requirement that a manufacturer supply American-made staplers. *See* Trial Tr. at 685:2–4. Regardless of the Government's payment behavior, there would appear to the Court to be a significant difference between a requirement that a health care service provider *use* American-made staplers and a requirement that a manufacturer *produce* staplers made in America.

Still, the Government's continued payments in light of its *actual* awareness of misconduct is not proof *per se* that the misconduct is immaterial under the FCA. Courts have long held that an FCA defendant is "not automatically exonerated by any overlapping knowledge by government officials." *United States ex rel. Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993). There are many good reasons, including important public health and safety considerations, why the Government might continue to pay claims in such circumstances. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003) (government might have good reason to pay because the contract is "advantageous to the government" or is too far along to terminate). There are circumstances in which the Government may properly stop payments, but such decisions are necessarily tempered by the need to ensure adequate access to health care. The Government must ensure the delivery of health care to many millions of Americans enrolled in Medicaid, Medicare, and other health insurance programs. "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing." *United States v. Berkeley HeartLab, Inc.*, No. 14-cv-230, 2017 WL 4803911, at *7 (D.S.C. Oct. 23, 2017).

The materiality question in this case, as Relators put it, is simple: "If PVA had been truthful with Medicare when it submitted its bills, and said – 'We have not yet completed this vascular study, but intend to do so in the coming days, weeks, months, or years' – would Medicare have paid those claims?" ECF No. 214 at 4. The jury answered no. Despite PVA's assertions to the contrary, Relators presented ample evidence at trial to support the jury's materiality finding, including the testimony of Relators' Medicare billing experts, Dr. James Alexander and Robert Church, various Medicare publications, and PVA's own internal compliance policies.

Relators' first billing expert, Dr. James Alexander, served for eight years as a full-time Medical Director for Medicare Part B in Texas under Blue Cross/Blue Shield of Texas, including four years as the Chief Medical Director for the State of Texas. Trial Tr. at 178:13–180:14. During his tenure, on an almost daily basis, he participated in decisions whether or not to pay claims that were alleged to have been billed improperly. *Id.* at 181:2–7. Dr. Alexander testified that Medicare would not have paid the claims if it had known that the services were not yet complete, *id.* at 188:7–11; 204:16–22, because Medicare does not pay prospectively for services, *id.* 202:1–13. *See also id.* at 203:6–9 ("[I]f something has not been completed . . . it is considered an invalid claim to be billed to Medicare. And if Medicare had known about it, they would not have paid it."). Dr. Alexander also clarified that Medicare does not make partial payments for partially completed services. *Id.* at 205:5–17; 206:7–14. Relators' second billing expert, Robert Church, who has worked for and with multiple government payors, including Medicare, on billing and payment issues over the course of 30 years, agreed. *Id.* at 347:13-350:20. Like Dr. Alexander, he confirmed that "[i]f a doctor submits a bill to Medicare and says, 'Here's a bill and I have not completed the work, but I plan to do it soon, in a few days, a few weeks,'" Medicare would not pay that bill. *Id.* at 353:14–19; 354:5–22.

Relators' expert testimony was corroborated by several documents that emphasize the importance of only billing for services that have actually been performed. The Medicare Program Integrity Manual identifies examples of Medicare fraud, including: "Incorrect reporting of diagnoses or procedures to maximize payment," "Billing for services not furnished," "Unbundling or 'exploding charges,'" and "Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnishes the services." PEX 58 at 7–8. The Medicare Learning Network Booklet entitled "Medicare Fraud & Abuse: Prevent, Detect, Report,"

describes similar examples of Medicare fraud and abuse, including "Knowingly billing for services not furnished, supplies not provided, or both, including falsifying records to show delivery of such items." PEX 57 at 5.[5] The billing form submitted to Medicare itself—the CMS-1500 form—requires explicit certification by the billing physician that the services being billed for have been "furnished." PEX 35 (emphasis added).

PVA's internal documents also demonstrate the importance of waiting to bill Medicare until services have been completed. For example, its "Compliance Pledge" includes the following billing guidelines:

- "Procedural codes . . . should only be selected which are supported in the chart."
- "[T]he patient's chart is the only defense against a claim of fraud or abuse. If it is not documented, it never happened and cannot be billed."
- "High Risk Areas" include: "1. Billing for items or services not actually rendered," and "4. Duplicated billing."
- "Claim development and submission policies and procedures should: 1. Provide for proper and timely documentation of all physician and other professional services prior to billing to ensure that only accurate and properly documented services are billed[.]"
- The "code used by the billing staff [should] accurately describe[] the service that was ordered by the physician and performed by [PVA]."
- "[A] claim should not be submitted by [PVA] if it is known that documentation does not exist and/or the service was not provided."

PEX 19. The Compliance Pledge was explicitly intended to set forth the broad outlines of a "specific Compliance Plan to address Medicare fraud and abuse laws." *Id.* at DEF000697.

In 2017, PVA "[t]ransitioned to billing after studies are read"—described internally as "Compliance billing"—in part to "[e]nsure no audit requests for incomplete medical records[.]" PEX 29 at DEF007697–98; *see also* DEF007691; Trial Tr. at 140:16:16–25. This "Compliance

[5] Dr. Alexander confirmed that both the Medicare Program Integrity Manual and the rules in the Medicare Learning Network Booklet would be considered by Medicare when determining whether to pay an allegedly improper claim. Trial Tr. 209:20–210:10, 215:23–216:11, 217:22–25.

Billing Project" represented "a SIGNIFICANT change to workflow in the vascular lab," and PVA acknowledged that it would "[t]ake[] significantly longer to bill exam[s]." PEX 29 at DEF007703. A "Vascular Lab Compliance Review" presentation given in 2018 by PVA's technical director, Barbara Burrow, confirmed that "Examples of improper claims include: . . . Billing for services not provided." PEX 20 at DEF0175801.

PVA urges the Court to disregard Relators' evidence of materiality and insists that the only relevant evidence is the Government's continued payment of claims after its investigation into PVA's billing practices. PVA's argument significantly overestimates the probative value of the 2018 meeting in multiple respects, and incorrectly assigns dispositive weight to *Escobar*'s government-action factor.

As a preliminary matter, the Court observes that the 2018 meeting was a part of the Government's *qui tam* investigation. A *qui tam* investigation focuses not on payment decisions, but on whether the DOJ and its agency clients should (1) commit their limited resources to intervening in the *qui tam* case, (2) decline intervention and allow relators to move forward with the case alone, or (3) decline intervention and exercise their discretion to dismiss the relators' case. Given the diverse—and ultimately opaque—factors bearing on the Government's intervention decision, courts routinely exclude it from the materiality analysis altogether:

> In *Escobar* itself, the government chose not to intervene, and the Supreme Court did not mention this as a relevant factor in its materiality analysis. On remand, the First Circuit held that the relators had sufficiently pleaded materiality, without reference to the government's declination of intervention. Furthermore, the False Claims Act is designed to allow relators to proceed with a *qui tam* action even after the United States has declined to intervene. If relators' ability to plead sufficiently the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the [FCA].

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) (citations omitted). As Relators point out, under PVA's logic, any case in which the

Government declines to intervene—approximately 85% of *qui tam* cases—would presumptively fail the materiality test. ECF No. 214 at 15. The Court declines to adopt PVA's theory of intervention given its conspicuous absence from *Escobar* and its progeny.

Second, materiality should be decided at the time of the payment decision, not after-the-fact. The government-action factor turns on whether the government paid a specific claim notwithstanding its *contemporaneous and actual* knowledge that the claim was false. *Escobar* explains that governmental action is relevant only "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," or "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position[.]" 579 U.S. at 195. Again, the Government was not making a payment decision at the 2018 meeting—it was reviewing claims that had already been paid for the purpose of determining whether to intervene in this lawsuit. Thus, the meeting in 2018 cannot establish that the Government knowingly paid false claims *before* the meeting.

Third, the Government's action or inaction is only probative after it acquires "actual knowledge" of the fraud. It is unclear, however, whether the Government understood the nature of PVA's pre-billing scheme from the limited information Ms. Britt provided at the 2018 meeting. Ms. Britt admitted that she detailed only one patient file at the meeting, and did not know whether it was a "testing only" patient or an "E&M" patient. Trial Tr. at 647:10–648:3. Nor could she recall whether the patient file in question demonstrated the falsity at issue. *Id.* at 648:4–8. She did not "provide the government with any statistics on the percentage of claims that PVA submits to Medicare before a MedStreaming report is finalized," *id.* at 648:14–17, and was not aware of the proportion or number of files produced to the Government included prematurely billed claims, *id.*

at 648:18–21. Based on this testimony, the jury easily could have concluded that the Government did not necessarily gain "actual knowledge" from the 2018 meeting.

Fourth, the Government's continued payment of PVA's claims is not evidence that Medicare knowingly paid false claims following the 2018 meeting because, by 2018, PVA had significantly changed its billing practices. The jury heard testimony from Relators' statistical expert, Dr. Zachary Nye, that, from 2014 to 2016, between 40% and 60% of PVA's claims on a monthly basis were false. Trial Tr. at 475:2–5. Following the 2017 Compliance Billing Project, the rates dropped to approximately 5%. Trial Tr. 475:5–8. Put differently, the Government cannot be said to have "actual knowledge" that the claims it paid in 2018 and beyond were false given that the vast majority of PVA's claims during that time period were *not* factually false.

Finally, even if PVA had established that the Government had actual knowledge of PVA's fraud at any point, the jury could have rationally concluded that the Government chose to pursue PVA's conduct through other means, including by allowing this lawsuit to run its course. Trial Tr. 301:1–19 (allowing FCA cases to proceed is one alternative that OIG has to addressing fraudulent billing). PVA points out that the Government could have stopped payments to PVA and canceled its contract, ECF No. 208 at 8, but, as previously noted, there are many reasons that the Government might continue payments in such circumstances, including the health and safety of Medicare beneficiaries. *See Kreindler*, 985 F.2d at 1156; *Harrison*, 352 F.3d at 917; *Berkeley HeartLab, Inc.*, 2017 WL 4803911, at *7.

Given the limited probative value of the 2018 meeting, PVA's reliance on the Fifth Circuit's decision in *Harman* is misplaced. In *Harman*, there was ample and uncontroverted evidence that the Government had actual knowledge of the purported fraud, *and* that the Government made an informed and intentional decision in response. On the eve of trial, the

Government agency issued a memo explicitly stating that despite the design change to the guardrails at issue, the guardrails remained eligible for payment at all times. 872 F.3d at 663. As the Fifth Circuit observed, the Government's reaction was exceptional in its "gravity and clarity," and thus left no doubt as to a lack of materiality. *Id.; see also id.* at 663–64 ("[T]his case is *not* about inferring governmental approval from continued payment. Here, the government has never retracted its explicit approval, instead stating that an 'unbroken chain of eligibility' has existed since 2005."). Here, there was no Government agency finding at all, let alone a decision with the clarity recognized in *Harman*.

The jury would have needed to make multiple inferences about both what the Government learned at the 2018 meeting and its conduct thereafter to impute any views on materiality to the Government. Its failure to do so is no reason to disturb the verdict—nothing in the law required the jury to reject all of Relators' credible evidence of materiality in favor of PVA's theory of the case. *Urban Developers*, 468 F.3d at 297. Indeed, *Escobar* confirms that no one factor is dispositive of the fact-intensive materiality inquiry. This holistic assessment of a false statement's ability to affect the Government's payment decisions is often a matter for the jury. *See United States v. Hodge*, 933 F.3d 468, 474 (5th Cir. 2019) (affirming denial of motion for judgment as a matter of law on materiality); *see also Prather*, 892 F.3d at 831 (explaining that the materiality inquiry is "holistic" in nature involving multiple, fact-intensive factors); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906–07 (9th Cir. 2017) (same); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109–12 (1st Cir. 2016) ("*Escobar II*") (same); Restatement (Second) of Torts § 538 cmt. e (1977) (recognizing that the materiality of a misrepresentation often depends on the jury's assessment of what is reasonable).

The jury concluded that the PVA's false statements were material. Post-*Escobar*, the Fifth Circuit still requires "proof only that the defendant's false statements *could have influenced* the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *Harman*, 872 F.3d at 661 (emphasis added). The jury's finding was supported by the evidence at trial. It is also supported by the kind of common sense analysis contemplated under *Escobar*. Just as "a *reasonable person* would realize the imperative of a functioning firearm," a reasonable person would not pay for services that had not been rendered absent an agreement to prospective payment. *Escobar*, 579 U.S. at 191. The obvious risks of such an arrangement—that the service would be performed in an untimely manner, or not at all—are not purely hypothetical. Indeed, trial testimony confirmed that, in one instance, PVA took nearly two years to interpret a vascular study after the technical component was complete. *See* Trial Tr. 204:8–15; 586:16–18.

In asking the Court to reverse the jury's materiality finding, PVA invites the Court to engage in policymaking. To conclude, as a matter of law, that the falsity of the claim for a service not yet provided was "immaterial" because the service was performed shortly thereafter would be to concoct out of whole cloth a rule without any statutory or regulatory basis—and without any clearly discernable limits. How soon after a false claim is made must a service be performed to treat its falsity as "immaterial"? Days? Weeks? Months? Years? These are questions for Congress and for regulators; these are not questions for courts. As a practical matter, a judicially created rule permitting pre-billing so long as the services are performed within a reasonable amount of time would hamstring the Government in any future efforts to address such false claims, through enforcement actions or through run-of-the-mill claim-denials. PVA's preferred rule would burden the Government with asking, each time it receives a claim for payment, whether the billed service

had actually been performed. And any refusal to pay a claim for a service that had not been performed would likely be met with the (judicially endorsed) excuse that the claimant intended to provide the service "soon." The Court declines PVA's invitation to impose this state of uncertainty and opacity on the Medicare system.

For the foregoing reasons, PVA's motion for judgment as a matter of law on basis that Relators failed to establish materiality is **DENIED**.

### 3. Damages

PVA insists that, as a matter of logic, "the government did not incur any damages" because "it is not an issue about whether PVA would be paid for those services, but simply when." ECF No. 208 at 12. The jury heard this argument at trial,[6] and rejected it. PVA's motion to set aside the jury's award of damages is difficult to assess in part because PVA failed to timely retain and designate a damages expert during the course of discovery in this case. Thus, PVA had no evidence to rebut the analyses conducted by Relators' damages expert, Dr. Zachary Nye. Nor did PVA attempt to cross-examine or impeach Dr. Nye on the points raised in its motion. In short, PVA failed to present any alternate damages models to the jury. Nonetheless, PVA now advances two alternative theories of damages—one based on the reimbursement rate for the professional component only and another based on the interest accrued between the billing date and the average time to completion of the professional component. As discussed more fully below, both of PVA's

[6] *See, e.g.*, the following excerpts from PVA's closing arguments:

> [T]hat's what relators' issue is. It's simply about timing. Importantly, it's not about whether PVA "would be" paid. Their focus is on "when" PVA was paid, not "whether" PVA would be paid. Trial Tr. at 766:21–25.
>
> If you look at [all of the claims at issue in this case], you're going to see that the government wasn't actually harmed here. The services were performed and PVA was paid for those services. Nobody on the stand contradicted that. In fact, everybody supported that. Even relators' primary expert, Dr. Alexander admitted that PVA would have received the money in these instances. In some cases, just later. *Id.* at 768:19–25.

damages models are flawed because they do not account for trial testimony about the practical administration of the Medicare system.

PVA suggests that the Court should sever the global bill into the technical component and professional component of the vascular studies and recalculate damages based on the professional component only. *Id.* at 13. The average reimbursement rate for the professional component, according to PVA, is $22 per vascular study. Trial testimony by witnesses from both parties, however, suggest that this methodology is inappropriate because it departs from Medicare's billing practices in multiple respects.

First, PVA's vice president of operations acknowledged that when a service provider is performing both the technical and professional component of a vascular study, Medicare guidelines state that the provider should use the global bill. Trial Tr. at 402:18–20 (testimony from Ms. Britt that the Medicare guidelines states establish that "if the provider is doing both services that you are to global bill."). Relators' Medicare billing expert, Dr. Alexander, explained that, although the technical component and professional component exist as separate CPT codes, they are billed separately only in limited circumstances, such as when hospital staff conduct the TC, and an outside physician completes the interpretation. *See* Trial Tr. at 229:6–25. When the same service provider is expected to perform both components, Dr. Alexander testified that Medicare does not reimburse for the technical portion without an interpretation because a study without an interpretation is "useless in patient care." *Id.* at 300:4–6; *see also id.* (Relator Tiffany Montcrieff testimony describing that without the physician's interpretation and diagnosis, the patient cannot be treated, and therefore her preliminary report as a technologist "is useless."). Indeed, as Ms. Burrow's compliance review presentation explained, "[n]on-invasive vascular studies done for screening purposes (i.e., without signs or symptoms of disease) are considered not reasonable and

necessary and are therefore non-covered by Medicare," PEX 20 at DEF0175817; *see also id.* at DEF0175802 ("Non-invasive vascular studies are considered not reasonable and necessary if the results are not needed for clinical decision making."). In sum, because PVA was performing both the technical and professional components, it was required to bill globally.

Second, as noted above, Medicare does not make partial payments for partially completed services. At trial, Dr. Alexander explained:

> [I]f a claim is invalid for payment, the whole claim is invalid for payment and not a portion of it that was completed. That's just, again, something that's driven through the whole system. . . . Medicare pays for things that are completed, not for things that are partially completed. And that makes it -- if it's not complete, it's invalid for being submitted, it would be denied when that's known and no part of it is then payable. . . . [P]eople can submit an appeal where they send in additional information and might explain some of the circumstances, but, you know, with just the fact that it was not completed, it would get denied if it was known.

Trial Tr. at 205:5–17; s*ee also id.* at 206:7–14 (testifying that if a claim for services that had not been performed had been submitted to him, he would have denied it); *id.* at 353:14–354:22 (corroborating testimony by Mr. Church). This bright-line rule makes sense given the practical requirements of managing the Medicare system. It is unsurprising that, in managing billions of dollars in Medicare claims each year, the Government does not scrutinize every claim, searching for a reason to pay it, in full or in part. Thus, a reasonable juror could conclude that, had the Government known that PVA had billed for an interpretation that had not been performed, it would have rejected PVA's claim for payment in its entirety.

Nonetheless, in considering damages, the Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case. *See United States. v. Aerodex, Inc.,* 469 F.2d 1003, 1011 (5th Cir. 1972) (describing measure of FCA damages applied in other cases as the "difference between what the government paid and what it should have paid" absent the false statement); *United States. v. Sci. Applications Int'l Corp.,* 626 F.3d

1257, 1279 (D.C. Cir. 2010) ("[t]o establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased.").

Still, PVA's position that the Government did not suffer *any* damages because PVA would have been paid sooner or later is clearly unavailing. Our laws plainly recognize that payment today is not the same as payment tomorrow. *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). This first principle of economics, known as the "time value of money," is certainly not unknown to PVA. Indeed, it appears that PVA's entire pre-billing structure was premised on the clear benefit of receiving payment "now" rather than "later." *See* ECF No. 308 at 12 (citing trial testimony that the change they considered during the spring of 2017 would not have led to any reduction or change the total money paid to PVA, but simply resulted in a "delay" in the timing of Medicare's payment).

The common measure of the difference between payment now and payment later is interest. *Gore, Inc. v. Glickman*, 137 F.3d 863, 868 (5th Cir. 1998) ("interest . . . compensate[s] one for the time value of money."). Interest alone, however, may not adequately account for the harm that fraudulent pre-billing schemes cause to the Government. Courts have recognized that "harm" under the FCA is unique, and often exceeds the direct monetary damage to the government. "Fraud harms the United States in ways untethered to the value of any ultimate payment." *Yates*, 21 F.4th 1288, 1316. As to Medicare, specifically: "Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system." *Id.* (quoting *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003)).

Assuming that interest is the best measure of damages in this case, the Court turns to the interest-based damages models presented in PVA's briefing, which yield estimated damages between $2,366.52 (based on a 3% interest rate) and $7,888.39 (based on a 10% interest rate). *See* ECF No. 208 at 15. PVA's calculations rely on a flawed assumption about how the Medicare reimbursement system operates. Specifically, PVA calculated the interest that would have accrued over a period of 10.5537 days, which purportedly represents the average time between the submission of a bill to Medicare and the signing of related MedStreaming report. *See id.* This ten-day period dramatically understates the Government's damages in this case.

PVA's own billing expert acknowledged that, when Medicare denies a claim, "[t]he provider [can] appeal the claim, provide additional documentation in support of the claim, and work towards a final determination." Trial Tr. at 565:9–11. When the Government identifies and rejects an improper claim that is later corrected, it benefits from the extended payment term between the due date of the original claim and the due date of the corrected claim. When the Government is unable to reject a false claim because it is unaware of a contractor's fraud, it has been harmed by, among other things, the loss of these extended payment terms. Thus, the proper measure of damages is the interest accrued in the time between the date the Government *paid* the false claim and the date that the claim is *determined to be false*—here, the jury verdict on February 16, 2022. For the purposes of illustration, using a median payment date of December 2, 2015,[7] and PVA's proposed alternative interest rates of 3% and 10%, the Government's estimated damages between the payment date and the date of the jury verdict would yield estimated damages between $559,030.07 and $2,349,846.50, and treble damages of $1,677,090.21 and $7,049,539.50.

[7] Dr. Nye calculated that approximately half of the false claims were submitted before, and half after, November 2, 2015. *See* ECF No. 207-1 at 2. Because a damages model premised on extended payment terms should be measured from the date of payment (rather than the date of billing), the Court assumes for the purposes of these calculations that PVA's claims were paid 30 days after they were submitted to Medicare.

Because the services for which PVA billed were eventually performed, the Court agrees with PVA that the jury's verdict on damages must be set aside for an interest-based model of damages. However, given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing, the Court has insufficient information from which to calculate damages at this time. The parties shall confer over the proper methodology for assessing damages consistent with this order, including the appropriate interest rate and the time period in which interest accrued, based on Dr. Nye's analysis. Within thirty (30) days of the filing of this order, the parties shall submit a joint advisory indicating their proposed models for evaluating damages, including any supporting evidence.

Accordingly, PVA's motion for judgment as a matter of law is **GRANTED IN PART** and **DENIED IN PART**.

## II. Relators' Motion for Assessment of Statutory Penalties (ECF No. 207)

Violators of the False Claims Act are liable "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Violators are also responsible for the costs of a civil action. *Id.* § 3729(a)(3). Therefore, violators are liable for statutory penalties, treble damages, and costs.[8]

Relators ask the Court to impose statutory penalties against PVA in the amount of $21,825,592—approximately one-third of the statutory minimum for the 7,380 false claims

[8] Of this award, *qui tam* plaintiffs may be awarded a "reasonable" amount in "civil penalties and damages," including a portion of any statutory penalties as well as treble damage awards. 31 U.S.C. § 3730(d)(2). "The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." *Id.* Thus, Relators are entitled to 25–30% of the total statutory penalties, actual or treble damages owed to the Government, as well as attorney's fees and costs.

identified by the jury. ECF No. 207. PVA faces a maximum statutory penalty of $128,288,622.[9] Relators, however, seek only $21,825,592 in statutory penalties, plus treble damages, totaling approximately one-third of the statutory minimum. PVA objects that even this reduced penalty violates the Eighth Amendment's prohibition on excessive fines. ECF No. 215.

It is unsettled whether the Eighth Amendment's Excessive Fines Clause applies to monetary awards under the FCA. The Eighth Amendment states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., amend. VIII. To evaluate claims under the Excessive Fines Clause, courts must first determine whether the monetary forfeiture is a "fine" as set out in *United States v. Bajakajian*, 524 U.S. 321 (1998) and *Austin v. United States*, 509 U.S. 602 (1993). Then, courts must assess whether the fine is "grossly disproportional to the gravity of a defendant's offense." *Id*. at 337. If so, the fine is excessive.

The Eighth Amendment's prohibition on "excessive fines" addresses the government's power to extract payments as punishment. *See generally Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 268 (1989). In essence, the Excessive Fines Clause was intended to "limit only those fines directly imposed by, and payable to, the government." *Id*. at 268. The Excessive Fines Clause has rarely been interpreted and, consequently, its outer

---

[9] The statutory penalty is assessed per false claim. The per-claim amount is determined by Congress and violators are responsible for fines of "not less than $5,000 and not more than $10,000" per claim, as adjusted by the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L 101-410. 31 U.S.C. § 3729(a)(1). The penalty has increased at several points in time. Thus, penalties are allotted based on the time period during which the false claim occurred. According to an analysis of PVA's 7,380 false claims performed by Dr. Nye, 3,643 claims occurred before November 2, 2015, and 3,737 claims occurred after November 2, 2015. ECF No. 207-1. Relators calculated the minimum and maximum available penalties associated with each period and concluded that PVA is subject to a statutory penalty ranging from $64,144,311 to $128,288,622. ECF No. 207. PVA suggests that Dr. Nye's methodology is flawed because "there is no way to determine what claims the jury counted towards their final tally of false claims," and, accordingly, when those false claims were made. ECF No. 215 at 9–10. As Relators point out, however, Dr. Nye's calculations are ultimately unnecessary for the Court to consider in light of the requested remittitur. ECF No. 218 at 11–12. Even assuming that all of the false claims were submitted before November 2015, the minimum statutory penalty would still be $40,590,000.

boundaries are not well-defined. Initially, the Supreme Court understood the Clause to limit only criminal forfeitures, although the Court has since held that it applies to both criminal and civil forfeitures. *Compare Browning-Ferris*, 492 U.S. at 262 (stating in dicta that the Excessive Fines Clause "appl[ies] to primarily, and perhaps exclusively to criminal prosecutions and punishment") with *Austin v. United States*, 509 U.S. 602, 610 (1993) (concluding that "thus, the question is not [] whether forfeiture [] is civil or criminal, but rather whether it is punishment").

While the Supreme Court has recognized that awards under the FCA are in part punitive in nature,[10] it has explicitly left open the question whether a private *qui tam* plaintiff's recovery of damages on behalf of the government implicates the Eighth Amendment.[11] *Browning-Ferris,* 492 U.S. at 275 n.21. Other circuits have concluded that non-intervened FCA qui tam actions are subject to the Eighth Amendment's prohibition on excessive fines. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015); *United States v. Aleff*, 772 F.3d 508 (8th Cir. 2014); *Mackby*, 339 F.3d at 1013; *Yates*, 21 F.4th at 1288. Nonetheless, the Court need not reach the question here because, even assuming that the Excessive Fines Clause applies to private FCA actions, the reduced penalty in this case is not grossly disproportionate to the gravity of PVA's conduct.

A "punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. This inquiry does not turn, as

---

[10] *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000) ("[T]he current version of the FCA imposes damages that are essentially punitive in nature."); *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 130 (2003) (explaining that treble damages provision has "compensatory traits along with the punitive"); *Escobar*, 579 U.S. at 182 (citing *Stevens,* 529 U.S. at 784).

[11] There are reasons to doubt that FCA civil penalties are "fines" imposing punishment. First, the penalty provisions have a criminal counterpart, 18 U.S.C. § 287, indicating that Congress viewed the civil penalties as distinct from the criminal. Second, the statutory text explicitly describes the forfeiture as a "civil penalty" and is regulated by the Federal Civil Penalties Inflation Adjustment Act of 1990. Third, although the FCA imposes various scienter requirements—knowledge or intent, depending on the provision—the penalties are imposed at the culmination of civil proceedings and are not dependent on an underlying criminal conviction, contrary to the statute at issue in *Bajakajian*.

PVA suggests (ECF No. 215 at 7), on the ratio of damages to penalties—especially not in the context of the FCA, where Congress established minimum and maximum penalties for each false claim submitted by a defendant, in addition to treble damages for losses caused by the defendant's conduct.[12] *See* 31 U.S.C. § 3729(a)(1). Indeed, the FCA's penalty and damages provisions were enacted precisely because the submission of false claims harms the government in serious but difficult-to-quantify ways. *See* S. Rep. No. 99-345, at 3 (1986) ("The cost of fraud cannot always be measured in dollars and cents[.]"). The Excessive Fines Clause thus does not "confine[]" the "concept of harm . . . strictly to the economic realm" in the FCA context. *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013). Moreover, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature[,]" and "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise," a court should only deem a judgment unconstitutional if the amount of the judgment is "grossly disproportionate to the gravity of the defendant's offense[.]" *Bajakajian*, 524 U.S. at 336–37.

Courts may also consider where the imposed penalty lies on the range of penalties provided by the legislature. *See id.* n.14; *see also Yates*, 21 F.4th at 1314 (finding that when a judgment "fall[s] below the maximum statutory fine[] for a given offense, the judgment is entitled to a "strong presumption of constitutionality"); *accord United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020) ("If the value of the forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." (internal quotation and

[12] Even so, the Court notes that the Eleventh Circuit in *Yates* ultimately upheld the trial court's assessment of $1,177,000 in penalties, representing a multiplier of over *155 times* single damages. *Id.* at 1297. By comparison, here, the proportion of requested penalties ($21,825,592) to the Court's estimated damages (between $559,030.07 and $2,349,846.50), is between 9 and 39. Courts have approved similar ratios in FCA cases, and even allowed significant penalties where there are no damages sought. *See, e.g.*, *Bunk*, 741 F.3d at 409 (awarding $24 million in penalties where relator "sought no damages").

alteration marks omitted)). Here, Relators are not only willing to accept the statutory minimum, but a remittitur below the minimum. Accordingly, any award within the range provided by Congress is presumptively consistent with the Eighth Amendment. Logically then, a penalty *beneath* the statutory minimum also satisfies the Eighth Amendment.[13] Because Relators request a monetary damage significantly lower than the statutory minimum, it is presumptively constitutional.

Second, this Court finds that the requested amount is reasonable because PVA is in the class of defendants the FCA is designed to address. The False Claims Act targets the "growing pervasiveness of fraud" against the Government, enhances "the Government's ability to recover losses sustained as a result of" that fraud, and encourages "any individual knowing of Government fraud to bring that information forward." S. REP. 99-345, 17, 1986 U.S.C.C.A.N. 5266, 5282. PVA made over seven thousand false claims to receive reimbursements for services that had not been provided. Having knowledge of PVA's misconduct, Relators brought this suit. Thus, despite PVA's attempt to categorize its conduct as "mere reporting offense[s]" analogous to that in *Bajakajian*, this case is easily distinguishable.[14]

Third, although PVA attempts to argue its behavior "fall[s] short of being reprehensible," ECF No. 215 at 3–4, this Court disagrees for several reasons. At bottom, PVA caused significant

---

[13] This Court presumes that it has the discretion to impose monetary awards in an amount below the statutory minimum. *Compare Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975) ("The Government tacitly admits that the court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government.") *with* S. REP. 99-345, 17, 1986 U.S.C.C.A.N. 5266, 5282 ("The Committee reaffirms the apparent belief of the act's initial drafters that *defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving fine determinations with district courts*, possibly resulting in discretionary nominal payments.") (emphasis added).

[14] The defendant in *Bajakajian* was not a "money launderer, a drug trafficker, or a tax evader," three categories of people the statutes at issue addressed. In contrast, the jury found that PVA knowingly submitted false claims for government reimbursement—precisely the species of conduct prohibited by the FCA.

harm. Not only did PVA cause significant damage to the Government in the form of interest, but the consequences extend beyond monetary harm. False claims require the Government to expend additional resources—both financial and personnel—investigating and prosecuting fraud. False claims also undermine public confidence in the Government and, perhaps most importantly, compromise the administration of Government programs, like Medicare, that Americans depend upon to access quality health care. Contrary to PVA's objection that "this was not a scheme to defraud the public fisc," *id*. at 4, it is impossible to characterize the knowing perpetuation of fraud upon the United States and its programs as anything but a scheme to defraud the public. Finally, although PVA maintains that its conduct bears no relationship to criminal activity, on the contrary, false statements to the Government *can* be prosecuted as criminally. 18 U.S.C. § 287. The fact that the civil provisions impose a knowledge or intent requirement further indicates that Congress found this behavior serious and reprehensible.[15]

Additionally, PVA maintains that the penalties are unnecessary because merely "requiring PVA to forfeit the sums that Relators claim were prematurely billed for the professional component" would be more than sufficient to deter future misconduct. ECF No. 215 at 5–6. PVA is correct that FCA awards are designed, in part, to be punitive and to serve a deterrent effect. *United States v. Bornstein*, 423 U.S. 303, 309 n.5 (1976) (stating that the False Claims Act was adopted "for the purpose of punishing and preventing . . . frauds."). The damages awarded here are not punitive, however, but compensate the Government, in the form of interest, for its loss of access to funds wrongfully paid to PVA between the payment date and the date that the fraud was identified by the jury. *See Bajakajian*, 524 U.S. at 329 (characterizing forfeiture of currency that

[15] PVA also requests a lower penalty because its conduct harmed only the Government rather than Medicare beneficiaries. *See* ECF No. 215 at 3. It is unclear what this argument is intended to achieve, however, given that the FCA was designed to prevent harm to the Government. Moreover, PVA successfully sought via motion *in limine* to exclude evidence and argument regarding patient safety and medical necessity. *See* ECF No. 162.

"*does not* serve the remedial purpose of compensating the Government for a loss" as punitive because of its deterrent effect) (emphasis added). Courts have recognized in the context of securities violations that, "[w]ithout civil penalties, the only financial risk to FCA violators is the forfeiture of their ill-gotten gains." *S.E.C. v. Thomas*, No. 3:13-CV-739-L, 2014 WL 840030, at *4 (N.D. Tex. Mar. 4, 2014) (citing *S.E.C. v. AmeriFirst Funding, Inc.*, No. 3:07–CV–1188–D, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008)). The same holds true here. Because the entire purpose of PVA's pre-billing structure was to receive payments earlier, compensating the Government with interest on its early payments only serves to disgorge PVA's ill-gotten gains, not to discourage the underlying scheme. Finally, PVA asks that the award be reduced because it is unable to pay a hefty sum, though it fails to offer any evidence demonstrating its financial condition. ECF No. 215 at 7. "The familiar maxim ignorance of the law is no excuse" holds true here. *See Elonis v. United States*, 575 U.S. 723, 734–35 (2015). PVA should have considered the consequences of defrauding one of the Government's largest benefits programs before submitting its false claims. The Fifth Circuit has also rejected this argument. *United States v. Suarez*, 966 F.3d 376, 388 (5th Cir. 2020) (rejecting argument that defendant was "unable to pay the forfeiture judgment or any fine" as having no support in the Fifth Circuit).

In sum, the requested monetary sanction is not grossly disproportional to PVA's conduct. Relators request a monetary award significantly less than the minimum fines required by statute. In light of PVA's conduct, the Court cannot say that the award is disproportional. Statutory penalties of $21,825,592 do not violate the Eighth Amendment's Excessive Fines Clause, assuming that it applies here.

To the extent that Relators seek attorneys' fees and costs, as provided for in 31 U.S.C. § 3730(d)(2), Relators must submit a motion for attorneys' fees and a bill of costs to the Court within thirty (30) days of this order or seek an extension of time in which to do so.

## CONCLUSION

For the foregoing reasons, PVA's renewed motion for judgment as a matter of law (ECF No. 208) is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED IN PART** with respect to damages, which will need to be recalculated in a manner consistent with this order.

Within **fourteen (14) days of the filing of this order**, the parties are **DIRECTED** to confer over the proper methodology for assessing damages, including the appropriate interest rate and the time period in which interest accrued, based on Dr. Nye's analysis. Within **thirty (30) days of the filing of this order**, the parties shall submit a joint advisory indicating their proposed models for evaluating damages, including any supporting evidence.

To the extent that Relators seek attorneys' fees and costs, as provided for in 31 U.S.C. § 3730(d)(2), Relators must submit a motion for attorneys' fees and a bill of costs to the Court **within thirty (30) days of this order** or seek an extension of time in which to do so.

Relators' motion for statutory penalties (ECF No. 207) is **GRANTED**. The Court will postpone entering a judgment pursuant to Rule 58 until it has made a final determination concerning the proper measure of damages.

**SIGNED** this 9th day of January, 2023.



XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

# Tab 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR; *Plaintiffs* | § | SA-17-CV-00317-XR |
| -vs- | § | |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., *Defendant* | § | |

**ORDER**

On this date, the Court considered Relators' Motion for Attorneys' Fees, Costs, and Expenses (ECF No. 223), Defendant's Response (ECF No. 238), and Relators' Reply (ECF No. 245). After careful consideration, the Court issues the following order.

**BACKGROUND**

This case arises out of the alleged fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Relators filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Relators allege that PVA falsely billed Medicare for services it had not performed. *See* ECF No. 8. After a five-day trial held in February 2022, the jury agreed, awarding $2,728,199 in damages. ECF No. 201.

Relators now move to recover $2,932,563.2, comprised of $2,227,375.00 in attorneys' fees and $705,188.70 in costs and expenses. *See* ECF Nos. 223; 245. Defendant opposes the attorneys' fees sought, arguing (1) Relators' counsel billed for unrecoverable time, such as travel, and used block-billing "to prevent determination that the work performed was reasonable;" (2) the hourly

rates are unreasonable; and (3) that the lodestar should be reduced to reflect "Relators' limited results." *See* ECF No. 328. PVA argues instead that attorneys' fees between $350,000 to $750,000 are reasonable. *Id.*

## LEGAL STANDARD

Under the False Claims Act, prevailing relators are entitled to "receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." 31 U.S.C. § 3730(d)(2). "All such expenses, fees, and costs shall be awarded against the defendant." *Id.*

The district court should use the "lodestar" method to calculate reasonable attorneys' fees. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010). To use the lodestar method, the court calculates the base amount of attorneys' fees to which a party is entitled by multiplying the number of hours the attorneys reasonably worked by the prevailing hourly rate. *Id.* This sum, or lodestar amount, is strongly presumed to be the reasonable amount to which the prevailing party is entitled. *Id.* at 550–52. However, the prevailing party has the burden of establishing the reasonableness of the award. *Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir. 1996).

In determining the number of hours the attorneys reasonably worked, the district court should not include hours that are improperly documented, redundant, or excessive. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993)). To determine if hours are reasonable, the district court must consider whether "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). Additionally, the prevailing party seeking attorneys' fees bears the burden of showing the proper use of "billing judgment," or the process by which attorneys write off duplicative, unproductive, or excessive hours. *Walker v.*

*United States Dep't of Housing & Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996). To prove proper billing judgment was used, the prevailing party must show documentation of both hours charged and hours written off. *Saizan v. Delta Conrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). Absent documentation showing the proper use of billing judgment, the district court should reduce the attorneys' fees awarded by "a percentage intended to substitute for the exercise of billing judgment." *Id.*

The market rate for comparable service by lawyers of similar experience, skill, and reputation is considered the prevailing rate for the purposes of the lodestar calculation. *McClain*, 649 F.3d at 381 (citing *Blum v. Stevenson*, 465 U.S. 886, 889 (1983)). The relevant market for the purposes of determining the prevailing rate to be used in the lodestar calculation is the market in which the district court sits. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (citing *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 558 (5th Cir. 1998)). However, where it is necessary for the prevailing party seeking attorneys' fees to use out-of-town lawyers, the district court should use the standard rate from the out-of-town market to calculate the base lodestar amount instead. *McClain*, 649 F.3d at 382–83.

After determining the base lodestar amount, the court has discretion to adjust the attorneys' fee award according to the factors enumerated in *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974). The "*Johnson* factors" are: (1) the time and labor required; (2) the novelty and difficulty of the legal questions; (3) the requisite skill to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the

"undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *E.g., Black v. SettlePou, P.C.*, 732 F.3d 492, 502 n.7 (5th Cir. 2013) (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). The court may not consider *Johnson* factors it already used for the purpose of calculating the lodestar amount. *Black*, 732 F.2d at 503.

Finally, Federal Rule of Civil Procedure 54(d)(1) states that "Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." FED. R. CIV. PROC. 54. Section (d)(2) allows a party to recover "related nontaxable expenses" in addition to attorneys' fees. *Id.* 54(d)(2). However, as with attorneys' billed hours, "the governing substantive law dictates recoverable expenses." *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 529 n.61 (5th Cir. 2001). These reasonably related expenses include "postage, photocopying, paralegal services, long distance telephone charges, and travel costs." *Id.* at 529.

## DISCUSSION

### I. Lodestar

Relators seek $2,227,375.00 in attorneys' fees, based on a total of 5,147.65 reported hours of work relating to the litigation, as indicated below.[1]

| Attorney | Requested hourly rate | Hours worked | Total amount billed |
|---|---|---|---|
| Justin Berger | $750 | 1,330.65 | 997,987.50 |
| Sarvenaz (Nazy) Fahimi | $500 | 1,649.40 | 824,700 |
| Adam Shapiro | $400 | 67.3 | $26,920.00 |
| Michael Montano | $400 | 45.4 | $18,160.00 |
| Paralegal time | $175 | 2,054.90 | 359,607.50 |
| **Total** | | **5,147.65** | **$2,227,375.00** |

*See* ECF Nos. 223-1; 223-2 at 3; 245-2.

To support these fees, Relators provided: (1) time sheets detailing all time expended on this matter by counsel and paralegals, *see generally* ECF Nos. 223-2; (2) declarations by lead counsel, Justin Berger, and the junior partner on the matter, "Nazy" Fahimi, *id*. 223-1; 223-4; and (3) declarations by Glenn Grossenbacher, Rand J. Riklin, and Wallace M. Brylak Jr., three attorneys in the San Antonio area, *id*. 223-5; 223-6; 223-7.

[1] These numbers included the time counsel spent after the Court issued its Order granting in part and denying in part Defendant's Motion for Directed Verdict. *See* ECF No. 245-2. *See Frew v. Traylor*, 688 F. App'x 249, 254 (5th Cir. 2017), *as revised* (Apr. 28, 2017) ("Fees may also be recoverable for successful work done after entry of the consent decree that is done to enforce the decree.").

**A. Reasonableness of Hourly Rates**

The Court must determine the applicable hourly rate, keeping in mind that the fee award, in the end, must "only be reasonable and sufficient to attract competent counsel." *U.S. ex rel. Cook-Reska v. Cmty. Health Sys., Inc.*, 641 F. App'x 396, 400 (5th Cir. 2016) (citing *McClain*, 649 F.3d at 381). Generally, "the court should base its award on the prevailing market rates in the relevant community," i.e., the local geographic community. *Id*. Ultimately, the district court is an "expert" in assessing matters of attorneys' fees and may use this expertise and judgment to make an independent valuation of an appropriate fee award. *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 526 F.2d 865, 868 (5th Cir. 1976).

Relators request a $750 hourly billing rate for Berger, a $500 per hour rate for Fahimi, $400 per hour for the two associates, Shapiro and Montano, and $175 for all paralegals. PVA maintains that these are "excessive" rates and out of step with rates charged in the San Antonio legal market. ECF No. 238 at 4. PVA argues that the median hourly rate in San Antonio is $285 per hour and proposes that the Court reduce the hourly rates to $300.00 per hour per partner attorney, $200.00 per hour for associates, and $100.00 for paralegals and other support staff. *Id*. at 6.[2] *Id*.

The Court disagrees with PVA and instead finds that Relators' fees are reasonable within San Antonio, are reflective of the larger market of *qui tam* litigators, and are warranted because of counsels' skill and experience.

---

[2] Defendant arrived at these numbers by relying on an analysis of 2019 attorney incomes performed by the State Bar of Texas. *See 2019 Income And Hourly Rates*, State Bar of Texas, November 3, 2020, available at: https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends&Template=/CM/ContentDisplay.cfm&ContentID=54237. The median rate included all practice areas (personal injury and family law included).

"Rates may be adduced through direct or opinion evidence as to what local attorneys charge under similar circumstances." *United States v. Cmty. Health Sys., Inc.*, No. CIV. A. H-09-1565, 2015 WL 3386153, at *8 (S.D. Tex. May 4, 2015), *aff'd sub nom. U.S., ex rel., Cook-Reska v. Cmty. Health Sys., Inc.*, 641 F. App'x 396 (5th Cir. 2016). Relators provided declarations by Glenn Grossenbacher, Rand J. Riklin, and Wallace M. Brylak Jr. in support of their request for fees. Mr. Grossenbacher and Mr. Riklin are *qui tam* litigators in the San Antonio area, both currently charge $750 per hour for their services, and maintain that Relators' hourly rates are reasonable for the local market. *Id*. 223-5 at 3 ("Based on my knowledge of CPM's reputation, and its skill in handling this matter, I believe the rates sought . . . are imminently reasonable for this region;" *id*. 224-6 at 2 ("I currently charge $750 in representing relators in this type of litigation, which is in conformity with what experienced local *qui tam* attorneys charge in the San Antonio market").

Furthermore, the Court finds that the requested rates are consistent with what *qui tam* attorneys charge in the national market. Given the specialized area of the law and the "small" pool of attorneys around San Antonio who specialize in FCA cases, national awards may properly be considered.[3] Nationally, courts have found awards to be reasonable with hourly rates ranging from $400–$919 per hour for partners, $175–600 per hour for associates, and $110–225 per hour for paralegals.[4] Within this circuit, a district court in the Northern District of Texas affirmed a fee at $600 per hour in 2012; reasonable rates have certainly increased in the last decade. *See Becker v.*

---

[3] *See* ECF Nos. 223-6 at 2 ("*Qui tam* litigation is a very specialized area of law. There are only a few *qui tam* specialists who practice in the Western District of Texas."); *id*. 223-5 at 2 ("[I]n the San Antonio market, I am unaware of any local attorney(s) that are known in the local legal community to be experienced and regularly practice in this area.").

[4] *See United States ex rel. Nichols v. Computer Scis. Corp*., 499 F. Supp. 3d 32 (S.D.N.Y. 2020) (affirming partner rate of $850 per hour, associate rates of $425-500/hour, and paralegal rates of $125-225*); United States ex rel. Yasti v. Nagan Constr*., No. 17 CIV. 7163 (AT), 2021 WL 1063437 (S.D.N.Y. Mar. 18, 2021) (applying partner rate of $800 per hour, associate rates of $425-600/hour, and paralegal rates of $100-200); *Franchek v. Workrite Ergonomics, LLC*, No. 16CV02789JSWDMR, 2022 WL 3137928, at *6 (N.D. Cal. May 9, 2022), *report and recommendation adopted*, No. 16-CV-02789-JSW, 2022 WL 3137918 (N.D. Cal. May 31, 2022) (affirmed partner rate of $850 and $919); *United States ex rel. Menold v. Lotus Fam. Med.*, No. 3:17-CV-1728-PGS-LHG, 2022 WL 345046 (D.N.J. Feb. 4, 2022) (affirming partner rate of $675 per hour, senior associate rates of $520/hour).

*Tools & Metals, Inc.*, No. 3:05-CV-0627-L-BK, 2012 WL 12985112, at *11 (N.D. Tex. Dec. 12, 2012).[5]

Finally, the requested rates are commensurate with counsels' experience.[6] Lead counsel, Justin Berger graduated from the University of California Berkeley School of Law in 2006, clerked in a United States District Court, has 15 years of experience in the *qui tam* field, and has been counsel in "dozens" of *qui tam* cases. ECF No. 223 at 10. Nazy Fahimi is a junior partner at her law firm, has been practicing law since 2001, and has five years of *qui tam* experience. Counsel has garnered a national reputation for their expertise; indeed, Mr. Brylak referred Relators to Berger and his firm because he understood counsel to be "highly skilled and well known nationally in False Claims Act practice." *Id*. 223-7 at 2. Mr. Brylak's statements are supported by Mr. Grossenbacher and Mr. Riklin. *Id*. 223-5 ("I am familiar with the ability level and experience of Mr. Berger and his firm, and I know them to be highly skilled and very well-reputed in the *qui tam* area."); *id*. 223-6 ("I understand Mr. Berger and his colleagues to be highly skilled and well-reputed attorneys.").

Given counsels' experience and the Court's knowledge of fees charged by attorneys, support staff in the local community, and similarly skilled attorneys nationally, the Court finds the Relators' proposed rates to be reasonable.

[5] *See also Becker v. Tools & Metals, Inc.*, No. 3:05-CV-0627-L-BK, 2012 WL 12985112, at *11 (N.D. Tex. Dec. 12, 2012) (affirming partner rate of $600 per hour); *United States v. Cmty. Health Sys., Inc.*, No. CIV.A. H-09-1565, 2015 WL 3386153, at *19 (S.D. Tex. May 4, 2015), aff'd sub nom. *U.S., ex rel., Cook-Reska v. Cmty. Health Sys., Inc.*, 641 F. App'x 396 (5th Cir. 2016) (affirming partner rate of $550 per hour); *United States ex rel. Bliss v. Biocompatibles Int'l* PLC, No. SA-13-CV-667-XR, 2019 WL 79488, at *6 (W.D. Tex. 2019) (affirming lead counsel rate of $450 per hour); *Aldridge on behalf of United States v. Corp. Mgmt. Inc.*, No. 116CV00369HTWLRA, 2022 WL 983167 (S.D. Miss. Mar. 30, 2022) (affirming partner rate of $400–450 per hour).

[6] The Court also notes that counsel reduced their typical hourly rate for this suit. ECF No. 223 at 3.

**2. Reasonableness of Hours**

Parties seeking fees have the burden of showing the reasonableness of the hours billed and that they exercised billing judgment. "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan*, 448 F.3d at 799. "The court should exclude all time that is excessive, duplicative, or inadequately documented[.]" *Watkins*, 7 F.3d at 457. Hours can also be reduced for documentation that is "vague" or "brief," *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995), or "not illuminating as to the subject matter," *Leroy v. Houston*, 906 F.2d 1068, 1080 (5th Cir. 1990).

Relators assert that counsel spent a total of 5,147.65 hours working on this case and attached a time sheet documenting these hours. ECF No. 223-2. Relators argue that counsel exercised billing judgment by reducing or eliminating all entries that were "vague, clerical in nature, duplicative, unproductive . . . or mistakenly coded to this case file." *Id*. *223*-2 at 2. Relators claim that this reduced the total hours by 731.35, approximately 12.5% of all time recorded, although the eliminated entries are not reflected on the provided time sheet. *Id*. Moreover, Relators note that "significant work" was billed by associates, a Junior Partner, and paralegals, indicating a "proper leveraging of non-senior attorney time and minimal duplication involving multiple attorneys performing the same or redundant tasks." *Id*. at 3.

In response, PVA argues that the lodestar should be reduced because Relators showed poor billing judgment and had a low rate of success. First, PVA maintains that the provided time sheets are vague and inappropriately block-billed, making it "difficult for them to demonstrate that the fees requested are reasonable." ECF No. 238 at 3. PVA argues that this, coupled with the fact that counsel provided "no explanation" for the 731.35 hours that were written off, indicates a lack of

billing judgment. *Id*. Relatedly, PVA maintains that Relators' counsel inappropriately billed for travel time. *Id*. at 4.

Finally, PVA argues that the lodestar is disproportionate to Relators' overall success. ECF No. 238 at 6. Specifically, PVA contends that counsel spent a significant number of hours on claims on which PVA received a directed verdict or Relators voluntarily dismissed. *Id*. at 7. PVA maintains that because it received a directed verdict on "81% of the alleged improper claims," the "time spent pursuing unsuccessful claims are [] non-compensable." *Id*. at 7 (citing *Walker*, 99 F.3d at 769). Ultimately, PVA asks this Court to reduce Relators' attorneys' fees to an hourly rate of $300.00 per hour per partner attorney, $200.00 for associates, and $100.00 for staff. *Id*. at 6.

Although hours can be reduced for "vague" documentation, *Louisiana Power*, 50 F.3d at 324, the Court notes that PVA failed to provide the Court with a comprehensive list of the objectionable "vague" and "block-billed" entries. Similarly, PVA objects to the time entries related to traveling but identifies only a single entry from May 8, 2019 which reads: "Travel for MTD and CBC; prep SJF for hearing." *Id*. at 4; *see also* ECF No. 223-2.

After reviewing the time sheet provided and the parties' arguments, the Court determines that Relators' counsel exercised good billing judgment. The time sheets indicate that counsel used attorneys and support staff appropriately. While PVA objects to Relators' time-keeping methods, PVA failed to comprehensively identify the disputed entries. Thus, the Court finds that Relators' request for attorneys' fees is reasonable. Multiplying the hours expended by the relevant rates, the Court determines the lodestar amount to be $2,227,375.00.

## II. *Johnson* Factors

Courts may increase or decrease a lodestar amount based on the *Johnson* factors. The Court agrees with Defendant's argument that the results obtained justify a decrease in fees and concludes that the lodestar should be decreased by 20% because some of the hours charged were for work performed on unsuccessful claims. Thus, Relators are entitled to $1,781,900 in attorneys' fees.

## III. Costs

As the prevailing party, Relators seeks $705,188.70 in expenses pursuant to 31 U.S.C. § 3730(d) and costs pursuant to Federal Rule of Civil Procedure 54(d). Federal Rule of Civil Procedure 54(d) provides that costs "shall be allowed as of course to the prevailing party." 28 U.S.C. § 1920 defines the term "costs" as used in Rule 54(d) and enumerates the expenditures that a federal court may tax as a cost under Rule 54(d). *Gaddis v. United States*, 381 F.3d 444, 450 (5th Cir. 2004); *see also Crawford Fitting Co. v. Gibbons*, 482 U.S. 437, 441 (1987). Section 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Thus, unless otherwise authorized by statute, the types of costs that may be awarded under Federal Rule of Civil Procedure 54(d) are limited to those enumerated in 28 U.S.C. § 1920.

The governing law in this case, 31 U.S.C § 3730(d) of the False Claims Act, states that prevailing relators are entitled to recover "*reasonable expenses* which the court finds to have been necessarily incurred, *plus reasonable attorneys' fees and costs*." 31 U.S.C. § 3730(d)(2) (emphasis added). The Court finds that the plain language of § 3730(d)(2) authorizes prevailing relators to collect "reasonable expenses" beyond the "costs" typically permitted under Rule 54 and section 1920.

This finding is consistent with the plain text of the statute. Section 3730 espouses the recovery requirements for several categories of individuals, including *qui tam* relators, prevailing defendants under §3730(d)(4), and prevailing plaintiffs in retaliation cases brought under § 3730(h). Section (d) states:

> **(d) Award to qui tam plaintiff--(1)** If the Government proceeds with an action brought by a person under subsection (b) . . . [the relator] shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.
> **(2)** If the Government does not proceed with an action under this section . . . [the relator] shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.
> [. . .]
> **(4)** If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

31 U.S.C § 3730(d). Section 3730 also provides for recovery of expenditures by plaintiffs who sue under the False Claims Act's retaliation provisions. Under section 3730(h)(3), successful plaintiffs can recover back wages "and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C § 3730(h)(2).

Thus, section 3730 provides for three types of recovery—reasonable expenses, attorneys' fees, and costs—and explicitly differentiates among parties and in what circumstances these

expenditures can be recovered. *Qui tam* relators can recover reasonable expenses, attorneys' fees, and costs. *Id.* § 3730(d)(2). In contrast, prevailing defendants can only recover reasonable expenses and attorneys' fees only if the "court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." *Id.* § 3730(d)(4). Successful plaintiffs in retaliation cases can only recover "litigation costs and reasonable attorneys' fees." "If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). The plain text of the False Claims Act differentiates between recovery of these expenditures and clearly permits prevailing *qui tam* plaintiffs to recover reasonable expenses in addition to costs and attorneys' fees.

Furthermore, this finding is consistent with Supreme Court decision in *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012), where the Court interpreted the meaning of "cost" under Federal Rule of Civil Procedure 54(d). In *Tanigushi*, the Court differentiated between "costs," as enumerated in Rule 54, and other "expenses." *See generally id.* "Costs," the Court explained, are "limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts." *Taniguchi*, 566 U.S. at 573. The Court further differentiated "costs" from the "nontaxable expenses" typically "borne by litigants for attorneys, experts, consultants, and investigators." *Id.* at 573; *see also* 10 C. WRIGHT, A. MILLER, & M. KANE, FED. PRAC. & PROC. CIV. § 2666 (4th ed.) (hereinafter "§ 2666 Wright & Miller") ("Expenses, of course, include all the expenditures actually made by a litigant in connection with the action.") (internal quotation omitted).[7]

[7] The Court also notes that this decision is consistent with the Second, Eighth, and Tenth Circuits who have held that prevailing defendants in *qui tam* can be awarded costs without proof that the suit was "frivolous, clearly vexatious, or brought primarily for purposes of harassment," as required by 31 U.S.C. § 3730(d)(4). *See Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.,* 817 F.3d 433 (2d Cir. 2016); *U.S. ex rel. Costner v. United States*, 317 F.3d

Accordingly, Relators seek $705,188.70 in costs and expenses. ECF Nos. 223; 245. Relators provided the Court with a list of these expenditures. ECF Nos. 223-3; 245-2. The category summaries are reproduced below.

| **Category** | **Amount** |
|---|---|
| Court Costs | $876.20 |
| Deposition | $22,518.24 |
| Document Depository | $97,081.84 |
| Document Production | $49,187.40 |
| Document/Publications | $940 |
| Experts/Consultant | $476,210.26 |
| FedEx, Messenger & Delivery | $6,790.21 |
| Hearing Transcript | $663.30 |
| In-house Photocopies | $1,562.00 |
| Legal Research ("Lexis Nexis") | $9,624.88 |
| Postage | $259.83 |
| Service of Process | $1,335.90 |
| Sp. Master/Arbitration | $3,000.00 |
| Telephone/Fax | $474.96 |
| Travel | $34,663.68 |
| Total | **$705,188.70** |

Relators seek reimbursement for several categories of expenditures that are not enumerated under 28 U.S.C. § 1920 and would typically be unavailable. These include costs for postage, courier services, legal research, and e-discovery.[8] However, under Rule 54(d)(2)(A) and 31 U.S.C

889, 891 (8th Cir. 2003); *U.S. ex rel. Ritchie v. Lockheed Martin Corp.,* 558 F.3d 1161 (10th Cir. 2009). In doing so, these courts have differentiated between recoverable "expenses" authorized under § 3730(d)(4) (and only upon a showing of frivolousness, etc.) and "costs" under Rule 54(d) which are awarded as a matter of course. In doing so, these courts have noted that both the FCA and Rule 54 distinguish between costs and expenses. *See Assocs. Against Outlier Fraud*, 817 F.3d at 436 ([T]he distinction between "costs" and "expenses" is well established in the Federal Rules of Civil Procedure . . . This distinction between costs and expenses is no less clear in the FCA.); *U.S. ex rel. Costner*, 317 F.3d at 891 (8th Cir. 2003) ("That Congress expressly provided for fees, expenses and costs in two subsections but provided only for fees and expenses in § 3730(d)(4) indicates an intent to treat the awards differently . . . We conclude that § 3730(d)(4) is not an express provision regarding costs and thus does not displace the district court's authority to award costs under Rule 54."); *Ritchie*, 558 F.3d at 1172 ("Elsewhere in the FCA, the statute explicitly mentions "costs" as a category separate from attorneys' fees and expenses . . . Rule 54 also makes a distinction between attorneys' fees and expenses, which are only recoverable upon a motion specifying the legal grounds entitling the movant to the award, and costs, which are awarded as a matter of course.").

[8] *See Camesi v. Univ. of Pittsburgh Med. Ctr.*, 673 F. App'x 141 (3d Cir. 2016), *aff'd*, 753 F. App'x 135 (3d Cir. 2018) (discussing limits to what e-discovery tasks are recoverable as costs under § 1920).

§ 3730(d), these items may be recovered as "reasonable expenses." Because Defendant has not specifically objected to any of these items, the Court finds them to be reasonable. Thus, the Court awards Relators costs and expenses in the requested amount of $705,188.70.

## CONCLUSION

Relators' Motion for Attorneys' Fees, Costs, and Expenses (ECF No. 223) is **GRANTED IN PART** and **DENIED IN PART**. Relators are awarded a total amount of $ $1,781,900 in attorneys' fees and $705,188.70 in costs and reasonable expenses.

It is so **ORDERED**.

**SIGNED** this 1st day of August, 2023.

Xavier Rodriguez
United States District Judge

# Tab 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR,<br>*Plaintiffs*<br><br>v.<br><br>PERIPHERAL VASCULAR ASSOCIATES, P.A.,<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | SA-17-CV-00317-XR |

**ORDER**

On this date, the Court considered Defendant's (1) motion for finding of fact regarding an omitted element (ECF No. 232), (2) motion to reconsider partial summary judgment on scienter (ECF No. 234), and (3) motion for new trial (ECF No. 247), and the applicable responses (ECF Nos. 232, 242, 249), and replies (ECF Nos. 239, 243, 250) thereto.[1] After careful consideration, Defendant's motions are **DENIED**.

**BACKGROUND**

This False Claims Act case arises out of the allegedly fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Relators filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Relators alleged that PVA falsely billed Medicare for services it had not

[1] In addition, the Court considered the Government's statement of interest regarding additional post-verdict motions (ECF No. 241) as well as Defendant's response regarding knowledge of materiality (ECF No. 244).

performed. *See* ECF No. 8.[2] After a five-day trial held in February 2022, the jury agreed, awarding $2,728,199 in damages. ECF No. 201.

PVA is a full-service vascular surgery practice with multiple locations throughout San Antonio, Texas. ECF No. 123 at 2. Among other services, PVA performs vascular ultrasounds, which have two components relevant to this case: a technical component and a professional component. *Id.* In essence, the technical component is performing the ultrasound and the professional component is a physician analyzing the results. *Id.*

A healthcare provider can bill Medicare for both the technical and professional components of a vascular study using a "global" Current Procedural Terminology ("CPT") Code. *Id.* at 4. When a provider bills for just one component of a study, it must use a two-character "modifier" that signifies that only one component has been performed. *Id.* As relevant here, a provider can append the "-TC" modifier when billing the technical component only, or the "-26" modifier to bill for the professional component only. *Id.*

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. *Id.* at 5. A patient's medical record is contained in Allscripts CM. In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.* In their pleadings, Relators alleged, *inter alia*, that, in 2012, PVA implemented a scheme of too-quick billing designed to increase revenue. *Id.* at 6. Specifically, PVA began billing Medicare for both the professional and technical component before the patient's status became "Final" in MedStreaming—before the PVA physician had reviewed and interpreted the study and signed the report. *Id.* Relators alleged three distinct tranches

---

[2] After investigating the Relators' allegations for roughly a year, the Department of Justice declined to intervene. *See* ECF No. 20.

of claims: (1) the "Testing Only" tranche,[3] (2) the "Double Billing" tranche,[4] and (3) the "Wrong Provider" tranche.[5] ECF No. 221 at 3–4.

In August 2020, the parties filed cross-motions for summary judgment. ECF Nos. 94, 95. On December 14, 2020, the Court issued an order resolving the parties' cross-motions for summary judgment. *See United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 759–60 (W.D. Tex. 2020). As is relevant here, the Court granted Relators' motion with respect to the falsity and scienter elements of their claims, concluding that the issues of materiality and damages would be tried to the jury. *See id.* at 773.

A five-day trial was held in February 2022. After the close of Relators' case and then again before submission to the jury, PVA moved for judgment as a matter of law, arguing that, among other things, Relators had not satisfied their burden of proof as to materiality or damages. *See* ECF Nos. 196, 197. The Court granted the motions in part, concluding that Relators had failed to offer evidence of materiality as to one subset of claims and had failed to present evidence of payments made by the Medicare Advantage and Tricare programs, which have their own rules for payment. Tr. at 660:1–4, 672:3–8.[6] The motions were denied in all other respects. ECF No. 199.

---

[3] The "Testing Only" tranche includes vascular studies that PVA performed based on referrals from non-PVA healthcare providers. When a patient is referred to PVA for a vascular study only, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. Accordingly, a PVA physician's interpretations appear only in the MedStreaming reports. Relators assert that PVA billed Medicare before the MedStreaming report was signed.

[4] The "Double Billing" tranche contemplates services PVA provided to its own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and then order a vascular study to be conducted on the same day. Relators argue that PVA failed to generate a MedStreaming report to reflect the PVA physicians' interpretations of vascular studies. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations.

[5] Relators allege that PVA submitted bills to Medicare signed by the wrong "rendering" physician because PVA's system permitted any PVA physician to review and sign MedStreaming reports, regardless of whether that physician performed the interpretation.

[6] The Court granted judgment as a matter of law on Relators' claims in the "Wrong Provider" tranche.

Based on the remaining claims, the jury found that PVA had submitted 7,380 false claims, causing $2,728,199 in damages to the Government. ECF No. 201. Following the verdict, PVA renewed those portions of its previous motions for judgment as a matter of law that were denied by the Court under Federal Rule of Civil Procedure 50(b). ECF No. 208. On January 9, 2023, the Court issued a 32-page order denying in part and granting in part PVA's renewed motion. *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404 (W.D. Tex. 2023).[7] In relevant part, the Court held that the jury's finding as to materiality was supported by ample evidence at trial. *Id.* at 414–20. With respect to damages, however, the Court concluded that proper measure of harm to the Government was not the full value of the claim as the jury found, but the interest accrued in the time between the date Government paid the false claims and the date that the claim was determined to be false. *Id.* at 420–23. At the Court's direction, *id.* at 428, the parties subsequently filed joint advisories with proposed models for evaluating damages. *See* ECF Nos. 222, 230.[8]

Thereafter, PVA filed three additional post-trial motions requesting (1) a finding of fact regarding an allegedly omitted element of Relators' claim—whether PVA's knew that its billing practices were material to the Government's payment decision, ECF No. 232; (2) reconsideration of the Court's order granting partial summary judgment on scienter—specifically whether the summary judgment record supports pre-2017 knowledge of PVA's scheme, ECF No. 234; and (3) a new trial to reassess alleged factual issues regarding damages, scienter, and the appropriate number of false claims, ECF No. 247. Relators oppose each motion. The Court addresses each motion in turn.

---

[7] In this order, the Court also granted Relators' motion for statutory penalties. *Id.*

[8] Notably, while Relators submitted a damages model based on the facts found by the jury, *see* ECF No. 222, PVA submitted a damages model based its own version of the facts, *see* ECF No. 230.

## DISCUSSION

### I. The Supreme Court's decision in *SuperValu* has no bearing on this case.

Because all three of PVA's motions draw on misinterpretations of the Supreme Court's recent decision in *United States ex rel. Schutte v. SuperValu Inc. ("SuperValu")*, 598 U.S. 739, 743 (2023), the Court will briefly address the scope and impact of that ruling on the FCA landscape at the outset.

FCA liability requires the Government or relators to establish (1) a false statement or fraudulent course of conduct by the defendant; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim). *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).

The Supreme Court's decision in *SuperValu* focused on the scienter element—specifically, "[w]hether and when a defendant's contemporaneous subjective understanding or beliefs about the lawfulness of its conduct are relevant to whether it 'knowingly' violated the False Claims Act." *See* Petition for a Writ of Certiorari at 3, *SuperValu*, 143 S. Ct. 644 (No. 21-1326). The FCA's scienter requirement defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

The *SuperValu* Court addressed the Seventh Circuit's extension to FCA cases of the Supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)—a case interpreting the term "willfully" under the Fair Credit Reporting Act. *SuperValu*, 598 U.S. at 748. In relevant part, the Seventh Circuit read *Safeco* to require a two-step scienter inquiry in FCA

cases. *Id.* Under step one of this framework, a court would "ask whether a defendant's acts were consistent with any objectively reasonable interpretation of the relevant law that had not been ruled out by definitive legal authority or guidance." Step one, however, ignored whether the defendant believed that interpretation at the time of its claims. *Id.* If a defendant's act was not consistent with any objectively reasonable interpretation, then a court would proceed to step two. *Id.* Only under step two would a court then consider a defendant's subjective thoughts. *Id.* Put simply, the Seventh Circuit's framework required that a defendant's acts be objectively unreasonable before moving to any consideration of whether the defendant knowingly submitted a false claim. *Id.*

*SuperValu* rejected the Seventh Circuit's two-step framework. To begin, the Seventh Circuit's approach allowed *post-hoc* reasonable interpretations of the applicable law to provide a safe harbor for defendants who submitted claims with knowledge of their falsity. *Id.* This framework incorrectly shifted the focus of the scienter inquiry in FCA cases—what matters is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *Id.* at 752 (emphasis in original). In rejecting the Seventh Circuit's approach, *SuperValu* expounded a common-sense rule—what matters is a defendant's knowledge and subjective beliefs when it submits the claim, not what an objectively reasonable person thought upon submitting a claim or what a defendant may have thought in retrospect. *Id.* at 750.

But *SuperValu* did not hold that a defendant could consciously disregard facts and circumstances available at the time of claim submission to avoid FCA liability. *See id.* at 749–58. Tellingly, the Supreme Court clarified that FCA liability is not cabined to those with "actual knowledge" that their claims are false. *Id.* at 751. It also covers those "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity," as well as those who are "conscious of a substantial and unjustifiable

risk that their claims are false, but submit the claims anyway." *Id.* Moreover, the Supreme Court expressly did not foreclose the application of an objective form of recklessness in FCA cases. *Id.* at 751 n.5. That is, "[i]n some civil contexts, a defendant may be called 'reckless' for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk." *Id.*[9]

## II. Motion for Finding of Fact Regarding Omitted Element (ECF No. 232)

### *a. Legal Standard*

Under Federal Rule of Civil Procedure 49, a court may make a finding of fact on any issue of fact that was not submitted to the jury. FED. R. CIV. P. 49(a)(3); *see also Graphic Prod. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1569 (11th Cir. 1983). "If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict." *Id.*

### *b. Analysis*

PVA argues that the Court should make a finding of fact under Rule 49(a)(3) regarding an allegedly omitted element of Relators' FCA claim: whether PVA knew that its submissions were material to the Government's payment decision. The Fifth Circuit does not require an FCA claimant to show "knowledge of materiality." *See Longhi*, 575 F.3d at 467. Nonetheless, PVA asks the Court to recognize "knowledge of materiality" as a new element based on the Supreme Court's decisions in *Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar")*, 579 U.S. 176 (2016) and *SuperValu*, 598 U.S. 739, for the reasons stated below, the Court declines to do so.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). For materiality,

[9] Notably, PVA advanced the same approach rejected by *SuperValu* in its response to Relators' motion for summary judgment. ECF No. 112 at 15. There, the Court declined PVA's invitation, noting that "[f]or an interpretation to be reasonable, it must actually be held." ECF No. 123 at 51–52.

the FCA requires "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017).

Under the Supreme Court's decision in *Escobar*, "a matter is material" if: (1) a reasonable person would attach importance to it in determining a "choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *See Escobar*, 579 U.S. at 192 (internal quotation marks and citation omitted). *Escobar* identified several factors that are relevant to, but not automatically dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id*. at 193 n.5 (internal quotation marks omitted); whether the violation is "minor or insubstantial," *id*. at 194; and whether the government has taken action when it had actual knowledge of similar violations, *id*. at 195. "[P]roof of materiality can include, *but is not necessarily limited to*, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement" at issue. *Id*. at 194–95 (emphasis added).

Determining whether a violation is minor or insubstantial also appears to be a matter of common sense. In *Escobar*, the Supreme Court clarified that a condition can be material even where the Government does not expressly identify it as a condition of payment. *Id.* at 191 (noting that, even "if the Government failed to specify that the guns it orders must actually shoot . . . a reasonable person would understand the imperative of a functioning firearm"). On the other hand,

even an express condition may be immaterial. For example, "[i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act." *Id.* at 195. If the Government regularly pays the service provider's claims, even knowing that foreign-made staplers were used, that is "strong evidence" that the condition that the contractor must use American-made staplers is not material. *Id.*

While PVA makes much of the Supreme Court's analysis in *SuperValu*, as discussed above, that case addressed the proper standard of knowledge under the scienter element, not the FCA's materiality element. 598 U.S. at 743. *SuperValu* acknowledges that materiality and scienter are two separate requirements; it does not add a new element—knowledge of materiality—to claims under the FCA. *See Longhi*, 575 F.3d at 467. Post-*Escobar*, the Fifth Circuit still requires "proof only that the defendant's false statements *could have influenced* the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *Harman*, 872 F.3d at 661 (emphasis added). *SuperValu* did nothing to disturb that standard.

As this Court has previously explained, a defendant's subjective knowledge of materiality may be sufficient, but is *not* necessary, to establish materiality under the FCA. *See United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 747 (W.D. Tex. 2023). A defendant's actual, subjective understanding of materiality is only *necessary* when the Government attaches unreasonable importance to a misrepresentation that a reasonable person would consider immaterial. *See Escobar*, 579 U.S. at 192. Otherwise, a matter may be "material" if a reasonable person would attach importance to it in determining a choice of action, regardless of the defendant's subjective beliefs about matter. *Id.*

The FCA does not *require* that defendants have *knowledge* that their misrepresentations to the Government are material. To the extent that a scienter requirement applies to materiality—and not just falsity—it is built into the materiality analysis through the "reasonable person" standard. Indeed, *Escobar* itself forecloses PVA's argument in its discussion of implied conditions of payment:

> [B]ecause a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out.

*Id.* at 191. *Escobar* counsels that the materiality inquiry is holistic and largely objective in nature. *Id.* at 192–94; *see also United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019) ("No one factor is dispositive, and our inquiry is holistic.").

Here, the jury concluded that the PVA's false statements were material. The jury's finding was supported by the evidence at trial. It is also supported by the kind of common-sense analysis contemplated under *Escobar*. Just as "a *reasonable person* would realize the imperative of a functioning firearm," a reasonable person would not pay for services that had not been rendered absent an agreement to prospective payment. *Escobar*, 579 U.S. at 191.[10]

Accordingly, the Court declines to recognize a new fifth element for liability under the FCA and thus will not make a finding of fact regarding an allegedly omitted element.

### III. Motion for Reconsideration of Partial Summary Judgment (ECF No. 234)

#### *a. Legal Standard*

"[T]he Federal Rules of Civil Procedure do not provide for a motion for reconsideration." *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Nonetheless, the Fifth Circuit

[10] In addition, to the extent that PVA suggests that reliance is also a requisite element for FCA liability, Fifth Circuit case law counsels otherwise. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009) ("The False Claims Act, in contrast, lacks the elements of reliance and damages.").

has considered motions to reconsider final judgments under Rule 59(e) and 60(b). FED. R. CIV. P. 59(e) (allowing a court "to prevent a manifest injustice" by altering or amending a judgment upon a timely motion); FED. R. CIV. P. 60(b) (allowing a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" for "any . . . reason that justifies relief"); *see Doe v. Bridge City Indep. Sch. Dist.*, No. 20-40596, 2021 WL 4900296 at *1 (5th Cir. 2021) (Where appellants did not identify the rule by which they sought reconsideration, the court had discretion to analyze the motion under Rule 59(e) as a motion to alter or amend the judgment or under Rule 60(b) as a motion for relief from a judgment or order). Application of Rules 59(e) and 60(b) requires entry of a final judgment, however, and the Court has yet to issue a final judgment in this case, given the parties' numerous post-trial motions.

A court can revisit an interlocutory order, including an order on partial summary judgment, pursuant to Rule 54(b). *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990) ("[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). Indeed, the Court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981).

"Although the precise standard for evaluating a motion to reconsider under Rule 54(b) is unclear, whether to grant such a motion rests within the discretion of the court." *Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 553 (N.D. Tex. 2009). The standard would appear to be less exacting than that used in evaluating motions under Rule 59(e) or Rule 60(b). *See James v. Sadler*, 909 F.2d 834, 836 (5th Cir.1990) ("The policy interests underlying Rules 59 and 60, securing the finality of judgments, were not implicated in this case because the action was still proceeding against other defendants in the district court."). Still, the standards under Rule 59 and Rule 60 will inform the Court's analysis. *Vladmir Ltd. v. Pac. Parts Supply Co.*, No. CIV.A.SA-08-CV-819XR, 2009 WL 4110288, at *2 (W.D. Tex. Nov. 20, 2009). In particular, the Court considers whether the movant is simply pursuing its old arguments or improperly raising new arguments that should have been made earlier without any justification. *Id.*; *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (a Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the judgment issues"); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (Rule 59(e) cannot be used to "relitigate old matters" that have already been resolved).

***b. Analysis***

In its motion, PVA contends Relators' claims fail under *SuperValu* because they did not submit conclusive evidence with their motion for summary judgment, or at trial, that PVA had any conscious awareness of the risk that it was submitting false claims before 2017. ECF No. 234 at 1–6. In response, Relators assert that PVA's arguments rely on a misunderstanding of *SuperValu*, which did not change the law applied by this Court in its summary judgment order. ECF No. 242 at 2–3. Relators further assert that they submitted ample evidence that PVA was aware that its pre-2017 billing practices were improper, while PVA submitted no evidence to the contrary. *Id.* at 4.

With respect to the scienter element, the FCA applies to those who "knowingly assist[] in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). A person acts "knowingly" with respect to information if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b); *see also SuperValu*, 598 U.S. at 749.

The Supreme Court's recent decision in *SuperValu* addressed the evidentiary standard for proving the scienter element, holding that scienter refers to the defendant's *subjective* knowledge and beliefs, not what a hypothetical objectively reasonable person might have known or believed. *SuperValu*, 598 U.S. at 750. In doing so, *SuperValu* rejected the existence of an "objectively reasonable" safe harbor for defendants. *Id.* Further, as the United States points out, "the [*SuperValu*] court did not limit the type of evidence that the government could use to prove intent, including evidence *after* claims are presented." ECF No. 241 at 8 (emphasis added).

While PVA implies that *SuperValu*'s description of the three different mental states listed under 31 U.S.C. § 3729 is somehow groundbreaking, this framework is nothing new. Of course, what matters is the knowledge and subjective beliefs at the time of the claim, as *SuperValu* makes clear. 598 U.S. at 750. The subjective nature of the inquiry, however, does not cabin FCA liability only to those who have *actual* knowledge that their claims are false, despite PVA's apparent argument to the contrary. *See id.* at 752 ("What typically matters at common law is whether the defendant made the false statement 'without belief in its truth or recklessly, careless of whether it is true or false.'" (quoting Restatement (Second) of Torts § 526, Comment e)). Even more, the Court in *SuperValu* explicitly declined foreclose the application of an objective form of

recklessness to FCA liability. *Id.* at 751 n.5.[11] Read faithfully, nothing in *SuperValu* suggests that a defendant can bury its head in the sand and avoid FCA liability in the face of overwhelming evidence that its submissions to the Government contained false statements. *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 282-83 (5th Cir. 2020); *see also United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). Simply put, *SuperValu* does not alter the Court's summary judgment analysis.

Next, PVA challenges the evidentiary support for the Court's summary judgment ruling on scienter. According to PVA, there is "no conclusive evidence in the record as to PVA's state of mind prior to the 2017 compliance billing email and notes," and "no evidence at all that before 2017, PVA knew that signed stand-alone reports were somehow required." ECF No. 234 at 4.

PVA's arguments are largely beside the point because they disregard much of the evidence considered. The Court did not rely exclusively on the 2017 compliance billing email and notes in reaching its conclusion on scienter; instead, it considered evidence spanning from 2012 through 2017 along with "widespread industry publications" that were "strong evidence that PVA recklessly disregarded industry practice." ECF No. 123 at 48–53 & n.2. The question here is not whether PVA *knew* that a stand-alone report was required prior to the submission of a claim to Medicare. Rather, the question is whether PVA knew when it submitted the claims in the "Double Billing" tranche that the claims falsely represented to the Government that both components of a study had been performed, or

---

[11] In relevant part, the Supreme Court noted:

> In some civil contexts, a defendant may be called "reckless" for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk. We need not consider how (or whether) that objective form of "recklessness" relates to the FCA today because, as noted above, it is enough to say that the FCA's standards can be satisfied by a defendant's subjective awareness of the claim's falsity or an unjustifiable risk of such falsity.

*Id.* at 751 n.5 (citations omitted).

acted in "deliberate ignorance" or "reckless disregard" as to the falsity of that representation. *See SuperValu*, 598 U.S. at 750; ECF No. 123 at 36–43; 51–52.

In short, *SuperValu* does not alter this Court's analysis, and the Court declines to accept PVA's invitation to reconsider its order granting partial summary judgment.

## IV. Motion for a New Trial

### *a. Legal Standard*

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). A court may not "substitute its opinion for the jury's," but "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted).

### *b. Analysis*

According to PVA, a new trial is warranted to reassess three separate issues: (1) scienter, (2) the number of false claims, and (3) damages. ECF No. 247 at 2. First, PVA reasserts the scienter arguments made in its motion for reconsideration and now rejected by the Court. *Id.* at 3–4. Second, PVA argues that the Court must grant a new trial to accurately determine the number of false claims because Relators improperly measured the number of false claims and relied only on an expert opinion that should have been excluded. *Id.* at 4–9. Third, PVA contends that Relators cannot support any damages finding at this stage because the Court lacks the authority to adopt an interest-based model of damages. *Id.* at 3. For the reasons addressed below, Relators argue, and the Court agrees, no new trial is needed to reassess any of these issues. ECF No. 249 at 3–7.

i. Scienter

The Court declines to entertain PVA's scienter arguments for a third time. The Court finds no reason to disturb its order granting summary judgment as to scienter (ECF No. 123) and will not order a new trial on that basis.

ii. Number of Claims

Next, PVA argues that this Court should order a new trial to properly assess the number of false claims submitted by PVA. First, PVA takes issue with the number of claims found by the jury for the "Double Billing" tranche to the extent that the verdict was based on Dr. Nye's testimony. ECF No. 247 at 4–5. According to PVA, Dr. Zachary Nye testified only to the total number of "Double Billing" false claims in the aggregate for the Medicare Part B, Medicare Railroad, and Advantage Plans, without any breaking down the claims by payor. *Id.* PVA further asserts the Dr. Nye's opinions were "based on irrelevant and inadmissible data beyond the FCA and result in an overinclusive representation that, even if accurate, would inflate the totals and prejudice PVA." *Id.* at 5 (quoting ECF No. 86 at 8). In turn, PVA contends that these flaws in Dr. Nye's testimony ultimately led to Realtors' counsel suggesting there were 4,650 unique patient visits as a measure of the total number of false claims during closing arguments without adequate support. *Id.* Second, PVA argues that the Court should have excluded Dr. Nye's testimony altogether, as he failed to properly calculate PVA's by counting unique patient visits rather than batched Form 1500 submissions to Medicare. *Id.* at 5–9.

In response, Realtors contend that neither argument warrants a new trial. First, Relators point out that, while Dr. Nye did not break down the unique patient visit count after the Court granted judgment for PVA as to federal payors other than Medicare Part B, the Relators presented a conservative figure of 4,650 false claims during closing argument. ECF No. 249 at 5–7. Second,

Relators contend that PVA ultimately agreed to the Court's modified jury instruction that defined claims as equivalent to unique patient visits. *Id.* at 7–8 (citing Tr. 712:23–713:5).

PVA simply has not demonstrated the need for a new trial to reassess the precise number of "Double Billing" false claims. Here, PVA primarily contends that "Dr. Nye incorrectly tallied the number of false claims, requiring a new trial where the numbers can be accurately determined," and that the Court should in effect reconsider its ruling on PVA's motion to exclude Dr. Nye's allegedly "unreliable" and "inadmissible" testimony. ECF No. 247 at 2, 4–5; ECF No. 250 at 5–8.

In its motion to exclude Dr. Nye's testimony, PVA contended that his analysis was irrelevant and unreliable because it relied on data that allegedly did not distinguish between the technical and professional component of a global claim and may have included claims submitted to private payors, resulting in an artificially inflated number of claims. ECF No. 86 at 6–8. The Court denied the motion, noting that PVA's "argument [went] to the weight of Dr. Nye's opinion, and [was] not grounds for exclusion. . . . PVA's concerns [were] properly addressed on cross-examination or the presentation of refuting evidence." ECF No. 123 at 27–28. However, now, PVA asserts two different arguments that are at best only tangentially related to those made in its admissibility challenge—that Dr. Nye (1) failed to present a specific number of "Double Billing" false claims submitted to Medicare Part B, and (2) applied the wrong measure when assessing the number of false claims submitted by PVA. To the extent that PVA seeks to have the Court revisit its admission of Dr. Nye's testimony on a basis not furthered in its motion to exclude Dr. Nye's testimony, the Court declines to do so.

Even so, to the extent that PVA seeks a new trial on the basis that the precise number of Medicare Part B false claims was not directly presented to the jury, the Court declines this request. At this stage, PVA's "burden is . . . to show that there is no evidence to support the jury's verdict."

*Sierra v. Dorel Juv. Grp.*, 663 F. App'x 307, 310 (5th Cir. 2016) (citing *Whitehead*, 163 F.3d at 269). Indeed, upon this Court's review of the record, there is evidence to support the jury verdict. Here, Dr. Nye testified to the total number of false claims submitted for the "Double Billing" tranche, and Relators put before the jury the data upon which that opinion was based. Tr. at 467:2–19; Pls.' Exs. 88, 116. While the Court later granted a directed verdict as to a portion of the "Double Billing" false claims, the jury was entitled to rely upon Dr. Nye's testimony and the accompanying data in arriving at the ultimate number of "Double Billing" false claims submitted.[12]

Second, PVA's next argument—that Dr. Nye improperly measured the number of claims using unique patient visits rather than counting batched Form 1500 submissions—fairs the same. To begin, as Relators point out, PVA's trial counsel agreed to the Court's modified jury instruction allowing unique patient visits as a measurement of claims. *See* ECF No. 249 at 7–8.[13] Notably, this was done at the request of PVA after it objected to the original proposed jury charge. Tr. at 711:16–713:4. Though PVA did later object to the Court's charge, PVA only offered a formulaic objection lacking any specificity and taking issue with the new charge only to the extent that it differed with PVA's originally requested jury charge. Tr. at 715:20–716:12. Thus, this specific issue had been resolved upon submission to the jury. *See id.* It is simply too late for PVA to change its position. *See Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 127 (S.D.N.Y. 2007), *aff'd*, 294 F. App'x 680 (2d Cir. 2008).

In addition, PVA's own case law contradicts PVA's position that the proper measure of claims is the number of batched Form 1500 submissions, rather than unique patient visits or the

[12] In addition, it is not clear whether PVA intends to advance this argument as an independent basis for a new trial or simply as a part of a last-ditch effort to challenge the admissibility of Dr. Nye's testimony. *See* ECF No. 247.

[13] After receiving input from both parties, the Court and the parties ultimately settled on the following language to present to the jury: "In determining the number of false claims, if any, you should consider each unique patient visit reflected on the Form 1500, or electronic equivalent, not the number of CPT codes on a claim." Tr. at 712:24–713:4.

associated individual Form 1500 submissions. *See* ECF No. 247 at 6–7. Though PVA cites to *United States v. Krizek* to flesh out its view of the Supreme Court's *Bornstein* decision, the D.C. Circuit in *Krizek* addressed nearly the same question PVA now presses before this Court—what is the proper measure of claims in Medicare FCA cases? 111 F.3d 934, 940 (D.C. Cir. 1997). In answering this question, Court in *Krizek* held that "the 'claim' in this context is the HCFA 1500 form." *Id.* at 943. Indeed, because Form 1500 is patient-specific, *see* Pls.' Ex. 35, the number of unique patient visits appears to be a sufficient proxy to allow a jury to measure the number of claims here with a reasonable certainty—a point that PVA conceded at trial. *See* Tr. at 712:24–713:4, *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 610 (S.D. Tex. 2016) ("Relators have presented sufficient evidence for a jury to determine how many false claims were actually presented with reasonable certainty."). Accordingly, the Court will not order a new trial to reassess the number of claims issue.

iii. Interest-Based Damages

PVA further contends that the Court lacks authority to impose a new measure of damages at this late stage or enter a remittitur and must instead order a new trial. ECF No. 247 at 3; ECF No. 250 at 3–4. According to PVA, Relators failed to submit evidence of a legally viable damages theory, and the Court's rejection of Relators' damages calculation requires that it order a new trial to properly reassess the issue. *Id.* The Court disagrees.

*1. New Trial or Remittitur?*

Although a court cannot "substitute its own opinion for the jury's," a court may remit the damages award as a matter of law where the precise determination of damages depends on the application of legal rules and there are no fact issues left for the jury to decide. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 19 (D.D.C. 2017); *see also United States ex*

*rel. Feldman v. van Gorp*, 697 F.3d 78, 92 (2d Cir. 2012) ("We conclude, however, that here, where the question is not the benefit of the bargain between the plaintiff and the defendants, and the amount of each payment for which liability has been assessed is not in dispute, no further finding of fact as to the amount of the damages was necessary."). This proposition logically flows from the general rule that the proper measure of damages is a question of law, not a question of fact. *See TODCO Americas, Inc. v. El Paso oLeo E Gas Do Brasil, Ltda.*, No. CV H-08-1832, 2009 WL 10697535, at *4 (S.D. Tex. July 17, 2009); *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2020 WL 1124599, at *5 (N.D. Miss. Mar. 6, 2020). For example, a court can reduce damages where "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." CHARLES A. WRIGHT & ARTHUR R. MILLER, 11 FED. PRAC. & PROC. CIV. § 2815 (3d ed.); *see also Akey v. Placer Cnty.*, No. 2:14-CV-02402-KJM-DB, 2019 WL 5102241, at *4 (E.D. Cal. Oct. 11, 2019). The Court is faced with such a situation here.

As the Court explained in its order on PVA's renewed motion for judgment as a matter of law, it cannot ignore "the fact that the services for which PVA submitted claims were actually performed in every case." ECF No. 221 at 22. Thus, the Court held as a matter of law that the Government was entitled to an interest-based measure of damages. *Id.* at 24–25. The Court directed the parties to submit additional briefing on the question of damages because, "given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing," the Court had insufficient information from which to calculate damages at the time. ECF No. 221 at 25.

Outside of its calculation of final damages, the jury's remaining findings were left intact. *See id.*; ECF No. 201. PVA insists, however, that in order to revisit the proper calculation of the Government's damages, the Court must set aside the jury's findings and hold a new trial. ECF No.

250 at 3. PVA simply ignores the status of this case: there are no fact issues left for a jury to resolve.

Other courts have faced similar post-trial quandaries where the calculation of damages was straightforward given the jury's resolution of the fact issues and rooted in the same evidence relied on at trial. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 17 (D.D.C. 2017). For example, in *Lorazepam*, after multiple plaintiffs were dismissed on appeal, the trial court relied on post-trial expert calculations in entering a remittitur to calculate damages for the remaining plaintiffs, even though the damages had been presented "in the aggregate" at trial. *Id.* at 18–19. The defendants sought to reopen discovery and hold a new trial on damages. *Id.* The court, however, noted that the jury had resolved all fact issues in rendering its verdict and the defendants had failed to identify any flaws in the expert's post-trial calculation's methodology. *Id.* at 19. Thus, there were simply "no facts in dispute or evidence to be weighed." *Id.* at 18–19.

Similarly here, PVA purportedly seeks a new trial on damages. *See* ECF No. 201; ECF No. 222 at 6–9; ECF No. 247 at 3; *see generally* ECF No. 230. PVA's briefing, however, amounts to yet another attempt to relitigate its liability and merely confirms that the reassessment of damages does not present a question for the jury. Tellingly, PVA spends the entirety of its post-trial damages briefing attacking the number of claims found by the jury rather than attacking the Relators' updated damages calculation based on the jury's findings. *See* ECF No. 222 at 6–9; ECF No. 230. And in response to the Court's requests for briefing on the proper calculation of damages, PVA has repeatedly recycled arguments that have already been rejected by the Court, premised not on the jury's findings but on the facts it *wishes* the jury had found. *See* ECF No. 222 at 6–9; *see generally* ECF No. 230. Much like the defendants in *Lorazepam*, PVA fails to challenge the methodology of Dr. Nye's post-trial calculations in either its post-trial damages briefing or its

motion for a new trial, taking issue instead with the number of claims found by the jury. *See* ECF Nos. 222, 230.

Thus, the parties' briefing confirms that the jury's findings are sufficient to allow the Court to accurately remit damages based on an interest-based theory of damages. In addition, although Relators did not cite specific trial evidence in support of Dr. Nye's calculations, the Court is satisfied that it can rely on them in entering a remittitur because his figures were produced using "PVA's datasets on which all of his prior work was based." ECF No. 222 at 5. Because the resolution of the damages issues is simply a matter of law and the updated calculation will be rooted in the same data that was presented at trial, the Court concludes that it can properly enter a remittitur as a matter of law in lieu of granting a new trial.

*2. Applicable Interest Rate*

Before entering remittitur, the Court must resolve one remaining question of law: the appropriate interest rate. Relators propose that the Court use the interest rate for overpayments and underpayments to Medicare providers published by the Secretary of Treasury and Centers for Medicare and Medicaid Services ("CMS interest rate"), which was, as of the date of the jury's verdict, 9.125%. ECF No. 222. PVA urges the Court to apply the federal post-judgment interest rate in effect on the date of the jury's verdict, 1.08%. *See* ECF No. 230. [14]

According to Relators, the CMS interest rate adequately measures the time-value of money to the Medicare program. ECF No. 222 at 4. It is commonly used in administrative proceedings related to Medicare overpayments and underpayments as well as in district court proceedings to recover Medicare overpayments. *Id.* at 2–4 (first citing *United States v. GentleTouch Healthcare,*

[14] Notably, PVA has continually moved the mark on this point, submitting varying interest rate proposals to the Court in its briefs. *See* ECF No. 208 at 15 (proposing "the typical Medicare interest rate on overpayments"); ECF No. 222 at 8 (proposing "a U.S. Treasury rate on average of between 1.92%–3.67% since the verdict"); ECF No. 230 at 10 (proposing the federal postjudgment interest rate of 1.08% in effect on the date of the jury's verdict).

*Inc.*, No. A-21- CV-725-RP, 2022 WL 3449496, at *3 (W.D. Tex. June 14, 2022); and then *United States v. Eshcol Health Care Servs. Inc.*, No. 3:21-CV-2280-S-BH, 2022 WL 4227533, at *1 (N.D. Tex. Aug. 22, 2022), *report and recommendation adopted*, No. 3:21- CV-2280-S, 2022 WL 4227521 (N.D. Tex. Sept. 13, 2022)). PVA objects that the CMS interest rate is inapplicable because the Government did not make any overpayments—PVA contends that it performed the services at the center of the disputed claims. *See* ECF No. 230 at 10.

The Court finds Relators' rationale far more persuasive—the CM intertest rate is the interest rate that properly measures the value of money to the Medicare program. Further, PVA's argument that there were no overpayments yet again misses the point. While the services for which it billed Medicare were ultimately performed, those services were performed *after* PVA submitted its requests for payment. And as the Court already recognized: "payment today is not the same as payment tomorrow." ECF No. 221 at 23 (citing *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935)). Accounting for the time-value of money, the government *did* overpay for PVA's services. Thus, the Court concludes that it can properly adjust damages here as a matter of law by applying the published CMS interest rate in effect on the date of the jury's verdict.

Accordingly, the Court will not order a new trial to reassess damages. Instead, the Court will enter a remittitur based on the Relators' proposed measure of interest-based damages and will enter final judgment with damages in the amount of $220,252 for the "Testing Only" tranche and $1,235,127 for the "Double Billing" tranche—resulting in a damages figure of $1,455,379. *See* ECF No. 222. Trebled, the damages award here amounts to $4,366,137. 31 U.S.C. § 3729(a)(1).

## CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that:

PVA's motion for finding of fact regarding an omitted element (ECF No. 232) is **DENIED**.

PVA's motion to reconsider partial summary judgment on scienter (ECF No. 234) is **DENIED**.

PVA's motion for new trial (ECF No. 247) is **DENIED**.

Consistent with an interest-based model of damages, this Court will enter a remittitur as a matter of law for both the "Testing Only" tranche and the "Double Billing" tranche. A final judgment will issue separately pursuant to Rule 58.

It is so **ORDERED**.

**SIGNED** this 30th day of January, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

# Tab 9

current procedural terminology

# cpt® 2020

# Professional Edition


## Current CPT Editorial Panel

Mark S. Synovec, MD*, *Chair*
Kenneth P. Brin, MD, PhD, MACC*†, *Immediate Past Chair*
Christopher L. Jagmin, MD, FAAFP*, *Vice Chair*
Zach Hochstetler, MPP, MBA, CPC, *Secretary*
Linda M. Barney, MD, FACS
Virginia C. Calega, MD, MBA, FACP†
Leslie F. Davidson, PhD, OTR/L, FAOTA
Edith Hambrick, MD, JD, MPH*
David M. Kanter, MD, MBA, CPC
Katharine Krol, MD, FSIR, FACR*†
Barbara S. Levy, MD
Douglas C. Morrow, OD
Daniel Nagle, MD, FACS, FAAOS
Jan Anthony Nowak, PhD, MD
Judith A. O'Connell, DO, MHA, FAAO
Robert N. Piana, MD, FACC*
Daniel Picus, MD, FACR, RCC*
Jordan G. Pritzker, MD, MBA, FACOG
Lawrence M. Simon, MD, FAAP, FACS, FAAOA
Kevin E. Vorenkamp, MD


AMA AMERICAN MEDICAL ASSOCIATION

*Member of the CPT Executive Committee
†Former CPT Editorial Panel Member, who was active during 2020 content creation

**Executive Vice President, Chief Executive Officer:** James L. Madara, MD
**Chief Operating Officer, Senior Vice President, Health Solutions:** Laurie A.S. McGraw
**Vice President, Coding and Reimbursement Policy and Strategy:** Jay Ahlman
**Director, CPT Coding and Regulatory Services:** Zach Hochstetler
**Director, CPT Content Management & Development:** Leslie W. Prellwitz
**Manager, CPT Editorial Panel Processes:** Desiree Rozell
**Manager, CPT Content Management and Development:** Karen E. O'Hara
**Vice President, Operations:** Denise C. Foy
**Director, CPT Operations & Infrastructure:** Barbara Benstead
**Publishing Operations Manager:** Elizabeth Goodman Duke
**Senior Developmental Editor:** Lisa Chin-Johnson
**Production Specialist:** Mary Ann Albanese
**Vice President, Sales:** Lori Prestesater
**Director, Channel Sales:** Erin Kalitowski
**Executive, Key Account Manager:** Mark Daniels
**Vice President, Product Management:** Dave Sosnow
**Product Manager, Print and Digital Products:** Mark Ruthman
**Marketing Manager:** Vanessa Prieto

Printed in the United States of America. 19 20 21/ BD-RD / 9 8 7 6 5 4 3 2 1

Professional ISBN: 978-1-62202-898-6
ISSN: 0276-8283

*Current Procedural Terminology* (CPT®) is copyright 1966, 1970, 1973, 1977, 1981, 1983-2019 by the American Medical Association. All rights reserved.

1st Edition printed 1966
2nd Edition printed 1970
3rd Edition printed 1973
4th Edition printed 1977
Revised: 1978, 1979, 1980, 1981, 1982, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019

No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

To purchase additional CPT products, contact the American Medical Association Customer Service at 800 621-8335 or AMA|Store at **amastore.com**.
Refer to product number EP054120.

To request a license for distribution of products containing or reprinting CPT codes and/or guidelines, please see our website at www.ama-assn.org/go/cpt, or contact the American Medical Association CPT/DBP Intellectual Property Services, 330 North Wabash Avenue, Suite 39300, Chicago, IL 60611, 312 464-5022.

AC36:EP054120:9/19

## About CPT

*Current Procedural Terminology* (CPT®), Fourth Edition, is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians and other qualified health care professionals. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services, and will thereby provide an effective means for reliable nationwide communication among physicians and other qualified health care professionals, patients, and third parties. *CPT 2020* is the most recent revision of a work that first appeared in 1966.

CPT descriptive terms and identifying codes currently serve a wide variety of important functions in the field of medical nomenclature. The CPT code set is useful for administrative management purposes such as claims processing and for the development of guidelines for medical care review. The uniform language is also applicable to medical education and outcomes, health services, and quality research by providing a useful basis for local, regional, and national utilization comparisons. The CPT code set is the most widely accepted nomenclature for the reporting of physician and other qualified health care professional procedures and services under government and private health insurance programs. In 2000, the CPT code set was designated by the Department of Health and Human Services as the national coding standard for physician and other health care professional services and procedures under the Health Insurance Portability and Accountability Act (HIPAA). This means that for all financial and administrative health care transactions sent electronically, the CPT code set will need to be used.

The changes that appear in this revision have been prepared by the CPT Editorial Panel with the assistance of physicians and representatives of other health care professions representing all specialties of medicine, and with important contributions from many third-party payers and governmental agencies.

The American Medical Association trusts that this revision will continue the usefulness of its predecessors in identifying, describing, and coding medical, surgical, and diagnostic services.

## Maintenance and Authorship of the CPT Code Set

The CPT Editorial Panel (Panel) is tasked with ensuring that CPT codes remain up to date and reflect the latest medical care provided to patients. In order to do this, the Panel maintains an open process and convenes meetings at a minimum three times per year.

The Panel wishes to sincerely thank the many national medical specialty societies, health insurance organizations and agencies, and individual physicians and other health professionals who have made contributions. In particular the Panel acknowledges the efforts of the following Panel Organizational and Coding Liaison Participants:

Sue Bowman, RHIA, *American Health Information Management Association*

Raemarie Jiminez, CPC, *American Academy of Professional Coders*

Nelly Leon-Chisen, *American Hospital Association*

Mary E. Little, RN, CPC, *Blue Cross and Blue Shield Association*

Also key to authorship of the code set and resulting *CPT Professional Edition* codebook is AMA CPT staff. This experienced team prepares agenda materials for each panel meeting, facilitates the application process, compiles and reviews advisor comments, reconciles differences in opinions, and ultimately compiles all resulting information into a codebook filled with informative guidelines, practical tips, and procedural illustrations.

## AMA CPT Staff

Shawn Agyeman
Jay T. Ahlman
Thilani Attale, MS
Jennifer Bell, BS, RHIT, CPC, CPMA, CPC-I, CEMC, CPEDC
Barbara Benstead
Andrei Besleaga, BS, RHIT
Judy Connelly
Kyle Dahl
Caitlin Dale
Martha Espronceda
Desiree D. Evans, BS
DeHandro Hayden, BS
Zach Hochstetler, MPP, MBA, CPC
Janette Meggs, RHIA
Karen E. O'Hara, BS, CCS-P
Michael Pellegrino
Leslie W. Prellwitz, MBA, CCS, CCS-P
Desiree Rozell, MPA
Nancy Spector, BSN, MSC
Lianne Stancik, BA, RHIT
Keisha A. Sutton, MHA, CPC
Okwara Uzoh
Ada Walker, CCA
Arletrice Watkins, MHA, RHIA
Rejina L. Young

- The procedure or service satisfies the category-specific criteria set forth below.

## Category-Specific Requirements

### Category I Criteria

A proposal for a new or revised Category I code must satisfy all of the following criteria:

- All devices and drugs necessary for performance of the procedure or service have received FDA clearance or approval when such is required for performance of the procedure or service;
- The procedure or service is performed by many physicians or other qualified health care professionals across the United States;
- The procedure or service is performed with frequency consistent with the intended clinical use (ie, a service for a common condition should have high volume, whereas a service commonly performed for a rare condition may have low volume);
- The procedure or service is consistent with current medical practice; and
- The clinical efficacy of the procedure or service is documented in literature that meets the requirements set forth in the CPT code change application.

### Category II Criteria

The following criteria are used by the CPT/HCPAC and the CPT Editorial Panel for evaluating Category II code applications:

- Measurements that were developed and tested by a national organization;
- Evidence-based measurements with established ties to health outcomes;
- Measurements that address clinical conditions of high prevalence, high risk, or high cost; and
- Well-established measurements that are currently being used by large segments of the health care industry across the country.

In addition, all of the following are required:

- Definition or purpose of the measure is consistent with its intended use (quality improvement and accountability, or solely quality improvement)
- Aspect of care measured is substantially influenced by the physician (or other qualified health care professional or entity for which the code may be relevant)
- Reduces data collection burden on physicians (or other qualified health care professionals or entities)
- Significant
  - o Affects a large segment of health care community
  - o Tied to health outcomes
  - o Addresses clinical conditions of high prevalence, high costs, high risks
- Evidence-based
  - o Agreed upon
  - o Definable
  - o Measurable
- Risk-adjustment specifications and instructions for all outcome measures submitted or compelling evidence as to why risk adjustment is not relevant
- Sufficiently detailed to make it useful for multiple purposes
- Facilitates reporting of performance measure(s)
- Inclusion of select patient history, testing (eg, glycohemoglobin), other process measures, cognitive or procedure services within CPT, or physiologic measures (eg, blood pressure) to support performance measurements
- Performance measure–development process that includes
  - o Nationally recognized expert panel
  - o Multidisciplinary
  - o Vetting process

### Category III Criteria

The following **criteria** are used by the CPT/HCPAC Advisory Committee and the CPT Editorial Panel for evaluating Category III code **applications**:

- The procedure or service is currently or recently performed in humans; ***and***

At least one of the following additional criteria has been met:

- The application is supported by at least one CPT or HCPAC advisor representing practitioners who would use this procedure or service; ***or***
- The actual or potential clinical efficacy of the specific procedure or service is supported by peer reviewed literature, which is available in English for examination by the CPT Editorial Panel; ***or***
- There is (a) at least one Institutional Review Board–approved protocol of a study of the procedure or service being performed; (b) a description of a current and ongoing United States trial outlining the efficacy of the procedure or service; or (c) other evidence of evolving clinical utilization.

## Guidelines

Specific guidelines are presented at the beginning of each of the sections. These guidelines define items that are necessary to appropriately interpret and report the procedures and services contained in that section. For example, in the **Medicine** section, specific instructions are provided for handling unlisted services or procedures, special reports, and supplies and materials provided. Guidelines also provide explanations regarding terms that apply only to a particular section. For instance, **Radiology Guidelines** provide a definition of the unique term, "radiological supervision and interpretation." While in **Anesthesia**, a discussion of reporting time is included.

A written report (eg, handwritten or electronic) signed by the interpreting individual should be considered an integral part of a radiologic procedure or interpretation. Please see the guidelines regarding Imaging Guidance in each individual section.

number of specific code numbers have been designated for reporting unlisted procedures. When an unlisted procedure number is used, the service or procedure should be described (see specific section guidelines). Each of these unlisted procedural code numbers (with the appropriate accompanying topical entry) relates to a specific section of the book and is presented in the guidelines of that section.

In some cases alternative coding and procedural nomenclature as contained in other code sets may allow appropriate reporting of a more specific code. CPT references to use an unlisted procedure code do not preclude the reporting of an appropriate code that may be found in other code sets.

## Results, Testing, Interpretation, and Report

Results are the technical component of a service. Testing leads to results; results lead to interpretation. Reports are the work product of the interpretation of test results. Certain procedures or services described in CPT involve a technical component (eg, tests), which produces "results" (eg, data, images, slides). For clinical use, some of these results require interpretation. Some CPT descriptors specifically require interpretation and reporting in order to report that code.

## Special Report

A service that is rarely provided, unusual, variable, or new may require a special report. Pertinent information should include an adequate definition or description of the nature, extent, and need for the procedure and the time, effort, and equipment necessary to provide the service.

## Time

The CPT code set contains many codes with a time basis for code selection. The following standards shall apply to time measurement, unless there are code or code-range–specific instructions in guidelines, parenthetical instructions, or code descriptors to the contrary. Time is the face-to-face time with the patient. Phrases such as "interpretation and report" in the code descriptor are not intended to indicate in all cases that report writing is part of the reported time. A unit of time is attained when the mid-point is passed. For example, an hour is attained when 31 minutes have elapsed (more than midway between zero and sixty minutes). A second hour is attained when a total of 91 minutes have elapsed. When codes are ranked in sequential typical times and the actual time is between two typical times, the code with the typical time closest to the actual time is used. See also the **Evaluation and Management (E/M) Services Guidelines.** When another service is performed concurrently with a time-based service, the time associated with the concurrent service should not be included in the time used for reporting the time-based service. Some services measured in units other than days extend across calendar dates. When this occurs a continuous service does not reset and create a first hour. However, any disruption in the service does create a new initial service. For example, if intravenous hydration (96360, 96361) is given from 11 PM to 2 AM, 96360 would be reported once and 96361 twice. For facility reporting on a single date of service or for continuous services that last beyond midnight (ie, over a range of dates), report the total units of time provided continuously.

## Code Symbols

A summary listing of additions, deletions, and revisions applicable to the CPT codebook is found in **Appendix B.** New procedure numbers added to the CPT codebook are identified throughout the text with the ● symbol placed before the code number. In instances where a code revision has resulted in a substantially altered procedure descriptor, the ▲ symbol is placed before the code number. The ▶ ◀ symbols are used to indicate new and revised text other than the procedure descriptors. These symbols indicate CPT Editorial Panel actions. The AMA reserves the right to correct typographical errors and make stylistic improvements.

CPT add-on codes are annotated by the ✚ symbol and are listed in **Appendix D.** The symbol ⊘ is used to identify codes that are exempt from the use of modifier 51 but have not been designated as CPT add-on procedures or services. A list of codes exempt from modifier 51 usage is included in **Appendix E.** The ⚡ symbol is used to identify codes for vaccines that are pending FDA approval (see **Appendix K**). The # symbol is used to identify codes that are listed out of numerical sequence (see **Appendix N**). The ★ symbol is used to identify codes that may be used to report telemedicine services when appended by modifier 95 (see **Appendix P**).

Resequenced codes that are not placed numerically are identified with the # symbol, and a reference placed numerically (ie, Code is out of numerical sequence. See...) as a navigational alert to direct the user to the location of the out-of-sequence code (see **Appendix N**). Resequencing is utilized to allow placement of related concepts in appropriate locations within the families of codes regardless of the availability of numbers for sequential numerical placement.

Duplicate proprietary laboratory analyses (PLA) tests are annotated by the ✗ symbol. PLA codes describe proprietary clinical laboratory analyses and can be either provided by a single ("sole-source") laboratory or licensed or marketed to multiple providing laboratories (eg, cleared or approved by the Food and Drug Administration [FDA]). All codes that are included in the PLA section are also included in Appendix O, with the procedure's proprietary name. In some instances, the descriptor language of PLA codes may be identical and the code may only be differentiated by the listed proprietary name in Appendix O. When more than one PLA test has an identical descriptor, the codes will be denoted by the symbol ⇅.

▶Unless specifically noted, even though the Proprietary Laboratory Analyses section of the code set is located at the end of the Pathology and Laboratory section of the code set, a PLA code does not fulfill Category I code criteria. A PLA code(s) that has Category I status is annotated by the ⇅ symbol.◀

## Alphabetical Reference Index

This codebook features an expanded alphabetical index that includes listings by procedure and anatomic site. Procedures and services commonly known by their eponyms or other designations are also included.

## Counseling

Counseling is a discussion with a patient and/or family concerning one or more of the following areas:

- Diagnostic results, impressions, and/or recommended diagnostic studies
- Prognosis
- Risks and benefits of management (treatment) options
- Instructions for management (treatment) and/or follow-up
- Importance of compliance with chosen management (treatment) options
- Risk factor reduction
- Patient and family education

(For psychotherapy, see 90832-90834, 90836-90840)

## Family History

A review of medical events in the patient's family that includes significant information about:

- The health status or cause of death of parents, siblings, and children
- Specific diseases related to problems identified in the Chief Complaint or History of the Present Illness, and/or System Review
- Diseases of family members that may be hereditary or place the patient at risk

## History of Present Illness

A chronological description of the development of the patient's present illness from the first sign and/or symptom to the present. This includes a description of location, quality, severity, timing, context, modifying factors, and associated signs and symptoms significantly related to the presenting problem(s).

## Levels of E/M Services

Within each category or subcategory of E/M service, there are three to five levels of E/M services available for reporting purposes. Levels of E/M services are **not** interchangeable among the different categories or subcategories of service. For example, the first level of E/M services in the subcategory of office visit, new patient, does not have the same definition as the first level of E/M services in the subcategory of office visit, established patient.

The levels of E/M services include examinations, evaluations, treatments, conferences with or concerning patients, preventive pediatric and adult health supervision, and similar medical services, such as the determination of the need and/or location for appropriate care. Medical screening includes the history, examination, and medical decision making required to determine the need and/or location for appropriate care and treatment of the patient (eg, office and other outpatient setting, emergency department, nursing facility). The levels of E/M services encompass the wide variations in skill, effort, time, responsibility, and medical knowledge required for the prevention or diagnosis and treatment of illness or injury and the promotion of optimal health. Each level of E/M services may be used by all physicians or other qualified health care professionals.

The descriptors for the levels of E/M services recognize seven components, six of which are used in defining the levels of E/M services. These components are:

- History
- Examination
- Medical decision making
- Counseling
- Coordination of care
- Nature of presenting problem
- Time

The first three of these components (history, examination, and medical decision making) are considered the **key** components in selecting a level of E/M services. (See "Determine the Extent of History Obtained," page 9.)

The next three components (counseling, coordination of care, and the nature of the presenting problem) are considered **contributory** factors in the majority of encounters. Although the first two of these contributory factors are important E/M services, it is not required that these services be provided at every patient encounter.

Coordination of care with other physicians, other health care professionals, or agencies without a patient encounter on that day is reported using the case management codes.

The final component, time, is discussed in detail on page 7.

Any specifically identifiable procedure (ie, identified with a specific CPT code) performed on or subsequent to the date of initial or subsequent E/M services should be reported separately.

The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services. Physician performance of diagnostic tests/studies for which specific CPT codes are available may be reported separately, in addition to the appropriate E/M code. The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT code with modifier 26 appended.

The physician or other health care professional may need to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's

Copying, photographing, or sharing this CPT® book violates AMA's copyright.

**78799** Unlisted genitourinary procedure, diagnostic nuclear medicine

**78999** Unlisted miscellaneous procedure, diagnostic nuclear medicine

**79999** Radiopharmaceutical therapy, unlisted procedure

## Special Report

A service that is rarely provided, unusual, variable, or new may require a special report. Pertinent information should include an adequate definition or description of the nature, extent, and need for the procedure; and the time, effort, and equipment necessary to provide the service.

## Supervision and Interpretation, Imaging Guidance

Imaging may be required during the performance of certain procedures or certain imaging procedures may require surgical procedures to access the imaged area. Many services include image guidance, and imaging guidance is not separately reportable when it is included in the base service. The CPT code set typically defines in descriptors and/or guidelines when imaging guidance is included. When imaging is not included in a surgical procedure or procedure from the **Medicine** section, image guidance codes or codes labeled "radiological supervision and interpretation" (RS&I) may be reported for the portion of the service that requires imaging. All imaging guidance codes require: (1) image documentation in the patient record and (2) description of imaging guidance in the procedure report. All RS&I codes require: (1) image documentation in the patient's permanent record and (2) a procedure report or separate imaging report that includes written documentation of interpretive findings of information contained in the images and radiologic supervision of the service.

(The RS&I codes are not applicable to the Radiation Oncology subsection.)

## Administration of Contrast Material(s)

The phrase "with contrast" used in the codes for procedures performed using contrast for imaging enhancement represents contrast material administered intravascularly, intra-articularly, or intrathecally.

For intra-articular injection, use the appropriate joint injection code. If radiographic arthrography is performed, also use the arthrography supervision and interpretation code for the appropriate joint (which includes fluoroscopy). If computed tomography (CT) or magnetic resonance (MR) arthrography are performed without radiographic arthrography, use the appropriate joint injection code, the appropriate CT or MR code ("with contrast" or "without followed by contrast"), and the appropriate imaging guidance code for needle placement for contrast injection.

For spine examinations using computed tomography, magnetic resonance imaging, magnetic resonance angiography, "with contrast" includes intrathecal or intravascular injection. For intrathecal injection, use also 61055 or 62284.

Injection of intravascular contrast material is part of the "with contrast" CT, computed tomographic angiography (CTA), magnetic resonance imaging (MRI), and magnetic resonance angiography (MRA) procedures.

Oral and/or rectal contrast administration alone does not qualify as a study "with contrast."

## Written Report(s)

A written report (eg, handwritten or electronic) signed by the interpreting individual should be considered an integral part of a radiologic procedure or interpretation.

With regard to CPT descriptors for imaging services, "images" must contain anatomic information unique to the patient for which the imaging service is provided. "Images" refer to those acquired in either an analog (ie, film) or digital (ie, electronic) manner.

Copying, photographing, or sharing this CPT® book violates AMA's copyright.

(Use 76376 in conjunction with code[s] for base imaging procedure[s])

▶(Do not report 76376 in conjunction with 31627, 34839, 70496, 70498, 70544, 70545, 70546, 70547, 70548, 70549, 71275, 71555, 72159, 72191, 72198, 73206, 73225, 73706, 73725, 74174, 74175, 74185, 74261, 74262, 74263, 75557, 75559, 75561, 75563, 75565, 75571, 75572, 75573, 75574, 75635, 76377, 77046, 77047, 77048, 77049, 77061, 77062, 77063, 78012-78999, 93355, 0523T, 0559T, 0560T, 0561T, 0562T)◀

**76377** requiring image postprocessing on an independent workstation
- *CPT Changes: An Insider's View* 2006, 2013
- *CPT Assistant* Dec 05:1, Jan 07:31, Jul 08:3, May 09:9, Jun 09:9, Jul 09:10, Dec 09:13, Feb 10:6, Apr 10:5, 9, Jul 10:7, May 13:3, Jun 13:12, Apr 16:9, May 17:11, Jul 18:11
- *Clinical Examples in Radiology* Winter 06:17, Spring 06:8-9, Fall 06:9-10, Winter 07:4-5, Summer 07:1, 2, Summer 08:8, Fall 08:12, Spring 09:5, Summer 09:14, Fall 09:9, Winter 10:6, Spring 10:2, Summer 10:10, Fall 10:6, Winter 13:10, Winter 17:14, Spring 17:7, Summer 18:13

(Use 76377 in conjunction with code[s] for base imaging procedure[s])

▶(Do not report 76377 in conjunction with 34839, 70496, 70498, 70544, 70545, 70546, 70547, 70548, 70549, 71275, 71555, 72159, 72191, 72198, 73206, 73225, 73706, 73725, 74174, 74175, 74185, 74261, 74262, 74263, 75557, 75559, 75561, 75563, 75565, 75571, 75572, 75573, 75574, 75635, 76376, 77046, 77047, 77048, 77049, 77061, 77062, 77063, 78012-78999, 93355, 0523T, 0559T, 0560T, 0561T, 0562T)◀

(76376, 76377 require concurrent supervision of image postprocessing 3D manipulation of volumetric data set and image rendering)

**76380** Computed tomography, limited or localized follow-up study
- *CPT Changes: An Insider's View* 2002, 2003
- *CPT Assistant* Jul 07:13, Mar 19:11
- *Clinical Examples in Radiology* Summer 16:4

**76390** Magnetic resonance spectroscopy
- *CPT Assistant* Nov 97:25

(For magnetic resonance imaging, use appropriate MRI body site code)

**76391** Magnetic resonance (eg, vibration) elastography
- *CPT Changes: An Insider's View* 2019
- *Clinical Examples in Radiology* Fall 18:5

**76496** Unlisted fluoroscopic procedure (eg, diagnostic, interventional)
- *CPT Changes: An Insider's View* 2003
- *Clinical Examples in Radiology* Fall 07:3

**76497** Unlisted computed tomography procedure (eg, diagnostic, interventional)
- *CPT Changes: An Insider's View* 2003
- *CPT Assistant* Jun 05:11, Sep 18:10
- *Clinical Examples in Radiology* Spring 05:1, 7, Summer 18:13

**76498** Unlisted magnetic resonance procedure (eg, diagnostic, interventional)
- *CPT Changes: An Insider's View* 2003
- *CPT Assistant* Dec 11:17
- *Clinical Examples in Radiology* Fall 08:11, Spring 09:11, Winter 13:11, Spring 18:12, Fall 18:6

**76499** Unlisted diagnostic radiographic procedure
- *CPT Changes: An Insider's View* 2003
- *CPT Assistant* Jul 99:10, Sep 00:4, Apr 04:15, Nov 06:22, Mar 08:15, Dec 11:17, Dec 13:17, Jul 16:8
- *Clinical Examples in Radiology* Spring 11:8, Fall 14:10, Summer 15:8, Fall 18:5

# Diagnostic Ultrasound

All diagnostic ultrasound examinations require permanently recorded images with measurements, when such measurements are clinically indicated. For those codes whose sole diagnostic goal is a biometric measure (ie, 76514, 76516, and 76519), permanently recorded images are not required. A final, written report should be issued for inclusion in the patient's medical record. The prescription form for the intraocular lens satisfies the written report requirement for 76519. For those anatomic regions that have "complete" and "limited" ultrasound codes, note the elements that comprise a "complete" exam. The report should contain a description of these elements or the reason that an element could not be visualized (eg, obscured by bowel gas, surgically absent).

If less than the required elements for a "complete" exam are reported (eg, limited number of organs or limited portion of region evaluated), the "limited" code for that anatomic region should be used once per patient exam session. A "limited" exam of an anatomic region should not be reported for the same exam session as a "complete" exam of that same region.

Evaluation of vascular structures using both color and spectral Doppler is separately reportable. To report, see **Noninvasive Vascular Diagnostic Studies** (93880-93990). However, color Doppler alone, when performed for anatomic structure identification in conjunction with a real-time ultrasound examination, is not reported separately.

Ultrasound guidance procedures also require permanently recorded images of the site to be localized, as well as a documented description of the localization process, either separately or within the report of the procedure for which the guidance is utilized.

Use of ultrasound, without thorough evaluation of organ(s) or anatomic region, image documentation, and final, written report, is not separately reportable.

Copying, photographing, or sharing this CPT® book violates AMA's copyright.

interpretation of new INR test result(s), patient instructions, and dosage adjustments as needed.

If a significantly, separately identifiable evaluation and management (E/M) service is performed on the same day as 93792, the appropriate E/M service may be reported using modifier 25.

Do not report 93793 on the same day as an E/M service.

▶Do not report 93792, 93793 in conjunction with 98966, 98967, 98968, 99421, 99422, 99423, 99441, 99442, 99443, when telephone or online digital evaluation and management services address home and outpatient INR monitoring.◀

Do not report 93792, 93793 when performed during the service time of 99487, 99489, 99490, 99495, 99496.

**93792** Patient/caregiver training for initiation of home international normalized ratio (INR) monitoring under the direction of a physician or other qualified health care professional, face-to-face, including use and care of the INR monitor, obtaining blood sample, instructions for reporting home INR test results, and documentation of patient's/caregiver's ability to perform testing and report results

➲ *CPT Changes: An Insider's View* 2018

➲ *CPT Assistant* Mar 18:7

(For provision of test materials and equipment for home INR monitoring, see 99070 or the appropriate supply code)

**93793** Anticoagulant management for a patient taking warfarin, must include review and interpretation of a new home, office, or lab international normalized ratio (INR) test result, patient instructions, dosage adjustment (as needed), and scheduling of additional test(s), when performed

➲ *CPT Changes: An Insider's View* 2018

➲ *CPT Assistant* Nov 17:11, Mar 18:7

(Do not report 93793 in conjunction with 99201, 99202, 99203, 99204, 99205, 99211, 99212, 99213, 99214, 99215, 99241, 99242, 99243, 99244, 99245)

(Report 93793 no more than once per day, regardless of the number of tests reviewed)

## Other Procedures

**93797** Physician or other qualified health care professional services for outpatient cardiac rehabilitation; without continuous ECG monitoring (per session)

➲ *CPT Changes: An Insider's View* 2013

**93798** with continuous ECG monitoring (per session)

➲ *CPT Changes: An Insider's View* 2013

**93799** Unlisted cardiovascular service or procedure

➲ *CPT Assistant* Mar 98:11, Mar 02:10, Nov 05:15, Apr 09:9, Jul 10:10, Oct 11:7, Nov 11:11, Dec 13:18, Aug 18:11, Sep 18:10, Dec 18:11

## Noninvasive Vascular Diagnostic Studies

Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided.

The use of a simple hand-held or other Doppler device that does not produce hard copy output, or that produces a record that does not permit analysis of bidirectional vascular flow, is considered to be part of the physical examination of the vascular system and is not separately reported. The Ankle-Brachial Index (or ABI) is reportable with 93922 or 93923 as long as simultaneous Doppler recording and analysis of bidirectional blood flow, volume plethysmography, or transcutaneous oxygen tension measurements are also performed.

***Duplex scan*** (eg, 93880, 93882) describes an ultrasonic scanning procedure for characterizing the pattern and direction of blood flow in arteries or veins with the production of real-time images integrating B-mode two-dimensional vascular structure, Doppler spectral analysis, and color flow Doppler imaging.

***Physiologic studies*** Noninvasive physiologic studies are performed using equipment separate and distinct from the duplex ultrasound imager. Codes 93922, 93923, 93924 describe the evaluation of non-imaging physiologic recordings of pressures with Doppler analysis of bi-directional blood flow, plethysmography, and/or oxygen tension measurements appropriate for the anatomic area studied.

Limited studies for lower extremity require either:

(1) ankle/brachial indices at distal posterior tibial and anterior tibial/dorsalis pedis arteries plus bidirectional Doppler waveform recording and analysis at 1-2 levels; or (2) ankle/brachial indices at distal posterior tibial and anterior tibial/dorsalis pedis arteries plus volume plethysmography at 1-2 levels; or (3) ankle/brachial indices at distal posterior tibial and anterior tibial/dorsalis pedis arteries with transcutaneous oxygen tension measurements at 1-2 levels. Potential levels include high thigh, low thigh, calf, ankle, metatarsal and toes.

Limited studies for upper extremity require either:

(1) Doppler-determined systolic pressures and bidirectional Doppler waveform recording and analysis at 1-2 levels; or (2) Doppler-determined systolic pressures and volume plethysmography at 1-2 levels; or (3) Doppler-determined systolic pressures and transcutaneous oxygen tension measurements at 1-2 levels. Potential levels include arm, forearm, wrist, and digits.

Complete studies for lower extremity require either:

(1) ankle/brachial indices at distal posterior tibial and anterior tibial/dorsalis pedis arteries plus bidirectional

Copying, photographing, or sharing this CPT® book violates AMA's copyright.

Tab 10

American Medical Association
Physicians dedicated to the health of America

# Current Procedural Terminology

# cpt™ 2000

Celeste G. Kirschner, MHSA
Caryn A. Anderson, ART, CCS
Joyce A. Dalton
Stephanie J. Davis, BA
Desiree Evans
DeHandro Hayden, BS
Jennifer Kopacz, RRA
Grace M. Kotowicz, RN, BS
Marie L. Mindeman, ART
Karen E. O'Hara, BS, CCS-P
Mary R. O'Heron, RRA, CCS-P
Danielle Pavloski, ART
Dan Reyes, BA
Desiree Rozell, MPA
Arletrice A. Watkins, RRA
Rejina L. Young
Joan Zacharias, ART

Professional spiral ISBN: 1-57947-018-1
Professional binder ISBN: 1-57947-019-X
ISSN: 0276-8283

CPT is a trademark of the American Medical Association

All *Current Procedural Terminology* (CPT) five-digit numeric codes, descriptions, numeric modifiers, instructions, guidelines, and other material are Copyright 1999 American Medical Association. All Rights Reserved.

Copyright (c) 1966, 1970, 1973, 1977, 1981, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999 American Medical Association.

1st Edition printed 1966
2nd Edition printed 1970
3rd Edition printed 1973
4th Edition printed 1977
Revised: 1978, 1979, 1980, 1981, 1982, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999

For information regarding the reprinting or licensing of CPT information, please contact:
CPT Intellectual Property Services
American Medical Association
515 North State Street
Chicago, IL 60610
312 464-5022

Additional books may be purchased from the American Medical Association by calling 800 621-8335.

# Foreword

*Current Procedural Terminology*, Fourth Edition (*CPT*™) is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services, and will thereby provide an effective means for reliable nationwide communication among physicians, patients, and third parties. *CPT 2000* is the most recent revision of a work that first appeared in 1966.

CPT descriptive terms and identifying codes currently serve a wide variety of important functions in the field of medical nomenclature. CPT is the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs. CPT is also useful for administrative management purposes such as claims processing and for the development of guidelines for medical care review. The uniform language is likewise applicable to medical education and research by providing a useful basis for local, regional, and national utilization comparisons.

The changes that appear in this revision have been prepared by the CPT Editorial Panel with the assistance of physicians representing all specialties of medicine, and with important contributions from many third party payors and governmental agencies.

The American Medical Association trusts that this revision will continue the usefulness of its predecessors in identifying, describing, and coding medical, surgical, and diagnostic services.

E. Ratcliffe Anderson, Jr, MD
Executive Vice President

October 1, 1999

# Dedication

We dedicate *CPT 2000* to the memory of T. Reginald Harris, MD. Vision, leadership and dedication to the profession are Doctor Harris' hallmarks. He selflessly provided these qualities in his service as Chair of the CPT Editorial Panel. Doctor Harris served as the Chair of the Editorial Panel from August 1992 to May 1999. We will miss his warmth, his wisdom and his friendship as we continue our work in CPT.

## Requests to Update CPT

The effectiveness of *Current Procedural Terminology (CPT™)* is dependent upon constant updating to reflect changes in medical practice. This can only be accomplished through the interest and timely suggestions of practicing physicians, medical specialty societies, state medical associations, and other organizations and agencies. Accordingly, the American Medical Association welcomes correspondence, inquiries, and suggestions concerning old and new procedures, as well as other matters such as codes and indices.

For suggestions concerning the introduction of new procedures, or the coding, deleting, or revising of procedures contained in *CPT 2000*, correspondence requesting an application for coding change should be directed to:

CPT Editorial Research & Development
American Medical Association
515 North State Street
Chicago, Illinois 60610

All proposed additions to, or modifications of, *CPT 2000* will be by decision of the CPT Editorial Panel after consultation with appropriate medical specialty societies.

## Guidelines

Specific "Guidelines" are presented at the beginning of each of the six sections. These guidelines define items that are necessary to appropriately interpret and report the procedures and services contained in that section. For example, in the **Medicine** section, specific instructions are provided for handling unlisted services or procedures, special reports, and supplies and materials provided. Guidelines also provide explanations regarding terms that apply only to a particular section. For instance, **Surgery Guidelines** provides an explanation of the use of the star, while in **Radiology**, the unique term, "radiological supervision and interpretation" is defined.

## Starred Procedures

The star "*" is used to identify certain surgical procedures. A description of this reporting mechanism will be found in the **Surgery Guidelines**.

## Modifiers

A modifier provides the means by which the reporting physician can indicate that a service or procedure that has been performed has been altered by some specific circumstance but not changed in its definition or code. The judicious application of modifiers obviates the necessity for separate procedure listings that may describe the modifying circumstance. Modifiers may be used to indicate to the recipient of a report that:

- A service or procedure has both a professional and technical component.
- A service or procedure was performed by more than one physician and/or in more than one location.
- A service or procedure has been increased or reduced.
- Only part of a service was performed.
- An adjunctive service was performed.
- A bilateral procedure was performed.
- A service or procedure was provided more than once.
- Unusual events occurred.

***Example***
A physician providing diagnostic or therapeutic radiology services, ultrasound or nuclear medicine services in a hospital would use either modifier '-26' or 09926 to report the professional component.

73090-26 = Professional component only for an x-ray of the forearm

*or*

73090 AND 09926 = Professional component only for an x-ray of the forearm

***Example***
Two surgeons may be required to manage a specific surgical problem. When two surgeons work together as primary surgeons performing distinct part(s) of a single reportable procedure, each surgeon should report his/her distinct operative work by adding the modifier '-62' to the single definitive procedure code. Each surgeon should report the co-surgery once using the same procedure code. The modifier '-62' or the alternative modifier five-digit code 09962 would be applicable. For instance, a neurological surgeon and an otolaryngologist are working as co-surgeons in performing transsphenoidal excision of a pituitary neoplasm.

61548-62 = Hypophysectomy or excision of pituitary tumor, transnasal or transseptal approach, nonstereotactic + two surgeons modifier

*or*

61548 AND 09962 = Hypophysectomy or excision of pituitary tumor, transnasal or transseptal approach, nonstereotactic + two surgeons modifier

AND the second surgeon would report:

61548-62 = Hypophysectomy or excision of pituitary tumor, transnasal or transseptal approach, nonstereotactic + two surgeons modifier

*or*

61548 AND 09962 = Hypophysectomy or excision of pituitary tumor, transnasal or transseptal approach, nonstereotactic + two surgeons modifier

If additional procedure(s) (including add-on procedure(s)) are performed during the same surgical session, separate code(s) may be reported without the modifier '-62' added. **Note:** If a cosurgeon acts as an assistant in the performance of additional procedure(s) during the same surgical session, those services may be reported using separate procedure code(s) with the modifier '-80' or modifier '-81' added, as appropriate. A complete listing of modifiers is found in Appendix A.

## Unlisted Procedure or Service

It is recognized that there may be services or procedures performed by physicians that are not found in *CPT*. Therefore, a number of specific code numbers have been designated for reporting unlisted procedures. When an unlisted procedure number is used, the service or procedure should be described. Each of these unlisted procedural code numbers (with the appropriate accompanying topical entry) relates to a specific section of the book and is presented in the Guidelines of that section.

## Special Report

A service that is rarely provided, unusual, variable, or new may require a special report in determining medical appropriateness of the service. Pertinent information should include an adequate definition or description of the nature, extent, and need for the procedure; and the time, effort, and equipment necessary to provide the service. Additional items which may be included are:

Complexity of symptoms, final diagnosis, pertinent physical findings, diagnostic and therapeutic procedures, concurrent problems, and follow-up care.

## Code Changes

A summary listing of additions, deletions, and revisions applicable to *CPT 2000* is found in Appendix B. New procedure numbers added to *CPT* are identified throughout the text with the symbol "●" placed before the code number. In instances where a code revision has resulted in a substantially altered procedure descriptor, the symbol "▲" is placed before the code number. The symbols "▶ ◀" are used to indicate new and revised text other than the procedure descriptors. CPT add-on codes are annotated by a "+" symbol and are listed in **Appendix E**. The "⊘" symbol is used to identify codes that are exempt from the use of modifier '-51', but have not been designated as CPT add-on procedures/services. A list of codes exempt from modifier '-51' usage is included in **Appendix F**.

## Alphabetical Reference Index

A new, expanded alphabetical index is found in the back of the book. It includes listings by procedure and anatomic site. Procedures and services commonly known by their eponyms or other designations are also included.

## CPT in Electronic Formats

*CPT 2000* procedure codes and descriptors are also available on magnetic computer tapes, diskettes, and CD-ROM in various formats. For more information call (800) 621-8335.

**Visit CPT on the AMA Website**
**http://www.ama-assn.org/cpt**

## Concurrent Care

Concurrent care is the provision of similar services, eg, hospital visits, to the same patient by more than one physician on the same day. When concurrent care is provided, no special reporting is required. Modifier '-75' has been deleted.

## Counseling

Counseling is a discussion with a patient and/or family concerning one or more of the following areas:

- diagnostic results, impressions, and/or recommended diagnostic studies;
- prognosis;
- risks and benefits of management (treatment) options;
- instructions for management (treatment) and/or follow-up;
- importance of compliance with chosen management (treatment) options;
- risk factor reduction; and
- patient and family education.

(For psychotherapy, see 90804-90857)

## Family History

A review of medical events in the patient's family that includes significant information about:

- the health status or cause of death of parents, siblings, and children;
- specific diseases related to problems identified in the Chief Complaint or History of the Present Illness, and/or System Review;
- diseases of family members which may be hereditary or place the patient at risk.

## History of Present Illness

A chronological description of the development of the patient's present illness from the first sign and/or symptom to the present. This includes a description of location, quality, severity, timing, context, modifying factors and associated signs and symptoms significantly related to the presenting problem(s).

## Levels of E/M Services

Within each category or subcategory of E/M service, there are three to five levels of E/M services available for reporting purposes. Levels of E/M services are *not* interchangeable among the different categories or subcategories of service. For example, the first level of E/M services in the subcategory of office visit, new patient, does not have the same definition as the first level of E/M services in the subcategory of office visit, established patient.

The levels of E/M services include examinations, evaluations, treatments, conferences with or concerning patients, preventive pediatric and adult health supervision, and similar medical services, such as the determination of the need and/or location for appropriate care. Medical screening includes the history, examination, and medical decision-making required to determine the need and/or location for appropriate care and treatment of the patient (eg, office and other outpatient setting, emergency department, nursing facility, etc.). The levels of E/M services encompass the wide variations in skill, effort, time, responsibility and medical knowledge required for the prevention or diagnosis and treatment of illness or injury and the promotion of optimal health. Each level of E/M services may be used by all physicians.

The descriptors for the levels of E/M services recognize seven components, six of which are used in defining the levels of E/M services. These components are:

- history;
- examination;
- medical decision making;
- counseling;
- coordination of care;
- nature of presenting problem; and
- time.

The first three of these components (history, examination, and medical decision making) are considered the **key** components in selecting a level of E/M services. (See "Determine the Extent of History Obtained," page 6.)

The next three components (counseling, coordination of care, and the nature of the presenting problem) are considered **contributory** factors in the majority of encounters. Although the first two of these contributory factors are important E/M services, it is not required that these services be provided at every patient encounter.

Coordination of care with other providers or agencies without a patient encounter on that day is reported using the case management codes.

The final component, time, is discussed in detail (see page 4).

Any specifically identifiable procedure (ie, identified with a specific CPT code) performed on or subsequent to the date of initial or subsequent "E/M Services" should be reported separately.

The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services. Physician performance of diagnostic tests/studies for which specific CPT codes are available may be reported separately, in addition to the appropriate E/M code. The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT code with the modifier '-26' appended.

The physician may need to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's condition required a significant separately identifiable E/M service above and beyond other services provided or beyond the usual preservice and postservice care associated with the procedure that was performed. The E/M service may be caused or prompted by the symptoms or condition for which the procedure and/or service was provided. This circumstance may be reported by adding the modifier '-25' to the appropriate level of E/M service. As such, different diagnoses are not required for reporting of the procedure and the E/M services on the same date.

## Nature of Presenting Problem

A presenting problem is a disease, condition, illness, injury, symptom, sign, finding, complaint, or other reason for encounter, with or without a diagnosis being established at the time of the encounter. The E/M codes recognize five types of presenting problems that are defined as follows:

***Minimal:*** A problem that may not require the presence of the physician, but service is provided under the physician's supervision.

***Self-limited or minor:*** A problem that runs a definite and prescribed course, is transient in nature, and is not likely to permanently alter health status OR has a good prognosis with management/compliance.

***Low severity:*** A problem where the risk of morbidity without treatment is low; there is little to no risk of mortality without treatment; full recovery without functional impairment is expected.

***Moderate severity:*** A problem where the risk of morbidity without treatment is moderate; there is moderate risk of mortality without treatment; uncertain prognosis OR increased probability of prolonged functional impairment.

***High severity:*** A problem where the risk of morbidity without treatment is high to extreme; there is a moderate to high risk of mortality without treatment OR high probability of severe, prolonged functional impairment.

## Past History

A review of the patient's past experiences with illnesses, injuries, and treatments that includes significant information about:

- prior major illnesses and injuries;
- prior operations;
- prior hospitalizations;
- current medications;
- allergies (eg, drug, food);
- age appropriate immunization status;
- age appropriate feeding/dietary status.

## Social History

An age appropriate review of past and current activities that includes significant information about:

- marital status and/or living arrangements;
- current employment;
- occupational history;
- use of drugs, alcohol, and tobacco;
- level of education;
- sexual history;
- other relevant social factors.

## System Review (Review of Systems)

An inventory of body systems obtained through a series of questions seeking to identify signs and/or symptoms which the patient may be experiencing or has experienced. For the purposes of CPT the following elements of a system review have been identified:

Case 5:17-cv-00317-XR Document 95-6 *SEALED* Filed 08/21/20 Page 164 of 305



▶For spine examinations using computerized tomography, magnetic resonance imaging, magnetic resonance angiography, "with contrast" includes intrathecal or intravascular injection. For intrathecal injection, use also 61055 or 62284.◀

▶Injection of contrast material is part of the "with contrast" CT, MRI, MRA procedure.◀

Oral and ▶/or◀ rectal contrast ▶administration alone does not qualify as a study "with contrast."◀

## Written Report(s)

A written report, signed by the interpreting physician, should be considered an integral part of a radiologic procedure or interpretation.



24-50176.17812

**93734** Electronic analysis of single chamber pacemaker system (includes evaluation of programmable parameters at rest and during activity where applicable, using electrocardiographic recording and interpretation of recordings at rest and during exercise, analysis of event markers and device response); without reprogramming
*CPT Assistant* Summer 94:23; Feb 98:11

**93735** with reprogramming
*CPT Assistant* Summer 94:23; Feb 98:11

**93736** Electronic analysis of single chamber internal pacemaker system (may include rate, pulse amplitude and duration, configuration of wave form, and/or testing of sensory function of pacemaker), telephonic analysis
*CPT Assistant* Summer 94:23

▲**93737** Electronic analysis of single or dual chamber pacing cardioverter-defibrillator only (interrogation, evaluation of pulse generator status); without reprogramming
*CPT Assistant* Summer 94:22

**93738** with reprogramming
*CPT Assistant* Summer 94:22

**93740** Temperature gradient studies

(93750 has been deleted. To report, see 93875-93971)

●**93741** Electronic analysis of pacing cardioverter-defibrillator (includes interrogation, evaluation of pulse generator status, evaluation of programmable parameters at rest and during activity where applicable, using electrocardiographic recording and interpretation of recordings at rest and during exercise, analysis of event markers and device response); single chamber, without reprogramming

●**93742** single chamber, with reprogramming

●**93743** dual chamber, without reprogramming

●**93744** dual chamber, with reprogramming

**93760** Thermogram; cephalic

**93762** peripheral

**93770** Determination of venous pressure

(For central venous cannulization and pressure measurements, see 36488-36491, 36500)

(93780, 93781 have been deleted)

**93784** Ambulatory blood pressure monitoring, utilizing a system such as magnetic tape and/or computer disk, for 24 hours or longer; including recording, scanning analysis, interpretation and report

**93786** recording only

**93788** scanning analysis with report

**93790** physician review with interpretation and report

(93791-93796 have been deleted. To report, see 93731-93736)

## Other Procedures

**93797** Physician services for outpatient cardiac rehabilitation; without continuous ECG monitoring (per session)

**93798** with continuous ECG monitoring (per session)

**93799** Unlisted cardiovascular service or procedure
*CPT Assistant* Mar 98:11

## Non-Invasive Vascular Diagnostic Studies

Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided.

The use of a simple hand-held or other Doppler device that does not produce hard copy output, or that produces a record that does not permit analysis of bidirectional vascular flow, is considered to be part of the physical examination of the vascular system and is not separately reported.

***Duplex scan*** describes an ultrasonic scanning procedure with display of both two-dimensional structure and motion with time and Doppler ultrasonic signal documentation with spectral analysis and/or color flow velocity mapping or imaging.

## Cerebrovascular Arterial Studies

(93850, 93860 have been deleted. To report, see 93875-93882)

(93870 has been deleted. To report, see 93880 and 93882)

**93875** Non-invasive physiologic studies of extracranial arteries, complete bilateral study (eg, periorbital flow direction with arterial compression, ocular pneumoplethysmography, Doppler ultrasound spectral analysis)
*CPT Assistant* Jun 96:9; Dec 97:10

**93880** Duplex scan of extracranial arteries; complete bilateral study
*CPT Assistant* Jun 96:9

**93882** unilateral or limited study
*CPT Assistant* Jun 96:9

**93886** Transcranial Doppler study of the intracranial arteries; complete study
*CPT Assistant* Jun 96:9

**93888** limited study
*CPT Assistant* Jun 96:9

## Extremity Arterial Studies (Including Digits)

(93890, 93910 have been deleted. To report, see 93922-93931)

(93920, 93921 have been deleted. To report, see 93922-93924)

**93922** Non-invasive physiologic studies of upper or lower extremity arteries, single level, bilateral (eg, ankle/brachial indices, Doppler waveform analysis, volume plethysmography, transcutaneous oxygen tension measurement)
*CPT Assistant* Jun 96:9

**93923** Non-invasive physiologic studies of upper or lower extremity arteries, multiple levels or with provocative functional maneuvers, complete bilateral study (eg, segmental blood pressure measurements, segmental Doppler waveform analysis, segmental volume plethysmography, segmental transcutaneous oxygen tension measurements, measurements with postural provocative tests, measurements with reactive hyperemia)
*CPT Assistant* Jun 96:9

**93924** Non-invasive physiologic studies of lower extremity arteries, at rest and following treadmill stress testing, complete bilateral study
*CPT Assistant* Jun 96:9

**93925** Duplex scan of lower extremity arteries or arterial bypass grafts; complete bilateral study
*CPT Assistant* Jun 96:9

**93926** unilateral or limited study
*CPT Assistant* Jun 96:9

**93930** Duplex scan of upper extremity arteries or arterial bypass grafts; complete bilateral study
*CPT Assistant* Jun 96:9

**93931** unilateral or limited study
*CPT Assistant* Jun 96:9

## Extremity Venous Studies (Including Digits)

(93950, 93960 have been deleted. To report, see 93965-93971)

**93965** Non-invasive physiologic studies of extremity veins, complete bilateral study (eg, Doppler waveform analysis with responses to compression and other maneuvers, phleborheography, impedance plethysmography)
*CPT Assistant* Jun 96:9

**93970** Duplex scan of extremity veins including responses to compression and other maneuvers; complete bilateral study
*CPT Assistant* Jun 96:9

**93971** unilateral or limited study
*CPT Assistant* Jun 96:9