No. 24-50176

# In the United States Court of Appeals For the Fifth Circuit

UNITED STATES OF AMERICA EX REL. TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,
*Plaintiffs-Appellees,*

v.

PERIPHERAL VASCULAR ASSOCIATES, P.A.,
*Defendant-Appellant.*

Appeal from the United States District Court for the Western District of Texas, San Antonio Division; No. 5:17-CV-317

# REDACTED BRIEF OF APPELLANT

Joshua S. Smith
jsmith@beckredden.com
David M. Gunn
dgunn@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

ATTORNEYS FOR APPELLANT

**No. 24-50176**

# In the United States Court of Appeals For the Fifth Circuit

**UNITED STATES OF AMERICA EX REL. TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,**
***Plaintiffs-Appellees,***

**v.**

**PERIPHERAL VASCULAR ASSOCIATES, P.A.,**
***Defendant-Appellant.***

Appeal from the United States District Court for the
Western District of Texas, San Antonio Division; No. 5:17-CV-317

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Plaintiffs-Appellees:**

   United States of America ex rel. Tiffany Montcrief, Relator; Roberta A. Martinez, Relator; Alicia Burnett, Relator

2. **Defendant-Appellant:**

   Peripheral Vascular Associates, P.A.

3. **Counsel for Plaintiffs-Appellees:**

Misty A. Hataway-Coné
CONÉ PLLC

Justin T. Berger (pro hac vice)
Sarvenaz J. Fahimi (pro hac vice)
COTCHETT, PITRE & MCCARTHY, LLP

Wallace M. Brylak, Jr.
BRYLAK LAW

4. **Appellate Counsel for Defendant-Appellant:**

Joshua S. Smith
David M. Gunn
BECK REDDEN LLP

5. **Counsel in the District Court for Defendant-Appellant**

David M. Prichard
David R. Montpas
Glenn W. MacTaggart
PRICHARD YOUNG, LLP

Sean McKenna
Mark A. Cole
Lauren M. Nelson
SPENCER FANE LLP

Jeff Wurzburg
NORTON ROSE FULBRIGHT US LLP

*/s/ Joshua S. Smith*
Joshua S. Smith
*Attorney of Record for Appellant*

## Statement Regarding Oral Argument

Appellant requests oral argument. First, the appeal presents complex arguments regarding the False Claims Act. Second, the issues on appeal necessarily require close study of the record, which exceeds 30,000 pages in length.

Finally, the substantial money judgment (more than $28 million) rested on several unorthodox rulings, such as the partial summary judgment for the plaintiff on scienter. As relevant here, the district court issued three substantive opinions that collectively span over 110 pages in length.[1] Two of these opinions were issued after trial, which explains in part why the court delayed judgment until two years after the trial. Oral argument would enable the parties to answer any lingering questions that the Court may have regarding these complex issues.

[1] ROA.3972-4030, 5147-78, 5540-63.

**TABLE OF CONTENTS**

**Page**

Statement Regarding Oral Argument ..................... iii

Statement of Jurisdiction..................... xi

Issues Presented ..................... xii

Statement of the Case.....................1

Summary of Argument .....................17

Standard of Review.....................19

Argument.....................20

I. The partial summary judgment that PVA knowingly submitted false claims should be reversed. .....................20

A. PVA's bills to Medicare were not false. .....................22

1. The district court mixed and matched the requirements for different medical procedures. .....................23

2. Radiology vs. vascular ultrasounds. .....................24

3. Evaluation and management vs. vascular ultrasounds. .....................26

B. Alternatively, PVA did not know the claims were false. .....................29

1. PVA's officers and staff explained why they believed their bills were proper. .....................30

2. The 2017 billing change was irrelevant.....................32

3. Industry practices and pre-2017 emails are irrelevant. .....................34

II. PVA did not know that any false statements were material. .....................36

A. No evidence supports the jury finding on materiality. .....................36

B. Alternatively, PVA did not know that the timing of the MedStreaming reports was material. ....................................... 39

1. There is no fraud if the defendant does not realize the misstatements are material. ...................................... 41

2. Relators forfeited any opportunity to obtain a finding on this essential element. ................................... 46

III. The penalty and damages awards should be reversed. ........................ 49

A. Damages should be deleted or retried. ...................................... 49

1. Relators did not present valid damages evidence at trial. ........................................................................ 49

2. Courts cannot grant "remittitur" based on evidence never before the jury. ..................................................... 50

3. The "remittitur" fails on its own terms. .......................... 52

B. The penalty award and trebled damages violate the Eighth Amendment. ....................................................................... 53

IV. PVA preserves its argument that the FCA's *qui tam* scheme violates Article II. ....................................................................... 57

Conclusion ........................................................................................ 58

Certificate of Service ........................................................................ 60

Certificate of Compliance .................................................................. 61

## INDEX OF AUTHORITIES

**CASES** **PAGE(S)**


*Allison Engine Co. v. United States ex rel. Sanders*,
553 U.S. 662 (2008).....45

*Brown v. Bryan Cty.*,
219 F.3d 450 (5th Cir. 2000).....19

*Buckley v. Valeo*,
424 U.S. 1 (1976).....58

*Caldarera v. E. Airlines, Inc.*,
705 F.2d 778 (5th Cir. 1983).....51

*Cunningham v. Circle 8 Crane Servs., L.L.C.*,
64 F.4th 597 (5th Cir. 2023).....31

*Dallas Indep. Sch. Dist. v. Woody*,
865 F.3d 303 (5th Cir. 2017).....19

*United States ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015).....53

*United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*,
950 F.3d 277 (5th Cir. 2020).....25, 31

*Dupree v. Younger*,
598 U.S. 729 (2023).....57

*Eiland v. Westinghouse Elec. Corp.*,
58 F.3d 176 (5th Cir. 1995).....19

*U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333 (5th Cir. 2008).....42, 45

*Field v. Mans*,
516 U.S. 59 (1995).....43

*Guile v. United States*,
422 F.3d 221 (5th Cir. 2005).....38

*Guzman v. Allstate Assurance Co.*,
18 F.4th 157 (5th Cir. 2021) .......................................................................19

*Halliburton, Inc. v. Administrative Review Board*,
771 F.3d 254 (5th Cir. 2014) .......................................................................52

*United States ex rel. Harman v. Trinity Indus. Inc.*,
872 F.3d 645 (5th Cir. 2017) .................................................................20, 37, 38

*Hodges v. Easton*,
106 U.S. 408 (1882)...................................................................................48

*United States ex rel. King v. Solvay Pharms., Inc.*,
871 F.3d 318 (5th Cir. 2017) ...................................................................32, 33

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
575 F.3d 458 (5th Cir. 2009) .......................................................................36

*Longoria v. Hunter Express, Ltd.*,
932 F.3d 360 (2019)...................................................................................19

*Lyons v. Katy Indep. Sch. Dist.*,
964 F.3d 298 (5th Cir. 2020) .................................................................21, 31, 36

*In re Mercer*,
246 F.3d 391 (5th Cir. 2001) .......................................................................43

*Ohio Hosp. Ass'n v. Shalala*,
201 F.3d 418 (6th Cir. 1999) .......................................................................22

*United States ex rel. Polansky v. Executive Health Rees., Inc.*,
599 U.S. 419 (2023)...................................................................................57

*Raicevic v. Fieldwood Energy, L.L.C.*,
979 F.3d 1027 (5th Cir. 2020) .....................................................................47

*Riley v. St. Luke's Episcopal Hospital*,
252 F.3d 749 (5th Cir. 2001) ...................................................................57, 58

*Ruckh v. Salus Rehabilitation, LLC*,
963 F.3d 1089 (11th Cir. 2020) ...................................................................39

*United States ex rel. Schutte v. SuperValu, Inc.*,
598 U.S. 739 (2023)....................................................................16, 20, 30, 34

*SEC v. Jarkesy*,
No. 22-856, 2024 WL 3187811 (June 27, 2024)...............................................49

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020)..........................................................................................57

*Sekhar v. United States*,
570 U.S. 729 (2013)..........................................................................................42

*Smith v. Transworld Drilling Company*,
773 F.2d 610 (5th Cir. 1985) ...........................................................................52

*United States ex rel. Taylor-Vick v. Smith*,
513 F.3d 228 (5th Cir. 2008) ...........................................................................44

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*,
512 F. Supp. 3d 1096 (D. Hawai'i 2021) ..........................................................39

*Tull v. United States*,
481 U.S. 412 (1987)..........................................................................................49

*United States v. Aerodex, Inc.*,
469 F.2d 1003 (5th Cir. 1972) .........................................................................44

*United States v. Aleff*,
772 F.3d 508 (8th Cir. 2014) ...........................................................................53

*United States v. Bajakajian*,
524 U.S. 321 (1998)....................................................................19, 54, 55, 56

*United States v. Hangar One, Inc.*,
563 F.2d 1155 (5th Cir. 1977) .........................................................................44

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ...........................................................................53

*United States v. Moss*,
34 F.4th 1176 (11th Cir. 2022) .........................................................................27

*United States v. Priola*,
272 F.2d 589 (5th Cir. 1959) ....................................................................44

*United States v. Ridglea State Bank*,
357 F.2d 495 (5th Cir. 1966) ....................................................................44

*United States v. Southland Mgmt. Corp.*,
326 F.3d 669 (5th Cir. 2003) ....................................................................22

*United States v. Suarez*,
966 F.3d 376 (5th Cir. 2020) ....................................................53, 54, 55

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)........................................................................*passim*

*Vela v. City of Houston*,
276 F.3d 659 (5th Cir. 2001) ....................................................................21

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)...........................................................................41, 53

*Vogler v. Blackmore*,
352 F.3d 150 (5th Cir. 2003) ....................................................................51

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
417 F.3d 450 (5th Cir. 2005) ....................................................................44

*Worsham v. City of Pasadena*,
881 F.2d 1336 (5th Cir. 1989) ..................................................................53

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) .................................................................53

**UNITED STATES CONSTITUTION**

U.S. Const. art. II, § 2, cl. 2 ...............................................................58

U.S. Const. art. II, § 3 .................................................................................58

U.S. Const. amend. VIII..............................................................................53

**STATUTES**


18 U.S.C.
§ 287 .......... 54

28 U.S.C.
§ 1291 .......... xi
§ 1331 .......... xi

31 U.S.C.
§ 3729 .......... xi, 17
§ 3729(a)(1)(A) .......... 42
§ 3729(b)(1) .......... 54
§ 3729(b)(1)(A) .......... 30
§ 3729(b)(1)(B) .......... 45
§ 3730(b) .......... xi
§ 3730(d) .......... 2


**REGULATIONS**


42 C.F.R. § 424.34 .......... 5

45 C.F.R. § 162.1002(a)(5) .......... 22

45 C.F.R. § 162.1002(b)(1) .......... 22

45 C.F.R. § 162.1002(c)(1) .......... 22


**RULES**


Fed. R. Civ. P. 49(a)(3) .......... 16, 47, 48


**OTHER AUTHORITIES**


MEDICAL BILLING AND CODING, https://www.medicalbillingand coding.org/using-cpt .......... 25

Restatement (Second) of Torts § 526 cmt. a (1976) .......... 43

Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2507 (3d ed.) .......... 47, 48

## Statement of Jurisdiction

The district court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This action arose under the False Claims Act. 31 U.S.C. § 3729; *see* ROA.5540 ("Relators filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* … on behalf of the United States Government.").

Appellate jurisdiction exists under 28 U.S.C. § 1291 because Appellant timely filed a notice of appeal from the "Final Judgment" entered on February 14, 2024, which is a final order that disposes of all parties' claims. ROA.5564-65 (Final Judgment); ROA.5566-68 (notice of appeal filed March 11, 2024).

## ISSUES PRESENTED

This is a False Claims Act dispute. The issues are:

**1. Partial summary judgment on falsity and knowledge of falsity.** Did Relators fail to prove beyond peradventure (or even raise a fact issue) that PVA knowingly submitted false claims?

**2. Materiality.** Did Relators fail to present legally sufficient evidence that the alleged misrepresentations were material to Medicare's payment decision?

**3. Knowledge of materiality.** Did the district court err by ruling that a defendant can be liable for "fraud" under the FCA, even if the defendant is unaware that minor omissions or violations are significant enough to potentially influence the government's payment decision?

**4. Damages.** Did the district court err by awarding damages based on a post-trial expert affidavit advancing a damages measure that was never presented to the jury?

**5. Eighth Amendment.** Does the award of trebled damages and statutory penalties—based on a mere paperwork error—violate the Excessive Fines Clause?

**6. Article II.** The en banc court has held that the *qui tam* provisions of the False Claims Act do not violate Article II of the United States Constitution. Several members of the United States Supreme Court have recently flagged this question, and PVA respectfully preserves the issue.

## Statement of the Case

This False Claims Act dispute involves reimbursement requests to Medicare for vascular ultrasounds. Defendant Peripheral Vascular Associates, P.A. ("PVA") sent these bills to Medicare after the ultrasounds were performed—every one of them took place—but before a physician signed off on a "final report" of the results.

Relators claim that PVA could not bill Medicare until after that final report was signed, even if a physician had already exercised medical judgment in reviewing the ultrasounds. Accordingly, they insist that PVA's claims were premature—and were therefore just as false as if the ultrasounds were never performed at all.

Based on these supposed timing and paperwork violations, the final judgment awards over $21.8 million in statutory penalties, $4.3 million in trebled damages, and $2.4 million in attorneys' fees and costs. ROA.5564. The appeal involves:

- a partial summary judgment order holding that PVA knowingly submitted false claims to Medicare (ROA.3972-4030; *see* ROA.5549-54);
- a jury verdict making findings on materiality, damages, and the number of "false" claims (ROA.5006-10); and
- post-trial orders that granted "remittitur" based on a new damages measure (which was not presented to the jury), awarded attorney's fees, and assessed over $21.8 million in penalties (ROA.5147-78, 5480-94, 5540-63).

Unless otherwise noted, this Statement of the Case cites to summary judgment evidence in the body of the text and to trial evidence in footnotes.

## I. Factual background.

PVA did everything that was required to earn payment from Medicare for these ultrasounds. The district court emphasized this point after trial:

> [T]he Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case.

ROA.5168.[2] The "fraud" turns solely on the timing of PVA's invoices and whether PVA billed Medicare too early.

***The parties***

PVA was founded as a vascular surgery practice that treated vascular disease. ROA.2938, 16901. It began providing these services in 1975 in San Antonio and later expanded to satellite offices throughout South Texas. ROA.27464-65.[3] At the time of trial, PVA had 22 physicians and roughly 220 employees; it handled approximately 80,000 patient visits per year.[4]

Relators are three former employees of PVA; allured by the FCA's bounty program, they sued on behalf of the United States in early 2017. ROA.51-52 (complaint); *see* 31 U.S.C. § 3730(d). Before filing suit, Relators "provided the Government with the information" about their allegations. ROA.51-52 (complaint).

---

2 ROA.6521 ("provide[d] the services"); ROA.6100-01 (Relators' expert does not dispute this).
3 ROA.5870-71, 6371, 6416, 6663.
4 ROA.6371.

The government investigated these allegations and then declined to intervene. ROA.66-68 ("Election to Decline Intervention"); *see* ROA.2957, 3023-52.[5] Meanwhile, Medicare continued to reimburse PVA, without raising questions or concerns.[6]

***Vascular ultrasounds: Two components***

The key facts turn on how PVA billed for "noninvasive vascular diagnostic studies." ROA.17679; *see* ROA.3140 (Relators' MSJ). These services are also known as "vascular ultrasounds" or "vascular studies." ROA.2953-54 ("vascular ultrasound study").[7]

The ultrasound allows doctors to see if a patient's "blood flow is proper or if there's a problem" requiring surgery.[8] Vascular ultrasounds have two components:

1. Technical component. The "technical component" is the "manual performance" of the ultrasound. ROA.3123; *see* ROA.2941.[9]

2. Professional component. The "professional component" is the physician's act of "interpret[ing]" the resulting data. ROA.2941.[10]

---

[5] ROA.6491-96.

[6] ROA.6500 ("Medicare [has not] stopped paying"); ROA.6521 ("the government [has not] told PVA to change how it bills or codes").

[7] ROA.6180 ("vascular ultrasounds"); ROA.6199-200 ("vascular laboratory study"); ROA.6372 ("Vascular studies").

[8] ROA.6374-75.

[9] ROA.6096 ("technical performance of the test … with equipment and the personnel").

[10] ROA.6097 ("reading and interpreting the results").

Medicare paid PVA "between $100 and $200" for the technical component, but only "about $22" for the professional component.[11] These two components can be billed separately or—as was PVA's practice—they can be rolled into a single charge and billed "as a global service." ROA.16902, 16947.[12]

The "fraud" theory is not that PVA failed to treat patients or perform either component of the ultrasound. Rather, the theory is that even though PVA performed both parts of the ultrasound for every single patient, the doctor's subsequent sign-off in a final report took place after the bill instead of before.

***Medicare Reimbursement and the CPT Manual***

PVA used alphanumeric "CPT Codes" to report the medical services that it provided. ROA.2039-40, 3096-97.[13] These codes are set forth in a publication by the American Medical Association—namely, *Current Procedural Terminology, Fourth Edition* ("Manual"). ROA.17671-79.[14]

To bill globally, a provider would list the code for the specific type of vascular ultrasound that it performed. ROA.16904, 17067.[15] To bill for only the technical or professional component, a provider would tack on a "modifier" code; for example, the "-26" modifier means the bill is for the professional part alone. ROA.11348.[16]

---

[11] ROA.6388; *see* ROA.6414 ("we get paid $22 for reading a study").
[12] ROA.6167; *see* ROA.6170 ("they are added together for the global fee").
[13] *See* ROA.6065-66.
[14] ROA.6921-29; *see* ROA.6159, 6170.
[15] *E.g.*, ROA.6115, 6185-87.
[16] ROA.6164.

PVA submitted these codes to Medicare using an electronic "CMS-1500 form." ROA.17072;[17] *see* 42 C.F.R. § 424.34. Here is an excerpt from the paper version of the CMS-1500 form, which has fields for the provider to list the relevant "CPT" code, along with the "date(s) of service":


EXHIBIT 8

HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER

NUCC Instruction Manual available at: www.nucc.org

PLEASE PRINT OR TYPE

APPROVED OMB-0938-1197 FORM 1500 (02-12)

ROA.17645.[18] By signing this form, the provider certifies "that the services listed above" were "furnished" and were "medically … necessary." ROA.17646.[19]

---

[17] ROA.6061, 6063-64.

[18] ROA.6917-18.

[19] *See* ROA.6067-69, 6223.

### *Medicare guidance regarding "Billing Date of Service"*

According to Relators, PVA could not submit a global ultrasound code to Medicare (using an electronic CMS-1500 form) until after a PVA physician had already signed off on a written ultrasound report. ROA.3139-40. But it is not unusual for the technical and professional components to be completed on different days. Medicare has issued a bulletin addressing such situations.

For global bills, Medicare allows providers to list the date of the technical component as the "date of service" on the CMS-1500 form, even if the professional component occurred later:

> When billing a global service, the provider can submit the professional component with a date of service reflecting when the review and interpretation is completed or can submit the date of service as the date the technical component was performed. This will allow ease of processing for both Medicare and the supplemental payers.

ROA.11501-02, 20770-71 (Medicare guidance bulletin); *see* ROA.20855, 20891-92 (Relators' expert).[20]

There can be little wonder why PVA believed that it was allowed to bill Medicare after the ultrasound was completed, even if a physician had not yet signed the final ultrasound paperwork:

- "Medicare allows us to do that" (ROA.17069);
- "we got guidance that it would be any time after the technical component was completed" (ROA.17194);

[20] ROA.6144 (Relators' expert); *see* ROA.6141-44.

- "you are given the ability to choose the technical component date" (ROA.16907);
- "My understanding is Medicare says you may bill these things globally on the day that it was done. And that's what we do."[21]

***Ultrasounds with an office visit***

The "majority" of PVA's patients had an office visit with a physician when they came in for an ultrasound. ROA.16998. These were known as "Evaluation and Management" visits, or "E&M" for short. ROA.16912-13.[22]

The core facts regarding these visits are undisputed. A physician would review the ultrasound, go over it with the patient, and sign off on the key findings—before Medicare was billed. In some cases, however, the physician would not sign off on an additional "final" report until after Medicare had been billed.

1. Performing the ultrasound. First, a sonographer performed the ultrasound and recorded the data for a physician to review. ROA.16959-60 ("would have handed a handwritten note or the arterial Doppler waveform to the physician"); ROA.16961 ("The preliminary report that they hand to the physician the same day is critical because that is what the physician is using to treat his patient.").[23]

2. Interpreting the ultrasound. Next, the physician would review and interpret the results so that they could be discussed with the patient:

---

[21] ROA.6145.
[22] ROA.6163.
[23] ROA.5868-69 ("we provide the doctors with the results"); ROA.5919 ("we give them the measurements").

> [W]hen I see a patient in the office, and the testing is done while they're in the office, I have already looked and interpreted the study and made a notation in the medical record that shows what the study has shown.

ROA.2947 ("professional component was completed when I interpreted the study in the office right after the study was performed"); ROA.16913 ("in the course of that office visit … there would be a review of the [study]"); *see* ROA.2954 (similar).[24]

3. Recording the interpretation in "Allscripts". The physician's interpretation was then recorded in the patient's "official medical record." ROA.16980 ("When the PVA physician sees a patient, he dictates the results of the ultrasound into our electronic medical record…."); ROA.17008-09 ("the reading and interpreting studies is reflected … in the physician note").[25]

PVA stored these medical records from office visits in a program called "Allscripts Clinical Module" or "Allscripts CM." ROA.2955; *see* ROA.2946, 3090.[26] Here is an example. It includes the physician's summary of the key ultrasound findings. ROA.3006 (below).

[redacted]

---

[24] ROA.5919 ("interpreting it right then and there"); ROA.6200 ("I discuss the results realtime with the patient so that they have a complete understanding of what my exam found"); ROA.6375 ("[W]e show it to them. We talk to them. We draw pictures."); ROA.6398 ("for 99 percent of the people we see … we interpret that report that day").

[25] ROA.5921 ("when they see the patient … they also put their interpretation into their notes … and they sign off on that document"); ROA.6375 ("we enter the note in the computer … in the exam room"); ROA.6378 ("description for all vascular studies" in "medical record").

[26] ROA.6375, 6402; *see* ROA.6404 ("the interpretation of the study is in Allscripts").

The doctor signed this statement before PVA billed Medicare:

[redacted]

ROA.3006; *see* ROA.3007 (listing "Bill Date" as [redacted]).

4. Billing Medicare. When the physician "sign[ed] off on" the patient's medical notes, this caused PVA's billing software to automatically "create[] a voucher" for billing staff to review. ROA.3090, 3095-96. Medicare was billed "the following day." ROA.3095, 3098.

5. Signing a "MedStreaming" report. If the physician had not done so already, the physician would then sign off on a separate ultrasound report in PVA's "MedStreaming" program. ROA.16957, 17001.[27] According to Relators' expert, PVA billed Medicare for the ultrasound (a) **after** a physician signed off on the MedStreaming report for about 75% of patient ultrasound visits and (b) **before** a physician signed off on the MedStreaming report for about 25% of patient ultrasound visits. ROA.21045 ("24.9%"). Relators allege that the latter group of bills (which predate the MedStreaming report) were fraudulent. ROA.3158.

But Medicare does not mandate the use of this particular software. PVA adopted the MedStreaming software program in 2014 to achieve private accreditation. ROA.16957, 16999, 17001.

[27] ROA.5872 ("[S]ometimes it is. Sometimes it was not.").

The key benefit of the MedStreaming report was its "easy-to-read format," which was "easier for referring physicians, providers, health care workers, and patients to understand." ROA.2954, 16987.[28] The report presents technical data from the ultrasound,[29] along with the physician's "impressions." For example:

[redacted]

ROA.3008; *see* ROA.3006 (doctor's prior interpretation in Allscripts); ROA.3009 (raw ultrasound data). The doctor's signature is at the bottom.[30]

---

[28] ROA.6404 ("[W]e bend over backwards to make that stand-alone note easy to read.").

[29] ROA.5870 ("the velocities and the numbers"); *see* ROA.6378 ("scanned into Medstreaming").

[30] ROA.5821; *e.g.*, ROA.6931, 10625, 10677 (sample reports).

### *Ultrasounds without an office visit*

Separately, PVA performed a "very low volume" of ultrasounds for patients who came for "testing only." ROA.17180.[31] A PVA physician would interpret the ultrasound, but without seeing the patient for an office visit or recording the findings in the office visit notes. ROA.16949, 17184-86; *see* ROA.2955.[32] Instead, the findings were recorded only in MedStreaming ROA.2954 ("Every vascular study has a formal MedStreaming report.").[33] These patients accounted for less than 5% of PVA's vascular ultrasounds. ROA.3128 (9,458 out of 194,886 studies).

## II. Procedural history.

Relators filed this lawsuit in April 2017. ROA.49-63 (complaint); ROA.536-55 (amended complaint). In addition to their FCA allegations, Relators also asserted retaliation and employment-related claims—which were subsequently nonsuited or dismissed. ROA.550-53 (amended complaint); ROA.2896 (order of nonsuit); ROA.5589, 5591 (oral order of dismissal).

### *Two buckets of "false claims"*

Relators alleged multiple theories of fraud. This brief focuses on the two that made it to the jury. Relators divided the "false" invoices that PVA submitted to Medicare into two different buckets.

---

[31] ROA.5921 ("very small portion").
[32] ROA.5921.
[33] ROA.5921.

1. Ultrasounds with an office visit ("double billing"). Because PVA billed Medicare for both an office visit and an ultrasound, Relators dubbed this their "double billing" theory. ROA.3143-45 (MSJ); ROA.4462 (joint pretrial order). This label is ironic in that a bill for an office visit covers just the office visit, not the separate act of interpreting the ultrasound. ROA.17677.[34] In substance, Relators concede their complaint was not with the office visit bills, but with ultrasound bills that predate the physician's signature on the final MedStreaming report.[35]

2. Ultrasounds without an office visit ("testing only"). For these ultrasounds, the physician did not have an opportunity to record his or her interpretation in the office visit medical notes. Instead, the interpretation was recorded solely in the MedStreaming program. Again, Relators complain that PVA billed Medicare before a PVA physician applied his or her electronic signature to the MedStreaming report. ROA.3142-43 (MSJ); ROA.4462 (joint pretrial order).

***Partial summary judgment***

At first, the district court's perception of this case was influenced by prior False Claims Act disputes. *Cf.* ROA.5757 (the court: "I mentioned to you-all before I have had a number of these cases").

---

[34] ROA.6440; *see* ROA.6926 ("The actual performance and/or interpretation of diagnostic tests/studies … are not included in the levels of E/M services.").

[35] ROA.6618 (closing: "We're not asking you to have them give that money back for the E&M codes."); *see* ROA.6346 (damages expert did not consider "charges for the E&M codes").

The parties filed cross-motions for summary judgment,[36] and the court granted partial summary judgment that PVA knowingly submitted false claims. ROA.4028-29. First, the court held that PVA's ultrasound bills were "false" when they were sent to Medicare before a PVA physician had signed a "written report" that was "separate" from any prior office visit notes:

> The Court finds that a healthcare provider's submission of the CMS-1500 form certifying that it had rendered the services described therein is legally and factually false when a separate written report depicting a physician's interpretations has not been completed.

ROA.4028. The court based this ruling on perceived paperwork requirements for "Radiology" and "E&M" procedures, rather than requirements that are specific to vascular ultrasounds. ROA.4010-13.

Second, the court held that PVA had the requisite state of mind with respect to whether its invoices were "false":

> The Court also finds that PVA acted knowingly, with deliberate ignorance, or with reckless disregard for the truth or falsity of the information provided when it submitted the CMS-1500 form certifying that it had completed the professional component of a vascular studying [sic] when it had not done so.

ROA.4028. The court emphasized that PVA had briefly experimented with a different billing procedure in 2017. ROA.4020-24.

[36] ROA.2897-927 (PVA's MSJ); ROA.3524-99 (Relators' response); ROA.3683-710 (PVA's reply); *see* ROA.3129-203 (Relators' MSJ); ROA.3620-660 (PVA's response); ROA.3915-41 (Relators' reply).

Internal documents show that PVA attempted a "compliance billing" project where it waited to send invoices until after a MedStreaming report was signed. *Id.*; *see* ROA.16989-90, 17220, 17226-28, 17415, 17422, 17432, 17439, 17441, 17444-45 (evidence cited by the summary-judgment order). These documents, however, do not state whether PVA was attempting to comply with Medicare, with private insurers, or with an accreditation body. Even so, the district court made a matter-of-law inference that PVA had knowingly defrauded the government. ROA.4028, 5551-54.

***Trial***

From that point on, it was downhill sledding for Relators. At trial, they hired experts to testify that PVA's "false" statements were "material" to Medicare's payment decisions.[37] Their damages expert presented evidence of ultrasound bills that PVA submitted to Medicare "from 2014 to 2019."[38]

PVA asked the court to require the jury to decide whether PVA had submitted each claim to Medicare "KNOWING the falsity of the claim was MATERIAL" (an issue distinct from the partial summary judgment regarding whether PVA knew the claims were false). ROA.4646; *see* ROA.6585. The court overruled PVA's request. ROA.6585. As a result, there is no finding that PVA knew the alleged paperwork requirement was significant enough to matter.

---

[37] ROA.6056, 6070-77, 6222.
[38] ROA.6365.

Instead, the court instructed the jury that "it has already been determined that relators established the first two elements, falsity and knowledge."[39] Unsurprisingly, the jury found that the "false" claims were "material" and "caused" the government "to pay out money or to forfeit moneys due." ROA.5006, 5008. The jury also made findings about damages and the number of "false" claims. ROA.5007, 5009.

| | **Testing only** | **Double billing** |
|---|---|---|
| **Damages** | $408,765 | $2,319,434 |
| **Number of claims** | 2,755 | 4,625 |

***Post-verdict proceedings***

The court delayed judgment for two years after trial. ROA.5564. Meanwhile, the court assessed $21,825,592 in statutory penalties. ROA.5171-78; *see* ROA.5014-24 (motion); ROA.5079-89 (response); ROA.5117 (reply). This equates to a penalty of over $2,950 per "false" claim, even though (a) the only step that Relators say was not yet complete at the time of billing was the "$22" professional component[40] and (b) regardless of timing, the professional component was "actually performed in every case."[41] The court also awarded over $2.7 million in attorneys' fees, costs, and expenses. ROA.5480-94.

---

[39] ROA.6595.
[40] *See* ROA.6388, 6414 ("$22").
[41] *See* ROA.5168 (district court: "actually performed in every case").

The court granted JMOL "in part." ROA.5171; *see* ROA.5025-44 (motion). The court "set aside" the verdict on damages, which had been based on Relators' claim that "damages" should equal the full amount that Medicare paid PVA for the ultrasounds that it performed. ROA.5171. Rather than deleting damages altogether, the court allowed Relators to plug that significant hole (post-verdict) by submitting a post-trial expert affidavit with a new damages measure. ROA.5169; *see* ROA.5183, 5198-200. The court (not a jury) relied on this new affidavit to grant a "remittitur" and award $4.3 million in trebled damages. ROA.5558-62.

Based on fresh guidance from the Supreme Court, PVA asked the court to reconsider the partial summary judgment: "The 2017 'compliance billing' email and notes do not conclusively establish PVA's state of mind in 2014, 2015, or 2016." ROA.5385; *see United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 752 (2023) (scienter turns on "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it"). The court declined to reconsider. ROA.5549-54.

PVA asked the court to make a finding of fact regarding the element that had been omitted at trial—namely, whether PVA had guilty knowledge that the paperwork errors were material. ROA.5373-82 (citing Fed. R. Civ. P. 49(a)(3)). The court refused, holding that such proof is not required. ROA.5546-49.

The court also denied PVA's motion for new trial. ROA.5554-58; *see* ROA.5495-504 (motion). Judgment was entered in February 2024. ROA.5564.

## SUMMARY OF ARGUMENT

This is a False Claims Act dispute. 31 U.S.C. § 3729. PVA fully performed every ultrasound that it billed Medicare for. In the district court's words:

> [T]he Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case.

ROA.5168. Even so, the court awarded $28+ million based on supposed timing and paperwork violations. The theory is that PVA defrauded Medicare by billing for the ultrasounds before a physician signed off on a final "report" of the ultrasound.

This Court should reverse and render a take-nothing judgment. There are several independent paths to reversal.

First, the partial summary judgment holding that PVA knowingly submitted false claims should be reversed. The district court held that PVA failed to comply with the paperwork requirements for "radiology" and "evaluation and management" services. But this case is not about bills for "radiology" and "evaluation and management." This case is about bills for vascular ultrasounds. There is no evidence that PVA violated any applicable requirements. Nor is there evidence that PVA knowingly billed Medicare for "false" claims. Indeed, the summary-judgment evidence includes testimony by PVA's employees explaining why they believed that PVA's bills were accurate and true. Because the parties filed cross-motions, this Court should render judgment in PVA's favor.

Second, PVA did not know that these alleged paperwork requirements were material to Medicare's decision to pay. No evidence supports the jury finding on materiality. And even if these requirements were material, there is neither evidence nor a finding that PVA knew this to be so. Relators' claims fail as a matter of law.

Third, the award of trebled damages and penalties should be reversed. The district court recognized that the trial record contains no valid damages evidence. Even so, the court allowed Relators to plug that significant hole by submitting a post-trial expert affidavit. Based on evidence that the jury never saw or considered, the court granted a "remittitur." This was improper and violates PVA's right to a jury trial. In any event, the penalty and trebled damages awards are unconstitutional under the Eighth Amendment. The award is grossly disproportionate to PVA's alleged paperwork violations.

Finally, PVA recognizes that the en banc Court has held that the FCA's *qui tam* device is constitutional. But several members of the United States Supreme Court have recently flagged the issue, and PVA wishes to preserve its argument that private enforcement of the FCA violates Article II of the Constitution.

## Standard of Review

A de novo standard applies to review of summary judgment orders and rulings on JMOL. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (summary judgment); *Brown v. Bryan Cty.*, 219 F.3d 450, 456 (5th Cir. 2000) (JMOL). For summary judgment, the evidence should be viewed "in the light most favorable to the nonmovant." *Guzman*, 18 F.4th at 160. For JMOL, the evidence should be viewed in the light most favorable to the verdict. *Brown*, 219 F.3d at 456.

Similarly, legal questions (here, determinations regarding the precise elements of a claim under the FCA) are reviewed de novo. *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). The excessiveness of a statutory fine or penalty under the Eighth Amendment is also reviewed "de novo," comparing "the amount of the forfeiture to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998); *see id.* at 336 n.10 (any supporting fact-findings are reviewed for clear error).

Finally, the district court's decision to grant remittitur is reviewed for an "abuse of discretion." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364 (2019). The verdict must be reduced to the "maximum amount the jury could properly have awarded," *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, (5th Cir. 1995), which necessarily means that the remittitur must be based on the evidence that was presented to the jury.

## ARGUMENT

The False Claims Act is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). This case proves the importance of those limits. As the district court recognized, the services that PVA billed Medicare for "were actually performed in every case." ROA.5168.

The only "fraud" consists of supposed timing errors. The theory is that PVA billed Medicare too early, before its physicians had signed off on a final "report" for ultrasounds that had already been performed. This supposed paperwork violation "is not the stuff of fraud." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 656 (5th Cir. 2017). The $28+ million judgment should be reversed.

### I. The partial summary judgment that PVA knowingly submitted false claims should be reversed.

Two "essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023). The parties filed cross-motions for summary judgment, and the trial court granted partial summary judgment in favor of Relators on these two elements. ROA.4028-29; *see* ROA.3972-4030. This ruling was erroneous.

Relators bore "the burden of proof" and could obtain summary judgment only if they proved their paperwork theory "beyond peradventure." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020). The summary-judgment order does not mention this standard. Instead, it rests on appearances and suggestions:

- "it is **not necessarily the case** that PVA knew that its practices were fraudulent"
- "it **appears** that a written report is required"
- "Relators highlight many other industry publications that **appear** to support their theory"
- "Relators provide evidence that **suggests** that at least some staff at PVA knew that studies needed to be interpreted prior to billing"

ROA.4010, 4013, 4023-24 (emphasis added). Mere appearances are not enough to support a summary judgment in favor of a plaintiff. Nor do they create fact issues to surmount PVA's own summary-judgment motion.

Relators built their case by testing PVA's invoices and mental state against the wrong billing standards. This Court should reverse and render. *Vela v. City of Houston*, 276 F.3d 659, 671 n.17 (5th Cir. 2001) ("In situations involving cross-motions for summary judgment and upon finding no genuine issues of material fact, this court regularly reverses grants of summary judgment and enters judgment for the opposite party.").

### A. PVA's bills to Medicare were not false.

"It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674-75 (5th Cir. 2003). The district court recognized that the Medicare statutes and regulations do not expressly require the "written report" that Relators say PVA failed to timely sign. *See* ROA.4006-07.

Instead, the court focused on the CPT Manual, emphasizing that PVA used CPT codes to tell Medicare which procedures it performed. ROA.4003-09; *see* 45 C.F.R. § 162.1002(a)(5), (b)(1), (c)(1). The Manual is akin to a dictionary, and so the court reasoned that when PVA put these codes on an invoice, PVA was representing that it performed the procedure as defined in the Manual. ROA.4007-09; *see Ohio Hosp. Ass'n v. Shalala*, 201 F.3d 418, 420 (6th Cir. 1999) (the Manual is the "Rosetta Stone for the billing codes"). This first holding is not at issue.

Next, the court turned to language in the Manual about "written reports." ROA.4009-14, 4028. But as PVA warned, this "written report" language was not in the part of the Manual that discusses the ultrasounds that are at issue. ROA.3650, 3904. Relators' summary-judgment exhibits demonstrate that they were relying on the wrong parts of the Manual (the wrong entry in the dictionary, so to speak). No evidence exists that PVA violated any applicable portion of the Manual.

### 1. The district court mixed and matched the requirements for different medical procedures.

Relators attached short excerpts from the Manual to their motion. ROA.17671-79 (2020 edition); ROA.17805-14 (2000 edition). Those excerpts are separated by hundreds of missing pages. ROA.17671-79 (pages xv, xvii, 6, 475, 495, and 694). These snippets create the impression that Relators' favorite pages in the Manual all run together and apply to the ultrasounds that are at issue.

The Manual's introduction, however, explains its structure and layout. The Manual is broken into sections, each with "[s]pecific guidelines" that apply only "in that section." ROA.17674. For example, there is a "Medicine section," and there is a separate "Radiology" section. ROA.17808; *see* ROA.17674-77. They are not the same.


**Guidelines**

Specific guidelines are presented at the beginning of each of the sections. These guidelines define items that are necessary to appropriately interpret and report the procedures and services contained in that section. For example, in the **Medicine** section, specific instructions are provided for handling unlisted services or procedures, special reports, and supplies and materials provided. Guidelines also provide explanations regarding terms that apply only to a particular section. For instance, **Radiology Guidelines** provide a definition of the unique term, "radiological supervision and interpretation." While in **Anesthesia**, a discussion of reporting time is included.

These distinctions are significant because the district court based its decision on the "written report" requirements in two different sections of the Manual:

- "The CPT Manual's Radiology Guidelines" (ROA.4010-11); and
- The sections of the "CPT Manual" regarding "evaluation and management," which is also referred to as "E&M." (ROA.4012-13).

This case, however, does not concern bills for "radiology" procedures or "evaluation and management" services. Instead, this case concerns a separate category of procedures—namely, "Non-Invasive Vascular Diagnostic Studies."

Relators confessed to this fact below: "The services at issue in this case … are primarily categorized as 'Non-Invasive Vascular Diagnostic Studies.'" ROA.3140. Indeed, "Non-Invasive Vascular Diagnostic Studies" are the **only** category of procedure at issue. Relators' summary-judgment evidence was limited to this category of procedures.[42] Similarly, when the jury was asked to award damages and tally the number of "false" claims, the trial evidence did not include codes for "Radiology" and "E&M" services.[43]

Whatever paperwork requirements there may be for "Radiology" and "E&M" services, Relators have not identified any that apply to vascular ultrasounds.

#### 2. Radiology vs. vascular ultrasounds.

The district court thought the Manual's "Radiology Guidelines" also "expressly cover diagnostic ultrasounds." ROA.4010. As support, the court cited a page of the Manual regarding "Radiology"—not ultrasounds. *Id.* (citing page 475 of the Manual); *see* ROA.17677 (page 475).

[42] Their summary-judgment evidence includes a list of ultrasounds that are at issue and the CPT codes that were used to describe them. ROA.27893-98; *see* ROA.26958 (affidavit regarding the lists). Each code fell within the range of "93880-93998," which is the set of codes for "Non-Invasive Vascular Diagnostic Procedures." ROA.17679.

[43] PX-88; *see* ROA.10432-579 (column "AN": "Procedure Code").

To be fair, some ultrasound procedures are indeed set forth in the "Radiology" section of the Manual. ROA.17678 (page 495 of the Manual). But not the "Noninvasive Vascular Diagnostic Studies" at issue here. ROA.17679. They fall hundreds of pages later in the "Medicine" section. ROA.17679 ("Medicine / Noninvasive Vascular Diagnostic Studies"). As the Manual's introduction explains, readers should examine "the guidelines regarding Imaging Guidance **in each individual section.**" ROA.17674 (emphasis added).

The court also relied on a third-party training website about billing and coding. ROA.4008. This resource proves the point. The portion of the Manual regarding medical services "is divided into six sections"—namely, "Evaluation and Management (E&M), Anesthesia, Surgery, Radiology, Pathology and Laboratory, and Medicine." MEDICAL BILLING AND CODING, https://www.medicalbillingandcoding.org/using-cpt/. "Each section … has guidelines **specific to that section**." *Id.* (emphasis added). Mixing and matching is forbidden.

The court also cited the "Medicare Claims Processing Manual" regarding "Radiology Services and Other Diagnostic Procedures." ROA.4010. This manual, however, is "sub-regulatory" guidance that has "no binding legal effect." *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020). There is no evidence that PVA agreed to follow the nonbinding guidance in that document, which is primarily directed towards "radiology" anyway.

Finally, the court stated that this "written report" requirement is "undisputed." ROA.4007; *see* ROA.4010 ("does not dispute"). But as support for this statement, the court cited PVA's summary-judgment response, where PVA explained that the Manual "does **not** require a separate, stand-alone report for vascular services that are billed globally." ROA.3630 (emphasis added); *see* ROA.4010 (citing "ECF No. 112 at 11-12").

The court also cited the appendices that the parties attached to their summary-judgment briefing. ROA.4007 (citing "ECF No. 95 Ex. 1; ECF No. 112 Ex. 1."); *see* ROA.3166-202 (Relators' appendix); ROA.3647-60 (PVA's appendix). But PVA's responsive appendix made the same point that PVA makes now:

> According to the materials cited by Relators, the procedures at issue do not fall within the umbrella of Radiology…. CPT Codes for "Non-Invasive Vascular Diagnostic Studies" … fall under the separate section of "Medicine."

ROA.3650 ¶ 21. The district court erred by mixing and matching the guidance in the CPT Manual. This case is about bills for ultrasounds, not bills for radiology. No evidence exists that PVA's ultrasound bills were false.

#### 3. Evaluation and management vs. vascular ultrasounds.

Finally, the district court examined the Manual's guidelines for "Evaluation and Management" (E&M) services. ROA.4012-13 (discussing "Ex. 45, at p. 6."). Based on these E&M guidelines, the court ruled that PVA must create a "separate" ultrasound report that is distinct from PVA's office visit notes. ROA.4012-13.

Like the "Radiology Guidelines," the E&M guidelines lie in their own section of the Manual—hundreds of pages before the "Medicine" section regarding vascular ultrasounds. ROA.17676, 17679. Relators do not claim that PVA improperly billed for E&M procedures. ROA.6618 (closing: "We're not asking you to have them give that money back for the E&M codes."); *see* ROA.6346 (damages expert did not consider "charges for the E&M codes"). This case is about ultrasound reimbursement, not reimbursement for E&M services.

The E&M guidelines govern how PVA could code its office visits with its patients. When PVA physicians had office visits with clients who came in for ultrasounds, PVA would also bill Medicare for an "E&M" service—*i.e.*, the office visit. ROA.16912, 27003-05. The more complex the office visit, the greater the "level" of the reportable E&M service—leading to greater reimbursement from Medicare. ROA.16913.[44]

Because ultrasounds are separately billable, the Manual prohibits providers from including the time that went into reading and interpreting an ultrasound when deciding what "level" of E&M visit to report:

> The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services.

ROA.17676.

---

44 *United States v. Moss*, 34 F.4th 1176, 1182 (11th Cir. 2022) ("a higher CPT code generally gets a higher reimbursement amount").

Relators twisted this guidance to support their "double billing" claim, on the theory that PVA could not bill for an ultrasound that was interpreted during an office visit. ROA.3143-45. That is backwards. These guidelines forbid providers from using ultrasound work to inflate the "level" of the E&M service; they do not forbid providers from billing for the separate work of doing an ultrasound.

The E&M guidelines go on to acknowledge that there are two separate ways to code the ultrasound. Providers may bill using a global code or they may bill for an individual component by tacking a modifier on to the global code:

> **[1]** Physician performance of diagnostic tests/studies for which specific CPT codes are available may be reported separately, in addition to the appropriate E/M code. **[2]** The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT code with modifier 26 appended.

ROA.17676. PVA's actions were consistent with this global billing guidance. When PVA performed both components, it billed globally rather than separately. ROA.16947.

Even so, the district court held that PVA had to follow the "separate … written report" requirement for non-global billing. ROA.4013 ("The Court reads the use of the permissive 'may' not as bestowing an option…."). The Manual does not impose this requirement for global billing. Nor does the Manual say that the E&M guidance applies to the separate "Medicine" section. ROA.17679. This guidance does not apply to the vascular ultrasounds that are at issue here.

Finally, the court vaguely referenced "other industry publications that appear to support [Relators'] theory." ROA.4013. This tentative observation is beside the point. As the court recognized, the industry does not universally require a stand-alone report. ROA.4012 ("permissible in some circumstances"). The Manual is the dictionary for CPT codes, and there is no basis to hold PVA to standards that neither Medicare nor the Manual has embraced.

* * *

No evidence exists that PVA's bills to Medicare were false. As relevant here, it is undisputed that PVA billed Medicare for vascular ultrasounds, not "radiology" or "E&M" services. Even so, the district court held that PVA's billing practices were "legally and factually false" based on guidelines in those separate portions of the CPT Manual. ROA.4028.

The partial summary judgment was improper. Relators failed to raise a fact issue that PVA violated any applicable portion of the Manual. This Court should reverse and render. If the Court agrees, then the Court may stop here without reaching any other issues in this brief.

### B. Alternatively, PVA did not know the claims were false.

Even if PVA's claims were false, no evidence exists that PVA knew that it had to flip hundreds of pages back in the Manual to learn about paperwork requirements in other sections of that document. As defined in the FCA, "knowingly" includes three different mental states:

> First, that the person "has actual knowledge of the information," § 3729(b)(1)(A)(i). Second, that the person "acts in deliberate ignorance of the truth or falsity of the information," § 3729(b)(1)(A)(ii). And, third, that the person "acts in reckless disregard of the truth or falsity of the information," § 3729(b)(1)(A)(iii). In short, either actual knowledge, deliberate ignorance, or recklessness will suffice.

*Schutte*, 598 U.S. at 749-50; *see* 31 U.S.C. § 3729(b)(1)(A).

Just as the district court used the wrong yardstick to measure the truth or falsity of PVA's invoices, so it tested PVA's state of mind as to immaterial facts. *See* ROA.4019-24, 4028-29 (partial summary judgment). The partial summary judgment on PVA's state of mind should be reversed.

First, Relators failed to conclusively establish this element; at a minimum, Relators should have been required to persuade a factfinder that PVA had a guilty state of mind. Second, Relators did not even create a fact issue on this element; in other words, this element presents another path to rendering judgment that Relators take nothing.

#### 1. PVA's officers and staff explained why they believed their bills were proper.

The district court agreed that "it is not necessarily the case that PVA knew that its practices were fraudulent." ROA.4023. Even so, the court faulted PVA for holding Relators to their burden of proof: "PVA points to no concrete evidence that it was under the impression that its actions were proper." ROA.4022.

The court did not explain how this reasoning could be squared with Relators' summary-judgment burden. As plaintiffs, Relators could not prevail at the summary-judgment stage unless they proved this element "beyond peradventure." *Lyons*, 964 F.3d at 302. Relators did not do so. As a result, the burden never shifted to PVA to present responsive evidence of its own. *Cunningham v. Circle 8 Crane Servs., L.L.C.*, 64 F.4th 597, 600 (5th Cir. 2023) ("Only if the movant succeeds must the nonmovant designate specific facts showing that there is a genuine issue for trial.").

Relators' own evidence refutes their motion. For example, Relators provided the district court with a Medicare bulletin providing guidance about the "Billing Date of Service on Professional Claims." ROA.20770. Providers may "submit the date of service as the date the technical component was performed," even if the professional component did not take place until later. ROA.11501-02, 20770-71.

This Court has questioned whether such guidance may make a claim "true" or "false" in the factual sense. *See Drummond*, 950 F.3d at 281 (discussing "sub-regulatory guidance"). But with respect to PVA's state of mind, this guidance explains why PVA honestly believed that its bills were proper:

- A senior-level manager (Kathy Britt) testified: "We bill on the technical component, when the test has been completed, because Medicare allows us to do that." ROA.17069, 17016.

- PVA's business development officer (Brian Hembling) agreed: "we got guidance that it would be any time after the technical component was completed." ROA.17194; *see* ROA.17166.
- The chair of PVA's coding and compliance committee (Dr. Alsabrook) also agreed: "I am aware that you are given the ability to choose the technical component date or professional component date when you're doing global billing." ROA.16907; *see* ROA.16889, 17104.

PVA was neither reckless nor acting with conscious indifference when it relied on Medicare's own guidance regarding the proper date of service.

Relators submitted this evidence to the court. By definition, they failed to prove PVA's state of mind "beyond peradventure." The partial summary judgment in their favor should be reversed.

#### 2. The 2017 billing change was irrelevant.

Relators did not even raise a fact issue. They built their case on circumstantial evidence that did not concern Medicare. This gap in proof is fatal. *See United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 n.12 (5th Cir. 2017) ("it would be speculation to infer that Solvay specifically intended such prescriptions to be reimbursed **by Medicaid**") (emphasis added).

In 2017, PVA temporarily experimented with waiting to send bills until after a MedStreaming report was signed and finalized. *E.g.*, ROA.17432, 17439. From

this, Relators—and the district court—inferred guilty knowledge on PVA's part. ROA.4020-24. This analysis has two primary flaws.

First, there is no evidence that PVA's 2017 change was motivated by an understanding of Medicare's requirements or of the CPT Manual. The paper trail vaguely refers to the 2017 change as "compliance billing"—but without stating what PVA was attempting to comply with. *E.g.*, ROA.17432 ("Allowed for Compliance billing after study interpreted"); ROA.17439 ("Ensure no audit requests for incomplete medical records."). If anything, this change demonstrates that PVA was attempting to comply with its understanding of the rules. ROA.16990-91 ("for a time we thought that we needed to have the study interpreted before it was billed"). PVA is privately accredited. ROA.16955-56, 16986. It also serves patients covered by private insurance. ROA.17049; *see* ROA.21130 (list of payors). Who was PVA attempting to comply with? Relators can only speculate. Under *Solvay*, this gap in proof is fatal. 871 F.3d at 332 n.12.

PVA had a history of taking a belt-and-suspenders approach to ensure accurate billing. It employed a "double validation" system, where billing codes were double-checked by a second set of eyes before billing. ROA.3096. PVA should not be penalized for experimenting with a second set of redundancies.

Second, this evidence is largely from the wrong time period. In *Schutte*, the Supreme Court clarified that scienter turns on "what the defendant thought when submitting the false claim—not what the defendant may have thought *after*

submitting it." 598 U.S. at 752 ("what the defendant knew when presenting the claim"). Relators sought—and obtained—damages and penalties for thousands of claims that PVA submitted in 2014, 2015, 2016, and early 2017 (and also in 2018 and 2019). *See* ROA.6343, 6365 (Relators' evidence of the number of claims from 2014 through 2019). This 2017 evidence does not establish PVA's state-of-mind beforehand (let alone "beyond peradventure").

### 3. Industry practices and pre-2017 emails are irrelevant.

The partial summary judgment preceded *Schutte*, which clarified that scienter turns on the defendant's state of mind "when submitting the false claim." 598 U.S. at 752. After *Schutte*, PVA promptly moved for reconsideration. ROA.5384-89. The district court, however, rejected *Schutte* as "largely beside the point." ROA.5553.

The court explained that its partial summary judgment rested on other evidence too:

> PVA's arguments are largely beside the point because they disregard much of the evidence considered. The Court did not rely exclusively on the 2017 compliance billing email and notes in reaching its conclusion on scienter; instead, it considered evidence spanning from 2012 through 2017 along with 'widespread industry publications' that were 'strong evidence that PVA recklessly disregarded industry practice.'"

ROA.5553. These industry practices and pre-2017 evidence, however, were largely an afterthought in the original summary-judgment order. *See* ROA.4021 n.2; ROA.4020, 4023-24. And for good reason.

In its original order, the court relegated the pre-2017 evidence to a footnote: "Relators also cite internal e-mails from before PVA started using MedStreaming, which appear to indicate that Burrow knew that vascular studies could not be billed until after interpretation." ROA.4021 n.2 (citing Relators' MSJ Exs. 12 & 14). There were only two such emails.

In one email, a PVA employee generically wrote (without even referencing Medicare's requirements) that certain studies "were not actually interpreted and cannot be billed until they are." ROA.17226. This goes only to the need for a physician to do the substantive work of interpreting a report with respect to some unidentified payor. It does not support Relators' theory that PVA was aware of Medicare's supposed paperwork requirement about final reports. In the other email, the employee warned one of the physicians that although "62 reports in focus [are] ready for your signature," only "[o]ne is being held for billing awaiting the complete report." ROA.17220 (emphasis added). Tellingly, the employee was holding only the incomplete report for billing—not necessarily the unsigned reports. Moreover, there is no mention of Medicare. These emails are not evidence of PVA's state of mind with respect to Medicare.

Finally, the court pointed to outside materials: "There is no reasonable explanation for PVA's failure to understand that no other healthcare providers utilized similar billing practices." ROA.4020. That statement is peculiar, for Relators submitted deposition testimony from an expert who confessed to periods of

time when he billed Medicare **before** a final report was signed. ROA.17132 ("So before I signed off, I'm sure those bills were going out."). In any event, PVA's sole obligation was to bill accurately—not to bill the same way as anyone else.

* * *

It is neither reckless nor dishonest to take a Medicare bulletin at its word. PVA honestly believed that its bills to Medicare were accurate and correct. This Court should reverse and render judgment that Relators take nothing.

Alternatively, if the Court concludes that fact issues exist, then the Court should reverse the partial summary judgment and remand for trial. Relators did not prove PVA's state of mind "beyond peradventure." *See Lyons*, 964 F.3d at 302. Their own evidence confirms that PVA did not knowingly submit false claims.

## II. PVA did not know that any false statements were material.

The jury trial presents two additional paths to rendition. First, no legally-sufficient evidence exists that the alleged misrepresentations were material to Medicare's payment decision. Second, even if evidence supported the jury finding on materiality, there is neither a finding nor proof that PVA knew that Medicare cared about the timing of a physician's signature on a final MedStreaming report.

### A. No evidence supports the jury finding on materiality.

A "false or fraudulent claim or statement violates the FCA only if it is material." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009); *see Escobar*, 579 U.S. at 191.

This standard is "rigorous" and "demanding." *Escobar*, 579 U.S. at 192, 194. The Supreme Court has defined "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 579 U.S. at 192-93; *see Harman*, 872 F.3d at 661 ("the defendant's false statements 'could have' influenced the government's pay decision or had the 'potential' to influence the government's decision").

Relators failed to meet their burden at trial. The district court erred by overruling PVA's motion for JMOL on this point. ROA.5155-66; *see* ROA.5025-44 (motion). It is not enough for Relators to prove that PVA missed some step in the performance of a vascular ultrasound, no matter how minor or technical. The Supreme Court rejected that approach in *Escobar*:

> At oral argument, the United States explained the implications of its position: If the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act. To the Government, liability would attach if the defendant's use of foreign staplers would entitle the Government not to pay the claim in whole or part—irrespective of whether the Government routinely pays claims despite knowing that foreign staplers were used…. The False Claims Act does not adopt such an extraordinarily expansive view of liability.

*Escobar*, 579 U.S. at 195-96. There must be evidence that the specific omission or violation is itself material. *See id.*

Medicare has explained that it does not care about the date that a final report is signed. When global bills are submitted, the provider may list the technical component as the "date of service," even if the professional component occurred later. ROA.6144. Relators contend that providers must still wait to drop the bill until a final report is signed, lest the bill be technically false. ROA.6141-44. Even if that were so, it would go to falsity—not materiality. Medicare has made clear that this date has no "potential" to influence its payment decision. *See Harman*, 872 F.3d at 661. Medicare does not even ask for providers to certify that date. It is immaterial.

At trial, Relators' experts embraced the same line of reasoning that *Escobar* rejected. They testified that Medicare does not pay for incomplete medical work that does not comply with the CPT Manual. *E.g.*, ROA.6056 ("not fully completed"); ROA.6070 ("if something has not been completed"); *see also* ROA.6071, 6074, 6077, 6222. The district court held that this testimony—along with several generic documents about the importance of accurately billing Medicare—was sufficient to create a fact issue. ROA.5159-61.

This evidence, however, begs the question. Were the ultrasounds **materially incomplete** at the time that PVA billed Medicare? Relators' experts failed to address this question. Their testimony is not probative evidence. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone.") (internal quotation marks omitted).

Consider *Ruckh v. Salus Rehabilitation, LLC,* where the Eleventh Circuit rejected a "fraud" claim that a provider billed Medicaid without preparing and maintaining comprehensive care plans. 963 F.3d 1089, 1109 (11th Cir. 2020). This alleged paperwork violation was not material:

> Here, the relator failed to connect the absence of care plans to specific representations regarding the services provided. Moreover, the relator did not allege, let alone prove, any deficiencies in the Medicaid services provided.

*Id.* at 1109; *see Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC,* 512 F. Supp. 3d 1096, 1123 (D. Hawai'i 2021) (holding that because documentation regarding "the treatment plan" is not the same as "the treatment itself," the missing documentation was immaterial).

The same reasoning applies here. As the district court recognized, "the services for which PVA submitted claims were actually performed in every case." ROA.5168. The timing of a physician signature on a MedStreaming report is immaterial. It does not influence Medicare's decision to pay for an ultrasound.

### B. Alternatively, PVA did not know that the timing of the MedStreaming reports was material.

Even if Relators presented evidence that the alleged misstatements were material, there is neither finding nor proof that PVA was aware of this fact. The intent inquiry under the FCA has two components. Relators must prove that PVA "[1] knowingly violated a requirement that [2] the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181.

As already discussed, the district court granted partial summary judgment on the first component. ROA.4028 ("PVA acted knowingly, with deliberate ignorance, or with reckless disregard for the truth or falsity of the information…."). In contrast, the second component has never been adjudicated.

As discussed, Medicare allows providers to list the date of the technical component as the "date of service" when billing for a global CPT code. ROA.6144. At trial, witness after witness testified that PVA took this to mean that Medicare did not care whether the bills were sent before a "final report" was signed:

- "Medicare believes that we can bill the global component of both the professional component and the tech component at the time of service, or at the time of report signing. In our company, we had chosen to do it at the time of the service." ROA.6181.

- "It's okay to bill Medicare the way we bill Medicare…. [Y]ou can bill them on the day that the exam was performed. I mean, it states that." ROA.6396.

- "My understanding is Medicare says you may bill these things globally on the day that it was done. And that's what we do." ROA.6415.

- "Yes, it's my belief" that "PVA coded and billed these vascular studies correctly…." ROA.6510.

Relators knew this was a weak spot in their theory, so they opposed PVA's attempts to secure a finding that PVA knew the alleged misstatements were material. ROA.4646, 5373-76, 6585 (PVA's attempts to secure a finding); *see* ROA.5400-04 (Relators' position). The district court sided with Relators. ROA.5546-49.

Having successfully opposed PVA's attempts to obtain a jury finding regarding whether PVA knew that its alleged paperwork violations were material, Relators must live with the consequences. They should take nothing.

### 1. There is no fraud if the defendant does not realize the misstatements are material.

*Escobar* means what it says. A FCA defendant is not liable unless it "knows" the requirement that it violated is "material to the Government's payment decision." 579 U.S. at 181. The mere fact that a defendant is aware of technical inaccuracies does not automatically translate into fraud.

If the defendant does not know that a misrepresentation is significant enough that it could induce government action, then the "punitive" penalties in the statute should not be imposed. *Id.*; *see id.* at 182 ("essentially punitive in nature") (quoting *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000)).

This Court has not yet had the opportunity to elaborate on this part of *Escobar*. When PVA raised this requirement, the district court "decline[d] to recognize a new fifth element for liability under the FCA." ROA.5549; *see* ROA.5546-49 (district court's full opinion on this point). Instead, the district court lumped the inquiry into the element of materiality, holding that a "reasonable person" (*i.e.*, negligence) standard will suffice:

> The FCA does not *require* the defendants have *knowledge* that their misrepresentations to the Government are material. To the extent that a scienter requirement applies to materiality—and not just falsity—it is built into the materiality analysis through the "reasonable person" standard.

ROA.5549. This negligence-based standard (a) misunderstands *Escobar* and (b) contradicts Circuit precedent. *Escobar*, 579 U.S. at 181; *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (holding that the FCA is not satisfied "by mere negligence or even gross negligence").

- ***Escobar.*** The separate element of materiality is indeed linked to whether a "reasonable man would attach importance" to the misrepresentation. *Escobar*, 579 U.S. at 193. But materiality is not the only element. The defendant in a fraud case must also "know[]" of that fact. *Id.* at 181. The district court was not free to ignore this language from *Escobar*. From start to finish, *Escobar* confirms that knowledge of materiality is required.

First, the FCA incorporates "all other elements of common-law fraud that are consistent with the statutory text." *Escobar*, 579 U.S. at 187 n.2. The statute "imposes civil liability on 'any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *Id.* at 187 (quoting 31 U.S.C. § 3729(a)(1)(A)). Although "Congress did not define what makes a claim 'false' or 'fraudulent,'" it is "a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *Id.* (quoting *Sekhar v. United States*, 570 U.S. 729, 732 (2013)).

For example, Section 3729(a)(1)(A) does not expressly identify "materiality" as an essential element, but the Supreme Court did not hesitate to require it anyway. *Escobar*, 579 U.S. at 193. For the same reasons, knowledge of materiality is also required. *See id.* at 181.

Second, the Court need look no further than the Restatement (Second) of Torts for guidance about the common law—as the Supreme Court did in *Escobar*. 579 U.S. at 188. The Supreme Court has embraced the Restatement as "the most widely accepted distillation of the common law of torts." *Field v. Mans,* 516 U.S. 59, 70 (1995).

Under the Restatement, mere knowledge of falsity is not enough to establish fraud; rather, there must also be an "expectation of influencing the other's conduct by the misrepresentation." Restatement (Second) of Torts § 526 cmt. a (1976). The Restatement confirms that "scienter" captures only the first half of the equation:

> The word "fraudulent" is here used as referring solely to the maker's knowledge of the untrue character of his representation. This element of the defendant's conduct frequently is called "scienter" by the courts. Intent and expectation of influencing the other's conduct by the misrepresentation are … a **separate and distinct element** necessary to liability….

Restatement (Section) of Torts § 526 cmt. a (1977) (emphasis added).

Sitting en banc, this Court has made the same point: "the Restatement treats the elements separately." *In re Mercer*, 246 F.3d 391, 410 (5th Cir. 2001) (en banc) (distinguishing "whether a representation is fraudulently made" with the "maker's

purpose to induce the recipient to act in reliance upon the misrepresentation"). As the Supreme Court unanimously confirmed in *Escobar*, this common-law rule carries over to the FCA. 579 U.S. at 181 ("whether the defendant knowingly violated a requirement that the defendant knows is material"). Without knowledge that a falsity is material, there can be no intent to defraud.

- ***Circuit precedent.*** Although this Circuit's FCA precedent has not always used the same words as *Escobar*, the substantive rule is the same. If a defendant is merely negligent with respect to whether a statement will induce reliance, then there is no fraud. Instead, there must be a "guilty intent" and a "purpose" to "cheat":

> It is a long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate "'**guilty knowledge of a purpose on the part of [the defendant] to cheat the Government**,'" *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) (quoting *United States v. Priola*, 272 F.2d 589, 594 (5th Cir. 1959)), or "'**knowledge or guilty intent**,'" *Aerodex*, 469 F.2d at 1007 (quoting *United States v. Ridglea State Bank*, 357 F.2d 495, 498 (5th Cir. 1966)); *see also United States v. Hangar One, Inc.*, 563 F.2d 1155, 1157 (5th Cir. 1977).

*United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (emphasis added); *see United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) ("Williams has failed to plead the basis for his belief that Bell Helicopter filed these claims **knowing it was defrauding** the government.") (emphasis added).

If a defendant innocently believes that misstatements are trivialities that are not worth anyone's time and attention, then there is no fraudulent intent. Consider *United States ex rel. Farmer*, where this Court addressed documents that "were notarized without the full slate of required signatures":

> Though abuses of the notarization process are not trivial, no reasonable jury would conclude from such evidence that defendants knowingly or recklessly were perpetuating a fraud on the United States. The logical connection between these omissions and knowingly submitting false claims is too attenuated.

*U.S. ex rel. Farmer v. City of Houston,* 523 F.3d 333, 341 (5th Cir. 2008). The alleged paperwork violations in this case are no different. Mere knowledge of omitted "signatures" is not enough to establish fraud.

Perhaps Relators will respond that the statutory definition of "knowing" and "knowingly" does not require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). But this definition merely disclaims "specific intent with regard to the truth or falsity of the 'information'"; it does not refer to "a defendant's purpose in making" that misstatement. *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 n.2 (2008). Under *Escobar* and this Court's longstanding precedent, knowledge of materiality is required.

### 2. Relators forfeited any opportunity to obtain a finding on this essential element.

PVA repeatedly raised *Escobar* and the knowledge-of-materiality requirement before trial,[45] during trial,[46] and after trial.[47] When Relators sidestepped the issue at trial, PVA filed a Rule 50(a) motion arguing that "Relators have failed to prove that PVA 'knowingly violated a requirement that [PVA] knows is material to the Government's payment decision." ROA.4984, 4995.

And when the district court denied PVA's Rule 50(a) motion, PVA took the next step of requesting a finding on this element. Here is the question that PVA proposed in its pretrial draft charge:

> Question 4: Did Relators prove by a preponderance of the evidence that when PVA submitted the claim, PVA did so KNOWING the falsity of the claim was MATERIAL to the United States Government?
>
> Yes ___
>
> No ___

ROA.4646. At the charge conference, PVA "reurg[ed] our proposed verdict form and object[ed] to the jury not being required to find **the elements here** with regard to each alleged false claim." ROA.6585 (emphasis added).

---

[45] ROA.4464 ("LIST OF CONTESTED ISSUES OF FACT … Defendant's List … Whether PVA knowingly made a false record or statement material to a false claim"); *see* ROA.2918 (MSJ: "In addition to their inability to prove scienter, Relators cannot prove that PVA 'knowingly violated a requirement that [PVA] knows is material to the Government's payment decision.'").

[46] ROA.4984, 4995 (Rule 50(a) motion: "Relators have failed to prove that PVA 'knowingly violated a requirement that [PVA] knows is material….'").

[47] ROA.5028 (PVA's Rule 50(b) motion: "Relators failed to prove that PVA 'knowingly violated a requirement that [PVA] knows is material...'"); ROA.5373 (PVA's motion for finding of fact regarding omitted element: "knows is material").

The district court overruled this objection. *Id.* After trial, PVA raised the requirement all over again in its Rule 50(b) motion, but the district court denied this motion too. ROA.5147-78; *see* ROA.5028 (motion).

Relators' attempt to dodge this element has consequences. The omission in the charge does not make *Escobar*'s teachings go away. This scenario is governed by Civil Procedure Rule 49(a)(3), regarding "*Issues Not Submitted*":

> A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. **If** the party does not demand submission, the court may make a finding on the issue. **If** the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.

Fed. R. Civ. P. 49(a)(3) (emphasis added); *see Raicevic v. Fieldwood Energy, L.L.C.*, 979 F.3d 1027, 1034 (5th Cir. 2020) (discussing Rule 49(a)(3)).

Although PVA requested a jury finding on knowledge of materiality, Relators did not. As a result, Relators "waiv[ed] the right to a jury trial" regarding this element. Fed. R. Civ. P. 49(a)(3); *see* Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2507 (3d ed.) ("Each party must make its own objection to the court's failure to submit a particular issue in a special interrogatory, or that party will be held to have waived jury trial on that issue, even though the other party who objected has not waived that right.").

Because PVA requested a jury finding, Relators cannot rely on the mechanism for judge-made findings in Rule 49(a)(3) to supply the missing finding. *See* Fed. R. Civ. P. 49(a)(3) ("**If** the party does not demand submission….") (emphasis added). Prior to Rule 49(a)(3), there was no rule stating that a party waived its right to a jury trial on elements that were omitted from the charge. 9B Fed. Prac. & Proc. Civ. § 2507 (3d ed.). Thus, omitted elements led to wasted time and resources—*i.e.*, a remand for a do-over. *E.g.*, *Hodges v. Easton*, 106 U.S. 408, 413 (1882). Rule 49(a)(3) prevents such inefficiencies. Relators had one chance to persuade a jury about this element, and that opportunity has been waived.

Indeed, Relators are already on record as opposing any judge-made findings on this element. Due to the business difficulties created by the impending judgment, PVA hoped that the district court might end matters by finding that Relators had failed their burden. ROA.5373-81 (motion for finding of fact). Relators responded by arguing that this element does not exist and a finding is therefore unnecessary. ROA.5401, 5404 ("The Court should deny PVA's motion….").

In summary, Relators failed to present evidence or obtain a finding on this essential element. PVA's witnesses universally denied having any such knowledge, which explains why Relators were so eager to sidestep the issue. This Court should reverse and render.

## III. The penalty and damages awards should be reversed.

The district court awarded $4,366,137 in trebled damages and $21,825,592 in statutory penalties. ROA.5564 (judgment); *see* ROA.5147, 5171-78 (order on penalties); ROA.5166-71, 5558-63 (orders on damages). This Court need not reach this point if a take-nothing judgment is rendered on other grounds. Regardless, the monetary awards are infected with independent error. Both should be set aside.

### A. Damages should be deleted or retried.

The district court correctly "set aside" the jury's damages award. ROA.5171. Even so, the court let Relators submit a post-trial expert affidavit with a new damages measure, which the court relied on to award $4.3 million in trebled damages. ROA.5558-62. This was improper and violated PVA's right to a jury trial. *Tull v. United States*, 481 U.S. 412, 418 (1987) ("After the adoption of the Seventh Amendment, federal courts followed this English common law in treating the civil penalty suit as a particular type of an action in debt, requiring a jury trial."). A jury trial is required when financial penalties for fraud are imposed. *SEC v. Jarkesy*, No. 22-856, 2024 WL 3187811, at *9, 14 (June 27, 2024).

#### 1. Relators did not present valid damages evidence at trial.

At trial, Relators presented evidence regarding one—and only one—damages theory. They persuaded the jury to assess "damages" as the amount that PVA received from the government for supposedly premature ultrasound bills. ROA.6338-39, 6615, 6618; *see* ROA.5007, 5009 (verdict: Qs 3 and 7).

The district court granted PVA's JMOL on this point, holding that Medicare paid too soon—not too much:

> the Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case.

ROA.5168; *see* ROA.5171 ("the services for which PVA billed were eventually performed").

Rather than delete damages altogether, the district court proposed an alternative model. ROA.5169. The court held that the proper damages measure is the "time value of money" for premature payments by Medicare. ROA.5169-70. This new measure, however, had no trial evidence to support it.

Relators' expert merely testified to the global amount that Medicare paid PVA, without providing the dates on which those payments occurred. ROA.6338-39. As the court explained, "the Court has insufficient information from which to calculate damages at this time." ROA.5171.

### 2. Courts cannot grant "remittitur" based on evidence never before the jury.

The proper course would have been to render judgment that Relators take nothing on their claim for damages. Instead, the court ordered the parties to confer "over the proper methodology" for filling the gap in the evidence. ROA.5171. Relators responded with a new affidavit from their expert. ROA.5198-200 (affidavit); *see* ROA.5180-83 (Relators' explanation).

For the first time, the expert "identif[ied] the payment posting date for each of the claims" and calculated interest. ROA.5199-200. The district court accepted the expert's post-trial affidavit because it was based on "PVA's datasets on which all of his prior work was based." ROA.5561. Thus, the court "enter[ed] a remittitur based on the Relators' proposed measure of interest-based damages." ROA.5562.

This was error. The expert's datasets were not presented to the jury, which is why Relators had to send their expert back to the drawing board to come up with interest-based damages. ROA.5198-200. PVA repeatedly objected to this post-trial evidence: "Any attempt now post-verdict to rely on ***new*** or revised calculations from Dr. Nye is an obvious admission of the lack of evidence in the trial record." ROA.5185; *see* ROA.5305, 5497, 5522.

A remittitur implicates Seventh Amendment concerns, and so it must be based on the trial evidence:

> [T]he verdict must be reduced to the maximum amount the **jury** could properly have awarded.

*Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (emphasis added); *see Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003).

Due to Relators' failure of proof, the "maximum amount the jury could properly have awarded" is $0. The court did not confront this rule. Instead, it reasoned that it could substitute new evidence because "there are no fact issues left for a jury to resolve." ROA.5560; *see* ROA.5558 (similar). That misses the point.

When the trial evidence fails to raise fact issues, the proper course is rendition—or, at most, a new trial. *See Smith v. Transworld Drilling Company*, 773 F.2d 610, 613 (5th Cir. 1985) ("If the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial."). A remittitur should not be based on evidence that was never presented to the jury.

**3. The "remittitur" fails on its own terms.**

Finally, the new damages calculation overcompensates the government. The court did not assess interest for the short period between when (a) PVA submitted a supposedly premature bill and (b) a PVA physicians signed off on a final ultrasound report. ROA.5170. Instead, the court awarded interest all the way until "the date that the claim is *determined to be false*—here, the jury verdict on February 16, 2022." ROA.5170.

Actual damages should make the plaintiff whole. *Halliburton, Inc. v. Administrative Review Board*, 771 F.3d 254, 266-67 (5th Cir. 2014). If PVA had waited to invoice Medicare until the MedStreaming reports were signed, then the government would have received the benefit of the time-value-of money for only a short period of time. But the award allows the government to claim a 9.125% interest rate (which was then trebled, for an effective rate of over 27%) all the way through the date of trial (ROA.5561-62), putting the government in a better position than if PVA had billed as Relators say PVA should have. This windfall should be reversed. At the least, a new trial is proper.

### B. The penalty award and trebled damages violate the Eighth Amendment.

Reversing the damages award necessarily requires reversal of the penalty award too. The jury found fewer false claims than Relators alleged, and so it is impossible to know exactly which claims the jury thought that the damages should be based on. *Compare* ROA.5007, 5009 (verdict); *with* ROA.6332-33, 6359-60 (expert testimony); ROA.6615, 6618 (closing argument). If this Court were to remand for a new trial on damages, then a new trial on the number of false claims would also be proper. The issues are "closely intertwined" and should be tried together. *See Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989).

The penalty award also fails on its own terms. "The Excessive Fines Clause of the Eighth Amendment states that 'excessive fines' shall not be imposed by the government." *United States v. Suarez*, 966 F.3d 376, 385 (5th Cir. 2020); *see* U.S. Const. amend. VIII. Trebled damages and penalties under the FCA are "essentially punitive." *Stevens*, 529 U.S. at 784-86. As such, they constitute a "fine" that is subject to the Eighth Amendment. *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021); *see United States v. Mackby*, 261 F.3d 821, 830-31 (9th Cir. 2001); *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387-89 (4th Cir. 2015).

Penalties violate the Excessive Fines Clause if they are "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1988) (discussing punitive forfeitures). The $21,825,592 penalty award (plus trebled damages) is grossly disproportional to PVA's conduct.

As the district court recognized, "the services for which PVA submitted claims were actually performed in every case." ROA.5168. The only alleged "wrong" was that PVA sometimes billed Medicare before a physician signed off on what Relators say is the final step of the $22 professional component. ROA.6388, 6414 ("$22"). Even so, the district court reasoned that PVA's claims were just as false as if no ultrasound was ever performed at all—and assessed penalties at an amount that works out to over $2,950 per "false" claim.

This Court considers several factors when evaluating whether there has been an Eighth Amendment violation. *Suarez*, 966 F.3d at 385. These factors highlight the gross disproportionality between the penalty and trebled damages award and the alleged paperwork violations that are at issue.

First, PVA's conduct was not criminal. *See id.* ("the essence of the defendant's crime and its relationship to other criminal activity"). The district court emphasized that knowingly false claims can be criminal under 18 U.S.C. § 287, ROA.5176, but that criminal statute does not define "knowingly" as loosely as the FCA (*i.e.*, to include recklessness or conscious indifference). *Compare* 18 U.S.C. § 287; *with* 31 U.S.C. § 3729(b)(1).

Second, PVA is not "within the class of people for whom the [FCA] was principally designed." *Suarez*, 966 F.3d at 385. The district court reasoned that by definition, the FCA is meant to target "fraud." ROA.5175. That reasoning contradicts *Escobar*, which confirms that the FCA "is **not** an all-purpose antifraud statute." *Escobar*, 579 U.S. at 194 (emphasis added; internal quotation marks omitted). PVA did everything that was required to obtain payment for ultrasounds, and its sole alleged misconduct amounts to a mere "reporting offense." *See Bajakajian*, 524 U.S. at 337 ("Respondent's crime was solely a reporting offense."). The punishment does not fit the supposed misconduct.

Third, the district court emphasized that (at Relators' request) it was awarding penalties at a rate lower than the current $5,000 statutory minimum. ROA.5174-75; *see Suarez*, 966 F.3d at 385. Although this Court has held that statutory ranges are presumptively constitutional, *Suarez*, 966 F.3d at 387, that presumption is rebuttable; otherwise, the Eighth Amendment would be a waste of ink. The penalty award amounts to nearly 100 times the $22 value of the purportedly late professional component. By definition, this is grossly disproportionate.

Fourth, no evidence exists of any "harm resulting from [PVA's] conduct." *See Suarez*, 966 F.3d at 385 ("nature of the harm"). The district court held otherwise based on Relators' post-trial affidavit. ROA.5176. As discussed, that evidence was not properly before the court. The court also emphasized the cost of investigating and prosecuting fraud. *Id.* But in *Bajakajian*, the Supreme Court held that a

$357,144 forfeiture was unconstitutional when "minimal" harm was caused—notwithstanding the government resources spent in discovering and prosecuting the "reporting offense" in that case. 524 U.S. at 324-25, 337-39 ("The currency was seized and respondent was taken into custody.").

The court ruled that PVA's conduct was "reprehensible." ROA.5175-76. But there is not even a finding that PVA purposed to cheat the government or knew that the alleged misrepresentations were material. Premature reporting of ultrasounds "affected only one party, the Government, and in a relatively minor way." *Bajakajian*, 524 U.S. at 339. The government received the benefit of the bargain in every case. ROA.5168 ("the services … were actually performed in every case").

These billing errors, if any, do not warrant the $21+ million penalty award and $4.3 million in trebled damages. The awards should be reversed under the Eighth Amendment. Nor do the existing record and findings allow for a smaller award. There is no jury finding regarding the damages the government suffered, and there is no finding that PVA had an intent to defraud—*i.e.*, that it knew this alleged paperwork violation was material to Medicare, but billed Medicare anyway. Without those findings, it is impossible for Relators to establish that any sum is proportional to PVA's alleged wrong. The penalty award and trebled damages should be reversed. At the least, a new trial is proper.

## IV. PVA preserves its argument that the FCA's *qui tam* scheme violates Article II.

PVA recognizes that this panel is bound by the en banc decision in *Riley v. St. Luke's Episcopal Hospital*, which held that the FCA's *qui tam* scheme complies with "the constitutional separation of powers doctrine under the Take Care and Appointments Clauses of Article II." 252 F.3d 749, 751 (5th Cir. 2001) (en banc).[48]

Last year, however, three members of the Supreme Court questioned the constitutionality of the *qui tam* device, and PVA wishes to preserve its argument that private Relators cannot wield the executive power by suing on behalf of the United States. *See United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 442-51 (2023) (Thomas, J., dissenting); *see also id.* at 442 (Kavanaugh, J., concurring, joined by Barret, J.) ("agree[ing] with Justice Thomas that '[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'").

The principles laid out in the separate writings in *Polansky* and *Riley* confirm why the FCA is unconstitutional. *Polansky*, 599 U.S. at 442-51 (Thomas, J., dissenting); *Riley*, 252 F.3d at 758-75 (Smith, J., dissenting).

The "executive Power" belongs "to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020). By definition, "conducting civil litigation" on behalf of the government "for vindicating public rights" is such

[48] Citing *Riley*, the district court rejected this argument at the summary-judgment stage. ROA.4028; *see Dupree v. Younger*, 598 U.S. 729, 731 (2023) ("a purely legal issue resolved at summary judgment" is preserved).

an executive function, which may be exercised "only by persons who are 'Officers of the United States'" under the Appointments Clause. *Buckley v. Valeo,* 424 U.S. 1, 138-40 (1976); *see* U.S. Const. art. II, § 2, cl. 2.

Moreover, "the FCA does not provide the Executive with enough control over the relator to be able to 'take care that the laws be faithfully executed.'" *Riley*, 252 F.3d at 762 (Smith, J, dissenting) (quoting U.S. Const. art. II, § 3). It is the Executive—not private relators—who should decide whether to pursue broad or novel legal theories. The FCA's *qui tam* scheme is unconstitutional.

## CONCLUSION

This Court should reverse and render judgment that Relators take nothing. Alternatively, this Court should reverse and remand for a new trial.

Respectfully submitted,

**BECK REDDEN LLP**

By: *<u>/s/ Joshua S. Smith</u>*
Joshua S. Smith
jsmith@beckredden.com
David M. Gunn
dgunn@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**Attorneys for Appellant**

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024 a copy of the foregoing Brief of Appellant was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record:

Misty A. Hataway-Coné
Misty@conepllc.com
CONÉ PLLC
2019 Washington Avenue, Ste. 201
Houston, Texas 77007

*Attorney for Appellees*

*<u>/s/ Joshua S. Smith</u>*
Joshua S. Smith
Attorney of Record for Appellant

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 12,849 words as counted by Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font.

Dated: July 3, 2024

*/s/ Joshua S. Smith*
Joshua S. Smith
**Attorney of Record for Appellant**