No. 24-50176

# In the United States Court of Appeals
# For the Fifth Circuit

**UNITED STATES OF AMERICA, EX REL., TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,**
***Plaintiffs-Appellees,***

**v.**

**PERIPHERAL VASCULAR ASSOCIATES, P.A.,**
***Defendant-Appellant.***

*Appeal from the United States District Court for the Western District of Texas, San Antonio Division; No. 5:17-CV-317*

**BRIEF OF APPELLEES TIFFANY MONTCRIEF, ROBERTA A. MARTINEZ, AND ALICIA BURNETT**

**Misty A. Hataway-Coné**
State Bar No. 24032277
Misty@conepllc.com
Coné PLLC
2019 Washington Ave., Ste. 201
Houston, Texas 77007
Phone: (713) 955-2729
Fax: (806) 843-5753
**ATTORNEY FOR APPELLEES TIFFANY MONTCRIEF, ROBERTA A. MARTINEZ, ALICIA BURNETT**

**No. 24-50176**

In the United States Court of Appeals For the Fifth Circuit

**UNITED STATES OF AMERICA, EX REL., TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,**
***Plaintiffs-Appellees,***

**v.**

**PERIPHERAL VASCULAR ASSOCIATES, P.A.,**
***Defendant-Appellant.***

*Appeal from the United States District Court for the Western District of Texas, San Antonio Division; No. 5:17-CV-317*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Plaintiffs-Appellees**:

   United States of America ex rel. Tiffany Montcrief, Relator; Roberta A. Martinez, Relator; Alicia Burnett, Relator

2. **Defendant-Appellant**:

   Peripheral Vascular Associates, P.A.

3. **Counsel for Plaintiffs-Appellees-Relators**:

Misty A. Hataway-Coné
CONÉ PLLC

Justin T. Berger (pro hac vice)
Sarvenaz J. Fahimi (pro hac vice)
COTCHETT, PITRE & MCCARTHY, LLP

Wallace M. Brylak, Jr.
BRYLAK LAW

4. **Appellate Counsel for Defendant-Appellant**:

Joshua S. Smith
David M. Gunn
BECK REDDEN LLP

5. **Counsel in the District Court for Defendant-Appellant**:

David M. Prichard
David R. Montpas
Glenn W. MacTaggart
PRICHARD YOUNG, LLP

Sean McKenna
Mark A. Cole
Lauren M. Nelson
SPENCER FANE LLP

Jeff Wurzburg
NORTON ROSE FULBRIGHT US LLP

*/s/ Misty Annette Hataway-Coné*
Misty Annette Hataway-Coné
**Attorney for Appellees**

## STATEMENT REGARDING ORAL ARGUMENT

Appellees Tiffany Montcrief, Roberta A. Martinez, and Alicia Burnett believe that the Court can resolve this appeal on the parties' briefs alone. Appellees do not believe that oral argument will enhance or assist this Court with reconciling the issues in this appeal. While Appellant believes argument will assist the Court, a review of the record before the District Court and the parties' briefing herein is more than sufficient for this Court to evaluate the issues raised. This case can thus be affirmed on the Court's summary calendar.

## TABLE OF CONTENTS

**INDEX OF AUTHORITIES ........ vi**
**STATEMENT OF JURISDICTION ........ xi**
**ISSUES PRESENTED ........ xi**
**STATEMENT OF THE CASE ........ 1**
**FACTUAL BACKGROUND ........ 1**
**SUMMARY OF THE ARGUMENT ........ 6**
**STANDARD OF REVIEW ........ 7**
**ARGUMENT AND AUTHORITIES ........ 8**
**I. False Claims Act Liability ........ 8**
**A. PVA's Bills Were False. ........ 10**
**B. PVA Acted Knowingly. ........ 14**
**II. The Jury's Finding of Materiality Is Supported by Ample Evidence. ........ 16**
**A. Summary of Appellees' Evidence of Materiality. ........ 17**
**B. PVA Failed to Present Any Evidence of its "Timing" Theory. ........ 27**
**C. PVA Admitted That Medicare Would Not Have Paid "Technical Component-Only" Claims. ........ 30**
**III. The Jury's Damages Findings Are Supported by Ample Evidence and the District Court May Remit the Damages ........ 31**
**A. Remittitur Rather than the Granting of a New Trial was Proper ........ 32**
**B. The Damages Award Does Not Violate the Eighth Amendment ........ 35**
**IV. The FCA's Qui Tam Scheme Does Not Violate Article II ........ 40**
**CONCLUSION ........ 41**

## INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Akey v. Placer Cnty.*,
No. 2:14-CV-02402-KJM-DB, 2019 WL 5102241 (E.D. Cal. Oct. 11, 2019) ... 32

*Brown v. Bryan Cty.*,
219 F.3d 450 (5th Cir. 2000)........................................................................ 7

*Coffel v. Stryker Corp.*,
284 F.3d 625 (5th Cir. 2002)........................................................................ 27

*Coker v. Georgia*,
433 U.S. 584 (1977)........................................................................ 39

*Dallas Indep. Sch. Dist. v. Woody*,
865 F.3d 303 (5th Cir. 2017)........................................................................ 7

*Eiland v. Westinghouse Elec. Corp.*,
58 F.3d 176, (5th Cir. 1995)........................................................................ 8

*Ellis v. Zheng*,
799 Fed. Appx. 551 (9th Cir. 2020)........................................................................ 36

*Guillory v. Domtar Indus., Inc.*,
95 F.3d 1320 (5th Cir. 1996)........................................................................ 14, 15

*Guzman v. Allstate Assurance Co.*,
18 F.4th 157 (5th Cir. 2021) ........................................................................ 7

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999)........................................................................ 8

*Longoria v. Hunter Express, Ltd.*,
932 F.3d 360 (2019)........................................................................ 7

*In re Lorazepam & Clorazepate Antitrust Litig.*,
261 F. Supp. 3d 14 (D.D.C. 2017) ........................................................ 32, 33, 34

*Luka v. Procter and Gamble Co.*,
785 F. Supp. 2d 712 (N.D. Ill. 2011) .................................................................. 40

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) ........................................................................... 8

*Riley v. St. Luke's Episcopal Hospital*,
252 F.3d 749 (5th Cir. 2001)......................................................................... 40

*Ronaldo Designer Jewelry Inc. V. Cox,*
1:17-CV-2-DMB-DAS, 2020 WL 1124599 (N.D. Miss. Mar. 6, 2020)............. 32

*SEC v. Recile*,
10 F.3d 1093 (5th Cir. 1993)......................................................................... 10

*TIG Ins. Co. v. Sedgwick James of Washington*,
276 F.3d 754 (5th Cir. 2002)......................................................................... 10

*TODCO Americas, Inc. v. El Paso oLeo E Gas Do Brasil, Ltda.*,
No. CV H-08-1832, 2009 WL 10697535 (S.D. Tex. July 17, 2009) .................. 32

*Toepleman v. United States*,
263 F.2d 697 (4th Cir. 1959)......................................................................... 39

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (5th Cir. 2013)..................................................................... 37, 39

*U.S. ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009)......................................................................... 11

*U.S. ex rel. Parikh v. Citizens Med. Ctr.*,
977 F. Supp. 2d 654 (S.D. Tex. 2013) ............................................................ 11

*U.S. v. Krizek,*
859 F. Supp. 5 (D.D.C, 1994) ........................................................................ 12

*United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*,
950 F.3d 277 (5th Cir. 2020)......................................................................... 14

*United States ex rel. Emerson Park v. Legacy Heart Care, LLC*,
No. 3:16-CV-0803-S, 2019 WL 4450371 (N.D. Tex. Sept. 17, 2019)................ 11

*United States ex rel. Feldman v. van Gorp*,
697 F.3d 78 (2d Cir. 2012)........................................................................ 32

*United States ex rel. Harman v. Trinity Industries Inc.*,
872 F.3d 645 (5th Cir. 2017)................................................................. 16, 25, 26

*United States ex rel. Longhi v. United States*,
575 F.3d 458 (5th Cir. 2009)...................................................................... 8, 9, 16

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
507 F. Supp. 3d 734 (W.D. Tex. 2020)................................................................ 3

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
649 F. Supp. 3d 404 (W.D. Tex. 2023)............................................................ 4, 5

*United States ex rel. Ruscher v. Omnicare, Inc.*,
663 F. App'x 368 (5th Cir. 2016)...................................................................... 11

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ...................................................................... 9, 11

*United States ex rel. Turner v. Michaelis Jackson & Assocs.*
No. 03-CV-4219-JPG, 2007 WL 496384 (S.D. Ill. Feb. 13, 2007)..................... 12

*United States v. Bajakajian*,
524 U.S. 321 (1998)........................................................................... 7, 35, 37

*United States v. Chaplin's, Inc.*,
646 F.3d 846 (11th Cir. 2011)...................................................................... 35

*United States v. Franklin–El*,
554 F.3d 903 (10th Cir.2009)...................................................................... 13

*United States v. Lucien*,
347 F.3d 45 (2d Cir.2003)........................................................................... 13

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003)........................................................................ 39

*United States v. Neifert–White Co.*,
390 U.S. 228 (1968)....................................................................................... 39

*United States v. Sci. Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010)...................................................................... 10

*United States v. Semrau*,
693 F.3d 510 (6th Cir. 2012)...................................................................... 12, 13

*United States v. Suarez*,
966 F.3d 376 (5th Cir. 2020)........................................................................... 36

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016)......................................................................... 37

*United States v. Wagoner*,
2018 WL 4539819 (N.D. Ind. Sept. 20, 2018) ................................................... 12

*Universal Health Servs., Inc. v. United States and Escobar,*
136 S.Ct. 1989, 195 L.Ed.2d 348 (2016)............................................. 9, 16, 26, 39

*Varljen v. Cleveland Gear Co., Inc.*,
250 F.3d 426 (6th Cir. 2001)........................................................................... 37

*Waldmann v. Fulp*,
259 F. Supp. 389–90 (S.D. Tex. 2016) ................................................................ 9

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ........................................................................ 35

**Statutes**

28 U.S.C. § 331 ........................................................................................... xi

28 U.S.C. § 1291 ......................................................................................... xi

31 U.S.C. § 3729 ......................................................................................... xi

31 U.S.C. § 3729(a) .......... 8

31 U.S.C. § 3729(a)(1) .......... 36

31 U.S.C. § 3729(b) .......... 9

**Rules**

Fed. R. Civ. P. 56(a) .......... 10

**Regulations**

45 C.F.R. §162.1002 .......... 13

**Other Authorities**

CHARLES A. WRIGHT & ARTHUR R. MILLER
11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.) .......... 32

S. Rep. 99-345 .......... 37, 38

## STATEMENT OF JURISDICTION

The district court has federal question jurisdiction pursuant to 28 U.S.C. § 331. This action arose under the False Claims Act. 31 U.S.C. § 3729; *see* ROA.5540 ("Relators filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. … on behalf of the United States Government.").

Appellate jurisdiction exists under 28 U.S.C. § 1291 because Appellant timely filed a notice of appeal from the "Final Judgment" entered on February 14, 2024, which is a final order that disposes of all parties' claims. ROA.5564-65 (Final Judgment); ROA.5566-68 (notice of appeal filed March 11, 2024).

## ISSUES PRESENTED

This is a False Claims Act dispute. The issues are:

1. Did the District Court err in finding Relators/Appellees presented legally sufficient proof that PVA knowingly submitted false claims as a matter of law?

2. Did the District Court err in finding Relators/Appellees presented legally sufficient evidence that the misrepresentations were material to Medicare's payment decision?

3. Did the District Court err by ruling that a defendant can be liable for fraud under the FCA, even if the defendant claims such fraud is based on "minor

omissions?"

4. Did the District Court err by awarding damages based on a post-trial expert affidavit?

5. Does the award of trebled damages and statutory penalties violate the Excessive Fines Clause?

## STATEMENT OF THE CASE

This False Claims Act case arises out of the fraudulent billing practices of Appellant, Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Appellees Tiffany Montcrief, Roberta A. Martinez, and Alicia Burnett filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Appellees alleged that PVA falsely billed Medicare for services it had not completed. ROA.54-59. After a five-day trial, `in February 2022, the jury agreed, awarding $2,728,199 in damages. ROA.6646-6648.

## FACTUAL BACKGROUND

PVA is a vascular surgery practice with multiple locations. ROA.52. Among other services, PVA performs vascular ultrasounds, a service which has two components: a technical component and a professional component. ROA.54. The technical component comprises the act of performing the ultrasound and the professional component is a physician analyzing the results. *Id.* When a healthcare provider provides both the technical and professional components of a vascular study, it must bill Medicare for both the technical and professional components of a vascular study using a "global" Current Procedural Terminology ("CPT") Code. ROA.349. When a provider bills for just one component of a study, it must use a two-character "modifier" that signifies that only one component has been performed.

ROA.54. A provider may affix the "-TC" modifier when billing the technical component only, or the "-26" modifier to bill for the professional component only. ROA.360-363.

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. ROA.5541. A patient's medical record is contained in Allscripts CM. *Id*. In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.*

In 2012, PVA implemented a scheme in which PVA submitted alleged "completed" bills to Medicare prior to a physician signing off on the bill. The scheme was specifically designed to increase revenue. *Id.* Specifically, PVA began billing Medicare for both the professional and technical component before the patient's status became "Final" in MedStreaming—before the PVA physician had reviewed and interpreted the study and signed the report. *Id.* Relators alleged three distinct

tranches of claims: (1) the "Testing Only" tranche,[1] (2) the "Double Billing" tranche,[2] and (3) the "Wrong Provider" tranche.[3] ROA.5541-5542.

In August 2020, the parties filed cross-motions for summary judgment. ROA.5542. On December 14, 2020, the District Court issued an order resolving the parties' cross-motions for summary judgment. *See United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 759–60 (W.D. Tex. 2020). The District Court granted Appellees' motion with respect to the falsity and scienter elements of their claims, concluding that the issues of materiality and damages would be tried to the jury. *See id.* at 773.

A five-day trial was held in February 2022. At the close of Appellees' case and then again before submission to the jury, PVA moved for judgment as a matter

[1] The "Testing Only" tranche includes vascular studies that PVA performed based on referrals from non-PVA healthcare providers. When a patient is referred to PVA for a vascular study only, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. Accordingly, a PVA physician's interpretations appear only in the MedStreaming reports. PVA billed Medicare before the MedStreaming report was signed.

[2] The "Double Billing" tranche contemplates services PVA provided to its own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and then order a vascular study to be conducted on the same day. Relators argue that PVA failed to generate a MedStreaming report to reflect the PVA physicians' interpretations of vascular studies. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations.

[3] PVA submitted bills to Medicare signed by the wrong "rendering" physician because PVA's system permitted any PVA physician to review and sign MedStreaming reports, regardless of whether that physician performed the interpretation.

of law, arguing that, among other things, Appellees had not satisfied their burden of proof as to materiality or damages. The District Court granted the motions in part, concluding that Relators had failed to offer evidence of materiality as to one subset of claims and had failed to present evidence of payments made by the Medicare Advantage and Tricare programs, which have their own rules for payment. ROA.6528:1–4, 6540:3–8. The motions were denied in all other respects. ROA.6589:8-16. Based on the remaining claims, the jury found that PVA had submitted 7,380 false claims, causing $2,728,199 in damages. ROA.6647:1-6648:1.

Following the verdict, PVA renewed those portions of its previous motions for judgment as a matter of law that were denied by the Court under Federal Rule of Civil Procedure 50(b). ROA.5025. On January 9, 2023, the District Court denied in part and granted in part PVA's renewed motion. *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404 (W.D. Tex. 2023). The Court also granted Appellees' motion for statutory penalties. *See id*. The jury's finding as to materiality was found to be supported by ample evidence at trial. *Id.* at 414–20.

With respect to damages, however, the Court concluded that proper measure of harm to the Government was not the full value of the claim as the jury found, but the interest accrued in the time between the date Government paid the false claims and the date that the claim was determined to be false. *Id.* at 420–23. The District

Court requested that the parties propose appropriate models for evaluating damages. *See id.* at 428. The parties did so. ROA.5179-5200.

Subsequently, PVA filed three additional post-trial motions requesting (1) a finding of fact regarding an allegedly omitted element of Relators' claim—whether PVA knew that its billing practices were material to the Government's payment decision, ROA.5373-5383; (2) reconsideration of the Court's order granting partial summary judgment on scienter—specifically whether the summary judgment record supported pre-2017 knowledge of PVA's scheme, ROA.5384-5390; and (3) a new trial to reassess alleged factual issues regarding damages, scienter, and the appropriate number of false claims. ROA.5495-5505. All three were denied. ROA.5147-5178; ROA.5540-5563. The District Court did enter a remittitur as a matter of law. ROA.5540-5563.

On February 14, 2024, Judgment was entered. ROA.5564-65. The District Court granted Appellees' motion for statutory penalties and granted in part and denied in part Appellees' motion for attorneys' fees and costs. *See id*. The District Court ordered recovery of $4,366,137 in trebled damages from PVA, as well as $21,825,592 in statutory penalties. Further, the Court ordered $1,781,900 in attorneys' fees and $705,188.70 in costs and reasonable expenses with post-judgment interest accruing at a rate of 4.84%. *See id*. This appeal followed. ROA.5566-68.

## SUMMARY OF THE ARGUMENT

This is a dispute under the False Claims Act. 31 U.S.C. § 3729. PVA was properly found to have submitted fraudulent bills in which a physician failed to sign off on the bill prior to submission. This conduct was committed knowingly and the District Court properly entered summary judgment on these two issues. These rulings should be affirmed.

Despite PVA's contention that this is simply a manifestation of "timing and paperwork violations" it is actually much more than that. This Court should affirm the judgment of the District Court. First, the partial summary judgment holding that PVA knowingly submitted false claims should be affirmed. The district court held that PVA failed to comply with federal requirements for proper submission of bills seeking reimbursement from the federal government. There was more than sufficient evidence presented at trial that PVA violated applicable requirements for submitting such bills and this evidence showed that PVA's attestations that the bills were complete was material to the government reimbursing for those services. Likewise, there was evidence that PVA knowingly billed Medicare for "false" claims.

The damages awarded to Appellees were proper as well and the District Court properly entered a remittitur within the proper confines of its inherent authority to do so. The damages were not violative of the Eighth Amendment and should therefore be affirmed. Equally, according to this Court's precedent, the FCA's qui

tam scheme is not violative of Article II. This Court should affirm the judgment of the District Court.

## STANDARD OF REVIEW

Courts apply a *de novo* standard to review of summary judgment orders and rulings on JMOL. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (summary judgment); *Brown v. Bryan Cty.*, 219 F.3d 450, 456 (5th Cir. 2000) (judgment as a matter of law). For summary judgment, the evidence should be viewed "in the light most favorable to the nonmovant." *Guzman*, 18 F.4th at 160. For a JMOL, the evidence should be viewed in the light most favorable to the verdict. *Brown*, 219 F.3d at 456.

Legal questions, such as determining the proper elements to a claim under the FCA, are reviewed *de novo*. *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). The excessiveness of a statutory fine or penalty under the Eighth Amendment is also reviewed "*de novo*," comparing "the amount of the forfeiture to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998); *see id*. at 336 n.10 (any supporting fact-findings are reviewed for clear error).

Finally, the district court's decision to grant remittitur is reviewed for an "abuse of discretion." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364 (2019).

The verdict must be reduced to the "maximum amount the jury could properly have awarded," *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, (5th Cir. 1995).

## ARGUMENT AND AUTHORITIES

### I. False Claims Act Liability

The False Claims Act ("FCA") prohibits false and fraudulent claims for reimbursement to the federal government. An entity violates the FCA when it:

> 1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval;
>
> 2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
>
> 3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

*United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (citing 31 U.S.C. § 3729(a) (2015)). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Id*. (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

The FCA applies to those who "knowingly assist[] in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). A person acts "knowingly" with respect to information

if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). "In addition to the statutory requirements, courts have held that a false or fraudulent claim violates the FCA only if the misrepresentation it contains is material." *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 589–90 (S.D. Tex. 2016)(citing *Longhi*, 575 F.3d at 467; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *Universal Health Servs., Inc. v. United States and Julio Escobar*, 136 S.Ct. 1989, 2002, 195 L.Ed.2d 348 (2016). The materiality requirement is a "rigorous" one. *Id.* at 1996. This Court has adopted a concise test for liability under the FCA. To succeed on a claim for violation of the FCA, the Government or relator must prove:

> 1) there was a false statement or fraudulent course of conduct;
>
> 2) made or carried out with the requisite scienter;
>
> 3) that was material; and
>
> 4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).

*Longhi*, 575 F.3d at 467.

Summary judgment as to PVA's fraud and scienter was appropriate in this case because Appellees presented sufficient evidence which demonstrated PVA submitted a false or fraudulent claim to a federal healthcare program within the

meaning of the FCA. Summary judgment was appropriate because if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002). In this case, PVA failed to do so and summary judgment was properly granted in favor of Appellees as to fraud and scienter.

"Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.* (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)). This is exactly what PVA has continuously done throughout this case and thus the District Court properly granted summary judgment in Appellees' favor. This Court should affirm.

**A. PVA's Bills Were False.**

PVA argues that its claims were not false because no Medicare statute or regulation requires preparation of a written report. This argument incorrectly assumes the framework of a "legally false" claim, rather than a "factually false" claim. As explained by this Court:

> FCA claims can be either legally false or factually false. *E.g., United States v. Sci. Applications Int'l Corp.*, 626

> F.3d 1257, 1266 (D.C. Cir. 2010) (recognizing factually false claims as "the paradigmatic case" and legally false claims as the "certification theory"). A claim is factually false when the information provided to the government for reimbursement is inaccurate. … A claim is legally false when "a claimant ... falsely certifies compliance with [a] statute or regulation." *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).

*See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016).

PVA's FCA violations are based first and foremost on the false information that it submitted on its CMS-1500 forms. Using a CPT code that misrepresents the services provided on a bill to Medicare is a factually "false" claim for purposes of the FCA, as it constitutes billing for services not performed, or misrepresenting the services performed. *See, e.g., U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009) ("Also alleged are specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill."); *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013); *United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371, at *9 (N.D. Tex. Sept. 17, 2019) ("Relator alleged that Remaining Defendants are liable under the FCA for 'upcoding [E&M] services to the highest level billing codes'—i.e., charging Medicare for unnecessary services or services

that were never actually provided. A defendant charging the Government for services not actually provided is a staple FCA violation."); *United States v. Wagoner*, No. 2:17-CV-478-TLS, 2018 WL 4539819, at *5 (N.D. Ind. Sept. 20, 2018); *United States ex rel. Turner v. Michaelis Jackson & Assocs.*, No. 03-CV-4219-JPG, 2007 WL 496384, at *7 (S.D. Ill. Feb. 13, 2007) ("relators have shown why the bill submitted to Medicare was false: it was billed pursuant to CPT 99213 rather than CPT 66984"); *U.S. v. Krizek*, 859 F. Supp. 5, 7–8 (D.D.C, 1994).

As explained by the Sixth Circuit Court of Appeals, in an opinion affirming the criminal conviction of a physician for Medicare fraud, though the CPT codes and their definitions are published by a private organization (the AMA), their misuse logically gives rise to legal liability. *See United States v. Semrau*, 693 F.3d 510, 530–31 (6th Cir. 2012). In *Semrau*, the defendant physician argued that "misuse of CPT codes cannot constitute criminal conduct because they are the product of a private organization and have not been formally promulgated by the government." *Id.* at 530. The Sixth Circuit disagreed, explaining as follows:

> As an initial matter, it seems clear that the CPT codes themselves create no laws or liability but are merely a government-sanctioned means of summarizing several pieces of information into a concise, standardized number. Congress directed the Secretary of Health and Human Services to "prescribe such regulations as may be necessary to carry out the administration of" Medicare, 42 U.S.C. § 1395hh(a)(1), and to "establish a uniform procedure coding system for the coding of all physicians' services," *id.* § 1395w–4(c)(5). The Secretary acted on this

> authority by adopting the CPT code set drafted by the AMA. 45 C.F.R. §162.1002. Dr. Semrau's attorney himself acknowledged during the trial that CPT codes "are simply a shorthand way of incorporating the description of the service." Thus, when Dr. Semrau submitted a claim for "99312," he was effectively submitting a claim for the services associated with that number in the AMA's CPT code set, as defined above.
>
> It is illogical to suggest that a person could escape liability because a claim comes in the form of a number instead of the words directly associated with that number. This is particularly true for the statute in question because "[t]he broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." *United States v. Lucien,* 347 F.3d 45, 51 (2d Cir.2003). In short, § 1347 "is simply a fraud statute." *United States v. Franklin–El,* 554 F.3d 903, 911 (10th Cir.2009). "Although the health care fraud statute does not (and could not) specify the innumerable fraud schemes one may devise," *id.* at 910–11, it is difficult to imagine a more obvious way to commit healthcare fraud than billing for services not actually rendered. Indeed, this court and other circuits have previously upheld convictions for CPT "upcoding." [Citations].

*Semrau*, 693 F.3d at 530–31.

When PVA billed using the global CPT codes, it was representing that it had completed a physician's interpretation, and a written report reflecting the physician's interpretation. Yet for 24.2% of its global billings, a PVA physician had not prepared and signed a final report in MedStreaming. PVA was thus falsely representing via submission of the global CPT codes that it had rendered the complete global service.

Here, PVA violated black-and-white billing rules, and falsely billed for services not rendered.

The District Court properly found that PVA met the elements for filing a false claim subject to the FCA and granted summary judgment to Appellees on this issue. The judgment of the District Court should be affirmed.

**B. PVA Acted Knowingly.**

PVA acted recklessly, in deliberate ignorance, and even with actual knowledge, that it was submitting false claims. *See, supra.* As recently emphasized by this Court in a FCA case, "presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists." *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020) (quoting *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996)). In *Drummond*, the defendants argued that their "good-faith reliance on the CMS Manual creates a genuine fact dispute about whether they had the requisite mental state to violate the False Claims Act." *Id.* This Court rejected that argument, holding that "there is no plausible reading of the CMS Manual that could support the defendants' billing practices." *Id.*

Equally, in this case, there is no "plausible reading" of the CPT manual, or any Medicare guidance, that could justify PVA's practices. To the contrary, as

detailed above, every Medicare and industry publication addressing the issues makes clear that PVA's practices were out of bounds. The District Court properly evaluated this evidence and found PVA committed these acts knowingly.

Specifically showing PVA's knowledge that its actions were improper, in 2017 PVA embarked on a short-lived "Compliance" project to increase the speed at which studies were read, and to **"Allow[] for Compliance," by "billing after study interpreted."** ROA.6814 (emphasis added). PVA knew that its practices were not compliant, hence the need for the project. The evidence, however, demonstrates that PVA's processes were designed to fail. For example, Martha McGee, PVA's Billing Supervisor, who has been with PVA for fourteen years, testified that PVA's "Medical Documentation and Coding Compliance Pledge" did not look familiar to her. ROA.3932. Similarly, PVA's Compliance Officer, Dr. Alsabrook, testified that PVA did not actually engage in the internal billing audit procedure laid out in its Compliance Manual. *See id*. When PVA's Vascular Lab Committee addressed the issue in 2017, it simply abandoned the "Compliance" project within a matter of months. Accordingly, PVA's "teams, committees, and processes" establish that it did not act innocently, but rather that it acted with full knowledge, or at least in reckless disregard or deliberate ignorance, of the billing requirements and its violations thereof.

As a result of this showing, the District Court correctly determined that there were no issues of material fact for a jury to determine. Thus, the District Court's ruling that PVA possessed the requisite knowledge that its scheme was fraudulent was correct and should be affirmed by this Court.

## II. The Jury's Finding of Materiality Is Supported by Ample Evidence.

As the jury was instructed, materiality asks whether the falsity at issue has a "natural tendency to influence or be capable of influencing the payment or receipt of money or property." ROA.6595:25-6596:2. Post-*Escobar*,[4] this Court still requires "proof only that the defendant's false statements **could have influenced** the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (emphasis added); *see also United States ex rel. Longhi Lithium Power Technologies*, 575 F.3d 458 (5th Cir. 2009) (same standard prior to *Escobar*). Though *Escobar* (and the jury charge) identified several categories of evidence that tend to negate materiality, and one factor that would tend to support materiality, those factors are not exhaustive. ROA.6596:8-6597:8.

[4] "Escobar" refers to the United States Supreme Court opinion in *Universal Health Servs., Inc. v. United States and Julio Escobar*, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016).

As detailed in the following subsections, there was ample evidence to support the jury's finding of materiality, and PVA's arguments to the contrary are unavailing.

**A. Summary of Appellees' Evidence of Materiality.**

The issue of materiality in this case can be boiled down to a single, fundamental question: If PVA had been truthful with Medicare when it submitted its bills, and said – "We have not yet completed this vascular study, but intend to do so in the coming days, weeks, months, or years" – would Medicare have paid those claims? The answer, as the jury appropriately determined, would be a resounding "no." The evidence the jury heard to support this conclusion was varied, and powerful. For example, Dr. James Alexander served for eight years as a full-time Medical Director for Medicare Part B in the State of Texas, including as the Chief Medical Director for four. ROA.6046:13-6048:14. During his tenure, on an almost daily basis, he participated in decisions whether or not to pay claims that were alleged to have been billed improperly. ROA.6049:2-7.

Since ending his tenure as Chief Medical Director for Medicare Part B, he has operated his own consulting company, along with the former Medicare OIG Inspector General for the Dallas Regional Office, and a former Medicare payment manager for Blue Cross Blue Shield. ROA.6050:1-6051:1. He also served as Medical Director for Blue Cross Blue Shield of Texas. ROA.6051:23-6052:7. Dr.

Alexander testified that he reviewed the allegations and files in this case, just as he would have in his role at Medicare when he was participating in payment decisions (ROA.6054:24-6055:24), and he reached the following conclusions:

- **Medicare would not have paid the claims if it had known the services were not yet complete**:

  - "[I]f Medicare had known that it was being billed for procedures, imaging or whatever, that were not fully completed when Medicare was billed, those would be invalid claims for billing Medicare and would not be -- should not be paid by Medicare." ROA.6056:7-11; *see also* ROA.6072:16-22 (Juan Lopez claim would not have been paid had Medicare known the truth).

- **Medicare does not pay prospectively, for claims that a provider intends to complete**:

  - "Q. . . . If PVA or a medical provider had submitted a bill to Medicare when you were medical director and they said, 'We haven't quite finished this service, but we intend to, we promise we'll do it in a few days or a few weeks,' would Medicare pay that bill?

    A. No. It -- again, it doesn't -- Medicare does not pay for services that are intended to be performed. If you perform the service and complete the service, as it's designed, and you bill for it, you are saying, 'I've done everything. I'm not planning to do something at a later date.' Okay?" ROA.6070:1-13.

  - "[I]f something has not been completed by Medicare, [ ] it is considered an invalid claim to be billed to Medicare. And if Medicare had known about it, they would not have paid it. And this is very important. We talked about the large amount of money that was -- that's in this system. Medicare

does not pay for a service that's intended to be done. It pays for a service where resources or expenses have been incurred already for it. It's reimbursing for that. It's not prospective payment, where if you decide to do something you can bill Medicare for it. If you think it up, you can bill Medicare for it. No. It has to be a complete service, then it's billable to Medicare." ROA.6071:6-19.

• **Medicare does not make partial payments for partially completed services**:

o "[A]s medical director, if this was presented to me as a situation, I would say this is not a billable claim, you do not get to be paid part of it. . . . And plus, I would say to them, 'And if you have a lot of claims like this, then you better start paying us back, and you've got to pay for them, you've better start paying us back for them because it's an overpayment.'" ROA.6073:7-14.

Similarly, Robert Church, who has worked for and with multiple government payors, including Medicaid and Medicare, on billing and payment issues over the course of 30 years (ROA. 6215:13-6218:20), testified the same. He reviewed the records and allegations in this case, just as he would have in the course of his 30-year career analyzing billing compliance issues. ROA.6219:11-6220:14. And like Dr. Alexander, he confirmed that "[i]f a doctor submits a bill to Medicare and says, '[h]ere's a bill and I have not completed the work, but I plan to do it soon, in a few days, a few weeks,'" Medicare would not pay that bill. ROA.6221:14-19; ROA.6222:5-22. Dr. Alexander's and Mr. Church's testimony were corroborated by documents that emphasize the importance of the rules at issue, including PVA's

internal compliance policies.

For example, the Medicare Program Integrity Manual identifies examples of Medicare fraud, including: "[i]ncorrect reporting of diagnoses or procedures to maximize payment," "[b]illing for services not furnished and/or supplies not provided," "[u]nbundling or 'exploding charges,'" and "[m]isrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnishes the services." ROA. 6080:8-6081:21. Dr. Alexander testified that he used this Program Integrity Manual every day in his role as Medicare Medical Director to ensure they were "taking care of the Medicare dollars" (ROA. 6077:20-6078:10). These rules were of significant importance to Medicare when deciding whether to pay claims of the type submitted by PVA. ROA. 6080:11-6081:19.

The Medicare Learning Network Booklet entitled "Medicare Fraud & Abuse: Prevent, Detect, Report," describes similar examples of Medicare fraud and abuse, including "Knowingly billing for services not furnished, supplies not provided, or both, including falsifying records to show delivery of such items." ROA.6084:4-11. Dr. Alexander confirmed that these "would be considered by Medicare when determining whether to pay a claim that's alleged to be improper, in the context of this case." ROA.6083:23-6084:11; ROA.6085:22-25. He further confirmed that both "fraud" and "abuse" are grounds for denial of Medicare payment. ROA.6084:20-6085:2.

The AMA CPT manual also reflects and corroborates important Medicare payment rules. As Dr. Alexander confirmed, the manual is "something as a Medicare Medical Director that [he] would refer to when determining whether claims alleged to have been billed improperly were coded wrong . . ." ROA.6158:23-6160:3; *see also* ROA.6186:21-6187:4 (testimony of Dr. Grady Alsabrook, confirming that the CPT codes used for billing are defined in the "CPT guidebook" published by the "American Medical Association as a guiding editorial manual, has been done so for decades."). The AMA CPT manual states, among other things: "[a] written report, for example, handwritten or electronic, signed by the interpreting individual should be considered an integral part of a radiologic procedure or interpretation." ROA.6159:14-6165:15. And with respect to E/M services: "The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately . . ." ROA.6164:2-10.

The CMS-1500 form requires explicit certification by the billing physician that the services being billed for have been "furnished." ROA.6069:18-25. The certifications on the CMS-1500 billing form, including that the services were "medically necessary and personally furnished by me," are a "key to the trust that" underlies the Medicare system, and are important to Medicare when it makes payment decision. ROA.6069:7-25; *see also* ROA.6224:13-23.

Accordingly, not only would violations of these fundamental rules lead to non-payment (where the government is aware of the falsity in advance), but could also lead to even harsher consequences, such as suspension and/or False Claims Act liability. In other words, while there are hundreds of Medicare rules and regulations, documents like these highlight the most important among them: ensuring that Medicare pays proper claims because "if it's not done right, we are paying for services that weren't done right, and that should not be the case." ROA.6175:7-6176:1.

PVA attempts to minimize the importance of these rules and documents, yet they can point to no contradictory documentary evidence. Worse yet, PVA's own internal documents corroborated the importance of these rules and undercut any attempts by PVA's witnesses to minimize them. PVA's internal "Compliance Pledge" repeatedly emphasizes the importance to Medicare of not billing until services have been completed.[5] ROA.5821:12. This "Pledge" reiterates rules and principals such as ensuring a patient's chart is properly documented because, oft repeated by PVA at trial, " if it is not documented, it never happened and cannot be billed." ROA.5823:17-21:

> • Procedural codes as well as diagnosis codes should only be selected which are supported in the chart. ROA.5823:8-11.

[5] PVA calls these changes irrelevant but the jury disagreed. *See* Appellant's Br. at 32.

• If it is not documented, it never happened and cannot be billed. ROA.5823:17-21.

• "High Risk Areas" include: 1. Billing for items or services not actually rendered; 2. Providing services which are not medically necessary; and 4. Duplicated billing. ROA.5824:10-25.

• Claim development and submission policies and procedures should: 1. Provide for proper and timely documentation of all physician and other professional services prior to billing to ensure that only accurate and properly documented services are billed. ROA.5825:6-12.

• [PVA] bills for laboratory services only after they are performed. ROA.5826:4-6.

• The CPT or HCPCS code used by the billing staff accurately describes the services that was ordered by the physician and performed by [PVA]. ROA.5826:10-14.

• [A] claim should not be submitted by [PVA] if it is known that documentation does not exist and/or the services was not provided. ROA.5888:10-5889:3.

Moreover, PVA's Compliance Pledge specifically describes its purpose as reflecting and applying important *Medicare* rules while also addressing Medicare fraud. ROA.5886:1-5. In other words, PVA's Compliance Pledge reflects not just "best practices," but ***required*** practices. *See also* ROA.6226:2-12. (confirming that the requirements emphasized in PVA's compliance plan are important to federal payers such as Medicare).

The Compliance Pledge was not PVA's only acknowledgment of the

importance of the Medicare billing rules at issue. For example, Barbara Burrow's 2018 "Vascular Lab Compliance Review" presentation stated on its very first slide:

> When you submit a claim for services performed for a Medicare patient, you are filing a bill with the Federal Government and certifying you earned the payment requested and complied with the billing requirements. . . . Examples of improper claims include: . . .Billing for services not provided.

ROA.6744.

Finally, internal documents surrounding PVA's 2017 Compliance Billing Project confirmed the importance of billing only after completion of the MedStreaming reports. In those documents, PVA's Vascular Lab Committee laid out three motives for the "[t]ransition to billing after studies are read," as (1) "Ensure billed to appropriate physician," (2) "**Ensure no audit requests for incomplete medical records**," and (3) "Allow for docs to read each others stuff." ROA.5917:21-25 (emphasis added); *see also* ROA.5915:16-20 (structure shift "allowed for Compliance billing after study interpreted"). Thus, PVA knew these issues were important and even understood why.

Despite PVA's suggestion otherwise, this was no trivial change to PVA's practices, but was "a SIGNIFICANT change to workflow in the vascular lab," with said change being "to bill after the exam has been read" and recognizing that this change "[t]akes significantly longer to bill exam." ROA.6826. The jury's role was to assess credibility but given that PVA itself took the time to reiterate these payment

rules in its Compliance Pledge and in Barbara Burrows' compliance presentation, in addition to the fact that it made "SIGNIFICANT" changes to its billing process in order to avoid payor audits (at least for a short time), coupled with PVA failing to hold bills until reports were completed, the jury naturally found any attempt by PVA's witnesses to understate the Medicare rules at issue to be far from credible.

PVA thus presented no compelling evidence (in fact, no evidence at all) that Medicare would have paid the claims at issue, had it known that the studies were not yet complete. In fact, when this precise question was put to PVA's expert, Melissa Scott, the response was, at best, evasive:

> Q. . . . In your opinion, if PVA had gone to Medicare in April 2015 and said, "We started this scan for Mr. Lopez, but we haven't done the impression yet. We haven't done the interpretation, and we are not going to do it until 2017," do you believe Medicare would have paid for the global ultrasound study?
>
> A. I believe that this example is problematic, but I also don't believe it's representative of their broader practice. I believe this is an outlier. But I will say that I did review all the documents on Mr. Lopez and there are other documents outside of this one that provide additional detail about the records that were available at the time that the claim was produced.

ROA.6454:16-6455:5.

PVA's reliance on *United States ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645 (5th Cir. 2017) is misplaced. In fact, this case highlights why PVA's emphasis on the 2018 government meeting failed. In *Harman*, there was ample and

uncontroverted evidence that the government had actual knowledge of the purported fraud, **and** that the government made an informed and intentional decision in response. In *Harman*, the government agency issued a memo explicitly stating that despite the design change to the guardrails at issue, at all times the guardrails remained eligible for payment. 872 F.3d at 663. As this Court recognized in *Harman*, the government's reaction in that case was exceptional in its "gravity and clarity," and thus left no doubt as to a lack of materiality. *Id.* In the case of PVA, there was no government agency finding at all, let alone a decision that was "grave" or "clear." Accordingly, *Harman* merely highlights why PVA's 2018 government meeting defense failed to sway the jury.

Finally, even if PVA had provided inescapable evidence of actual government knowledge and continued payment, that would only be strong evidence of lack of materiality—not dispositive or irrebuttable evidence. *See Escobar*, 136 S. Ct. at 2004-04; *see also Harman*, 872 F.3d at 663. The jury would have been free to weigh against it all of the substantial evidence of materiality described above in *supra*. The jury ultimately concluded that whatever the minimal probative value of the 2018 meeting, it was outweighed by the vast and varied evidence that had PVA been truthful in its claims—i.e., admitted that it had not yet completed the vascular studies—Medicare would not have paid the claims. The limited evidence that PVA presented on issues of materiality was contradicted, impeached, and/or came from

interested witnesses of which the jury was free to weigh as to credibility. Appellees' evidence, on the other hand, was compelling, and fully supports the verdict. The jury's finding of materiality must therefore stand. Giving deference to all of the forgoing evidence, the jury's finding of materiality should not be disturbed. *See Coffel v. Stryker Corp.*, 284 F.3d 625, 630–31, 641 (5th Cir. 2002). The judgment of the District Court should be affirmed.

**B. PVA Failed to Present Any Evidence of its "Timing" Theory.**

PVA argues ceaselessly, throughout the lead up to the jury trial and as it did in closing,[6] that this case is just a trivial issue of "timing." However, **PVA failed to provide the jury with any compelling evidence in support of this "timing" theory**. In order for its timing theory to prevail, PVA would have had to convince the jury that Medicare's reaction to PVA's submissions would have been: "[w]e, Medicare, will still pay you even though you have not completed the study because we believe that you will do so soon." There was no credible evidence in the record to support such a conclusion (other than Dr. Alsabrook's unbelievable testimony about a non-existent "bulletin" that allowed PVA to bill before interpretation[7]), and

[6] ROA.6634:22.

[7] Q. Who did you speak with at Medicare that told you that you could bill for these ultrasound studies before the physician had interpreted them?

A. That policy was in place when I became coding director and I had no need to change it since the Medicare guidelines had said it was appropriate previously.

for good reason. As Appellees' experts explained, these are bright-line rules. *See, e.g.,* ROA.6143:23-6144:3 (Dr. Alexander). For diagnostic tests such as these, Medicare Part B is a reimbursement-based system, not a prospective-payment system. PVA's expert, Melissa Scott, begrudgingly admitted as much. ROA.6466:2-6467:14.

Importantly, this is not a case where the United States was purchasing a product in which late delivery had little-to-no impact on the value and purpose of

---

> Q. Who told you, when you came into that role, "Hey, Medicare told us this is okay to bill before the physician's interpretation is done?"
>
> A. Kathy Britt was the person that told me.
>
> Q. Did she tell you who she spoke with at Medicare that gave her that guidance?
>
> A. She had a memorandum or note from Medicare stating that.
>
> Q. Did she share that note with you?
>
> A. I have seen that, yeah.
>
> Q. And who was the note from?
>
> A. You know, it was some sort of a bulletin. I can't recall any detail beyond that.
>
> Q. Was it specific to PVA?
>
> A. No, I think it was a global bulletin to all providers.
>
> Q. And what did that bulletin say, Dr. Alsabrook?
>
> A. You know, the verbiage of the memorandum escapes me…

ROA.6181:17-6182:13.

the purchase. Instead, the United States reimburses providers for medically necessary services provided to Medicare patients. ROA.6069:18-25. The fundamental definition of medically necessary services under Medicare is "Health Care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine." ROA.6745. Specifically, as Barbara Burrow's own presentation admits: "[n]on-invasive vascular studies are considered not reasonable and necessary if the results are not needed for clinical decision making. If the study results will have no impact on the decision for further diagnostic or therapeutic procedures or will not provide any unique diagnostic information that would impact patient management, then the non-invasive studies are not reasonable and necessary." ROA.6745.

In other words, Medicare does not pay for preventive medicine, or screening for disease or illness that is not presented. Accordingly, a diagnostic study that is not interpreted until days, weeks, or months later necessarily either (1) is worthless, because the sick patient is not receiving timely diagnosis and care; or (2) fails the medical necessity test, because it is being used essentially as a screening test, not for treatment of acute illness. PVA presumably realized it could not overcome this conundrum, especially without opening the door to issues of patient PVA's expert, Melissa Scott, who testified that the rendering of "medically necessary treatment services" is Medicare's primary goal vis-à-vis patients. ROA.6431:14-20.

### C. PVA Admitted That Medicare Would Not Have Paid "Technical Component-Only" Claims.

PVA suggests that because it completed the technical component (TC) of the ultrasound studies, Medicare would not have found its claims materially false, or only found them partially false. As with PVA's "timing" theory, however, there was no such evidence in the record. To the contrary, PVA's witnesses admitted that they were not permitted to bill only for the TC. ROA.6270:18-20 ("they tell you there, if the provider is doing both services that you are to global bill. We follow those guidelines.") ROA.6272:23-24; ("[I]f you do both services, you bill globally.") 6273:9-12; ("[T]hese are the instructions that our carriers tell us how to bill. Tells us to bill globally, if we do both pieces of that.") ROA.6273:3-12; ("'Providers who perform both a technical and the professional component should bill them globally.'") ROA.6275:8-10.

In other words, had PVA submitted truthful bills, stating that they had only completed the TC of the studies, Medicare would not have paid the claims. This testimony was accurate. Medicare does not reimburse for TC-only vascular ultrasound claims. It will allow the bill for a completed vascular study to be split in limited circumstances, such as when hospital staff conduct the TC, and an outside physician completes the interpretation. But without somebody completing the interpretation, the TC is worthless and not compensable. ROA.6073:5-13 ("Medicare pays for things that are completed, not for things that are partially

completed. . . . [I]f it's not complete, it's invalid for being submitted, it would be denied when that's known and no part of it is then payable."); ROA.6097:11-14 ("The way they were set up, normally as an imaging center with both the technical part under them and the professional part under them, it should not be usual that they would be billing the technical component alone."); ROA.6167:24-6168:6 ("a technical component without a qualified physician interpretation is really pretty useless in patient care."); *see also* ROA.5817:10-16 (Tiffany Montcrief's testimony described that without the physician's interpretation and diagnosis, the patient cannot be treated, and therefore her preliminary report as a technologist "is useless.") ROA.5823:22-5824:1. For this reason, when a facility such as PVA is performing a vascular study, it must bill on a global basis, as Ms. Britt acknowledged. ROA.6275:7-11.

Accordingly, even assuming PVA had fully completed the TC on all of the false claims at issue (a fact which it did not establish), and if PVA had submitted truthful claims, stating that only the TC had been completed, Medicare would not have paid those claims.

## III. The Jury's Damages Findings Are Supported by Ample Evidence and the District Court May Remit the Damages.

Although a court cannot "substitute its own opinion for the jury's," a court may remit the damages award as a matter of law where the precise determination of damages depends on the application of legal rules and there are no fact issues left

for the jury to decide. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 19 (D.D.C. 2017); *see also United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 92 (2d Cir. 2012) ("We conclude, however, that here, where the question is not the benefit of the bargain between the plaintiff and the defendants, and the amount of each payment for which liability has been assessed is not in dispute, no further finding of fact as to the amount of the damages was necessary."). This proposition logically flows from the general rule that the proper measure of damages is a question of law, not a question of fact. *See TODCO Americas, Inc. v. El Paso oLeo E Gas Do Brasil, Ltda.*, No. CV H-08-1832, 2009 WL 10697535, at *4 (S.D. Tex. July 17, 2009); *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2020 WL 1124599, at *5 (N.D. Miss. Mar. 6, 2020). For example, a court can reduce damages where "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." CHARLES A. WRIGHT & ARTHUR R. MILLER, 11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.); *see also Akey v. Placer Cnty.*, No. 2:14-CV-02402-KJM-DB, 2019 WL 5102241, at *4 (E.D. Cal. Oct. 11, 2019). The District Court was faced with just such a situation here.

### A. Remittitur Rather than the Granting of a New Trial was Proper

As the District Court explained in its order on PVA's renewed motion for judgment as a matter of law, it cannot ignore "the fact that the services for which PVA submitted claims were actually performed in every case." ROA.5168. Thus,

the District Court held, as a matter of law, that the Government was entitled to an interest-based measure of damages. ROA.5169. The Court directed the parties to submit additional briefing on the question of damages because, "given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing," the Court had insufficient information from which to calculate damages at the time. ROA.5166.

Outside of its calculation of final damages, the jury's remaining findings were left intact. *See* ROA.5147-5178. PVA argues, however, that in order to revisit the proper calculation of the Government's damages, the District Court was required to set aside the jury's findings and hold a new trial. In so arguing, **PVA ignores the obvious fact that there are no fact issues left for a jury to resolve.** Other courts have faced similar post-trial quandaries where the calculation of damages was straightforward given the jury's resolution of the fact issues and rooted in the same evidence relied on at trial. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d at 17. For example, in *Lorazepam*, after multiple plaintiffs were dismissed on appeal, the trial court relied on post-trial expert calculations in entering a remittitur to calculate damages for the remaining plaintiffs, even though the damages had been presented "in the aggregate" at trial. *Id.* at 18–19. The defendants sought to reopen discovery and hold a new trial on damages. *Id.* The court, however, noted that the jury had resolved all fact issues in rendering its verdict and the

defendants had failed to identify any flaws in the expert's post-trial calculation's methodology. *Id.* at 19. Thus, there were simply "no facts in dispute or evidence to be weighed." *Id.* at 18–19. Similarly here, PVA seeks a new trial on damages (as well as fraud and scienter). PVA's arguments are nothing more than another attempt to relitigate its liability and merely confirms that the reassessment of damages does not present a question for the jury.

Much like the defendants in *Lorazepam*, PVA fails to challenge the methodology of Dr. Nye's post-trial calculations in either its post-trial damages briefing or its motion for a new trial, taking issue instead with interest based calculation of the damages.

The jury's findings are sufficient to allow a District Court to accurately remit damages based on an interest-based theory of damages. In addition, although Appellees did not cite specific trial evidence in support of Dr. Nye's calculations, the District Court was satisfied that it could rely on them in entering a remittitur because his figures were produced using "PVA's datasets on which all of his prior work was based." ROA.5166. Because the resolution of the damages issues is simply a matter of law and the updated calculations were rooted in the same data that was presented at trial, the District Court properly concluded that it was within its power to enter a remittitur as a matter of law in lieu of granting a new trial. The judgment of the District Court should be affirmed.

### B. The Damages Award Does Not Violate the Eighth Amendment

PVA next argues that the damages awarded by the District Court violate the Eighth Amendment. In *Bajakajian*, the Supreme Court held that the question whether a money judgment is constitutionally excessive is governed by two principles. First, the Court recognized that decisions "about the appropriate punishment for an offense belong in the first instance to the legislature." *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). Second, the Court acknowledged that "any judicial determination regarding the gravity of a particular . . . offense will be inherently imprecise." *Id*. The Court therefore declined to "requir[e] strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense." *Id*. The Court instead held that a money judgment is unconstitutional only if "the amount of the [judgment]" is "grossly disproportional to the gravity of the defendant's offense[.]" *Id*. at 336-37. In other words, a judgment need only "bear some relationship to the gravity of the offense that it is designed to punish." *Id*. at 334.

Courts have "assigned great weight to the fines approved by Congress," which "as a representative body[] can distill the monetary value society places on harmful conduct[.]" *United States v. Chaplin's, Inc.*, 646 F.3d 846, 852 (11th Cir. 2011). A money judgment that "fall[s] below the maximum statutory fine[] for a given offense" is entitled to a "strong presumption of constitutionality." *Yates v. Pinellas*

*Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (internal quotation marks and citation omitted); *see also United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020); *Ellis v. Zheng*, 799 Fed. Appx. 551, 552 (9th Cir. 2020) ("Indeed, we have never found an FCA penalty within the range permitted by Congress to violate the Excessive Fines Clause.").

Pertinent to this case, the FCA imposes both treble damages and a civil penalty not less than $5,500 for each false claim. 31 U.S.C. § 3729(a)(1). This provision reflects Congress's express determination that damages and penalties of this magnitude are an appropriate sanction for each FCA violation a defendant commits. *See Zheng*, 799 Fed. Appx. at 552 ("The FCA deliberately prescribes harsh penalties, reflecting Congress's judgment that committing fraud on the government is a serious offense."). A judgment imposing treble damages and the minimum penalty permitted by the FCA would be a presumptively constitutional penalty and not grossly disproportionate to the gravity of the offense. PVA suggests that the damages were unconstitutional based on four factors. PVA argues first that its actions were not criminal. Second, PVA argues that it is not a member of the class the FCA was principally designed. Third, PVA argues that the penalty is disproportionate to the alleged value of the service performed. And fourth, there was no harm in falsely submitting bills before they were completed to Medicare.

As it relates to PVA's arguments for its first and fourth point, in *Bajakajian*, the Court refused to require "strict proportionality between the amount of a punitive [judgment] and the gravity of a[n] . . . offense." 524 U.S. at 336. And the government has even recovered substantial statutory penalties under the FCA where no damages were sought by relator. *E.g.*, *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 399, 409 (5th Cir. 2013)(holding that a $24 million FCA penalties judgment did not violate the Excessive Fines Clause even where relator "chose to forgo proof of damages"); *see also United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1173 (9th Cir. 2016) ("Proof of damage to the government is not required."); *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 429 (6th Cir. 2001); ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); S. Rep. 99-345, at 8 ("The United States is entitled to recover such forfeitures solely upon proof that false claims were made, without proof of any damages.").

Even if a judgment imposing the minimum penalty were unconstitutionally excessive, there is no dispute that, in any FCA case, the government can avoid an unconstitutionally excessive judgment by exercising its prosecutorial discretion to limit its request for penalties to a subset of false claims. *Id*. at 406-07. There is likewise no dispute that a relator, who acts on the government's behalf in a *qui tam* lawsuit, can exercise that same power. *Id*. Indeed, to avoid any constitutional issue,

the relators here agreed to accept a remittitur below the minimum penalty. Accordingly, a judgment imposing the remitted amount of penalties would be presumptively constitutional—a presumption PVA does not rebut.

PVA maintains that its actions were not criminal but fails to develop this argument. PVA appears to be arguing that the state of mind for a criminal case and one brought under the FCA makes some sort of difference in determining whether a FCA damage award is constitutional. PVA cites to no cases in which Courts have determined that an FCA damage award was unconstitutional because the bad actor's conduct did not rise to the level of a criminal offense. Knowingly providing false information to a federal agency to obtain federal funds to which the claimant is not legally entitled is a serious form of misconduct—and the Court at summary judgment and the jury at trial found that PVA engaged in that misconduct on numerous occasions.

PVA next asserts that the false claims were not "reprehensible" and any harm from the false claims was "minimal." Congress enacted the FCA's penalty and damages provisions precisely because the submission of false claims harms the government in serious but difficult-to-quantify ways. *See* S. Rep. No. 99-345, at 3. And fraud "erodes public confidence in the Government's ability to efficiently and effectively manage its programs." *Id.* Namely, "[f]raudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine

public confidence in the system." *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003). For these reasons, the Excessive Fines Clause does not "confine[]" the "concept of harm . . . strictly to the economic realm" in the FCA context. *Bunk*, 741 F.3d at 409; *see also Toepleman v. United States*, 263 F.2d 697, 699 (4th Cir. 1959) ("[T]o the Government[,] a false claim, successful or not, is always costly" due to "the expense of the constant Treasury vigil they necessitate.").

PVA argues that it is not in "the class of persons for whom the FCA was principally designed." (internal quotation marks omitted). Since the FCA's enactment in 1863, "Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Escobar*, 136 S.Ct. at 1996; *see also United States v. Neifert–White Co.*, 390 U.S. 228, 233, (1968) (The FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money"). Here, PVA was found to have submitted false claims for payment to the government and is clearly in the class of person for whom the FCA was designed.

Congress set the penalty amounts to distill the monetary value society places on the harmful conduct. The Eighth Amendment does not give the courts the power to displace Congress's choices. *Cf. Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality op.) ("[T]hese Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices[.]"). Each of PVA's

arguments regarding the constitutionality of the damages awarded fails. The judgment of the District Court should be affirmed.

## IV. The FCA's Qui Tam Scheme Does Not Violate Article II

PVA asserts that it included the argument that the FCA's Qui Tam Scheme could potentially violate Article II for potential appellate review. Appellees, in order to also preserve their right to address such an argument, responds accordingly. As PVA acknowledges, this Court's opinion in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) is controlling. This Court, *en banc*, held that pursuit of FCA claims where the government does not intervene (1) does not interfere with the President's constitutionally assigned functions under Article II's Take Care Clause; (2) does not violate the Appointments Clause ("We are persuaded that this argument holds even less vitality than the arguments made about the Take Care Clause, given that *qui tam* relators are not officers of the United States"); and (3) does not violate separation of powers principles. *See Riley,* 252 F.3d at 753-57. The majority's *en banc* opinion has been reiterated in numerous cases and any argument suggesting otherwise should fail. *See, e.g., Luka v. Procter and Gamble Co.*, 785 F. Supp. 2d 712 (N.D. Ill. 2011). As the FCA's qui tam scheme does not violate Article II, the judgment of the District Court should be affirmed.

## CONCLUSION

For the foregoing reasons, Appellees/Relators Tiffany Montcrief, Roberta A. Martinez, and Alicia Burnett respectfully request that the Court affirm the judgment of the District Court, in its entirety.

Respectfully submitted,

**Coné PLLC**

By: *__/s/ Misty Annette Hataway-Coné__*
Misty Annette Hataway-Coné
State Bar No. 24032277
Misty@conepllc.com
2019 Washington Ave., Ste. 201
Houston, TX 77007
Phone: 713-955-2729
Fax: 806-243-5753
**ATTORNEY FOR PLAINTIFF-APPELLEES-RELATORS TIFFANY MONTCRIEF, ROBERTA A. MARTINEZ, AND ALICIA BURNETT**

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 9,774 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font.

Dated: October 1, 2024

/s/ *Misty Annette Hataway-Coné*
Misty Annette Hataway-Coné
**Attorney for Appellees Tiffany Montcrief, Roberta A. Martinez, and Alicia Burnett**

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, I electronically transmitted this motion to the Clerk of the Court using the Court's ECF System. I further certify that counsel of record for Appellants is being served with a copy of this response by electronic means via the Court's ECF system, or by email, as follows:

**BECK REDDEN LLP**
Joshua S. Smith
jsmith@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
**ATTORNEYS FOR APPELLANT**

/s/ *Misty Annette Hataway-Coné*
Misty Annette Hataway-Coné