**No. 24-50176**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

UNITED STATES OF AMERICA, EX REL, TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,

Plaintiffs-Appellees,

v.

PERIPHERAL VASCULAR ASSOCIATES, P.A.,

Defendant-Appellant.

---

On Appeal from the United States District Court for the Western District of Texas, San Antonio Division (No. 5:17-cv-317)

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

---


BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as amicus curiae is a governmental party. 5th Cir. R. 28.2.1.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-appellees:

United States of America ex rel. Tiffany Montcrieff, Relator; Roberta A. Martinez, Relator; Alicia Burnett, Relator

Defendant-appellant:

Peripheral Vascular Associates, P.A.

Counsel:

For plaintiffs-appellees:

Misty A. Hataway-Coné
CONÉ PLLC

Justin T. Berger
JUSTIN T. BERGER LAW

Sarvenaz J. Fahimi
COTCHETT, PITRE & MCCARTHY, LLP

Wallace M. Brylak, Jr.
BRYLAK LAW

For defendant-appellant:

Joshua S. Smith
David M. Gunn
BECK REDDEN LLP

David M. Prichard
David R. Montpas
Glenn W. MacTaggart
PRICHARD YOUNG, LLP

Sean McKenna
NELSON MULLINS RILEY & SCARBOROUGH LLP

Mark A. Cole
Lauren M. Nelson
SPENCER FANE LLP

Jeff Wurzburg
NORTON ROSE FULBRIGHT US LLP

*s/ Martin Totaro*
Martin Totaro

## TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES ........................................ 1

STATEMENT OF THE CASE ........................................ 3

A. Statutory Background ........................................ 3

B. Factual Background and Prior Proceedings ........................................ 3

SUMMARY OF ARGUMENT ........................................ 6

ARGUMENT ........................................ 10

I. PVA Misstates Medicare Submission Requirements ........................................ 10

II. Sufficient Evidence Supports the Findings That PVA Acted Knowingly ........................................ 15

III. The Court Need Not Address Whether the District Court Improperly Rejected the Jury's Damages Determination ........................................ 21

IV. The District Court's Monetary Judgment Did Not Violate the Excessive Fines Clause ........................................ 25

CONCLUSION ........................................ 29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**


*Art Midwest Inc. v. Atlantic Ltd. P'ship XII*,
742 F.3d 206 (5th Cir. 2014) .......... 21

*Grashoff v. Adams*,
65 F.4th 910 (7th Cir. 2023) .......... 26, 27

*Jacobs v. National Drug Intelligence Ctr.*,
548 F.3d 375 (5th Cir. 2008) .......... 10

*McFadden v. United States*,
576 U.S. 186 (2015) .......... 20

*Ohio Hosp. Ass'n v. Shalala*,
201 F.3d 418 (6th Cir. 1999) .......... 10

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) .......... 10

*United States v. Bajakajian*,
524 U.S. 321 (1998) .......... 25, 26, 27

*United States v. Bornstein*,
423 U.S. 303 (1976) .......... 22

*United States v. Greenlaw*,
84 F.4th 325 (5th Cir. 2023) .......... 20

*United States v. Hughes*,
585 F.2d 284 (7th Cir. 1978) .......... 28

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003) .......... 23, 28

*United States v. Rogan*,
517 F.3d 449 (7th Cir. 2008) .......... 22, 23, 26

*United States v. Science Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) .......... 22

*United States v. Semrau*,
693 F.3d 510 (6th Cir. 2012) .......... 10

*United States v. Suarez*,
966 F.3d 376 (5th Cir. 2020) .................................................. 26, 29, 30

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013) .......................................................... 26, 29

*United States ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015) ............................................................... 24

*United States ex rel. Emanuele v. Medicor Assocs.*,
2017 WL 4867614 (W.D. Pa. Oct. 26, 2017) ......................................... 24

*United States ex rel. Freedman v. Suarez-Hoyos*,
2012 WL 4344199 (M.D. Fla. Sept. 21, 2012) ...................................... 24

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) ............................................................... 22

*United States ex rel. Longhi v. United States*,
575 F.3d 458 (5th Cir. 2009) ......................................................... 22, 23

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023) ........................................................................... 19

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*,
2019 WL 571349 (W.D. Tex. Feb. 12, 2019) ......................................... 23

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ...................................................... 7, 8, 15, 16, 17, 18

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ............................................................................. 3

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) .............................................................. 28

**Statutes:**

False Claims Act:
31 U.S.C. § 3729 *et seq.* ...................................................................... 1
31 U.S.C. § 3729(a)(1) ................................................................... 3, 25
31 U.S.C. § 3729(a)(1)(A) ..................................................................... 3
31 U.S.C. § 3729(b)(1)(A) ..................................................................... 3

31 U.S.C. § 3730(a) .......................................................................... 3
31 U.S.C. § 3730(b)(1) ...................................................................... 3

**Legislative Material:**

S. Rep. No. 99-345 (1986) ........................................................... 28

**Other Authorities:**

Am. Med. Ass'n, *CPT Professional 2015* (2014) ........................................ 13

Am. Med. Ass'n, *CPT Professional 2016* (2015) ........................................13

## INTEREST OF THE UNITED STATES

In this declined qui tam action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, a jury found that defendant Peripheral Vascular Associates (PVA) violated the Act through thousands of claims it submitted to Medicare for vascular ultrasound services. Ultrasounds have a technical component, which is when the ultrasound is performed, and a professional component, which is when a physician analyzes the results. This case concerns two categories of false claims PVA submitted to the federal government for its ultrasounds: (1) PVA billed Medicare for both the professional and technical component without the PVA physician completing the professional component of the vascular study before billing; and (2) PVA billed Medicare for an office visit and vascular study conducted the same day without a separate, written report containing the physician's interpretations necessary to allow PVA to bill using a specialized vascular code.

In district court, relators—former PVA employees—demonstrated that PVA changed its billing practices to submit thousands of claims to Medicare before it actually finished the professional component despite expressly certifying that it had satisfied this requirement. PVA did so to accelerate its receipt of payments from the federal government. PVA

characterizes its billing scheme as a mere technical oversight. That explanation does not apply at all to the first category of false claims. And it misses the mark for the second category because a separate, signed, written report is what triggered PVA's ability to bill Medicare for a vascular study in addition to an office visit. Accordingly, after a five-day trial, a jury found that PVA submitted thousands of claims to Medicare that violated the False Claims Act, causing over $2.7 million in damages. The district court entered a final judgment imposing over $4 million in trebled damages after remittitur and $21 million in statutory penalties.

Because the United States is a real party in interest in all actions under the False Claims Act, it has a substantial interest in this Court's interpretation of the Act. The United States likewise has a substantial interest in ensuring the integrity of Medicare. Medicare depends in large part on the good faith of healthcare providers to deliver the services they promised *before* billing the government. When providers ignore conditions for payment that go to the essence of the bargain between providers and the federal government, the public suffers.

The United States accordingly submits this amicus brief in support of plaintiffs-appellees to address various arguments PVA has made on appeal challenging the jury's verdict and the district court's final judgment.

## STATEMENT OF THE CASE

### A. Statutory Background

The False Claims Act prohibits "knowingly" submitting (or causing the submission of) "false or fraudulent claim[s] for payment or approval" to the United States. 31 U.S.C. § 3729(a)(1)(A). The knowledge requirement is satisfied if a defendant "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). False Claims Act actions may be brought by the Attorney General or by a private qui tam relator in the name of the United States. *Id.* § 3730(a), (b)(1).

False Claims Act violators are "liable . . . for a civil penalty of not less than $5,000 and not more than $10,000," adjusted for inflation, "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The statute provides a separate penalty for each false claim submitted. *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000).

### B. Factual Background and Prior Proceedings

PVA is a full-service vascular surgery practice in San Antonio, Texas. It performs vascular ultrasounds, which have a technical component and a professional component. The technical component is performing the

ultrasound, and the professional component is a physician analyzing the results. The components can be billed to Medicare together or separately, using codes adopted by the Department of Health and Human Services.

Three former PVA employees sued PVA under the False Claims Act, alleging that PVA falsely billed Medicare for services from 2014 to 2019. ROA.536-55. Relators alleged that PVA: (1) fraudulently billed Medicare for both the professional and technical component without the PVA physician completing the professional component of the vascular study (described in district court as "Testing Only" claims); and (2) fraudulently billed Medicare for an office visit and vascular study conducted the same day without a separate, written report containing the physician's interpretations necessary to also bill for a vascular study (described in district court as "Double Billing" claims).

The district court granted summary judgment to relators on falsity and scienter but allowed the issues of materiality and damages to go to the jury. ROA.3972-4030. After a five-day trial in February 2022, the jury returned a verdict for the relators, finding that PVA falsely submitted 2,755 "Testing Only" claims and 4,625 "Double Billing" claims to Medicare, causing over $2.7 million in damages. ROA.5006-10.

The district court explained at length why the jury could reasonably conclude that, if PVA had informed Medicare of its actual billing practices, Medicare would not have paid PVA's claims. ROA.5158. Relators "presented ample evidence at trial" to support PVA's liability. ROA.5158 (referencing "testimony of Relators' Medicare billing experts, . . . various Medicare publications, and PVA's own internal compliance policies"). For example, one expert "testified that Medicare would not have paid the claims if it had known that the services were not yet complete," that "Medicare does not pay prospectively for services," and that "Medicare does not make partial payments for partially completed services." ROA.5159. Another expert testified that "[i]f a doctor submits a bill to Medicare and says, 'Here's a bill and I have not completed the work, but I plan to do it soon, in a few days, a few weeks,' Medicare would not pay that bill." ROA.5159 (alteration in original) (some quotation marks omitted). Other evidence confirmed "the importance of only billing for services that have actually been performed." ROA.5159. And "[t]he billing form submitted to Medicare itself" requires "explicit certification" that "the services being billed for have been 'furnished.'" ROA.5160 (emphasis omitted). If there were any residual doubt, "PVA's internal documents also demonstrate the

importance of waiting to bill Medicare until services have been completed." ROA.5160.

At relators' request seeking penalties amounting to roughly one-third the statutory minimum for the 7,380 false claims, the district court imposed almost $22 million in penalties. ROA.5171-77; ROA.5172 n.9. The district court also entered a post-trial order remitting actual damages to $1,455,379. ROA.5562. According to the court, the proper measure of harm to the federal government was not the full value of the false claims, as the jury found, but rather the interest accrued in the time between the date the government paid the false claims and the date of the jury's verdict. The court then entered a final judgment imposing $4,366,137 in trebled damages, $21,825,592 in statutory penalties, $1,781,900 in attorneys' fees, and $705,188 in costs and expenses. ROA.5564-65.

## SUMMARY OF ARGUMENT

I. When PVA submitted claims to Medicare, it certified that each claim was true, accurate, and complete; that the claim complied with applicable Medicare laws, regulations, and program instructions for payment; and that PVA actually furnished the services for which it sought reimbursement. The evidence showed that many of those certifications were false. PVA submitted thousands of claims to Medicare using the

American Medical Association's Current Procedural Terminology (CPT) codes for "Noninvasive Vascular Diagnostic Studies." Vascular ultrasounds include a technical component (performing the ultrasound) and a professional component (a physician interpreting the data). Contrary to PVA's certifications, many of its claims sought reimbursement using a "global" billing code indicating that PVA had conducted the technical and professional components of the test when it had only performed the technical component. And many of PVA's claims sought reimbursement without separate, written reports of the ultrasounds even though such reports are what allowed PVA to bill using the Noninvasive Vascular Diagnostic Studies codes in addition to separately billing Medicare for the office visits.

II. PVA's challenge to the finding that it knowingly submitted false claims lacks merit. PVA contends that the district court misapplied *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), but the district court took full account of *Escobar*, explaining that, "[j]ust as 'a reasonable person would realize the imperative of a functioning firearm,' a reasonable person would not pay for services that had not been rendered absent an agreement to prospective

payment." ROA.5549 (emphasis omitted) (quoting *Escobar*, 579 U.S. at 191).

Nor can PVA credibly claim that it did not act with at least deliberate ignorance or reckless disregard of the materiality of its thousands of false claims. PVA expressly certified that its claims for reimbursement were accurate and complied with all relevant laws, regulations, and program instructions, and that PVA had actually furnished all of the services for which PVA billed the government. By requiring express certifications of compliance with those critical requirements, the government put PVA on notice that they were material. PVA also contends that the district court mistakenly examined evidence from after its claims were submitted to support the conclusion that PVA acted knowingly. But courts often look to events after the alleged misconduct as evidence of knowledge at the time of the allegation, and the district court did not err by doing so here.

III. PVA also suggests that relators failed to present sufficient damages evidence at trial for the full value of the false claims PVA submitted, but that issue is not properly before this Court because the district court reduced the jury's verdict and relators have not cross-appealed that reduction. This Court accordingly has no occasion to address the issue.

IV. PVA wrongly contends that the district court's monetary judgment violates the Eighth Amendment's Excessive Fines Clause. The district court determined the amount of the judgment by trebling the government's damages and imposing civil penalties below the bottom end of the statutorily prescribed range. PVA fails to overcome that presumptively constitutional judgment. Although PVA claims that no one was harmed by its fraud, at a minimum its misconduct undermined the integrity of Medicare and eroded public confidence in the government's ability to manage that important program. PVA also argues that it is not within the class of people for whom the False Claims Act was designed, but it falsely billed the federal government for services incomplete at the time of billing. The thousands of false claims PVA submitted confirm that its misconduct was part of a pattern warranting a serious sanction. In any event, if this Court were to hold the judgment unconstitutionally excessive, the proper remedy would be to remand for a reevaluation by the district court.

## ARGUMENT[1]

### I. PVA Misstates Medicare Submission Requirements

This case concerns false claims submitted using the American Medical Association's CPT codes for "Non-invasive Vascular Diagnostic Studies." PVA Br. 24 & n.43. Providers using CPT codes on a bill to Medicare are "effectively submitting a claim for the services associated with that number in the [American Medical Association]'s CPT code set." *United States v. Semrau*, 693 F.3d 510, 530 (6th Cir. 2012). The CPT codes are found in the CPT Manual, the "Rosetta Stone" of the codes used to bill Medicare. *Ohio Hosp. Ass'n v. Shalala*, 201 F.3d 418, 420 (6th Cir. 1999). When submitting a form to Medicare for payment, a healthcare provider such as PVA certifies that the claim for reimbursement is true, accurate, and complete; that it complies with applicable Medicare laws, regulations,

[1] PVA states (Br. 59), for preservation purposes only, that non-intervened False Claims Act cases violate Article II, although it concedes (Br. 57) that those arguments are foreclosed by binding precedent. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc). Under this Court's "rule of orderliness," that concession precludes consideration of the issue at this stage. *Jacobs v. National Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). In recent district court litigation, the government has intervened to defend the False Claims Act qui tam provisions against similar constitutional challenges. *E.g.*, *United States ex rel. D'Anna v. Lee Memorial Health Sys.*, No. 2:14-cv-437 (M.D. Fla.).

and program instructions for payment; and that the services were actually furnished. ROA.3974; ROA.4028.

Vascular ultrasounds have two parts: a technical component, which is the performance of the ultrasound, and a professional component, which is a physician interpreting the resulting data. ROA.3974-77. When a single provider conducts the ultrasound and also interprets the results, the services may be billed globally rather than for the individual portions separately. For Noninvasive Vascular Diagnostic Studies, the CPT Manual states: "Vascular studies include patient care required to perform the studies, supervision of the studies *and interpretation of study results with copies for patient records of hard copy output with analysis of all data*, including bidirectional vascular flow or imaging when provided." ROA.17813 (emphasis added). This provision requires a provider to read the ultrasound and include the "analysis of all data" in a patient's records. For the "Testing Only" claims at issue in this case, however, PVA failed to do so before billing for the procedures and used a "global" billing code falsely representing that it had conducted both the technical and professional components of the test. PVA concedes that for those claims, the physician did not "record his or her interpretation in the office visit medical notes" and instead recorded the interpretation in its

"MedStreaming program" *after* PVA had submitted claims for those ultrasounds. PVA Br. 12; ROA.5149. Claims falling into that category are false.

PVA also did not have separate, written reports of the ultrasounds before PVA submitted the "Double Billing" claims for payment. PVA urges (Br. 23-29) that it could be paid for Noninvasive Vascular Diagnostic Studies codes without separate, written reports because that requirement applies only to Radiology and Evaluation and Management (E/M) codes, which are not at issue in this case. But the district court properly rejected that argument in finding that this category of claims was also false.

Contrary to PVA's argument (Br. 25), the district court did not conflate requirements for codes found in different parts of the CPT Manual. The "Double Billing" claims involve PVA physicians visiting with a patient to provide E/M services and then ordering a vascular study to be conducted on the same day, with PVA billing for the vascular study *separately and additionally* under a Noninvasive Vascular Diagnostic Studies code. PVA Br. 7-10. The CPT Manual allows for that practice but with certain requirements. It states, in the E/M section, that a "physician's interpretation of the results of diagnostic tests/studies (ie, professional component) *with preparation of a separate distinctly identifiable signed*

*written report* may also be reported separately" from the submission of an E/M code. Am. Med. Ass'n, *CPT Professional 2015*, at 6 (2014) (emphasis added); *see also* ROA.17811 (including excerpts from CPT Professional 2000 with same language). A diagnostic test such as an ultrasound may accordingly be billed with a Noninvasive Vascular Diagnostic Studies code even for patients who also receive E/M services, but if a provider does so a separate written report must be included.

Since 2016, moreover, the CPT Manual's Medicine section has stated that, "[w]hen imaging guidance or imaging supervision and interpretation is included in a procedure, *guidelines for image documentation and report, included in the guidelines for Radiology . . . will apply*." Am. Med. Ass'n, *CPT Professional 2016*, at 575 (2015) (emphasis added); *see also* PVA Br. 25 (referencing the Medicare Claims Processing Manual). And it does not appear to be in dispute that the Radiology Guidelines mandate a separate report that includes interpretive findings of information contained in the images taken. The district court thus correctly concluded that "[t]he CPT Manual's Radiology Guidelines . . . expressly cover diagnostic ultrasounds," ROA.4010, which involve imaging guidance or imaging supervision and require image documentation.

The requirement for a separate written report is a prerequisite for PVA to bill separately using a Noninvasive Vascular Diagnostic Studies code—no separate written report, no separate billing code. PVA mistakenly frames that requirement as a minor, insignificant, technical violation of a failure by a physician to "sign off" on work already completed. PVA Br. 1, 4, 6, 7, 9, 12. But the "Double Billing" claims go far beyond bills submitted prematurely, PVA Br. 12, 36, 39, and PVA's conduct did not involve mere "omitted 'signatures,'" PVA Br. 45. PVA's failure to satisfy a fundamental precondition that allowed it to bill separately under a different code means that every time it did so, PVA's actions resulted in a false claim. And this errant justification does not even apply to the "Testing Only" claims because, as noted above, PVA concedes that its physicians never interpreted ultrasounds in that category before submitting those claims.

PVA's reliance on a Medicare bulletin to justify its billing practices is likewise unavailing. PVA Br. 6-7, 31. The bulletin states that, if a provider submits a global bill that includes a technical and professional component, it can list as a date of service the date on which either component is completed. But that assumes both components *have already been completed*. The bulletin in no way suggests that a provider can submit a

bill prematurely, with the expectation that a provider will complete the professional component at some undetermined point in the future.

## II. Sufficient Evidence Supports the Findings That PVA Acted Knowingly

PVA raises two challenges to the district court's findings that PVA had sufficient knowledge to be liable under the False Claims Act. Both challenges lack merit.

A. PVA urges (Br. 39-45) that because the Supreme Court in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), stated that "[w]hat matters is . . . whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision," *id.* at 181, the district court erred when it "decline[d]" to "recognize 'knowledge of materiality' as a new element" in cases brought under the False Claims Act, ROA.5546. That view misinterprets *Escobar* as well as the way in which the district court faithfully applied that decision.

In *Escobar*, the Supreme Court set forth a framework for determining whether a misrepresentation or omission is material under the implied certification theory of liability under the False Claims Act. The Court stated that "a matter is material" if: (1) a "reasonable" person would attach importance to it in determining a "choice of action," or (2) "the defendant

knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. 579 U.S. at 193 (quotation marks omitted). *Escobar* identified several factors that are relevant to, but not automatically dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id.* at 193 n.5 (quotation marks omitted); whether the government pays a claim despite its actual knowledge that certain requirements were violated, *id.* at 195; and whether the regulatory or contractual violation is significant, *id.* at 196.

The district court properly applied *Escobar*. It walked through *Escobar's* discussion of materiality at length. ROA.5546-49. It observed that "*Escobar* counsels that the materiality inquiry is holistic and largely objective in nature." ROA.5549. It stated that, "[t]o the extent that a scienter requirement applies to materiality—and not just falsity—it is built into the materiality analysis through the 'reasonable person' standard." ROA.5549 (citing *Escobar*, 579 U.S. at 191). It noted that "the jury concluded that the PVA's false statements were material," with the "jury's finding . . . supported by the evidence at trial." ROA.5549. And it explained

that those findings were "supported by the kind of common-sense analysis contemplated under *Escobar*," because "[j]ust as 'a reasonable person would realize the imperative of a functioning firearm,' a reasonable person would not pay for services that had not been rendered absent an agreement to prospective payment." ROA.5549 (emphasis omitted) (quoting *Escobar*, 579 U.S. at 191).

PVA contends that the district court erroneously adopted a "negligence-based standard," PVA Br. 42, by invoking a reasonable person standard, but the court merely followed *Escobar's* holding and reasoning. *Escobar* explained that a "defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." 579 U.S. at 191. As one example, the Court stated that "[i]f the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has 'actual knowledge.'" *Id.* Additionally, "because a *reasonable person* would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out." *Id.* (emphasis added). When

discussing how a reasonable person would understand the effects of the false statements on the "likely or actual behavior of the recipient of the alleged misrepresentation," *id.* at 193 (quotation marks omitted), the Supreme Court was not establishing a legal standard akin to how negligence cases are resolved in tort law. It instead offered a framework to analyze whether a defendant acted with deliberate ignorance or reckless disregard of the materiality of a false claim. The district court quoted and applied *Escobar's* mode of analysis directly, and nowhere in that framework did *Escobar* indicate that it was imposing "a new fifth element for liability under" the False Claims Act. ROA.5549.

Further, there can be little doubt that PVA knew or acted with deliberate ignorance or reckless disregard of the materiality of its thousands of false claims. PVA labels its violations as minor or insubstantial and suggests that, at most, it was "aware of technical inaccuracies." PVA Br. 41. But PVA expressly certified that its claims to Medicare were accurate; that it complied with all relevant laws, regulations, and program instructions; and that PVA had actually furnished all of the services for which PVA billed the government. ROA.4028; ROA.3974 ("When submitting the CMS-1500 form, a healthcare provider certifies that the claim for reimbursement is 'true, accurate and complete,' 'complies

with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment,' and that the 'services on this form were medically necessary and personally furnished by me.'"). Such certifications are "key to the trust that things are going to be done right," to ensure that "Medicare [is] operating in the way it should." ROA.6069. The certifications operate to "guard[ ] the system," ROA.6069, providing a critical part of the essence of the bargain between PVA and the federal government. Although PVA in many instances later sought to cure its inaccurate representations, that does not undermine the district court's finding both that a reasonable person would not pay for services that had not actually been provided yet and that PVA knew this. ROA.5549.

B. Citing *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), PVA also argues (Br. 33-34) that the district court erred by relying on evidence from after PVA submitted its claims to support its finding that PVA knowingly submitted false claims. That argument lacks merit. The Supreme Court in *Schutte* stated that a defendant's knowledge depends on "what the defendant thought when submitting the false claim—not what the defendant may have thought after submitting it." 598 U.S. at 752 (emphasis omitted). But the Court in no way limited the types of evidence that could be used to prove knowledge at the time the claims were

submitted. PVA errs by conflating after-the-fact evidence that may be permissibly used to establish earlier knowledge with a defendant's later knowledge that, on its own, does not show intent at the earlier time when the defendant initially submitted a false claim.

Courts routinely look to events after alleged misconduct as evidence of knowledge at the time of the allegation. *E.g.*, *McFadden v. United States*, 576 U.S. 186, 192 n.1 (2015) (noting that "a defendant's concealment of his activities" and "evasive behavior with respect to law enforcement" provide evidence of knowledge); *United States v. Greenlaw*, 84 F.4th 325, 345 (5th Cir. 2023) ("We also agree with the Government that Appellants' concealment of these actions provide support for an inference of intent."). That is precisely what the district court did here. PVA began using MedStreaming in 2014 and billed the government without a separate physician interpretation of an ultrasound, but evidence from 2017 showed that PVA for a brief period properly waited to send bills "until after a MedStreaming report was signed and finalized." PVA Br. 32. According to the district court, "PVA abandoned this policy change when it realized that about a third of its revenue would not come in as quickly as it did under the current practice" and "then continued billing prior to reading vascular studies." ROA.4024. The court found that this scheme "strongly suggests

that PVA knew its practices skirted the line of compliance, and declined to get back into compliance when it realized that revenues would drop if it did so." ROA.4024. That analysis comports with *Schutte*: PVA changed course in 2017 to cure its prior knowing lack of compliance with billing requirements, before reverting to its unlawful practices when PVA saw its revenues decline.

## III. The Court Need Not Address Whether the District Court Improperly Rejected the Jury's Damages Determination

PVA states in passing (Br. 49-50) that the district court correctly rejected the jury's determination that relators' damages included the full amount that PVA received from the government for premature ultrasound bills. That issue, however, is not properly before the Court because relators do not disagree and did not file a cross-appeal on the issue (which would be necessary to reinstate the original, larger damages award). *See Art Midwest Inc. v. Atlantic Ltd. P'ship XII*, 742 F.3d 206, 211 (5th Cir. 2014) ("This circuit follows the general rule that, in the absence of a cross-appeal, an appellate court has no jurisdiction to modify a judgment so as to enlarge the rights of the appellee or diminish the rights of the appellant." (alteration and quotation marks omitted)). Accordingly, the United States takes no position on whether the jury's original damages calculation was

correct on the facts of this case, and the Court likewise need not address that issue.

We note, however, that the calculation of damages in False Claims Act cases often presents difficult fact-specific questions. In cases where the government receives a good or service, damages are the difference between what the government paid for and the actual value of the goods or services it received instead. *See, e.g.*, *United States v. Bornstein*, 423 U.S. 303, 317 n.13 (1976); *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003). In cases "where there is no tangible benefit to the government," *United States ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009), damages are impossible to calculate, or the defendant failed to comply with a threshold eligibility requirement, however, courts have sometimes determined that the appropriate measure of damages is the full amount of the claims paid. *See, e.g.*, *id.*

In *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), the Seventh Circuit applied those principles in the context of Medicare claims that had been tainted by unlawful kickbacks. The court stated that through Medicare, "[t]he government offers a subsidy (from the patients'

perspective, a form of insurance), with conditions," and "[w]hen the conditions are not satisfied, nothing is due." *Id.* at 453. Accordingly, the court found that "the entire amount" the government had paid on the kickback-tainted claims "must be paid back." *Id.* And that was true even though "most of the patients for which claims were submitted received some medical care—perhaps all the care reflected in the claim forms." *Id.*

Similarly, in *Longhi*, this Court held that a company that had fraudulently represented its qualifications for research grants was liable for the full amount of the grants in damages, even though the company had proceeded "to successfully design and manufacture" the products that the grant-funded research was meant to explore. 575 F.3d at 472-73. The Court reasoned that "the bargain" for which the government had negotiated in that case "was to award money to eligible deserving small businesses," not to obtain "a specific product or good," the value of which could be measured against what the government had actually received. *Id.* at 473. The fact that the work was completed could not remedy the contractor's lack of eligibility.[2]

---

[2] *See also, e..g., United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003) ("Had Mackby been truthful, the government would have known that he was entitled to nothing . . . ."); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386-87 (4th Cir. 2015); *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 WL 571349, at *9 (W.D. Tex.

*Continued on next page.*

In this case, there is no occasion to address what measure of damages the Court might find to be appropriate if the relators had cross-appealed to urge an increased damages award. Relators did not cross-appeal from the district court's determination that only an interest-based measure of damages was appropriate on the facts here. *See* ROA.5514 (relators agreeing that any remittitur should "be based on the Medicare interest rate for overpayments and underpayments"). Instead, the sole question before this Court is whether, assuming an interest-based measure of damages was correct based on the unique procedural posture of this case, the district court acted appropriately in calculating those interest-based damages with record evidence presented in this case. Because of the highly case-specific nature of that question and the fact that relators have not preserved any argument that a higher measure of damages was appropriate, the government takes no position on whether the district court's interest-based damages calculation should be affirmed or instead remanded for further proceedings.

---

Feb. 12, 2019); *United States ex rel. Emanuele v. Medicor Assocs.*, 2017 WL 4867614, at *9 (W.D. Pa. Oct. 26, 2017); *United States ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199, at *4 (M.D. Fla. Sept. 21, 2012).

## IV. The District Court's Monetary Judgment Did Not Violate the Excessive Fines Clause

The district court determined the monetary award by trebling the damages and imposing less than the minimum penalty prescribed by the False Claims Act for each false claim. ROA.5564; *see* 31 U.S.C. § 3729(a)(1). PVA's contention that those penalties violate the Eighth Amendment's bar against excessive fines (Br. 53-56) lacks merit.

In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court held that two principles govern whether a judgment is consistent with the Excessive Fines Clause. First, decisions "about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336. Second, "any judicial determination regarding the gravity of a particular . . . offense will be inherently imprecise." *Id.* The Court therefore declined to "requir[e] strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense." *Id.* It instead held that a money judgment is unconstitutional only if it is "grossly disproportional to the gravity of the defendant's offense." *Id.* at 337. That framework is highly deferential: A judgment need only "bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334.

A money judgment that falls below the maximum statutory fine is entitled to a "strong presumption" of constitutionality. *United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020). Further, the government can exercise its prosecutorial discretion to limit its request for penalties to a subset of false claims. *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406-07 (4th Cir. 2013).

At relators' request, the district court imposed civil penalties in the amount of roughly one-third the statutory minimum for the 7,380 false claims. ROA.5171-77.[3] The statutory range reflects Congress's determination of an "appropriate" sanction for the False Claims Act violations that the district court found. *Bajakajian*, 524 U.S. at 336; *see Grashoff v. Adams*, 65 F.4th 910, 920 (7th Cir. 2023) (deferring to "legislative judgments about punishments for unemployment fraud" in rejecting Excessive Fines Clause challenge); *Rogan*, 517 F.3d at 454 (observing that although the False Claims Act "has a penal component, . . . 'penal' does not mean 'excessive,' for 'judgments about the appropriate

[3] Although the district court should not have imposed a per penalty amount that is less than the statutory minimum, relators invited that error and did not cross-appeal on that issue, which accordingly is not before this Court.

punishment for an offense belong in the first instance to the legislature' "); ROA.5171-77.

PVA's challenges to the penalties assessed by the district court lack merit. PVA does not dispute that a penalty award within the statutory range is presumptively constitutional. PVA Br. 55. If anything, that presumption should be stronger where, as here, the relator sought penalties on only a subset of the false claims and thus the penalties assessed are well below the minimum amount prescribed by the False Claims Act. ROA.5175. Nor does PVA contend that the constitutionality of the penalties must be assessed by calculating the ratio of the judgment to the amount of the false claims that defendants submitted, an approach foreclosed by *Bajakajian's* refusal to require "strict proportionality between the amount of a punitive [judgment] and the gravity of a[n] . . . offense." 524 U.S. at 336.

PVA instead argues that it should escape paying penalties because no one was harmed by its fraud, but the district court properly rejected that argument. ROA.5176. As the court recognized, PVA's misconduct "undermines the integrity of" government-funded programs, " 'erodes . . . public confidence in the [g]overnment's ability to manage' the defrauded program," and requires the government to "spend time and resources investigating" and "remedying" the fraud. *Grashoff*, 65 F.4th at 920; *see*

*United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003) ("Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system."). Moreover, Congress enacted the False Claims Act's penalty and damages provisions precisely because "[f]raud harms the United States in ways untethered to the value of any ultimate payment," such as by diminishing "the public's confidence in the government." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1316 (11th Cir. 2021); *see* S. Rep. No. 99-345, at 3 (1986) (similar). The Excessive Fines Clause accordingly does not "confine[ ]" the "concept of harm . . . strictly to the economic realm" in this context. *Bunk*, 741 F.3d at 409. To the contrary, "[a] false claim is actionable under the [False Claims] Act even though the United States has suffered no measurable damages," *United States v. Hughes*, 585 F.2d 284, 286 n.1 (7th Cir. 1978), and the government has accordingly recovered substantial statutory penalties under the False Claims Act even where little or no damages were sought, *Bunk*, 741 F.3d at 399, 409 ($24 million False Claims Act penalties judgment did not violate the Excessive Fines Clause even where the relator "chose to forgo proof of damages"); *Yates*, 21 F.4th at 1314 (rejecting Excessive Fines Clause challenge to "judgment of $1.179 million based on $755.54 in actual damages").

Nor is PVA correct that its conduct falls outside the scope of the False Claims Act's intended coverage. PVA falsely billed Medicare for services that were incomplete at the time of billing while falsely certifying that it had complied with all applicable Medicare requirements. Such conduct falls within the heartland of the False Claims Act. ROA.5175. And although PVA was not criminally charged, the thousands of false claims it submitted show "the 'ongoing' nature of [PVA]'s conduct," which in turn "contributes to the gravity of the offense." *Suarez*, 966 F.3d at 386. That repeated misconduct stands in sharp contrast to "the one-time reporting violation in *Bajakajian*." *Id.*

In any event, if this Court were to conclude that the penalties assessed by the district court were excessive under the Eighth Amendment, the proper remedy would be to vacate the judgment and remand for a reevaluation by the district court in the first instance. *See Bunk*, 741 F.3d at 406-07. No new trial would be necessary.

## CONCLUSION

The Court should reject PVA's arguments on the issues addressed in this brief.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
JAIME ESPARZA
*United States Attorney*
MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
*s/ Martin Totaro*
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

October 2024

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2024, a copy of the foregoing brief was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record.

*s/ Martin Totaro*
Martin Totaro

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6104 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ Martin Totaro*
Martin Totaro