**No. 24-50176**

# In the United States Court of Appeals For the Fifth Circuit

**UNITED STATES OF AMERICA, EX REL., TIFFANY MONTCRIEF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; ALICIA BURNETT, RELATOR,**
***Plaintiffs-Appellees,***

**v.**

**PERIPHERAL VASCULAR ASSOCIATES, P.A.,**
***Defendant-Appellant.***

Appeal from the United States District Court for the Western District of Texas, San Antonio Division; No. 5:17-CV-317

## REPLY BRIEF OF APPELLANT


Joshua S. Smith
jsmith@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**ATTORNEY FOR APPELLANT**

## TABLE OF CONTENTS

**Page**


Introduction .....1

Argument in Reply .....2

I. PVA's invoices for vascular ultrasounds were not false. .....2

A. Did PVA have to follow the rules for X-rays and physician office visits when it billed for ultrasounds? .....3

B. The new arguments in the Government's amicus brief do not support the district court's ruling. .....6

C. Paperwork vs. medical work. .....10

1. "Double-billing" (ultrasound with office visit). .....11

2. "Testing only" (ultrasound without office visit). .....12

II. PVA did not knowingly make false statements that it knew were material. .....13

A. PVA did not know that its invoices were false. .....14

B. PVA did not know that any misstatements were material. .....17

III. No evidence supports the jury finding on materiality. .....19

IV. The penalty and damages awards are erroneous. .....21

A. Damages. .....21

B. Penalties. .....24

V. The *qui tam* device is unconstitutional. .....27

Conclusion .....28

Certificate of Service .....29

Certificate of Compliance .....30

## INDEX OF AUTHORITIES

**CASES** **PAGE(S)**

*United States ex rel. Aldridge v. Corp. Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023) ....................18

*Anderson v. City of New Orleans*,
38 F.4th 472 (5th Cir. 2022) ....................1, 8

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013) ....................26

*Caldarera v. E. Airlines*,
705 F.2d 778 (5th Cir. 1983) ....................23

*United States ex rel. Farmer v. City of Hous.*,
523 F.3d 333 (5th Cir. 2008) ....................17, 18

*Hernandez v. Garcia*,
820 F.3d 782 (5th Cir. 2016) ....................1

*Kelso v. Butler*,
899 F.3d 420 (5th Cir. 2018) ....................22

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
575 F.3d 458 (5th Cir. 2009) ....................18

*In re Lorazepam & Clorazepate Antitrust Litig.*,
261 F. Supp. 3d 14 (D.D.C. 2017)....................23

*Lujan v. Nat'l Wildlife Fed.*,
497 U.S. 871 (1990)....................23

*Lyons v. Katy Indep. Sch. Dist.*,
964 F.3d 298 (5th Cir. 2020) ....................2, 14

*In re Mercer*,
246 F.3d 391 (5th Cir. 2001) ....................17

*Off. of U.S. Tr. v. John Q. Hammons Fall 2006, LLC*,
144 S. Ct. 1588 (2024)....................5

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) ....................................................................27

*Russello v. United States*,
464 U.S. 16 (1983)..........................................................................................9

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)...........................................................................15, 16

*SEC v. Jarkesy*,
144 S. Ct. 2117 (2024)................................................................................23

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985) ....................................................................23

*Smith v. United States*,
343 F.2d 539 (5th Cir. 1965) ..................................................................1, 7

*United States ex rel. Taylor-Vick v. Smith*,
513 F.3d 228 (5th Cir. 2008) ....................................................................17

*Timbs v. Indiana*,
586 U.S. 146 (2019).....................................................................................26

*United States v. Bajakajian*,
524 U.S. 321 (1988)...........................................................................24, 26

*United States v. Greenlaw*,
84 F.4th 325 (5th Cir. 2023)......................................................................16

*United States v. Hughes*,
585 F.2d 284 (7th Cir. 1978) ....................................................................26

*United States v. Schwarzbaum*,
114 F.4th 1319 (11th Cir. 2024) ................................................................25

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) ..................................................................26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)........................................................ 13, 17, 18, 20, 21, 27

*Varljen v. Cleveland Gear Co.*,
250 F.3d 426 (6th Cir. 2001) .......................................................................26

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ....................................................................26

*United States ex rel. Zafirov v. Fla. Med. Assocs.*,
No. 8:19-cv-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla.
Sept. 30, 2024) .............................................................................................28

**UNITED STATES CONSTITUTION**

U.S. CONST. art. II, § 2, cl. 2 ...........................................................................27

**RULES**

Fed. R. Civ. P. 49(a)(3) .................................................................................18

**OTHER AUTHORITIES**

Restatement (Second) of Torts §§ 526-36 ....................................................17

## INTRODUCTION

Relators ignore whole sections of PVA's opening brief. *See* Blue Br. at 22-29 (explaining that the district court mixed and matched the requirements for different medical procedures); *id.* at 39-48 (explaining that Relators waived any opportunity to obtain a finding on an essential element of their case). They apparently concede that the district court erred on these points, which is reason enough to reverse. *Hernandez v. Garcia*, 820 F.3d 782, 786 n.3 (5th Cir. 2016) ("[appellee's] inadequate briefing constitutes waiver").

The Government tries to plug the gap with new arguments and new evidence. *E.g.*, Amicus Br. at 13 (relying on page "575" of the CPT Manual, which was never presented to the district court). The Government, however, did not believe in these arguments enough to raise them in the district court. Aside from weighing in on a few narrow legal issues, the Government told the district court that it "takes no position as to the merits of the parties' motions for summary judgment." ROA.3673.

It is far too late for the Government to inject new material here. *Anderson v. City of New Orleans*, 38 F.4th 472, 481 (5th Cir. 2022) ("For obvious reasons, new issues, generally, cannot be raised in an amicus brief."); *Smith v. United States*, 343 F.2d 539, 541 (5th Cir. 1965) ("Nor can the Court consider the new factual material included in the brief of the amicus."). That material would not support the district court's judgment even if it had been properly raised by Relators.

This Court should reverse.

## **ARGUMENT IN REPLY**

This much is common ground: *PVA always performed the medical services that it billed Medicare for.* The district court made this point after trial:

> [T]he Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case.

ROA.5168. The district court's judgment rests on the theory that PVA billed Medicare too early—not too much. ROA.5171 ("the services for which PVA billed were eventually performed"). The $27+ million award thus turns solely on an alleged timing violation with respect to when PVA completed certain paperwork.

The partial summary judgment on falsity and scienter presents the easiest path to reversal. This supposed clerical requirement does not exist in the first instance. Even if it did exist, PVA was not aware of it. The district court did not require Relators to prove these elements "beyond peradventure," as would be necessary for a summary judgment in favor of the party with the burden of proof. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020).

### **I. PVA's invoices for vascular ultrasounds were not false.**

The partial summary judgment must be based on evidence. *Id.* The district court, however, grounded its ruling on allegations and appearances: "In sum, the conduct **alleged** by the Relators constitutes a fraudulent course of conduct under the False Claims Act." ROA.4014 (emphasis added); ROA.4010 ("it **appears** that a written report is required") (emphasis added).

Relators follow suit. They do not provide a single record citation to support their argument that "PVA's Bills Were False." Red Br. at 10-14. In their "Statement of the Case," Relators discuss Medicare billing requirements by citing the district court's summary of their own allegations. ROA.5541 ("Relators alleged…."); *see* Red Br. at 2 (citing ROA.5541).

There is no evidence—let alone conclusive evidence—to support Relators' claim. The parties filed cross-motions for summary judgment. ROA.2897-927, 3129-203. The district court should have granted PVA's motion. This Court should reverse and render.

### A. Did PVA have to follow the rules for X-rays and physician office visits when it billed for ultrasounds?

The district court granted summary judgment based on a clerical requirement that—according to Relators' own summary judgment evidence—does not apply to vascular ultrasounds.

More specifically, the court held that PVA's bills for vascular ultrasounds were false because PVA did not wait to bill Medicare until after it did everything that would have been required to bill for an X-ray or an office visit with a physician. ROA.4010 (summary judgment order: "The CPT Manual's Radiology Guidelines, which expressly cover diagnostic ultrasounds..."); ROA.4012 (summary judgment order: relying on "p. 6" of the CPT Manual, which concerns evaluation and management services).

PVA's opening brief explained the flaw in this reasoning. Blue Br. at 22-29. The CPT Manual catalogues numerous types of ultrasounds. Some fall under the category of "Radiology." ROA.17678. Not so for the "Non-Invasive Vascular Diagnostic Studies" at issue here. ROA.17679. These procedures fall under the separate category of "Medicine." *Id.* Even so, the district court concluded that PVA must comply with "Radiology" guidelines and office visit rules before billing for procedures under the separate category of "Medicine." ROA.4010, 4012.

The CPT Manual's introduction forbids this approach. It rejects the practice of mixing and matching requirements in different sections of the Manual:

> Specific guidelines are presented at the beginning of each of the sections. These guidelines define items that are necessary to appropriately interpret and report the procedures and services contained in that section.

ROA.17674. PVA raised this mismatch in the district court and again on appeal. ROA.3650 ¶ 21; Blue Br. at 22-29. Relators had no answer in the district court, and they have no answer now.

The district court also relied on page 6 of the CPT Manual, which is in the portion of the manual regarding office visits with a physician (*i.e.*, "Evaluation and Management"). ROA.4012 (quoting "p. 6"); ROA.17676 (page 6); *see* ROA.16912-13 (evaluation and management refers to office visit with patient). The same rule against mixing and matching applies to this portion of the CPT Manual, which is separate from the "Medicine" section at issue in this case. *See* ROA.17679.

Moreover, these office visit guidelines exonerate PVA. The "actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter **are not** included" when determining how much to bill for an office visit. ROA.17676 (emphasis added). In other words, the office visit bill does not cover ultrasounds; the office visit and the ultrasound "may be reported separately." *Id.*

This section also recognizes that there are two ways to bill for the ultrasound. The technical and professional components can be combined in a global bill—as was PVA's practice. ROA.16947. Alternatively, the professional component can be split from the technical component and billed as a discrete service:

> [1] Physician performance of diagnostic test/studies for which specific CPT codes are available may be reported separately, in addition to the appropriate E/M code.
>
> [2] The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report **may also be reported separately**, using the appropriate CPT code with modifier 26 appended.

ROA.17676 (emphasis and paragraph breaks added).

PVA billed globally. ROA.16947. The district court, however, held that PVA must comply with the "signed written report" requirement for billing separately: "The Court reads the use of the permissive 'may' not as bestowing an option….". ROA.4013. This reading of the permissive language on page 6 is facially improper. *Off. of U.S. Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1594 (2024) ("contrasting "permissive 'may'" with "mandatory 'shall'").

Relators do not address these concerns, which were a major focus of PVA's opening brief. Blue Br. at 22-29. Instead, Relators quibble over the distinction between "legally false" and "factually false" claims and whether PVA was required to honor the CPT Manual's guidelines. Red Br. at 10-13. But PVA does not deny that it had to accurately describe its procedures.

The controversy is over whether PVA did so. On this point, Relators ask this Court to simply take them at their word:

> When PVA billed using global CPT codes, it was representing that it had completed a physician's interpretation, and a written report reflecting the physician's interpretation.

Red Br. at 13. No record citation would support this proposition, and so Relators do not provide one. PVA's invoices were not false.

### B. The new arguments in the Government's amicus brief do not support the district court's ruling.

The Government's amicus brief is the first time that it has taken a position on whether PVA failed to comply with the CPT Manual. ROA.3673 ("takes no position"). The Government declined to intervene in this *qui tam* action and repeatedly reminded the district court that "the government is not a party." ROA.5722; *see* ROA.66 ("declines to intervene"); ROA.5749 ("nonparty"); ROA.6659 ("not a party").

Now on appeal, the Government uses its amicus brief to discuss two portions of the CPT Manual that the district court neither cited nor relied on, including a section that is not in the record. These new arguments do not support the notion that PVA's invoices for vascular ultrasounds were false.

<u>Page 575 of the CPT Manual</u>. The Government purports to quote from page "575" of the 2016 version of the CPT Manual. Amicus Br. at 13. The Government claims that "[s]ince 2016," this page supports the notion that "Radiology" guidelines should be cross-applied to Non-Invasive Vascular Diagnostic Studies. *Id.* This argument fails for at least three reasons.

First, page 575 appears nowhere in the record. Relators did not believe that this page was significant enough to present to the district court, and it should not be considered on appeal. *Smith*, 343 F.2d at 541.

Second, the Government provides only an edited snippet of text without the surrounding context. Neither the district court nor the parties have had the opportunity to examine this passage in context for its true meaning.

Third, the Government represents that this passage from the CPT Manual has only existed "[s]ince 2016." Amicus Br. at 13. But Relators sought and obtained damages and penalties for ultrasound invoices that were submitted in 2014 and 2015 (as well as 2016 through 2019). ROA.6343, 6365. This ostensible guidance from the 2016 version of the CPT Manual could not have retroactively falsified PVA's prior invoices to Medicare.

Page 694 of the CPT Manual (ROA.17813). The district court based its decision on guidelines for X-rays and office visits, but the Government attempts to change the focus to guidelines that do expressly apply to "Noninvasive Vascular Diagnostic Studies." Amicus Br. at 11 (quoting ROA.17813). The district court did not rely on those guidelines and Relators do not raise them on appeal. The Government's new argument should not be considered. *Anderson*, 38 F.4th at 481 ("new issues, generally, cannot be raised in an amicus brief").

Even if Relators had properly briefed these guidelines, they do not contain the "written report" language that was the basis of the district court's order. Instead, they require:

- "interpretation of study results";
- "with copies for patient records of hard copy output";
- "with analysis of all data, including bidirectional vascular flow or imaging when provided."

ROA.17813. The Government apparently takes this to mean that the physician's report ("analysis of all data") must be included on hard copy patient records before Medicare could be billed. Amicus Br. at 11.

This language is best interpreted as requiring a hard copy printout of the ultrasound waveform and the numerical analysis of its contents—which was routinely performed at the time of every ultrasound. *See* ROA.16904 (discussing "printout[s] of certain tests, the actual test itself, in terms of waveforms, pressures,

other data points”). Here is an example of “the waveform report that is generated at the time of the vascular study, provided to the physician, and stored in Medstreaming.” ROA.2956; ROA.3009 (image below).




This numerical analysis of the patient’s ultrasound was “generated at the time of the vascular study.” ROA.2956. If this “hard copy … analysis” guideline was the same as the “written report” requirement that is used elsewhere in the CPT Manual, the drafters would have said so. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (“We refrain from concluding here that the differing language in the two

subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.”). The CPT Manual uses distinct language instead. No evidence exists that PVA failed to generate the requisite hard copy data before billing Medicare—an issue that was not the subject of the district court’s summary judgment order.

### C. Paperwork vs. medical work.

Because the evidence disproves Relators’ paperwork theory of liability, Relators attempt to change the subject.[1] They represent that PVA not only failed to fill out paperwork before billing Medicare, but also that PVA physicians did not exercise medical judgment and interpret the ultrasounds before Medicare was billed:

> Specifically, PVA began billing Medicare for both the professional and technical component before the patient’s status became “Final” in MedStreaming—**before the PVA physician had reviewed and interpreted the study** and signed the report.

Red Br. at 2 (emphasis added). Relators provide no evidence for this assertion; instead, they cite to the district court’s summary of their allegations. ROA.5541 (“Relators alleged….”); *see* Red Br. at 2 (citing ROA.5541).

[1] Relators also represent that PVA physicians “failed to sign off on bills.” Red Br. at 6. Relators, however, sought and obtained summary judgment with respect to allegedly unsigned “reports,” not bills. ROA.4028 (SJ order); ROA.3134 (MSJ). Relators also suggest that PVA failed to perform the technical component. Red Br. at 31. Their claim in the trial court, however, focused only on “the ‘professional’ half.” ROA.3140 (MSJ); *see* ROA.4003 (SJ order: “before the professional component was completed”). These new liability theories were not presented to the district court and cannot support the district court’s judgment.

No evidence exists that PVA failed to review and interpret studies before billing Medicare. This is true for both categories of allegedly false claims. The partial summary-judgment on falsity turns solely on the inapplicable paperwork rules for radiology and office visits. ROA.4028 (partial summary judgment focusing on absence of a timely "separate written report").

**1. "Double-billing" (ultrasound with office visit).**

As a preliminary matter, the "double-billing" label is a misnomer because Relators have never identified more than one bill for any ultrasound. *See* Blue Br. at 12. Relators have no response. This liability theory turns solely on a perceived copy-and-paste requirement from inapplicable portions of the CPT Manual.

PVA's opening brief explained that a PVA physician would always review and interpret the ultrasound before discussing it with the patient during an office visit; indeed, the physician would sign off on these written findings in the patient's office-visit notes before Medicare was billed. Blue Br. at 8-9 (collecting citations). This cut down on costs and prevented the need for a second office visit with another charge to Medicare. Relators have no response to these facts, and the district court did not hold otherwise. *See* ROA.4012 (discussing "PVA's practice of including the physicians' interpretations in the E/M visit notes").

The partial summary judgment on falsity does not turn on a failure to timely review and interpret ultrasound results—or even a failure to timely document the physician's conclusion. Rather, the district court ruled that PVA could not bill

Medicare until the physician's findings were reproduced in a report that was "separate" from the patient's other medical records. ROA.4028 (partial summary judgment: "separate written report"); *see* ROA.4012-13 (further discussion).

As already discussed, the summary-judgment evidence confirms that this supposed clerical requirement does not apply to vascular ultrasounds in the first instance. This copy-and-paste theory of liability fails as a matter of law.

**2. "Testing only" (ultrasound without office visit).**

This category of claims involves patients who did not have an office visit with a physician when they came to PVA for an ultrasound. ROA.17180. As Relators confess, this theory also turns on paperwork: "PVA billed Medicare before the MedStreaming report **was signed**." Red Br. at 3 n.1 (emphasis added).

For these ultrasounds, the physician admittedly did not have an opportunity to record his or her interpretation in any office visit notes. ROA.16949, 17184-86; *see* ROA.2955. Even so, a physician would always review and interpret the ultrasound report. ROA.16949, 17184-86; *see* ROA.2955. Relators do not point to any evidence that PVA's physicians failed to do so in a timely fashion.

The Government contends that "PVA concedes that its physicians never interpreted ultrasounds in that category before submitting those claims." Amicus Br. at 14. But PVA has never conceded this fact. ROA.3653 at ¶ 45 ("controverted"); *see* ROA.3187-88.

The district court did not hold that PVA physicians failed to review and interpret each of these ultrasounds before billing Medicare, and no evidence would support that conclusion. Rather, the partial summary judgment rests solely on a supposed clerical violation. ROA.4028 (partial summary judgment focusing on absence of a timely "separate written report"); *see* ROA.4011-13. As already discussed, that clerical requirement does not apply to vascular ultrasounds. PVA's invoices were not false. This Court should reverse and render.

## II. PVA did not knowingly make false statements that it knew were material.

The district court's rulings regarding PVA's state of mind present a separate path to rendition or (at a minimum) a new trial. According to the Government, "Sufficient Evidence Supports the **Findings** that PVA Acted Knowingly." Amicus Br. at 15 (emphasis added). That argument betrays the problem. No such "findings" were made.

Intent has two components. Relators must prove that PVA "[1] knowingly violated a requirement that [2] the defendant knows is material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016). The district court resolved the first question (knowledge of falsity) at the summary judgment stage. ROA.4024, 4028. The court held the second requirement (knowledge of materiality) does not exist and declined to submit it to the jury. ROA.4646, 6585; *see* ROA.5546-49. Either ruling justifies reversal.

### A. PVA did not know that its invoices were false.

In the same order that granted summary judgment on scienter, the district court also recognized that "it is **not** necessarily the case that PVA knew that its practices were fraudulent." ROA.4023 (emphasis added). Relators failed to prove PVA's state of mind "beyond peradventure." *Lyons*, 964 F.3d at 301-02.

First, Relators flee from their own evidence, which proves that PVA's employees were confident that their bills were proper:

- "Medicare allows us to do that" (ROA.17069);
- "we got guidance that it would be any time after the technical component was completed" (ROA.17194);
- "you are given the ability to choose the technical component date … when you're doing global billing" (ROA.16907).

At a minimum, this evidence creates a fact issue for trial.

Second, Relators ignore the Medicare bulletin regarding "Billing Date of Service on Professional Claims." ROA.20770-71. Providers may "submit the date of service as the date the technical component was performed," even if the professional component took place later. ROA.20771. Relators contend this bulletin is "non-existent" (Red Br. at 27), but they are the ones who filed it as summary-judgment evidence. ROA.20771. This case is not about doctors who leave a surgery half-done. At worst, this case concerns the date when paperwork was completed. This date is so inconsequential that not even Medicare wants to know when it occurred. *Id.* No conclusive evidence exists that PVA knew otherwise.

Third, Relators insist that no "plausible reading" of the CPT Manual "or any Medicare guidance" would justify PVA's practices. Red Br. at 14-15. They represent that "every Medicare and industry publication" supports their views—without citing even one to justify that assertion. *Id.* But as the district court recognized, the industry does not universally require a stand-alone report. ROA.4012 ("permissible in some circumstances"). PVA's practices were not the result of recklessness or conscious indifference. How was PVA to know that—contrary to the CPT Manual's introductory guidelines—it had to refer to the office visit rules (page 6 of the Manual) and the radiology rules (pages 475 and 495) when billing for "Noninvasive Vascular Diagnostic Studies" (page 694)? *See* ROA.17674-79.

Fourth, Relators emphasize an internal PVA email in 2017 regarding "compliance." *See* Red Br. at 15. This email, however, does not state what PVA was attempting to comply with. It is no evidence—much less conclusive evidence—that PVA knew that its bills to **Medicare** were somehow false.

Fifth, this 2017 evidence does not conclusively establish PVA's state of mind in 2014, 2015, or 2016. The key inquiry is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 752 (2023). This flows squarely from the statute's text:

> As noted above, the text encompasses those who "knowingly presen[t] ... a false or fraudulent claim"; the term "knowingly" thus modifies present-tense verbs like "presents." § 3729(a)(1)(A). As such, the focus is not, as respondents would have it, on *post hoc* interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim.

*Id.* at 752. The Government contends that *post hoc* evidence can create an "inference" about the defendant's prior state of mind. Amicus Br. at 20 (quoting *United States v. Greenlaw*, 84 F.4th 325, 245 (5th Cir. 2023)). But the Government never contends that such proof is conclusive. If evidence of a state of mind in one year is conclusive evidence of a state of mind four years prior, then *Schutte* is a dead letter.

Sixth, the district court's order quotes testimony by a PVA employee who testified that—at least prior to 2016—PVA believed its ultrasounds were proper: "we were not in the understanding that we had to have a report completed in MedStreaming to bill for it." ROA.4021; *see* ROA.16990 (deposition transcript). Even though this case concerns claims from both before and after 2016, the district court granted a blanket summary judgment that they were all knowingly false. ROA.4028 (partial summary judgment); *see* ROA.3137 (Relators' motion, which alleged violations "[f]rom at least January 1, 2014 to the present); ROA.6342-43, 6365 (Relators' trial evidence regarding "false" claims from 2014 through 2019).

Relators failed to prove PVA's state of mind "beyond peradventure." Their key evidence from 2017 does not refer to Medicare. As a result, Relators failed to raise a fact issue. This Court should reverse and render.

### B. PVA did not know that any misstatements were material.

Even if PVA's invoices were technically false and PVA knew this to be so, that would not be enough to prove fraud. The question of "whether a representation is fraudulently made" is separate and distinct from the "maker's purpose to induce the recipient to act in reliance." *In re Mercer*, 246 F.3d 391, 410 (5th Cir. 2001) (en banc) (discussing Restatement (Second) of Torts §§ 526-36 (1976)).

Mere knowledge of falsity is not enough. There must also be a "purpose to induce … reliance." *Id.* (discussing the Restatement). Under the FCA, the relator must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government." *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (collecting citations). In other words, there must be a misrepresentation that the speaker "knows is material." *Escobar*, 579 U.S. at 181.

As this Court held in *Farmer*, even an open and obvious "ministerial error" does not necessarily create a fact issue regarding fraudulent intent:

> With this in mind, a jury would put little weight on the fact that some documents were notarized **without the full slate of required signatures**. Though abuses of the notarization process are not trivial, no reasonable jury would conclude from such evidence that defendants knowingly or recklessly were perpetuating a fraud on the United States.

*United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 341 (5th Cir. 2008) (emphasis added). The same reasoning applies to the "signatures" that were allegedly missing here.

The Government contends that the evidence would support a finding that PVA knew this paperwork requirement was material. Amicus Br. at 18. That argument, however, ignores the procedural context. No such finding was made. PVA asked the district court to submit this element to the jury, but the district court declined to do so. ROA.4646, 6585. Relators waived and abandoned any opportunity to obtain such a finding. Fed. R. Civ. P. 49(a)(3). Relators do not address this point. They apparently concede defeat.

The Government's amicus brief could also be read to argue that this knowledge-of-materiality requirement does not exist in the first place. *See* Amicus Br. at 15-18. True, *Escobar* dealt largely with the separate element of materiality—how do you prove that a requirement would be "material to the Government's payment decision"? 579 U.S. at 192. That question involves an objective reasonable person standard. *Id.* at 193.

But as this Court has repeatedly held, fraud under the FCA requires far more than "mere negligence." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009) (quoting *Farmer*, 523 F.3d at 338); *see United States ex rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F.4th 727, 741 (5th Cir. 2023) (same). There must be a state of mind with respect to whether the false statement could induce reliance—*i.e.*, knowledge of materiality. *Escobar*, 579 U.S. at 181 ("knows is material"). Relators cannot satisfy this requirement, and they forfeited any opportunity to obtain a finding on it. This Court should reverse and render.

## III. No evidence supports the jury finding on materiality.

Relators defend the jury finding on materiality. But the only evidence regarding Medicare's view of Relators' timing/paperwork theory points in PVA's favor. Medicare has instructed that when global bills are submitted, the provider may list the technical component (*i.e.*, the date of the physical ultrasound) as the "date of service," even if the professional component occurred later. ROA.6144.

Relators represent that this guidance is "non-existent" (Red Br. at 27), but their own expert testified to it in front of the jury:

> Q. They can bill the entire global component based on the technical component date of service, that's what the rule is?
>
> A. That is correct.

ROA.6144. The date on which the $22 professional component was performed is so inconsequential that Medicare does not want to know. *See* ROA.6388 ("$22"). Medicare is content to know the date on which the physical ultrasound (worth "between $100 and $200") took place. *See* ROA.6388 (between "$100 and $200").

The Government contends that such a bill is false if it is submitted before the professional component is complete. Amicus Br. at 14-15. That misses the point for purposes of materiality. Medicare has given specific guidance that it does not care about knowing the date of the professional component. How can it be material?

Relators also go on at length about generalized evidence that Medicare is not in the habit of paying for work that is materially incomplete. Red Br. at 17-20 (quoting experts); *id.* at 20-21 (discussing Medicare documents and the certification

on Medicare invoices); *id.* at 22-23, 29 (discussing PVA documents and witnesses). This generic evidence, however, begs the question. Did the lack of a physician signature on a final ultrasound report render PVA's services materially incomplete?

The mere fact that *something* is left undone does not itself give rise to an inference of materiality. Otherwise, even a missing paperclip or staple would be actionable. The Supreme Court emphatically rejected that approach in *Escobar*:

> To the Government, liability would attach if the defendant's use of foreign staplers would entitle the Government not to pay the claim in whole or part—irrespective of whether the Government routinely pays claims despite knowing that foreign staplers were used.

579 U.S. at 195-96. "The False Claims Act does not adopt such an extraordinarily expansive view of liability." *Id.* at 196.

Relators emphasize the internal PVA email from 2017 regarding PVA's temporary change in billing practices. Red Br. at 24-25. That email does not reference Medicare. Relators also suggest that one particular ultrasound that PVA performed back in 2015 might have fallen through the cracks for long enough to create a material violation. *Id.* at 25. This one ultrasound "is an outlier" and does not support a materiality finding for the thousands of other invoices that are at issue in this case. ROA.6454-55. Nor is there evidence that a physician in fact failed to review this specific ultrasound in a timely fashion. ROA.6458.

In sum, no evidence exists that "a reasonable man would attach importance" to the date of a signed ultrasound report when deciding whether to reimburse PVA's claims. *See Escobar*, 579 U.S. at 193. Nor does evidence exist that PVA "knew or had reason to know" that Medicare "attaches importance" to the date of such a report. *See id.* Medicare's guidance proves the opposite.

## IV. The penalty and damages awards are erroneous.

Even if the Court does not reverse on liability, the monetary awards in the judgment should be reversed on independent grounds.

### A. Damages.

Relators do not defend the substance of the $4+ million trebled damages award either; ironically, they focus solely on procedure. Red Br. at 31-34. The Government does not defend this award either. Amicus Br. at 24 ("no position"). This award is procedurally and substantively improper.

<u>Substance</u>. As PVA's opening brief explained, the district court erred by assessing trebled interest for the entire period between when PVA received payment on allegedly false claims and the date of trial. Blue Br. at 52. To the extent that any award of trebled interest was proper, it should have been limited to the short period between when (a) PVA received payment for ultrasounds and (b) PVA finalized the report that was at issue for that ultrasound. *Id.* Relators have no response.

Procedure. The damages award rests on post-trial evidence the jury never saw. Relators went to trial on the theory that they could claw back the full payment that PVA received for supposedly premature bills. ROA.6338-39, 6615, 6618. The district court granted JMOL on this point and held that Relators failed to prove a viable damages model at trial: "the Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case." ROA.5168. No party challenges that ruling on appeal. *See* Amicus Br. at 21.

Although PVA did everything that it was required to do to preserve this error, the district court criticized PVA for not proving up Relators' damages for them:

> However, given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing, the Court has insufficient information from which to calculate damages at this time.

ROA.5171. The court therefore allowed Relators a second shot to prove up damages (this time based on the time-value of money) in post-trial briefing. *See id.* The court assessed over $4 million in trebled damages based on this post-trial evidence. ROA.5558-62 (order regarding damages); ROA.5564 (final judgment).

This ruling was unprecedented and improper. PVA filed a Rule 50(a) motion to put Relators on notice of the deficiency in their damages theory at the close of evidence. ROA.4987-88. This motion "alert[ed] the opposing party" to the "insufficiency **before the case [was] submitted to the factfinder**, thereby affording [the non-moving party] an opportunity to cure any defects in proof." *Kelso v. Butler*, 899 F.3d 420, 424 (5th Cir. 2018) (emphasis added).

If Relators wished to cure their gap in proof, they should have done so in front of the jury. A litigant's "failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 897 (1990). There was no basis to reopen evidence and permit Relators to prove damages to the bench. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024) (holding jury trial is required when penalties for fraud are imposed). At most, the district court could grant Relators a new trial. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

Relators pay lip service to "remittitur," but they ignore that a remittitur must be based on evidence that was presented to the jury. *Caldarera v. E. Airlines*, 705 F.2d 778, 784 (5th Cir. 1983) ("verdict must be reduced to the maximum amount the jury could properly have awarded"). Relators also cite an out-of-circuit district court decision to support this novel procedure, but that case makes no mention of whether the defendant filed a Rule 50(a) motion to put the plaintiff on notice of the evidentiary deficiency at trial—as PVA did here. *In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14 (D.D.C. 2017).

Ironically, Relators claim that "there are no fact issues left for a jury to resolve." Red Br. at 33 (emphasis removed). That is precisely why the district court properly granted PVA's motion for judgment as a matter of law. Regardless, PVA submitted an affidavit that vigorously contested the post-trial damages opinion by Relators' expert. ROA.32102-22 (Katherine Britt's affidavit).

Relators repeat the district court's assertion that its "remittitur" was "rooted in the same data that was presented at trial." Red Br. at 34; ROA.5561. That statement is incorrect. Without elaboration, Dr. Nye's post-trial affidavit generically asserted that his new damages model relied on the "PVA Datasets that are the basis of my analysis." ROA.5199 (Dr. Nye's post-trial affidavit). Dr. Nye did not attest that these same datasets were introduced at trial.

In his pretrial expert reports, Dr. Nye relied on three distinct datasets. ROA.21043-44. Only two datasets were introduced at trial. PX-88 (ROA.7126-10431); PX-116 (ROA.10432-579). Of these two datasets, one was severely truncated and contained far fewer entries than needed to calculate damages for the 7,380 claims that are at issue. ROA.5007, 5009 (jury findings regarding number of "false" claims); *see* PX-116 (ROA.10432-579) (12 spreadsheets with 101 rows of entries each and 1 spreadsheet with 7 rows of entries).

The damages award is unsupported and should be reversed. At most, the district court could grant a new trial; it was not authorized to decide damages itself.

**B. Penalties.**

Relators and the Government dodge the numbers. A fine violates the Eighth Amendment when it is "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1988).

It is undisputed that PVA performed the $22 professional component "in every case." ROA.5168 ("in every case"). Even so, the district court assessed a $2,957 penalty for every time that PVA submitted an ultrasound invoice to Medicare before a physician signed off on a final ultrasound report:

| Value of professional component | Penalty imposed per "false claim" |
|---|---|
| **$22** [2] | **$2,957** [3] |

If this penalty is not "grossly disproportional," then what is?

Consider the Eleventh Circuit's recent decision in *United States v. Schwarzbaum*, 114 F.4th 1319 (11th Cir. 2024). A $100,000 penalty for failing to disclose a $16,000 bank account was held to be unconstitutional:

> A fine that is over eight times the amount in the account on the day of the assessment, and over six times the greatest amount ever held in the account [] constitutes an excessive penalty.

*Id.* at 1338. The same logic applies here. The penalty is over 100 times the value of the supposedly incomplete professional component—a component that PVA undisputedly performed for every invoice submitted.

The Government would turn the "strong presumption" of constitutionality into a rubber stamp. Intangible factors such as the "public's confidence in the government" do not automatically justify all penalties. *Contra* Amicus Br. at 28.

---

[2] ROA.6388, 6414.

[3] The district court awarded $21,825,592 in penalties for 7,380 claims. ROA.5007-09, 5171-78.

King John was worried about public confidence too. *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) ("The Excessive Fines Clause traces its venerable lineage back to at least 1215, when Magna Carta guaranteed that '[a] Free-man shall not be amerced for a small fault, but after the manner of the fault….'").

The Supreme Court has made clear that the presumption of constitutionality is rebutted in cases of gross disproportionality. *Bajakajian*, 524 U.S. at 334. That is the case here.

The Government emphasizes cases where penalties were sustained even when the Government or the relator sought a small damages award or no damages at all. Amicus Br. at 28. Those cases, however, involved a substantive attempt to swindle the Government—not a mere timing or clerical error. The "gravity" of the defendant's offenses weighed in favor of a penalty. *See, e.g., Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1295-96 (11th Cir. 2021) (defendant repeatedly "altered the information on the claim forms" and "resubmitted" the false claims until defendant found a pattern that would persuade Medicare to pay); *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 395, 398, 409 (4th Cir. 2013) ("bid rigging scheme" for transportation of military personal property).[4] The supposed clerical violation in this case is far different.

---

[4] Several cases cited by the Government and Relators did not involve the Eighth Amendment. *E.g., United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426 (6th Cir. 2001); *United States v. Hughes*, 585 F.2d 284 (7th Cir. 1978).

PVA is not within the class of people that the False Claims Act was intended to reach. *See Escobar*, 579 U.S. at 181-82 (explaining that the FCA was prompted by fraud in the Civil War, when the United States was "billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war"). Again, PVA performed the services that Medicare paid for "in every case." ROA.5168. The penalty award is unconstitutional. It should be deleted or else reformed.

## V. The *qui tam* device is unconstitutional.

The briefing in this appeal is a case-study in why "the FCA does not provide the Executive with enough control over the relator to be able to 'take care that the laws be faithfully executed.'" *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 762 (5th Cir. 2001) (Smith, J., dissenting from en banc decision).

Although Relators are pursuing their claims on behalf of the United States, the Government criticizes them because (according to the Government) they "invited … error" in the district court. Amicus Br. at 26 n.3. On another point, the Government "takes no position" on Relators' argument. Amicus Br. at 24. This abdication of responsibility by the Executive is the polar opposite of "tak[ing] care that the laws be faithfully executed." *See* U.S. CONST. art. II, § 2, cl. 2.

Here, the Office of Inspector General subpoenaed PVA's medical records and held a meeting with PVA regarding its billing practices. ROA.2957, 3023-52. After its investigation, the Government declined to intervene. ROA.66. Accordingly, the case never should have been allowed to get off the ground. *United States ex rel. Zafirov v. Fla. Med. Assocs.*, No. 8:19-cv-01236-KKM-SPF, 2024 WL 4349242, at *19 (M.D. Fla. Sept. 30, 2024) (holding the *qui tam* device to be unconstitutional). PVA respectfully preserves its argument that the contrary decision in *Riley* should be reconsidered.

## CONCLUSION

This Court should reverse and render judgment that Relators take nothing. Alternatively, this Court should reverse and remand for a new trial or reconsideration of the statutory penalty award.

Respectfully submitted,

**BECK REDDEN LLP**

By: */s/ Joshua S. Smith*
Joshua S. Smith
jsmith@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**Attorney for Appellant**

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2024 a copy of the foregoing Reply Brief of Appellant was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record:

Misty A. Hataway-Coné
Misty@conepllc.com
CONÉ PLLC
2019 Washington Avenue, Ste. 201
Houston, Texas 77007

*Attorney for Appellees*

*/s/ Joshua S. Smith*
Joshua S. Smith
Attorney of Record for Appellant

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 6,498 words as counted by Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font.

Dated: October 22, 2024

*/s/ Joshua S. Smith*
Joshua S. Smith
**Attorney of Record for Appellant**