# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
March 28, 2025
Lyle W. Cayce
Clerk

---

No. 24-50176

---

United States of America, *ex rel*, Tiffany Montcrief, *Relator*; Roberta A. Martinez, *Relator*; Alicia Burnett, *Relator*,

*Plaintiffs—Appellees*,

*versus*

Peripheral Vascular Associates, P.A.,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:17-CV-317

---

Before Haynes, Duncan, and Wilson, *Circuit Judges*.

Haynes, *Circuit Judge*:

This is a False Claims Act case brought by Tiffany Montcrief and others (together "Relators") against Peripheral Vascular Associates, P.A. ("PVA"), a vascular surgery practice based in San Antonio and South Texas. Relators allege that PVA billed Medicare for vascular ultrasound services that PVA had not yet completed.

As relevant here, there are two categories of allegedly false claims: the "Testing Only" claims and the "Double Billing" claims. Before trial, the

district court granted partial summary judgment to Relators, concluding that PVA submitted Testing Only and Double Billing claims to Medicare that were knowingly false. A jury then determined that these false claims were material and that thousands of such claims caused the federal government (the "Government") to pay out money or forfeit moneys due. The district court entered judgment totaling approximately $28.7 million against PVA.

On appeal, PVA challenges the district court's grant of partial summary judgment to Relators. PVA also challenges certain rulings of the district court during and after trial with respect to materiality and damages.

We agree with some, but not all, of PVA's arguments. For the reasons below, we AFFIRM the district court's grant of partial summary judgment to Relators on the Testing Only claims, but we remand those claims for a new trial on damages. We REVERSE the partial summary judgment ruling with respect to the Double Billing claims. We thus VACATE the final judgment and REMAND for a new trial consistent with this opinion.

## I. Background

### A. Factual Background

#### *1. PVA and vascular ultrasounds*

PVA's vascular surgery practice, comprising twenty-two physicians and 220 employees across seventeen locations, handles about 80,000 patient encounters per year. Approximately 68 percent of PVA's revenue comes from Medicare and Medicare Advantage.

PVA performs "noninvasive vascular diagnostic studies," which are also known as "vascular ultrasounds" or "vascular studies." PVA conducts between approximately 40,000 and 50,000 such procedures per year.

A vascular ultrasound has two components: a technical component and a professional component. The technical component consists of a technician actually performing the ultrasound. The professional component

consists of a physician reading and interpreting the results of the ultrasound. The two components can be billed separately or combined into a single charge and billed "globally." PVA's practice was to bill the components globally.

### *2. Billing Medicare*

To bill Medicare, PVA used alphanumeric codes (the "CPT-4 codes") set forth in a manual, published by the American Medical Association, entitled *Current Procedural Terminology, Fourth Edition* (the "CPT-4 Manual" or "Manual"). The Department of Health and Human Services, which oversees Medicare, has adopted the codes in the CPT-4 Manual as one of its "standard medical data code sets." 45 C.F.R. § 162.1002 (a)(5), (b)(1), (c)(1). PVA reported these codes to Medicare on a claim form called the CMS-1500 form.

Each type of vascular ultrasound is associated with a certain CPT-4 code. To bill only for the technical component of the ultrasound, PVA could have appended a "TC" modifier to the end of the applicable code. To bill only for the professional component, PVA could have appended a "26" modifier. On a "global" bill for both components, no modifier is appended.

PVA could also, using certain CPT-4 codes, bill for "Evaluation and Management," or E/M, visits between physicians and patients. When a patient underwent a vascular ultrasound and also received an E/M visit, the treating physician would typically dictate his or her interpretation of the ultrasound into the notes in the patient's official medical record, which was contained in a program called "Allscripts." The medical record contained, in addition to the interpretation of the ultrasound, notes on the patient's history and physical examination—essentially, everything PVA did for that patient. The doctor would electronically sign this record before PVA billed for the relevant service.

A standalone written report interpreting the ultrasound would also be separately created in a program called "MedStreaming" and signed by a doctor. PVA adopted the MedStreaming program in 2014. A MedStreaming report would be created for every vascular study, regardless of whether the patient received an E/M visit or whether an interpretive dictation was entered into a patient's full record in Allscripts. As PVA concedes, PVA doctors sometimes wrote and signed the interpretive MedStreaming reports *after* claims for vascular ultrasounds were submitted to Medicare.

By signing a CMS-1500 form, a physician certifies, among other things, that the information on the form is true, accurate, and complete and that the claim complies with applicable law and instructions. The physician also certifies that "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare."

### *3. Testing Only and Double Billing claims*

As mentioned above, two theories of fraud are relevant to this appeal. The first theory focuses on what the parties call "Testing Only" claims. These claims were for vascular ultrasounds performed on patients who did not see a doctor, i.e., they did not receive an E/M visit, and no data was entered into Allscripts for these patients. Again, as PVA concedes, at least some of these claims were submitted to Medicare before a doctor wrote and signed the relevant MedStreaming report—the only interpretive report, whether written separately or dictated into a larger medical record, created for patients whose claims fell into this category.

The second theory focuses on what the parties call "Double Billing" claims. The parties agree that these claims were for services provided to patients who received E/M visits and underwent vascular ultrasounds and

for whom standalone MedStreaming reports were at least sometimes not written and finalized until after PVA billed Medicare. The "Double Billing" label appears to stem from the allegation that for each of these E/M visits, PVA billed Medicare for E/M services and also separately submitted global bills for ultrasound services.[1]

#### *4. Relevant CPT-4 provisions*

The CPT-4 Manual has been described as containing the "Rosetta Stone for the billing codes" used by Medicare. *Ohio Hosp. Ass'n v. Shalala*, 201 F.3d 418, 420 (6th Cir. 1999). It is updated periodically, including in or around 2016. The Manual's Introduction explains that "[s]pecific guidelines are presented at the beginning of each of the [Manual's] sections," such as the Medicine section, the Radiology section, or the E/M section. The guidelines "define items that are necessary to appropriately interpret and report the procedures and services *contained in that section*" and "provide explanations regarding terms that *apply only to a particular section*" (emphases added).

Vascular ultrasounds are addressed in the "Noninvasive Vascular Diagnostic Studies" subsection of the Medicine section. The introduction to that subsection explains that vascular studies "include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided."

[1] With respect to a third category of claims, the "Wrong Provider" claims, the district court granted judgment as a matter of law to PVA before submitting the case to the jury. Relators do not challenge this ruling, so we do not further address the Wrong Provider claims.

Since about 2016, the guidelines for the Medicine section have incorporated by cross-reference the guidelines for the Radiology section. *See* AM. MED. ASS'N, CURRENT PROCEDURAL TERMINOLOGY: CPT 2016 STANDARD EDITION 390 (4th ed. 2015) [hereinafter CPT 2016]. The latter guidelines contain somewhat ambiguous language about whether radiologic procedures require standalone written reports, *see* CPT 2016 at 285–86, and this language continued to change as the Manual was further updated between about 2016 and 2020. Moreover, the E/M guidelines appear to allow physicians to bill separately, using different CPT-4 codes, for E/M services and for vascular ultrasounds ordered during patient encounters, and these guidelines are also somewhat esoteric with respect to whether physicians' interpretations of the ultrasounds must appear in standalone written reports.

***5. PVA's temporary policy change***

Around early 2017, PVA changed its approach to billing for vascular ultrasounds. The practice transitioned to billing Medicare *after* the interpretive reports were created in MedStreaming. The change was expected to decrease the speed at which PVA could bill for its ultrasound services and slow down PVA's incoming cash flow.

The change was apparently recommended in part to avoid audit requests for incomplete medical records and because, at least for a time, PVA thought studies needed to be interpreted in written reports before they were billed. But the policy shift caused a significant change to workflow in the vascular lab. The district court found that PVA abandoned the policy change when it realized that about a third of its revenue would not come in as quickly. On appeal, PVA characterizes its policy change as a "temporar[y] experiment[]."

### B. Procedural History

The False Claims Act, codified at 31 U.S.C. §§ 3729–33, forbids knowingly submitting a false or fraudulent claim for payment to the Government. 31 U.S.C. § 3729(a); *see United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 742 (2023); *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). The Act "permits private parties," known as relators, "to bring lawsuits in the name of the United States—called *qui tam* lawsuits—against those who they believe have defrauded the Federal Government." *Schutte*, 598 U.S. at 743; *see* 31 U.S.C. § 3730(b); *Polansky*, 599 U.S. at 423. "When a relator files a complaint, the Government gets an initial opportunity to intervene in the case. If the Government does so, it takes the lead role. If not, that responsibility falls to the relator, the only person then pressing the suit." *Polansky*, 599 U.S. at 423.

Tiffany Montcrief[2] is a vascular technologist and sonographer who worked at PVA in 2016. In 2017, Montcrief and two other Relators filed this False Claims Act suit against PVA. The only claims that remain active are asserted under 31 U.S.C. § 3729(a). The Government declined to intervene in the case but, since then, has filed an amicus brief in this appeal.

A claim under the False Claims Act "consists of four elements: (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (per curiam) (internal quotation marks and

---

[2] Montcrief's name appears in the record alternatively as "Montcrief" and as "Montcrieff." We refer to Montcrief here as Montcrief's appellate counsel does.

citation omitted). After the parties filed cross motions for summary judgment, the district court granted summary judgment to Relators on the issues of falsity and knowledge of falsity and concluded that the issues of materiality and damages would be tried to a jury.

A five-day trial was held in February 2022. Relators put on expert testimony regarding ultrasound bills that PVA submitted to Medicare between 2014 and 2019.

PVA asked the district court to require the jury to decide whether PVA had submitted each claim to Medicare with knowledge that the falsity of the claim was material to the Government. The district court rejected that request.

The jury found that the claims PVA submitted to Medicare were material and that PVA submitted 2,755 Testing Only claims and 4,625 Double Billing claims that caused the Government to pay out money or forfeit moneys due. The jury found that the Government suffered $408,765 in damages because of the Testing Only Claims and $2,319,434 because of the Double Billing claims.

Relators argued to the district court that PVA was subject to between approximately $64 million and $128 million in statutory penalties. *See* 31 U.S.C. § 3729(a)(1). But Relators added that they would accept a judgment imposing approximately $21.8 million in statutory penalties to obviate any problem under the Excessive Fines Clause of the Eighth Amendment. The district court concluded that a judgment imposing about $21.8 million in penalties would not violate the Eighth Amendment. The district court also awarded Relators more than $2.4 million in attorneys' fees, costs, and expenses.

Relators also requested treble damages. *See* 31 U.S.C. § 3729(a)(1). PVA moved for judgment as a matter of law on damages, arguing that the

Government suffered no damages because "it [was] not an issue about whether PVA would be paid for [its] services, but simply when." In resolving this dispute, the district court noted that it could not "simply disregard the fact that the services for which PVA submitted claims were actually performed in every case." But it also observed that "payment today is not the same as payment tomorrow" and that "[t]he common measure of the difference between payment now and payment later is interest."

The district court therefore "set aside" the jury's verdict on damages in favor of "an interest-based model of damages." The district court concluded, however, that "given PVA's failure to rebut [expert] testimony at trial or to present a workable interest model in its post-trial briefing," there was "insufficient information from which to calculate damages." The district court therefore ordered the parties to propose models for evaluating damages and allowed them to submit evidence. Accordingly, Relators submitted an expert declaration that calculated interest-based damages in the amount of $1,455,379, before trebling. The district court accepted that calculation and entered a remittitur, resulting in a treble damages award of $4,366,137. Final judgment totaling approximately $28.7 million was entered February 14, 2024.

PVA timely appealed. In its amicus brief in support of Relators, the Government noted that it "is a real party in interest in all actions under the False Claims Act" and that it "has a substantial interest in ensuring the integrity of Medicare."

## II. Jurisdiction

The district court had federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291, as PVA appealed from the district court's final judgment.

## III. Discussion

PVA raises several issues for our review. First, PVA argues that the district court erred in granting partial summary judgment to Relators on the issues of falsity and knowledge of falsity. Next, PVA contends that the jury's finding on materiality was not supported by legally sufficient evidence. Further, PVA asserts that the jury should have been required to find that PVA knew its allegedly false claims were material to the Government. Finally, PVA takes issue with the district court's reliance in calculating damages on the post-trial expert declaration submitted by Relators. We address these issues in turn.[3]

### A. Summary Judgment Stage

The district court granted partial summary judgment to Relators on the issues of falsity and knowledge of falsity. *See Schutte*, 598 U.S. at 747 (stating that these are "two essential elements" of a False Claims Act violation). We review a grant of summary judgment de novo. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). In doing so, we "view the evidence in the light most favorable to the nonmovant," which in this case is PVA. *Id.* Further, we "draw all reasonable inferences in th[e] [nonmovant]'s favor." *Kirchner v. Deutsche Bank Nat'l Tr. Co.*, 896 F.3d 337, 339 (5th Cir. 2018) (per curiam).

---

[3] We do not reach two additional arguments made by PVA. First, because we remand for a new trial in full on the Double Billing claims and on damages on the Testing Only claims, we need not evaluate whether the district court's imposition of penalties and trebled damages violated the Excessive Fines Clause. Second, we decline to consider whether the qui tam provisions of the False Claims Act violate Article II of the Constitution, as PVA acknowledges that this issue is foreclosed at this juncture by our decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 751 (5th Cir. 2001) (en banc).

"The court shall grant summary judgment if the movant[s] show[] that there is no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law.'" FED. R. CIV. P. 56(a). Additionally, where the movants—here, Relators—bore the burden of proof at trial, the movants had to "establish beyond peradventure" the relevant elements of the claim to receive summary judgment on those elements. *Guzman*, 18 F.4th at 160 (quotation omitted).

***1. Falsity***

The False Claims Act penalizes claims that are factually false *or* legally false. *See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016) (per curiam). PVA argues that its Testing Only and Double Billing claims were not false. It contends that the district court erred in interpreting the CPT-4 Manual and in concluding at the summary judgment stage that the Manual required PVA to create separate, written reports for vascular ultrasounds in MedStreaming before billing Medicare.

We agree with PVA that partial summary judgment was inappropriate with respect to the Double Billing claims, but we find no error in the district court's treatment at the summary judgment stage of the Testing Only claims. We address each set of claims in turn.

a. Testing Only claims

As explained above, the Testing Only claims involved patients who did not see a doctor and for whom no report was created in Allscripts. The only interpretive reports created for these patients were the MedStreaming reports, which—at least as relevant here—were not finalized until *after* PVA billed Medicare.

From the fact that the MedStreaming reports were not finalized before PVA billed Medicare, the only reasonable inference is that PVA physicians failed to complete the professional components of the

corresponding vascular ultrasounds before billing Medicare using "global" CPT-4 codes, which covered both the technical and professional components. This is thus a "paradigmatic case" involving "a request for reimbursement for goods or services" that had not yet been furnished. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010). In other words, these claims were "factually false." *Ruscher*, 663 F. App'x at 373. Indeed, PVA physicians certified to Medicare on each relevant CMS-1500 claim form that "the services . . . were medically necessary and *personally furnished by me or were furnished incident to my professional service by my employee*" (emphasis added).

PVA's arguments to the contrary are not persuasive. First, PVA argues that the CPT-4 Manual does not require a physician billing for the professional component of a vascular ultrasound to create a written report memorializing his or her interpretation of the ultrasound. The key provision explains that "[v]ascular studies include patient care required to perform the studies, supervision of the studies and *interpretation of study results with copies for patient records of hard copy output with analysis of all data*, including bidirectional vascular flow or imaging when provided" (emphasis added). Based on this language, we conclude that the professional component of a vascular ultrasound requires some "analysis of all data" to be memorialized in a patient's records, e.g., via a written report by the evaluating professional.

Second, PVA suggests that the fact that doctors *signed* the relevant MedStreaming reports after billing Medicare does not mean the doctors did not perform the associated interpretive work before billing Medicare, but this argument is insufficient to avoid summary judgment. As an initial matter, it would be unreasonable on these facts to infer that PVA doctors only failed to sign their reports before billing Medicare but *did* perform all the other work required by the professional component. *See Kirchner*, 896 F.3d at 339 (stating that the court construes only *reasonable* inferences in the

nonmovant's favor). The evidence—including email, deposition testimony, and committee meeting notes—tends to show that, except during the time of the 2017 policy change, PVA was billing before studies were read and interpreted by physicians. Further, PVA points to no evidence suggesting otherwise with respect to any of the thousands of Testing Only claims submitted to the jury. *See Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (stating that once movants meet their summary judgment burden, "the burden shifts to the nonmovant to establish an issue of fact that warrants trial"). We therefore conclude that it was appropriate for the district court to grant summary judgment to Relators on the falsity element with respect to the Testing Only claims.

b. Double Billing claims

The Double Billing claims were for services provided to patients who received E/M visits and underwent vascular ultrasounds and for whom standalone MedStreaming reports were (as relevant here) not written and finalized until after PVA billed Medicare. It appears undisputed that Allscripts reports were created and signed before submitting these claims to Medicare and that the falsity of the claims thus turns on whether the CPT-4 Manual *also* required PVA to generate a separate MedStreaming report before billing. Like the parties, *see United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), we treat the meaning of the guidance in the CPT-4 Manual as ultimately presenting an issue of fact, although these claims appear akin to claims that are "legally false," *Ruscher*, 663 F. App'x at 373.

We agree with PVA's argument that the district court improperly mixed and matched provisions of the Manual that appear in different sections. For example, the district court relied on a statement in the Radiology section of the 2020 version of the Manual that "[u]se of ultrasound, without . . . final, written report, is not separately reportable."

But vascular ultrasounds are categorized under the Medicine section, not the Radiology section. Further, even though this case involves claims going back to 2014, the district court relied on the Manual's Radiology guidelines, which have only been incorporated by the Medicine guidelines since about 2016 and were further amended at an uncertain time between approximately 2016 and 2020.[4]

In any event, the most important question with respect to the Double Billing claims is whether the Manual requires a report *separate* from the report in Allscripts, i.e., whether it requires a separate MedStreaming report. Recall that each Double Billing patient received an E/M visit. The district court, in concluding that separate MedStreaming reports were required, accordingly relied on language that appears in the E/M section of the Manual. This language provides that a "physician's interpretation of the results of diagnostic tests/studies (ie, professional component) *with preparation of a separate distinctly identifiable signed written report* may also be reported separately, using the appropriate CPT code with modifier 26 appended" (emphasis added). The italicized text just quoted is the language emphasized by the district court and used to support its conclusion that a MedStreaming report is required in addition to an Allscripts report.

We cannot say "beyond peradventure" that this language is clear enough to support a grant of summary judgment to Relators. *Guzman*, 18 F.4th at 160 (quotation omitted). We conclude on this record that the CPT-4 Manual is ambiguous with respect to whether the section of an Allscripts report dedicated to interpreting a patient's ultrasound can serve as a "separate distinctly identifiable signed written report," even if it is attached

[4] As PVA points out, the language in the Medicine guidelines incorporating the Radiology guidelines does not appear in the record. Even if we were to take judicial notice of the language, that would not save the claims from before it first appeared in about 2016.

to the rest of the relevant patient's medical record. Indeed, PVA submitted to the district court an expert's opinion that the CPT-4 guidance "does not state . . . that in the context of an [E/M] service, there should be a stand-alone report." The expert continued: "It simply states that . . . the interpretation must be documented in written report to be supported." We therefore conclude that it was error to grant summary judgment to Relators on the falsity element with respect to the Double Billing claims.[5]

### 2. *Knowledge of falsity*

PVA also challenges the district court's summary judgment ruling regarding "knowledge" of falsity. With respect to the Testing Only claims, the district court did not err. The evidence makes clear that PVA was at least "conscious of a substantial and unjustifiable risk" that it could not submit global ultrasound claims to Medicare before doctors completed the professional components of the relevant ultrasounds and that PVA "submit[ted] the claims anyway." *Schutte*, 598 U.S. at 751. An email predating PVA's adoption in 2014 of MedStreaming shows awareness that "studies . . . cannot be billed until" they are "actually interpreted." Further, meeting notes indicate that PVA's shift to billing after completion of MedStreaming reports was "[r]ecommended" to "[e]nsure no audit requests for incomplete medical records." Regardless of whether PVA actually knew its Testing Only claims were false, its concern about "audit requests" and its earlier awareness that interpretation of vascular studies

---

[5] Since it filed a cross motion for summary judgment, PVA argues that we should reverse and render judgment for PVA. We decline PVA's invitation. As discussed above, we conclude that there are ambiguities in the record and in the CPT-4 Manual. These ambiguities preclude a grant of summary judgment on the falsity of the Double Billing claims for either party. Although the CPT-4 provisions do not clearly favor Relators, they also do not clearly exonerate PVA. Accordingly, this issue is most appropriately decided by a jury.

must precede billing show that PVA either "intentionally avoid[ed] taking steps" to learn whether the Testing Only claims were false or took "a substantial and unjustifiable risk" that they may have been false. *Schutte*, 598 U.S. at 751; *see also id.* at 753 ("Although the terms, in isolation, may have been somewhat ambiguous, that ambiguity does not preclude respondents from having learned their correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning.").

Relators' evidence of PVA's knowledge is not as strong, however, with respect to the Double Billing claims. For example, the pre-MedStreaming email showing awareness that "studies . . . cannot be billed until" they are "actually *interpreted*" (emphasis added) speaks only to the clear CPT-4 requirement that ultrasounds be interpreted. The email sheds no light on whether PVA was *also* aware that ultrasound interpretations reported in Allscripts (as opposed to MedStreaming) might not be sufficiently "separate[ly] [and] distinctly identifiable" such that they may not serve as predicates for global ultrasound bills. As discussed above, the record here does not even make clear that the "separate[ly] [and] distinctly identifiable" language means what Relators say it means. Accordingly, the district court erred in granting summary judgment to Relators on the scienter element with respect to the Double Billing claims.[6]

## B. Trial Stage

We next consider whether, with respect to the Testing Only claims, the judgment entered after trial can withstand PVA's challenges regarding materiality, knowledge of materiality, and damages.

---

[6] As above, we decline to reverse and render judgment for PVA on the Double Billing claims. Relators did submit evidence to the district court suggesting that a standalone report is required. Accordingly, the scienter issue should go to the jury.

### 1. *Materiality*

PVA briefly argues that no evidence supports the jury's finding on the materiality element. "The standard for appellate review of a jury's verdict is exacting," and the verdict "must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Granberry v. O'Barr*, 866 F.2d 112, 113 (5th Cir. 1988) (quotation omitted).

We affirm the verdict with respect to materiality. Relators' experts testified extensively that had Medicare known it was being billed for incomplete procedures, it would not have paid the relevant claims. We thus conclude that there was sufficient evidence from which the jury could conclude that Medicare "attach[ed] importance" to whether billed services had actually been rendered. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (quotation omitted).

### 2. *Knowledge of materiality*

PVA next argues that the jury should have been asked whether PVA had submitted each claim to Medicare with knowledge that the falsity of the claim was material to the Government—an issue distinct from the district court's summary judgment ruling that PVA knew the claims were false. In other words, PVA contends that the False Claims Act's scienter requirement applies not only to the falsity element but to the materiality element as well. This is a legal question that we review de novo. *See Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017).

While PVA relies on language in the Supreme Court's *Escobar* opinion suggesting that the False Claims Act's scienter requirement extends to the materiality element in certain situations, *see Escobar*, 579 U.S. at 181, we conclude that case had to do with "fraudulent" misrepresentations by omission rather than claims that were outright "false," 31 U.S.C.

§ 3729(a)(1)(A)–(B). By contrast, *Schutte*, decided more recently, involved outright falsehoods. There, respondent pharmacies were required when submitting reimbursement claims to Medicare and Medicaid to disclose their "usual and customary" prices for certain drugs. 598 U.S. at 743. Petitioners accused the pharmacies of "report[ing] higher prices to [Medicare and Medicaid] than the ones that they usually and customarily charged to the public." *Id.* at 745.

The Supreme Court held that even if the legal meaning of the regulatory phrase "usual and customary" was ambiguous, the pharmacies could be liable under the False Claims Act if they "correctly interpreted the relevant phrase and believed their claims were false." *Id.* at 743. In other words, the pharmacies could not rely on the possibility that some other person could have mistakenly, but reasonably, interpreted the phrase in a way that would have authorized their reimbursement practices. The Court rejected the pharmacies' argument that "information," as that term is used in the False Claims Act's definition of "knowingly," "can refer only to purely factual information." *Id.* at 751 n.4. The Court responded that the "definition of 'information' is broad" and added that "*in this context, the scienter requirement* of the [Act] *is plainly directed to the falsity of the claims submitted*." *Id.* (emphasis added).

This case involves outright falsehoods, not misrepresentations by omission. By signing a CMS-1500 form, a physician *expressly* certifies that "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision." With respect to the Testing Only claims, the district court concluded (and we have now affirmed) that certain of such express certifications made by PVA were false. Accordingly, we rely on

*Schutte* rather than *Escobar*.[7] We therefore conclude that the district court did not err in declining to extend the False Claims Act's scienter requirement to the materiality element in this case.

### *3. Damages*

a. Remittitur

Next, PVA challenges the district court's reliance on Relators' post-trial expert declaration in granting remittitur and recalculating damages. The district court's decision on remittitur is reviewed for abuse of discretion. *See Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364 (5th Cir. 2019).

PVA argues that at minimum, a new trial was required on damages. Relators' theory at trial was that damages should be measured according to the full amount paid by the Government in connection with each of PVA's allegedly false claims. The district court, acknowledging that "the services for which PVA billed were eventually performed," set aside the jury's verdict on damages in favor of "an interest-based model of damages." But the district court also concluded that there was "insufficient information from which to calculate damages." The district court thus allowed Relators to submit an expert declaration calculating interest-based damages in the amount of $1,455,379, before trebling, and the district court accepted that calculation.

We agree with PVA that the district court abused its discretion and that a new trial is required to calculate damages. The district court's

[7] At oral argument, counsel for PVA suggested that this case involves omissions rather than outright falsehoods. But counsel did not explain why we should treat a physician's CMS-1500 certification as an omission. *Escobar* involved "*implied* false certification" of compliance with Medicaid requirements. 579 U.S. at 186 (emphasis added). Here, PVA *expressly* certified on CMS-1500 forms that it had already furnished the relevant services.

remittitur was subject to the maximum recovery rule, under which "the verdict must be reduced to the maximum amount *the jury* could properly have awarded." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (emphasis added). The district court, however, expressly concluded after trial that there was "*insufficient information from which to calculate damages*" (emphasis added). Accordingly, it was improper for the district court to allow Relators to submit additional proof—their expert declaration—and to rely on that proof, which was never shown to the jury, to enter a damages award.[8]

Relators' response is unconvincing.[9] Relators contend that there were "no fact issues left for a jury to resolve" (emphasis removed), but that statement flatly contradicts the district court's express conclusion that the trial record did not contain sufficient evidence to properly calculate damages.

It is true that the district court, in concluding that its remittitur involved only an issue of law, credited Relators' statement that their expert's interest calculation was produced using "PVA's datasets on which all of his prior work was based." The district court determined that the expert's assurance was sufficient to cure the fact that Relators had "not cite[d] specific trial evidence in support of [the expert's] calculations."

---

[8] PVA also briefly argues that the remittitur fails on its own terms because interest should have accrued only from the time of the allegedly false bill until the time the relevant MedStreaming report was finalized, rather than (as the district court concluded) until the date the relevant claim was determined to be false by the jury. The district court rejected this argument, analogizing to the process Medicare uses when it denies a claim. We express no opinion on whether the district court's conclusion on this issue was correct.

[9] The Government advises that it "takes no position on whether the district court's interest-based damages calculation should be affirmed or instead remanded for further proceedings."

But the expert's new calculations were not submitted to the jury or subject to cross-examination, and the expert's new declaration acknowledged that, as we discuss further below, the jury's verdict departed somewhat from the calculations he presented at trial. Further, PVA submitted its own post-trial declaration that challenged Relators' damages calculations and set forth calculations of its own. Although the district court reproached PVA for using its post-trial briefing to "attempt to relitigate its liability," the district court did not mention this declaration in its order entering the remittitur. The district court may have found PVA's post-trial declaration to be lacking in credibility, but it is ordinarily the province of the jury to weigh credibility issues. *See United States v. Valasquez*, 881 F.3d 314, 328 (5th Cir. 2018) (per curiam).

All told, the damages award was based on calculations by a witness that were not presented to the jury and were contested by an opposing witness, Relators did not cite trial evidence supporting the calculations, and the district court expressly determined that the trial record did not contain sufficient evidence from which to calculate damages. We thus hold that the district court should have granted a new trial on damages with respect to the Testing Only claims. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (stating that "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial" (alteration in original) (quotation omitted)).[10]

---

[10] Once more, PVA urges us to render judgment for PVA on this issue. PVA argues that Relators completely failed to prove damages. However, although the district court concluded that the trial record was insufficient for calculating the exact measure of damages, the trial record contained plenty of evidence supporting a determination that the Government suffered *some* nonzero amount of damages under the interest-based damages theory. A new trial is thus preferable to rendering judgment for PVA. *See Smith*, 773 F.2d at 613.

b. Number of false claims

Damages must therefore be retried with respect to the Testing Only claims, but that might not be all. Relators' expert calculated $412,475 in damages resulting from the Testing Only claims, but the jury awarded only $408,765 in damages for those claims. PVA therefore argues that any new trial on damages should also determine the true number of false claims that resulted in damages. *See Worsham v. City of Pasadena*, 881 F.2d 1336, 1338–39 (5th Cir. 1989) (holding that it was not abuse of discretion to require new trial on damages *and* liability where damages award shocked the conscience and where damages issue was "inextricably linked" to liability issue).

We leave this issue for the district court to resolve in the first instance. In his declaration, Relators' expert suggested that it would be possible to identify, based on evidence presented at trial, which particular Testing Only claims were included in the jury's damages calculation—and which were not. On remand, the district court will have discretion to determine whether such an identification is possible and, if not, to decide that the issue of the number of actionable false claims is "too closely intertwined" with the issue of damages "to justify retrial on the damages issue alone." *Worsham*, 881 F.2d at 1339.

## IV. Conclusion

For the reasons above, we AFFIRM the district court's grant of summary judgment as to falsity and scienter with respect to the Testing Only claims and REVERSE the district court's grant of summary judgment as to falsity and scienter with respect to the Double Billing claims. Further, we VACATE the final judgment and REMAND for a new trial consistent with this opinion.

Stuart Kyle Duncan, *Circuit Judge*, concurring:

I fully concur in Judge Haynes' well-crafted opinion. I write separately to point out the constitutional flaws in the FCA's *qui tam* device, which our precedent prevents us from addressing. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc) (upholding FCA's constitutionality). In short, "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation." *United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting); *see id.* at 442 (Kavanaugh, J., joined by Barrett, J., concurring). This case exemplifies the problem.

Unlike Articles I and III, which respectively place federal legislative and judicial power in multi-member bodies, Article II places the power to execute federal law in one person: "The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1.[1] "The entire 'executive Power' belongs to the President alone," 599 U.S. at 449 (Thomas, J., dissenting), so "it can only be exercised by the President and those acting under him." *id.* The FCA defies this exclusive vesting of executive power twice over.

First, it violates the Appointments Clause, which empowers the President to appoint (with the Senate's advice and consent) all principal Officers of the United States. U.S. Const. art. II, § 2, cl. 2. Under Article II, an "Officer of the United States" is someone who occupies a

[1] *See also Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("Our Constitution permits only the federal government to exercise federal power[,] . . . [which] is why each of the first three articles begins by 'vest[ing]' legislative, executive, and judicial power 'in' specific entities: 'a Congress,' 'a President,' and a "supreme Court' and other federal 'Courts.'").

"continuing" position, *United States v. Germaine*, 99 U.S. 508, 511–512 (1879), and "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

Yet, the FCA "permits *private* parties"—relators—to sue on behalf of the United States. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 743 (2023) (emphasis added). A relator obviously "exercis[es] significant authority pursuant to the laws of the United States" by "conducting civil litigation in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 140. But that duty "may be discharged only by persons who are 'Officers of the United States.'" *Ibid.*

In that light, consider what Montcrief, a private person, did here. She "conduct[ed] civil litigation . . . for vindicating public rights" by initiating an enforcement action against PVA on behalf of the United States, with zero front-end executive review. *Ibid.* The United States then refused to intervene. Under that circumstance, the FCA let Montcrief take the "lead role" in litigating the case. *Polansky*, 599 U.S. at 423. The upshot: Montcrief "exercise[d] core executive power by deciding 'how to prioritize and how aggressively to pursue legal actions'" against PVA. *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 2024 WL 4349242, at *8 (M.D. Fla. Sept. 30, 2024) (quoting *United States v. Texas*, 599 U.S. 670, 678 (2023)).

A relator also occupies a "continuing position" for Article II purposes. A position is "continuing" if "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (citing *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 112–13 (2007)). Relators check all three boxes. Anyone can sue under the FCA, so the position "is not personal to a particular individual." *Ibid.* The position is not

transient because it can last years. Montcrief, after all, sued over *seven* years ago. Lastly, relators conduct litigation on behalf of the United States, so their duties are not "incidental."[2]

So, it seems inescapable that the FCA's *qui tam* device violates the Appointments Clause. Despite qualifying as an Officer, "[a] private relator under the FCA . . . is not 'appointed as an officer of the United States' under Article II." *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting) (quoting *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019)). Relators instead "appoint themselves." *Riley*, 252 F.3d at 767 (Smith, J., dissenting). The Appointments Clause does not allow that.

Second, the FCA's *qui tam* device violates the Take Care Clause, which provides that the President "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. Instead of "leav[ing] to speculation who is to administer the laws enacted by Congress," *Printz v. United States*, 521 U.S. 898, 922 (1997), the Clause "gives the Executive th[at] power." *Riley*, 252 F.3d at 760 (Smith, J., dissenting) (citing *Springer v. Government of Philippine Islands*, 277 U.S. 189, 202 (1928)).

That exclusive prerogative encompasses "the choice of how to prioritize and how aggressively to pursue legal actions against defendants

[2] It is irrelevant that the relator's position is "temporary." The qualifier "continuing" "does not exclusively refer to permanent positions." *Donziger*, 38 F.4th at 296. In fact, courts have recognized independent counsel as Article II Officers "even though the position terminates when the counsel 'has completed any investigations or prosecutions undertaken pursuant to'" governing law. *Ibid.* (quoting *Morrison v. Olson*, 487 U.S. 654, 664 (1988). Other "temporary" positions have also been deemed continuing for Article II purposes. *See*, *e.g.*, *In re Grand Jury Investigation*, 916 F.3d 1047, 1052–53 (D.C. Cir. 2019) (special counsel); *see also Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016) (one-time arbitrator under the Passenger Rail Investment and Improvement Act is an inferior officer); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver).

who violate the law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Yet the FCA "allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters." *Constitutionality of the* Qui Tam *Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 211 (1989). In other words, the *qui tam* device violates the Take Care Clause by allowing private persons like Montcrief to initiate and prosecute suits to enforce federal law.[3]

This case puts the FCA's flaws on vivid display. Without any green light by the President or his agents, Montcrief launched an enforcement action on behalf of the United States. The United States decided to stay in the bullpen. So, Montcrief pressed forward on her own steam—without government oversight—for seven years, eventually obtaining a multi-million dollar verdict. Only on appeal did the United States show up, submitting an *amicus* brief that did not even fully support Montcrief's legal position.

A Constitution like ours—one that vests *all* federal executive power in a President—does not allow this outsourcing of prosecutorial power to a private person. That is not some arcane technicality. "[I]f people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Black*, 53 F.4th at 880 (citing THE FEDERALIST No. 51). Yet that is precisely what happens when a private person brings a *qui tam* action under the FCA.

I respectfully concur, while hoping this anomalous practice will someday come to an end.

---

[3] Some argue that "the long historical pedigree of *qui tam* suits" shows they do not violate Article II. *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). Not so. "[H]istorical patterns cannot justify contemporary violations of constitutional guarantees." *Ibid.* (quoting *Marsh v. Chambers*, 463 U.S. 783, 790 (1983)).